UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff(s), | ) | |
| vs. | ) | Case No. S1-1:06CR 88 JCH |
| TRON KENT, a/k/a TRONE KENT, | ) | |
| Defendant(s). | ) | |

## REPORT AND RECOMMENDATION

The defendant filed his Motion to Suppress Evidence and Statements (Document #45); the government filed Government's Response to Defendant's Motion to Suppress Evidence and Statements (Document #53); the defendant filed his Brief in Support of Motion to Suppress Evidence and Statements (Document #54).

An evidentiary hearing was held and a transcript was ordered. The defendant filed his Second Brief in Support of Motion to Suppress Evidence and Statements (Document #66); the government filed Government's Memorandum in Opposition to Defendant's Motion to Suppress (Document #70).

## Factual Background

On January 20, 2004, Sikeston Detective John Blakely received a telephone call from a Confidential Informant (CI). The CI was a new informant, without any prior reports or information that had been provided to the police. The CI had signed an agreement to work as a CI and was going to be paid for his information about criminal activities.

During this conversation, the CI told Blakely that a black male known as "TKO" had just left

his residence. "TKO" was wearing a blue puffy coat and was walking south on Westgate Street in Sikeston. The CI further reported that "TKO" had a black .380 caliber pistol in his coat and that the pistol was stolen.

Blakely knew "TKO" as the person who sold crack cocaine to another CI in an undercover buy during 2003. Blakely did not remember that "TKO" was the nickname of Tron Kent until after Kent was arrested and brought to the police station.

Blakely also knew that the area around Westgate Street was previously a high-crime area, but at this time the current criminal activity occurring there was crack cocaine distribution.

After receiving the call, Blakely called the dispatcher at the Sikeston Police Station. He reported the substance of the call he had received and requested that the dispatcher send an officer to Westgate Street to make contact with TKO.

Sikeston Police Officer Rick Rapert was on duty when Blakely called the station. The dispatcher contacted Rapert by the intercom. The dispatcher related most of Blakely's information and requested that Rapert make contact with TKO. Rapert left the station and drove to Westgate Street. Officer Joey Henry also drove to that area in his car.

When Rapert arrived at Westgate Street, he saw a subject who fit the general description of the person they were looking for. The man was walking on Westgate Street by himself. No one else was on the street in the area.

Rapert stopped his car and shouted at the man. He asked him to step over to his car and said he would like to talk with him for a minute. The man said "What's up?" and walked over to the car.

Rapert told the man that they were investigating a suspicious-person call concerning a report of a man armed with a hand gun. Rapert said that the man he was talking to fit the description.

Rapert said that he wanted to pat the man down to see if he had a weapon. If he didn't, he would be free to go in a minute or so. Rapert did not have his firearm drawn at this time.

The man said okay and stepped over to Rapert's car and put his hands on the car. Officer Henry walked up and told the man that he was just going to pat him down real quick. The man took his hands off the car, stood up, shoved his hands in his coat pockets and started to walk off.

Rapert then drew his service weapon and ordered the man back to the car. Henry grabbed the man and forced him to Rapert's car. Henry patted the man down and called out "Gun." Henry then pulled a handgun from the man's coat. The man was arrested for the offense of carrying a concealed weapon. Henry handcuffed the man and searched him further. Henry found packets of a rock-like substance in the man's pockets that appeared to be crack cocaine. The man was identified as Tron Kent.

Kent was transported back to the police station for processing. While being booked, Kent asked to speak with Blakely. After the booking, Kent was brought to Blakely's office and given the <u>Miranda</u> warnings. The warnings were both verbal and written. Kent signed the waiver form indicating that he understood his rights and was willing to talk.

Blakely interviewed Kent. Kent made incriminating statements concerning his possession of the crack cocaine and the handgun.

The next portion of this case occurred in Charleston, Missouri. On May 8, 2006, the Charleston, Missouri, police force was informed that there was a state felony arrest warrant pending for the arrest of Tron Kent. Officer Barry Morgan also received notice of this warrant.

Morgan received information that Kent was driving a black Dodge Intrepid near Marshall Street in Charleston. Shortly thereafter, Morgan saw a vehicle that fit the description given to him

earlier. He could see the silhouette and shape of the driver and believed that it looked like Tron Kent. Morgan knew what Kent looked like at the time and knew that both Kent and this driver wore their hair in braids. Morgan activated his emergency lights. The vehicle turned in front of him and Morgan could see the side of the driver's face. It looked to Morgan like Tron Kent.

The car stopped. The driver was Tron Kent. He was arrested. A cell phone was seized from the car after Kent was arrested.

The car was registered to Sally Doyle. Officer Anthony Moody went to Sally Doyle's house and made contact with Sally Doyle and her daughter, Amy Doyle. The Doyles said that Kent was living with Amy Doyle in their house in Charleston. Amy and Kent shared a bedroom in the house. Moody asked both Amy and Sally Doyle for consent to search the room. Both consented.

Several items were taken from the room, including crack cocaine and a handgun.

The Missouri State Highway Patrol (MSHP) also searched this room the next day with the consent of Amy and Sally Doyle.

Kent was interviewed by MSHP Sergeant Jeff Heath and DEA Special Agent Larry Gregory. Kent was given Miranda warnings and agreed to make a statement. Kent said he had never been in Amy Doyle's bedroom. He also said that the cell phone was not his. Kent further agreed to give a buccal swab, which was taken by Heath.

## **Discussion**

The defendant seeks to have all evidence seized in connection with his arrests on January 20, 2004, and May 8, 2006, suppressed as resulting from arrests which were illegal. He claims seizure of items from the home of Sally and Amy Doyle was illegal as stemming from his illegal arrests. Defendant argues that all statements obtained from defendant and Sally and Amy Doyle followed the

- 4 -

arrests which defendant asserts were unlawful and, consequently, should be suppressed. The government opposes defendant's motion to suppress.

### **Reasonable Suspicion to Stop the Defendant**

The defendant's first ground for suppression is that the officers lacked reasonable suspicion to stop the defendant.

The Fourth Amendment requires that law enforcement officers "must be able to articulate something more than inchoate and unparticularized suspicion or hunch" for making a brief investigatory, Terry stop. United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, citing Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968). Courts consider the totality of the circumstances when evaluating the validity of a stop. Sokolow, 490 U.S. at 8. Probable cause is not required nor is a preponderance of the evidence standard necessary.

The law is summarized in the holding of Terry that when an officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the person with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman, makes reasonable inquiries, there is nothing in the initial stages of the encounter which serves to dispel his reasonable fear for his own or others' safety, he is entitled to further protection of himself and others in the area to conduct a limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment and any weapons seized may properly be introduced in evidence against the person from whom they were taken. Terry, 392 U.S. at 30-31, 88 S.Ct. at 1884-1885.

The first source of information the Sikeston Police Officers received concerning the suspect came from a confidential informant (CI). As noted earlier, the CI was a new informant without any prior reports. He had signed an agreement to work as an informant. The informant called Detective Blakely and told him that a black male known as "TKO" had just left his residence. TKO was wearing a blue puffy coat and was walking south on Westgate Street in Sikeston. The CI continued that TKO had a black, .380 caliber pistol in his coat and that the pistol was stolen.

When he learned the person described as TKO might be armed with a concealed weapon and was walking in the Westgate neighborhood, he immediately took action to investigate, calling from his home to the dispatcher at the police station to send an officer to make contact with TKO. He related the information he had received to the dispatcher. Blakely told the dispatcher to notify the supervisor by phone, not radio, because of scanners. Blakely believed someone would hear it on the scanner and the subject would be gone. The supervisor was Officer Rick Rapert whom the dispatcher contacted by intercom. Rapert was requested to make contact with TKO. Rapert drove to Westgate Street. Another officer, Joey Henry, drove to that area.

The knowledge of one officer is considered the knowledge of all officers cooperating in an investigation. United States v. Wilson, 964 F.2d 807, 809 (8th Cir. 1992), citing United States v. Wajda, 810 F.2d 754, 758 (8th Cir.)(quoting Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225 (1964)).

The officers, as they approached the suspect on Westgate, had the following collective knowledge of "specific and articulable facts along with rational inferences" from those facts:

1. The information was recent. TKO had just left the CI's residence.

2. The information was based on first-hand personal observation

3. TKO was wearing a blue puffy coat.

4. TKO was walking south on Westgate Street.

5. The CI reported that TKO had a black, .380 caliber pistol in his pocket.

6. The pistol was reported by the CI to be stolen.

7. Detective Blakely knew TKO had sold crack cocaine to another CI during 2003 during an undercover buy.

8. Although Westgate Street was a previously high-crime area, high crime had been reduced somewhat "but we still had narcotics problems in that area" and the trafficking in crack cocaine was "pretty consistent" according to Blakely.

9. Officer Rapert arrived at Westgate Street and saw a person who fit the general description given to him and who was in a dark blue puffy coat walking on Westgate by himself.

10. If the man had a weapon, it was concealed.

Officer Rapert stopped his car and asked the man to step over, that Rapert would like to talk to him for a minute. The man asked "What's up?" and came over to the car. Officer Rapert told the man they were investigating a suspicious-person call concerning a report of a man armed with a handgun. He told the subject that he, the subject, fit the description. Rapert continued that he wanted to pat the subject down to see if he had a weapon. If the man did not have a weapon, he would be free to go in a minute or so. Rapert explained further that the officers were not there to detain him for anything else other than they were just investigating and if the person suspected of carrying a weapon was not the man he was talking to, then the subject would be on his way. The individual said "Okay," came over to the car and in response to instructions from Officer Rapert, put his hands on the car.

Officer Henry started coming from the other direction. He said to the subject, "I'm just going

to pat you down real quick," and began to approach the person. Officer Rapert continued in his testimony, "... but at that moment, the subject immediately took his hands off the hood of the car, shoved them in his coat pocket and made a gesture like he was going to leave, and went around the front end of my patrol car like he was going to just continue walking down the sidewalk on the opposite side where I was." (Tr. 25).

At this point, the person described as TKO had been told the officers were investigating information that someone in that location was carrying a handgun. When the officers told the individual that they were going to pat him down to see if he was carrying a weapon, the individual, in effect, refused to allow the officers to conduct the patdown and began to walk away. In addition, the person shoved his hands in his coat pocket, which could have been an indication he was going to take out a weapon or use a weapon.

The court finds the officers had specific articulable facts providing reasonable suspicion to detain the defendant. Although the defendant argues that the CI had no track record. That is true. However, as the Second Circuit stated in United States v. Salazar, 945 F.2d 47, 50-51 (2nd Cir. 1991), "A face-to-face informant must, as a general matter, be thought more reliable than an anonymous tipster, for the former runs the greater risk that he may be held accountable if his information proves false." The CI was considered by Blakely to be sufficiently trustworthy to be signed up to be an informant. For tips there is no requirement that the informant even be known. Illinois v. Gates, 462 U.S. 213, 237-238, 103 S.Ct. 2317 (1983). The CI in this instance had offered firsthand knowledge of the person who had just been at the CI's residence. He was walking in an area known for crack cocaine trafficking. He was alleged to be carrying a concealed weapon, which is a crime in itself. Blakely remembered that there had been a controlled buy from TKO in 2003.

There was a danger and immediacy involved in this factual situation, which is not always present in an investigatory stop. The likelihood of finding weapons with one who has been involved in drug trafficking is alluded to in many cases. The person described as TKO, when informed of the officer's intent to pat him down for weapons, in effect, refused to be patted down and placed his hands in his pockets where a weapon might be located and was going to walk away, which under the circumstances, could reasonably be interpreted as an admission that he was the man they were looking for. The officers were faced with a situation such as the one described in Terry:

> We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

392 U.S. at 23-24, 88 S.Ct. at 1881.

In his own words, Officer Rapert explained why he pulled his revolver on the defendant:

> Since I had been given the information that he was supposedly armed, and he was not really compliant at that point with what I had asked him to do, for officer safety, I pulled my service weapon out and pointed at him and told him to put his hands on the car, to put his hands back on the car, and his hands were still in his pockets....

(Tr. 25).

There was also concern for the safety of the public when there is an unknown location of a weapon involved, as illustrated in New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626 (1984). In a different context, the Supreme Court recognized the "public safety" exception to the requirement that Miranda warnings at least be given before a suspect's answers may be admitted into evidence.

The defendant, Quarles, was involved in the robbery of a supermarket. He was apprehended by an officer, but his weapon was missing. He had an empty shoulder holster. Without giving <u>Miranda</u> warnings, the officer asked the suspect where the weapon was. The defendant, Quarles, told the officer where the weapon was. The Supreme Court held that the officer's question and the defendant's answer were admissible at trial because they were reasonably prompted by public safety and did not violate <u>Miranda</u>. <u>See</u> <u>also</u> <u>United States v. Edwards</u>, 885 F.2d 377, 384 (7th Cir. 1989) (response to question whether defendant drug dealer had gun admissible under public safety exception because drug dealers are known to arm themselves and thus pose threat to public safety); <u>United States v. Luker</u>, 395 F.3d 830, 833-34 (8th Cir. 2005)(response to police question about vehicle's contents during traffic stop admissible under public safety exception because officers aware of defendant's history of drug use and concerned about needles when searching vehicle).

The officers were justified in drawing their weapons under this factual situation and Mr. Kent was properly seized.

When Tron Kent was patted down and the .380 caliber pistol was discovered, he was properly arrested for the Missouri felony offense of carrying a concealed weapon.

After he was arrested, Kent was further searched incident to the arrest and two plastic bags that appeared to contain crack cocaine were found.

The court finds that in light of the information they had, there was reasonable suspicion for the officers to make an investigative stop of Tron Kent and he was properly seized and then arrested. The pistol found on his person was properly seized and is admissible as is the crack cocaine found on the defendant's person after he was searched incident to his arrest.

After he was arrested and transported to the Sikeston Police Station, Kent, while he was being

booked, asked to speak with Detective Blakely. After the booking, he was brought to Blakely's office and given the <u>Miranda</u> warnings. The warnings were both verbal and written. The waiver form was introduced into evidence at the evidentiary hearing. Detective Blakely stated that he read the rights while the person being interviewed also looks at the <u>Miranda</u> warnings. After each <u>Miranda</u> warning is recited, the defendant puts his initials next to the warning. Mr. Kent put TK next to each of the warnings. Mr. Kent agreed that he understood his rights. The defendant initialed on the form the word "yes" after the statement, "Having these rights in mind, do you wish to talk to us now."

The statement taken by Detective Blakely involved Blakely's asking a question and typing the question out on the computer. Tron Kent then answered and Blakely typed out the answer. After the question and answer session, the computer page would be printed out. Tron Kent would then read each question and answer and if it was correct, he would put his initials next to the question and answer. If it was not what was said, then Blakely testified he would fix it to match exactly what the subject said that he did say and after the statement had been read, the interviewee signed the bottom of each page. Blakely testified that the exhibit offered at the evidentiary hearing was a question and answer statement he took of Mr. Kent on January 20, 2004, containing the initials and responses to the questions asked. Blakely testified that the exhibit was a complete, accurate, typed statement of the answers that Mr. Kent gave to the questions he asked and there had been no alterations to the form. In the interview, Mr. Kent agreed that he was in possession of a pistol and crack cocaine.

The court finds the statement given by the defendant on January 20, 2004, was given after <u>Miranda</u> warnings were administered which the defendant acknowledged. The interview was conducted at the request of the defendant and after he stated he understood his rights and wished to

speak with Detective Blakely.

The court finds the defendant's statement was voluntary and followed an understanding waiver of those warnings. The court finds the defendant's statement to Detective Blakely on January 20, 2004, Exhibit #2 introduced at the evidentiary hearing, is admissible at trial.

## The Stop on May 8, 2006, and the Aftermath

The events involved in the stop of the automobile the defendant was driving in Charleston, Missouri, on May 8, 2006, have been set out earlier in the Factual Background of this Report and Recommendation. Police officers were informed that there was a state felony arrest warrant pending for Tron Kent. Officer Morgan received information from an anonymous caller that Kent was driving a black Dodge Intrepid near Marshall Street in Charleston. Morgan went to the area and saw a vehicle that fit the description of the car that Morgan had been given. Officer Morgan was familiar with Mr. Kent and the person driving the black Dodge Intrepid looked like Kent to Morgan. Kent wore his hair in braids and this driver had his hair in braids. Morgan activated his emergency lights. The driver of the Intrepid turned a corner and Officer Morgan said he could see the side of the man's face and it looked like Tron Kent. The car was stopped and the driver was Tron Kent. On the basis of the felony arrest warrants for Assault, Unlawful Use of a Weapon and Armed Criminal Action which had been issued earlier, Kent was arrested. After the arrest, a cell phone was seized from the automobile Kent had been driving.

The information which Officer Morgan possessed constituted specific articulable facts sufficient to provide reasonable suspicion that it was the defendant for whom the arrest warrants had been issued who was driving the car. The officers did not know for certain that the driver was Tron Kent. They had sufficient information to warrant a reasonable police officer to believe the driver was

- 12 -

Tron Kent, a person for whom there were felony warrants issued. The officers had reasonable suspicion that the driver was Tron Kent. If it was Tron Kent, then there was probable cause on the basis of the arrest warrants that the driver, Kent, had engaged in criminal activity. The car was properly stopped.

The government cites <u>Adams v. Williams</u>, 407 U.S. 143, 92 S.Ct. 1921 (1972). <u>Adams</u> quotes <u>Terry</u> for the finding that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." <u>Id</u>. at 22, 22 S.Ct. at 1880. If the individual was Tron Kent, there obviously was probable cause. As the <u>Adams</u> court stated, "A brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information may be the most reasonable in light of the facts known to the officer at the time." <u>Id</u>. at 21-22, 88 S.Ct. at 1879-1880. <u>See</u> <u>also</u> <u>United States v. Unverzagt</u>, 424 F.2d 396 (8th Cir. 1970).

When the officers ran the registration of the Intrepid, they learned it was owned by Sally Doyle. Officer Anthony Moody went to Sally Doyle's house and spoke to her and her daughter, Amy Doyle. They said that Kent was living with Amy Doyle in their house in Charleston and that Amy and Kent shared a bedroom. Officer Moody's reason for going to the Doyles was to make sure that Mrs. Doyle knew that Tron Kent had her automobile. Both Amy Doyle and Sally Doyle consented to the search of the room Amy had been sharing with Kent. Crack cocaine and a handgun were found in the bedroom. The next day, May 9, 2006, the Missouri Highway Patrol searched the bedroom shared by Amy and Kent after both Amy and Sally Doyle gave their consent.

As far as the search of the defendant's bedroom shared with Amy Doyle is concerned, any

person with common authority over, or other sufficient relationship to, the place or effects being searched can give valid consent. United States v. Matlock, 415 U.S. 164, 171 (1974). During a search of the room, police found a .22 caliber revolver in a nightstand, $540.00 and narcotics in a female shoe box, a wooden jewelry box with four baggies of cocaine base, sandwich bags, seven cigarette butts, a bed sheet with fluids and a jacket and jeans. The items found in the bedroom occupied by Amy Doyle and Tron Kent are admissible based on the consent of both Doyles.

On May 9, 2006, the defendant was interviewed by Special Agent Larry Gregory of the Drug Enforcement Administration. Sergeant Jeff Heath of the Missouri State Highway Patrol was present and asked most of the questions. At the beginning of the interview, Sergeant Heath advised the defendant who he and Agent Gregory were, why they were there and advised the defendant of his Miranda rights. This was done on a written form. Kent initialed and signed in the proper places on the prepared form. Initially Kent agreed to the interview. Initially he said he had never been to the Sally Doyle residence. Then he said he had been there three or four times but only inside the house in the front room. He said he had never been anywhere else in the house except for the front room. He indicated that he did not have a cell phone. At the end of the interview, Mr. Kent said he had nothing else he wanted to say to Sergeant Heath and Agent Gregory. Agent Gregory then stated that he was seizing the cell phone that was in Mr. Kent's property and Kent stated "I don't care, it's not mine."

When Agent Gregory advised Mr. Kent that he was seizing the cell phone, it was after Kent said he had nothing else he wanted to say to the officers. Did that mean at this point Agent Gregory could not make the remark he did? The statement was not interrogation. It was simply an advice by Agent Gregory of an action he was taking as a result of Kent's statement that he did not have a cell

- 14 -

phone. It is similar to a law enforcement officer advising a defendant of the status of an investigation, which is not interrogation. See United States v. Allen, 247 F.3d 741, 765-66 (8th Cir. 2001) ("keeping a suspect informed of the progress of the investigation and the status of the charges against him" is not interrogation.) The defendant has not claimed that his response that "I don't care, it's not mine" is suppressible as a violation of Miranda. In fact, it is a volunteered statement which is admissible. United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996); United States v. McCoy, 200 F.3d 582, 584 (8th Cir. 2000). It merely repeats the statement by Kent earlier in the interview that Kent did not have a cell phone. It was after that earlier statement that he did not own a cell phone that Kent said he had nothing further to say.

If the defendant claims that the last statement of Mr. Kent, that he did not care, the cell phone was not his, violated Miranda warnings, he may argue this to the trial judge if the defendant files objections to this Report and Recommendation. This court finds that it was a volunteered statement following Agent Gregory's informing Kent that the cell phone in Kent's property was being seized.

According to the testimony of Agent Gregory, Sergeant Heath also took a buccal swab of the inside of Kent's mouth with Kent's permission.

There is an additional reason why the items found in Amy's bedroom are admissible. According to the testimony, Tron Kent told Agent Gregory and Sergeant Heath that he had never been in Amy Doyle's bedroom and that the cell phone was not his. By denying he had never been in Amy Doyle's bedroom, he was abandoning any property that might otherwise be attributed to him. In United States v. Porter, 107 F.3d 582 (8th Cir. 1997), the Eighth Circuit held, "The warrantless search of abandoned property does not violate the Fourth Amendment." Id. at 583, citing Abel v. United States, 362 U.S. 217, 241, 80 S.Ct. 683, 698 (1960). In the Porter case, the defendant told

an officer that a bag did not belong to him and that the officer could go ahead and search the bag because it was not his. The Porter court held that by denying ownership of the bag and telling the officer to search the bag, Porter abandoned it. Id. citing United States v. Thompkins, 998 F.2d 629, 632-33 (8th Cir. 1993).

The court finds the statement given by the defendant to Agent Gregory and Sergeant Heath on May 9, 2006, is admissible as having been given after Miranda warnings had been properly given. The statement made to Agent Gregory when Kent was told that the cell phone would be seized, "I don't care, it's not mine." was a volunteered statement not made in a response to interrogation and is admissible.

The court further finds that the items found both by Officer Morgan on May 8, 2006, from the bedroom occupied by the defendant were obtained and seized by consent of Amy Doyle who also occupied that bedroom.

The court further finds that the items taken later by the Missouri State Highway Patrol from that bedroom, including the sheets from the bed, were taken by consent of Sally Doyle and Amy Doyle.

The court finds that the buccal swab taken of the defendant's mouth by Sergeant Heath was taken by consent.

The court finds that all the above items of physical evidence are admissible.

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Evidence and Statements (Document #45) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

*[signature: Lewis M. Blanton]*

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of April, 2007.