UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION


UNITED STATES OF AMERICA,          )
                                   )
                  Plaintiff,       )
                                   )
     vs.                           )  No. 1:06-CR-00088(JCH)
                                   )
TRON KENT,                         )
                                   )
                  Defendant.       )


TRIAL PROCEEDINGS -- VOLUME I

BEFORE THE HONORABLE JEAN C. HAMILTON
UNITED STATES DISTRICT JUDGE

May 29, 2007


APPEARANCES:

For Plaintiff:      KEITH D. SORRELL, ESQ.
                    LARRY FERRELL, ESQ.
                    OFFICE OF U.S. ATTORNEY
                    325 Broadway, 2nd Floor
                    Cape Girardeau, MO  63701
                    (573) 334-3736


For Defendant:      THEODORE LISZEWSKI, ESQ.
                    11860 Lackland Road
                    St. Louis, MO  63146
                    (314) 450-7028


REPORTED BY:        DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                    Official Court Reporter
                    United States District Court
                    111 South Tenth Street, Third Floor
                    St. Louis, MO  63102
                    (314) 244-7449

1                          INDEX

2    MOTIONS IN LIMINE . . . . . . . . . . . . . . .      4

3    INITIAL JURY INSTRUCTIONS . . . . . . . . . . .     16

4    OPENING STATEMENT BY MR. SORRELL  . . . . . . .     22

5    OPENING STATEMENT BY MR. LISZEWSKI  . . . . . .     38

6    OFFICER JOEY HENRY --

7        Direct Examination by Mr. Sorrell . . . . . . .     44

8    DETECTIVE JOHN BLAKELY --

9        Direct Examination by Mr. Sorrell . . . . . . .     58

10       Cross Examination by Mr. Liszewski  . . . . . .     68

11   OFFICER BARRY MORGAN --

12       Direct Examination by Mr. Sorrell . . . . . . .     70

13       Cross Examination by Mr. Liszewski  . . . . . .    105

14   OFFICER ANTHONY MOODY --

15       Direct Examination by Mr. Sorrell . . . . . . .    114

16       Cross Examination by Mr. Liszewski  . . . . . .    126

17   DONALD HUSK --

18       Direct Examination by Mr. Ferrell . . . . . . .    132

19       Cross Examination by Mr. Liszewski  . . . . . .    141

20   CIRCUIT CLERK PAM GLASTETTER --

21       Direct Examination by Mr. Sorrell . . . . . . .    143

22   OFFER OF PROOF BY DEFENSE -- ANTHONY MOODY

23       Cross Examination by Mr. Liszewski  . . . . . .    156

24   AMY DOYLE --

25       Direct Examination by Mr. Ferrell . . . . . . .    162

1      Cross Examination by Mr. Liszewski  . . . . . . . .  247

2      Redirect Examination by Mr. Ferrell . . . . . . . .  261

3    SERGEANT JEFF HEATH --

4      Direct Examination by Mr. Sorrell . . . . . . . . .  262

5      Cross Examination by Mr. Liszewski  . . . . . . . .  271

6    DONALD WINDHAM --

7      Direct Examination by Mr. Sorrell . . . . . . . . .  274

8    JEREMY HODGES --

9      Direct Examination by Mr. Ferrell . . . . . . . . .  287

10   DETECTIVE JOHN BLAKELY --

11     Direct Examination by Mr. Ferrell . . . . . . . . .  298

12   DEA AGENT LARRY GREGORY --

13     Direct Examination by Mr. Ferrell . . . . . . . . .  305

14     Cross Examination by Mr. Liszewski  . . . . . . . .  327

15     Redirect Examination by Mr. Ferrell . . . . . . . .  334

16

17

18

19

20

21

22

23

24

25

1          (Proceedings began at 8:30 A.M.)

2          CLERK:  All rise.  This Court is now in session.

3    Please be seated.

4          THE COURT:  Okay.  Good morning.

5          MR. SORRELL:  Good morning.

6          THE COURT:  Let the record reflect that the Jury is

7    not in the courtroom yet.  There are some matters that we need

8    to take up in this case out of the presence of the Jury.  For

9    the record, this is Cause No. 1:06-CR-88, *United States v.*

10   *Tron Kent*, and the attorneys are here, Mr. Sorrell and

11   Mr. Ferrell and Mr. Liszewski.

12         Mr. Liszewski, you had filed a Motion in Limine last

13   Friday.  Do you want to take that up at this time?

14         MR. LISZEWSKI:  If the Court would be agreeable to

15   it, yes, Your Honor.

16         THE COURT:  Sure.  Why don't you go ahead.  We'll

17   go -- Why don't we do it item by item.

18         MR. LISZEWSKI:  Sure.  Your Honor, with respect to my

19   first request of the Court, basically, Judge, Mr. Kent does

20   have pending charges in state court.  He has a pending charge

21   for murder.  He has a pending charge for statutory rape.  He

22   has a pending charge for unlawful use of a weapon, and armed

23   criminal action.  That case is set to be tried in front of

24   Judge Lewis in Cape Girardeau County the last part of June.

25   Pat McMenamin is his counsel in the case.  I'd just ask the

1  Government not be able to refer to the existence of any of

2  those charges.  Those are unproven, unsubstantiated at this

3  point, and ---

4        THE COURT:  Any objection to that?

5        MR. SORRELL:  No, Your Honor, not in our Case in

6  Chief.  The only thing we will say is that it's possible on

7  Cross Examination that that same information might be elicited

8  depending on how questions are asked but we have no intention

9  of introducing it.

10        THE COURT:  Yeah.  I mean, obviously, if it should

11  come up in some other way, then we can talk about that.

12        MR. LISZEWSKI:  Absolutely.  I understand,

13  Your Honor.  If I open the door, it comes in.

14        THE COURT:  I'll grant that.  How about the next one?

15        MR. LISZEWSKI:  Judge, for Part II of my motion,

16  there was an outstanding warrant for assault, second, and a

17  UUW on the night that Mr. Kent was arrested, May 9th, 2006.

18  I'd just ask that, you know, obviously, if the Government is

19  going to refer to an outstanding warrant, I would just ask

20  that we leave it at that.

21        THE COURT:  Any problem?

22        MR. SORRELL:  No.  I may ask the question in a

23  leading form to avoid that, but we intend to refer to his

24  felony arrest warrant without reference to what it was.

25        THE COURT:  Okay, fine.

1          MR. LISZEWSKI:  That's fine.

2          THE COURT:  Then I'll grant that.  No. 3, you're

3    talking about any law enforcement officers, lay witnesses?

4          MR. LISZEWSKI:  Yes, Ma'am.  Judge, in our Motion to

5    Suppress hearing, you know, I inquired as to -- for instance,

6    with respect to Officer Moody, why he thought that Mr. Kent

7    may be involved with narcotics and narcotics distribution.  He

8    indicated that it was based on his personal experiences with

9    him.  I would just ask that personal experiences that are not

10   relevant to this case not be admitted, subject to us opening

11   the door.  I understand if we open the door to that, then

12   certainly that would be admissible at some level.

13         THE COURT:  Well, you need to be careful if you're

14   going to ask any question like that in Cross.

15         MR. LISZEWSKI:  Absolutely.  I agree.

16         THE COURT:  Okay.

17         MR. SORRELL:  We have no objection.  We have no

18   intention of bringing that up in our Case in Chief.

19         THE COURT:  Okay, fine.  We'll grant that.  Item 4 on

20   the prior convictions?

21         MR. LISZEWSKI:  Yes, Your Honor.  Just briefly,

22   it's -- it's well known Mr. Kent has three convictions for

23   controlled substance related offenses, two in Scott -- I

24   believe all three of those are in Scott County, Missouri.

25   There's one in Mississippi County -- excuse me -- and two in

1  Scott County.

2          Judge, for the record, I am going to make my

3  objection to the 404(b) evidence that the Government has

4  offered in this case.  It's my opinion that under a 403

5  balancing test, that it would be unfairly prejudicial and it

6  would deprive him of a fair trial.

7          THE COURT:  Well, I need to know exactly what you're

8  complaining about.  You're talking about prior convictions.

9  Why don't I get from the Government what your prior conviction

10 404(b) evidence is.

11         MR. SORRELL:  Your Honor, there are three instances

12 of prior conduct.  One is in 1999 where Mr. Kent was convicted

13 of the felony of possession of crack cocaine with the intent

14 to distribute.  In that event, which we will have both the

15 conviction record testified to by the Circuit Clerk and the

16 officer who made the arrest, the officer will testify that

17 Mr. Kent ran from him, and he also possessed a Ruger firearm,

18 a pistol, during that transaction.

19         So under the four-part *Dobbins* test basically,

20 whether or not this is admissible or not, it has to be

21 reasonably close in time.  This was in 1999.  It has to be

22 more probative and not unfairly prejudicial.  All relevant

23 evidence, of course, is prejudicial but this is probative in

24 the nature that this case also involves guns and crack

25 cocaine.  It is more important in this case because Counts or

1  Count V deals with -- or one of the Counts in the Counts III,

2  IV and V is possession of crack cocaine with the intent to

3  distribute, but it's a circumstantial evidence case.  And so

4  Mr. Kent's knowing possession of that evidence ---

5           THE COURT:  Which is your 404(b) evidence.

6           MR. SORRELL:  Exactly; addresses that issue.  And

7  then the Court has to make a finding that there is sufficient

8  evidence from which a jury could find that the 404(b) evidence

9  occurred.  In this case we have live testimony and the record

10  of the conviction which makes it a practical certainty, not

11  just a mere probability that the conduct occurred.

12           THE COURT:  Okay.

13           MR. SORRELL:  So under the *Dobbins* test, the evidence

14  is admissible and it's relevant in this particular case.

15           THE COURT:  Okay.  Go ahead, Mr. Liszewski.

16           MR. LISZEWSKI:  Yes, Ma'am.

17           MR. SORRELL:  Your Honor, I'm sorry.

18           THE COURT:  Yeah.

19           MR. SORRELL:  Plus there's two other convictions from

20  Scott County.  One involved the sale of crack cocaine by an

21  undercover agent working under the direction of Mr. Blakely.

22  We'll have that conviction record and Mr. Blakely's testimony,

23  and we'll also have Mr. Blakely and John Henry testifying

24  about a third conviction event where Mr. Kent was in

25  possession of crack cocaine and another pistol.

1          THE COURT:  Okay.  And these -- When did these other

2    two convictions occur?

3          MR. SORRELL:  They occurred in --

4          THE COURT:  Or the underlying.

5          MR. FERRELL:  -- 2003, I believe.

6          THE COURT:  Okay.  More recently then.

7          MR. SORRELL:  Oh, yes.

8          MR. LISZEWSKI:  I can see, Judge, they're well within

9    the 13-year time period that the Eighth Circuit has upheld for

10   convictions and admissibility.

11          My argument is this, Your Honor:  Essentially one of

12   the -- In my opinion, one of the more significant Counts is

13   Count III, the possession with intent to distribute the

14   cocaine base.  That carries a mandatory life sentence.  My

15   fear is this:  That essentially what you're asking a jury to

16   discern is that Tron Kent has been guilty of similar conduct

17   in the past, so -- but we're not going to ask you to consider

18   that as conduct of guilt now.  I'm not sure -- And I realize

19   the Eighth Circuit has instructions for that, but I just don't

20   feel that the Eighth Circuit instruction is going to

21   adequately address that because I don't think it's a realistic

22   expectation to ask a jury to separate those elements.

23          And additionally, with respect to the firearm counts

24   that the Government is intending to introduce as 404(b)

25   evidence, there were no convictions on those.  The only

1    convictions were on drug cases.  And my understanding of the

2    plea transcripts is at no point did Mr. Kent admit to

3    possessing a weapon.

4         MR. SORRELL:  That -- Those things are true, but

5    there's only about a hundred cases on this in the Eighth

6    Circuit where evidence exactly like this has been offered and

7    received before with the appropriate instructions limiting the

8    jury's consideration of those facts to the particular purpose.

9         THE COURT:  Yeah.  I think -- I think based on the

10   current law we have, and, obviously, that includes using an

11   instruction to tell the jury how to look at this evidence, how

12   to consider this evidence, I'll have to overrule that Motion

13   in Limine.  So I'll deny that item.

14        Now the DNA?

15        MR. LISZEWSKI:  Yes, Ma'am.  With respect to No. 5 in

16   my Motion in Limine, it's my understanding from the evidence

17   that Ruth Montgomery is a doctor from the Missouri State

18   Highway Patrol.  She would testify potentially that one of the

19   plastic bags in which controlled substances were found had a

20   Y-chromosome that shared similar characteristics with that of

21   Mr. Kent but that she could not confirm that Mr. Kent was the

22   source of that genetic material, nor exclude that.

23        My issue is this, Judge:  Under *Daubert* and under

24   Rule 702, it has to be something relevant and useful to the

25   jury.  There's nothing useful in an expert getting up there

1    and saying, "Well, in my opinion, this could be consistent

2    with it but I can't confirm it."  Essentially she's not going

3    to be able to testify to a reasonable degree of scientific

4    certainty that the genetic material found on that was

5    Mr. Kent's.  Accordingly, if she can, that shouldn't be

6    admissible.  And my -- You know, just to make sure my

7    objection is fully grounded, I would say that that would

8    deprive him of a fair trial right under the Sixth Amendment.

9            THE COURT:  Mr. Sorrell?

10           MR. SORRELL:  Your Honor, the scope of the expert's

11   opinion or the quality of the opinion is not a *Daubert* issue.

12   The *Daubert* test is basically designed to find out whether the

13   scientific evidence is reliable and basically is admissible

14   under that gatekeeping function, but that's not the objection

15   that Mr. Liszewski has raised.  He's raised an objection

16   saying he doesn't like the opinion that's going to be

17   expressed.

18           If I can, I'll run through it just real briefly to

19   show how we get to this point, --

20           THE COURT:  Sure.

21           MR. SORRELL:  -- but Miss Montgomery tested for DNA

22   on several samples that were found in the room.  She also had

23   a buccal swab from Mr. Kent to use as the sample for his DNA.

24           She first tested a pair of cigarette butts that were

25   found in the room.  They came back as matching his DNA within

1   one in several quadrillion.

2        She tested the bed sheets in that room and, again,

3   found the same match; that there was combined DNA.  They found

4   basically two people's DNA on that bed sheet that he shared

5   with Amy Doyle.  But there's a process whereby she can split

6   out the male semen component of that sample, and she did and

7   she found that that, again, was consistent with Mr. Kent's

8   DNA, and she will say it is consistent.

9        Then on the third sample was the crack cocaine

10  Baggie, one of the crack cocaine Baggies.  Again, it showed a

11  DNA from multiple individuals that cannot -- where she says

12  her opinion is that it cannot be -- he cannot be excluded

13  because she separated, again, his DNA into the -- or the DNA

14  on the bag into the Y-chromosome DNA, which is the male DNA,

15  and all of his markers show up.

16       There are 12 locations for DNA characteristics.  His

17  marker is on every single one of those markers from his DNA

18  test to what is found on the crack cocaine bag.  But since

19  there is two individuals' DNA on the bag or at least two, by

20  her professional standards, the only opinion she can say is he

21  cannot be eliminated, but that's just a fair interpretation of

22  the evidence.  That does not have anything to do with the

23  *Daubert* standard.  It goes to the weight of the evidence, not

24  its admissibility.

25       THE COURT:  Mr. Liszewski?

1          MR. LISZEWSKI:  Well, if by the Government's own

2     admission their expert can't say whether or not it is my

3     client, *Daubert* never really becomes a function.  It becomes a

4     function of relevance.  And if you cannot -- If they cannot

5     say that it is my client or it isn't my client, then the only

6     inference a jury can take from this is going to be a negative

7     inference.  And if a jury can't -- If we cannot get a

8     scientific degree of certainty with respect to that opinion,

9     it shouldn't be admissible.  That's one of the critical

10    functions of 702, and that's why *Daubert* is incorporated with

11    the relevancy provision of the federal rules.

12          THE COURT:  I think that's a determination the jury

13    needs to make, whether it's sufficiently reliable that they

14    can base their verdict on that particular evidence to a

15    reasonable degree of medical certainty beyond a reasonable

16    doubt.  So I think that can come in.  It seems to me that's

17    the sort of evidence that there should be, and I'm sure it

18    will be subject to vigorous Cross Examination as to why the

19    jury shouldn't believe it or why from the Government's

20    standpoint the jury should believe it.  So I think that can

21    come in, so I will deny that.

22          Then what about with respect to Item 6?

23          MR. LISZEWSKI:  Judge, that's just a ---

24          THE COURT:  What are the bad acts we're talking

25    about?

1          MR. LISZEWSKI:  Well, that's the thing.  I don't

2    know.

3          THE COURT:  Oh.  Well, I can't ---

4          MR. LISZEWSKI:  In the event something else were to

5    come up at trial.  The reason I put that in my Motion in

6    Limine is, first of all, I haven't received notice of it and,

7    secondly, I don't know of any other bad acts besides what the

8    Government has intended to introduce.

9          THE COURT:  Okay.  Well, I'm just going to deny this,

10   but certainly you have leave to raise anything that comes up.

11   I mean I can't make a ruling on what I don't know I'm making a

12   ruling on.

13         MR. LISZEWSKI:  Sure.  I understand.

14         THE COURT:  Yeah.  So I'll deny that but, obviously,

15   if something comes up, you can make the appropriate objection

16   and we'll take it up at that time.

17         MR. LISZEWSKI:  Yes, Your Honor.

18         THE COURT:  Okay.  Is there anything else then that

19   we need to take up before we bring the Jury in?

20         MR. SORRELL:  No, Your Honor.

21         MR. LISZEWSKI:  Your Honor, I actually just have a

22   couple of other things.

23         THE COURT:  Sure.  Go ahead.

24         MR. LISZEWSKI:  I understand Mr. Gregory and

25   Miss Novotny, they're the case agents.  They have a right to

1   stay in here.  I just ask for the rule on witnesses, first of

2   all.

3         The second thing I'd ask for, Judge, ---

4         THE COURT:  Sure.  Any problems?  Are there any

5   witnesses other than the case agents in here?

6         MR. SORRELL:  There are not.

7         THE COURT:  Okay.

8         MR. LISZEWSKI:  The second thing I would ask for,

9   Judge, is:  As the Court's well aware, I have filed motions in

10  this case and a Motion to Suppress.  I filed briefs in support

11  of that.  I'm hoping to expedite this.  I don't want to have

12  to make objections every time testimony comes out following a

13  search.  So what I would ask, and I don't believe the

14  Government would have any objection, is to basically stipulate

15  that my Motion to Suppress would be preserved.

16        THE COURT:  A continuing objection?

17        MR. LISZEWSKI:  Exactly.

18        THE COURT:  Yeah.  I don't have any problem if you

19  want to do it that way.

20        MR. SORRELL:  We have agreed that that may happen;

21  that any objection raised in the Motion to Suppress or any

22  issue raised on that motion may be observed without another

23  objection.

24        THE COURT:  And that's fine with me.

25        MR. LISZEWSKI:  I just want to make sure that extends

1   to testimony as well as exhibits.

2           MR. SORRELL:  Yes.

3           THE COURT:  Sure.

4           MR. LISZEWSKI:  Okay.

5           THE COURT:  I don't have any problem with that.

6           MR. LISZEWSKI:  I have nothing else, Your Honor.

7           THE COURT:  Okay.  Then I will take the -- We'll

8   bring the Jury out and I'll go ahead and we'll get them sworn,

9   and I'll give them my initial instructions and then we'll

10  proceed into opening statements.

11          (Jury seated by the Clerk.)

12          (The following proceedings were held within the

13  hearing and presence of the Jury:)

14          THE COURT:  Good morning, Ladies and Gentlemen.

15  Actually I'm going to ask you to stand up again and be sworn.

16          CLERK:  Would you all raise your right hands, and you

17  can respond by saying "I do."

18          You and each of you do solemnly swear or affirm that

19  you will well and truly try and true deliverance make in the

20  case now on trial and render a true verdict according to the

21  law and the evidence, so help you God?

22          THE JURY:  I do.

23          CLERK:  Be seated.

24          THE COURT:  Ladies and Gentlemen, I shall take a few

25  moments now to give you some initial instructions about this

1    case and about your duties as jurors.  At the end of the trial

2    I shall give you further instructions.  I may also give you

3    instructions during the trial.  Unless I specifically tell you

4    otherwise, all such instructions, both those I give you now

5    and those I give you later, are equally binding on you and

6    must be followed.

7         This is a criminal case brought against the Defendant

8    by the United States Government.  The Defendant is charged in

9    seven counts as follows:  Two counts of being a previously

10   convicted felon in possession of a firearm, two counts of

11   possession of a firearm in furtherance of a drug trafficking

12   crime, one count of possession of more than 50 grams of

13   cocaine base with the intent to distribute, one count of child

14   exploitation, and one count of possession of child

15   pornography.

16        These charges are set forth in what is called an

17   "indictment".  You should understand that an indictment is

18   simply an accusation.  It is not evidence of anything.  The

19   Defendant has pleaded "not guilty" to each charge and is

20   presumed to be innocent unless and until proven guilty of each

21   charge beyond a reasonable doubt.

22        It will be your duty to decide from the evidence

23   whether the Defendant is guilty or not guilty of the crimes

24   charged.  From the evidence, you will decide what the facts

25   are.  You are entitled to consider that evidence in the light

1  of your own observations and experiences in the affairs of

2  life.  You will then apply those facts to the law which I give

3  you in these and in my other instructions and in that way

4  reach your verdict.

5          You are the sole judges of the facts but you must

6  follow the law as stated in my instructions whether you agree

7  with it or not.  Do not allow sympathy or prejudice to

8  influence you.  The law demands of you a just verdict

9  unaffected by anything except the evidence, your common sense

10  and the law as I give it to you.  You should not take anything

11  I may say or do during the trial as indicating what I think of

12  the evidence or what I think your verdict should be.

13          Finally, please remember that only this Defendant,

14  not anyone else, is on trial here and that this Defendant is

15  on trial only for the crimes charged and not for anything

16  else.

17          I have mentioned the word "evidence."  Evidence

18  includes the testimony of witnesses, documents and other

19  things received as exhibits, any facts that have been

20  stipulated -- that is, formally agreed to -- by the parties

21  and any facts that have been judicially noticed; that is,

22  facts which I say you may but are not required to accept as

23  true even without evidence.  Certain things are not evidence

24  and I will list those for you now.

25          First, statements, arguments, questions and comments

1  by lawyers are not evidence.

2          Second, objections are not evidence.  Lawyers have a

3  right to object when they believe something is improper.  You

4  should not be influenced by the objection.  If I sustain an

5  objection to a question, you must ignore the question and must

6  not try to guess what the answer might have been.

7          Third, testimony that I strike from the record or

8  tell you to disregard is not evidence and must not be

9  considered.

10          Fourth, anything you see or hear about this case

11  outside the courtroom is not evidence unless I specifically

12  tell you otherwise during the trial.

13          Furthermore, a particular item of evidence is

14  sometimes received for a limited purpose only; that is, it can

15  be used by you only for one particular purpose and not for any

16  other purpose.  I shall tell you when that occurs and instruct

17  you on the purposes for which the item can and cannot be used.

18          Finally, some of you may have heard the terms "direct

19  evidence" and "circumstantial evidence."  You are instructed

20  that you should not be concerned with those terms since the

21  law makes no distinction between the weight to be given to

22  direct and to circumstantial evidence.

23          In deciding what the facts are, you may have to

24  decide what testimony you believe and what testimony you do

25  not believe.  You may believe all of what a witness said or

1    only part of it or none of it.  In deciding what testimony to

2    believe, consider the witness' intelligence, their opportunity

3    to have seen or heard the thing they testified about, their

4    memories, any motives they may have for testifying a certain

5    way, their manner while testifying, whether they said

6    something different at an earlier time, the general

7    reasonableness of their testimony, and the extent to which

8    their testimony is consistent with other evidence that you

9    believe.

10        During the trial, it may be necessary for me to talk

11   with the lawyers out of your hearing either by having a bench

12   conference here while the Jury is present or by calling a

13   recess.  Please understand that while you are waiting, we are

14   working.  The purpose of these conferences is to decide how

15   certain evidence is to be treated under the Rules of Evidence

16   and to avoid confusion and error.  We will, of course, do what

17   we can to keep the number and length of these conferences to a

18   minimum.

19        Finally, to ensure fairness, you as jurors must obey

20   the following rules.  First, do not talk among yourselves

21   about this case or about anyone involved with it until the end

22   of the case when you go to the Jury Room to decide on your

23   verdict.

24        Second, do not talk with anyone else about the case

25   or about anyone involved with it until the trial has ended and

1   you have been discharged as jurors.  "Anyone else" includes

2   members of your family and your friends.

3        Third, when you are outside of the courtroom, do not

4   let anyone tell you anything about the case or about anyone

5   involved with it.  If someone should try to talk to you about

6   the case, please report it to me immediately.

7        Fourth, you should not talk with or speak to any of

8   the parties, lawyers or witnesses involved in this case.  You

9   should not even pass the time of day with any of them.  It is

10  important not only that you do justice in this case but that

11  you also give the appearance of doing justice.  If a person

12  from one side of the lawsuit sees you talking to a person from

13  the other side, even if it is simply to pass the time of day,

14  an unwarranted and unnecessary suspicion about your fairness

15  might be aroused.

16       If any lawyer, party or witness does not speak to you

17  when you pass in the hall, ride the elevator or the like,

18  please keep in mind that I have instructed them to avoid

19  talking or visiting with you.

20       Fifth, do not read any news stories or articles about

21  the case or about anyone involved with it or listen to any

22  radio or television reports about the case or about anyone

23  involved with it.

24       Sixth, do not do any research or make any

25  investigation about the case on your own.

1          Seventh, do not make up your mind during the trial

2     about what the verdict should be.  Keep an open mind until

3     after you have gone to the Jury Room to decide the case and

4     you and your fellow jurors have discussed the evidence.

5          Now that I given you my preliminary instructions, we

6     are ready to begin the trial.  We will proceed in the

7     following manner.

8          First, the Government's attorney will make an opening

9     statement which is simply an outline to help you understand

10    what the Government expects to prove.

11         Next, the Defendant's attorney may, but does not have

12    to, make an opening statement.  Opening statements are not

13    evidence.  The Government will then present its evidence and

14    counsel for Defendant may cross-examine.

15         Following the Government's case, the Defendant may

16    present evidence and the Government's counsel may

17    cross-examine.  After presentation of the evidence is

18    completed, the attorneys will make their closing arguments to

19    summarize and interpret the evidence for you.  As with opening

20    statements, closing arguments are not evidence.  The Court

21    will instruct you further on the law.  After that, you will

22    retire to deliberate on your verdict.

23         Mr. Sorrell, would you give your opening statement?

24         MR. SORRELL:  Thank you, Your Honor.  May it please

25    the Court, Ladies and Gentlemen of the Jury.

1       My name is Keith Sorrell, and I'm the Assistant

2   United States Attorney representing the Government in this

3   case of *The United States of America v. Tron Kent*.  This case

4   is charged in seven counts which the Judge has already read to

5   you, but it begins on January the 20th of 2004.

6       On that date, Sikeston Police Officer Joey Henry was

7   engaged in his normal activities as a police officer in the

8   City of Sikeston.  While he was there, he received a radio

9   dispatch asking him to go check on a particular man on

10  Westgate Street.  The dispatcher told Mr. Henry that there was

11  a black male wearing a dark blue coat and wearing dark pants

12  who was walking down Westgate Street and he was carrying a

13  firearm.  The dispatcher asked Officer Henry to make contact

14  with the man to determine if this was true.

15      Officer Henry then left the Police Station in his

16  patrol car to go meet this request.  Officer Rappert --

17  Sergeant Rappert from the same department also left in his

18  patrol car to do the same thing.

19      The two officers met on opposite sides or started

20  approaching Westgate Street from opposite sides and started

21  driving toward one another.  About the time that they met,

22  they each saw a black male wearing a dark blue coat, wearing

23  dark pants who seemed to fit the description, and he was also

24  a black male.

25      The officers turned around and stopped their cars,

1   and Officer Rappert addressed the man on the sidewalk.  He

2   told the man that they needed to talk with him for a minute;

3   that they had a report of a man carrying a firearm that fit

4   his general description and that they would like to pat him

5   down, make sure if he had a weapon or not.  If he didn't have

6   a weapon, he would be on his way in a few minutes.

7        The man was standing on the sidewalk with his hands

8   in his coat pockets.  Sergeant Rappert directed the man to

9   take his hands out of his coat pockets which the man did.

10  Sergeant Rappert then told him to place his hands on the hood

11  of Sergeant Rappert's patrol car.  The man did.

12       The officers then started walking up toward the man

13  at which time the man suddenly stood back up, jammed his hands

14  back in his coat pockets and started to walk away.  At that

15  point Officer Rappert drew his service pistol, pointed it at

16  the man and ordered him back to the squad car.

17       Officer Henry, who was behind the man, grabbed him

18  from behind, placing his hands on both the man's arms and

19  putting him on the hood of the patrol car.  He then began

20  patting the man down.

21       When Officer Henry reached into the front right coat

22  pocket of the man, he felt a hard metallic object.  He reached

23  in the coat pocket and pulled out a Jennings .380 caliber

24  pistol.  He handed that pistol up on the car hood so Sergeant

25  Rappert could secure it.  The officers checked that firearm,

1  found that it was fully loaded; that it had one round in the

2  chamber.  The safety was off.  It was ready to fire.  The

3  safety on this particular firearm had been disabled.  In fact,

4  it could not be placed in a safe position.

5         Officer Henry then told the man that he was under

6  arrest for carrying a concealed weapon.  He continued his

7  search.  When Officer Henry got to the left side of the coat,

8  he found a plastic or two plastic Baggies.  He removed those

9  plastic Baggies from the man's coat pocket.  The items

10  contained five rocks each of a substance that appeared to be

11  crack cocaine.

12         The man was arrested and taken to the Police Station

13  there in Sikeston and processed.  While there, Mr. Henry

14  discovered that the man's identity was Tron Kent, the

15  Defendant in this particular case.

16         On January 20, 2004, Mr. Kent was a previously

17  convicted felon and was barred from having firearms.

18         Mr. Kent saw Detective Blakely who was also in the

19  Police Station and asked if he could speak to Mr. Blakely and

20  Mr. Blakely said, "Yes, as soon as you're finished with your

21  booking process."

22         About half an hour later, at the end of that process,

23  Mr. Kent was brought up to Detective Blakely's office.  And

24  Detective Blakely will tell you that he has a particular

25  procedure that he takes when he interviews a person in that he

1  sits at his desk at his computer and he types in, or he did at

2  this time, typed in the words of the questions that he would

3  ask.  He would wait for that person's response.  He would

4  denote his question by a "Q."  Then when the person would

5  answer, he would denote it by an "A" and a colon and then type

6  out exactly what words that person spoke.  He would continue

7  on doing the same thing for each question and each answer

8  during this interview.

9       At the conclusion of these interviews, Officer or

10 Detective Blakely will print out the statement.  He'll hand

11 it, the printed copy, to the person he's been interviewing and

12 ask him to review each question and each answer.  If the

13 person agrees that the words are correct and true, he is to

14 initial each question and answer, each question and answer

15 separately on the sheet.  And then if the statement is true,

16 the person is to sign at the bottom.  All these things were

17 done during this interview.

18      During this interview, Mr. Kent admitted that he was

19 a convicted felon and that he knew he was not allowed to carry

20 a firearm.  He admitted that he was carrying crack cocaine;

21 that he had purchased it for $50 and was going to sell it.  He

22 said that he didn't have any particular customers; that he

23 just sold it to whoever but he hoped to double his money.

24      Mr. Kent said he bought the pistol in Charleston from

25 a person he didn't name for $80 and said that he carried it

1 down there because that he knew what this town or Sikeston was

2 like.

3        The Government's evidence will also be that later on

4 in 2004 Mr. Kent appeared before a Circuit Judge and actually

5 pled guilty to the offense of possession of crack cocaine with

6 the intent to distribute.  And we will have his plea

7 transcript where he admitted the conduct of carrying the crack

8 cocaine with that intent, and we will have his conviction

9 record where he was convicted of that offense.

10        The Government's case then will turn to May 8th,

11 2006.  On May 8th, 2006, the Charleston, Missouri, Police

12 Department knew that there was a felony arrest warrant pending

13 for Mr. Kent, and they were looking for him to try to arrest

14 him.  On the evening of May the 8th, about 11:30 or shortly

15 before 11:30, the officers started receiving calls from

16 citizens that Mr. Kent was driving a black Dodge Intrepid and

17 they started reporting that he would be at certain locations,

18 and the officers started narrowing their search down for

19 Mr. Kent.

20        About 11:30 a black Dodge Intrepid was seen by two

21 officers in a patrol car that were Charleston police officers.

22 Those officers were Officer Sutton and Officer Morgan.  They

23 determined that the person that was driving that car looked a

24 lot like Tron Kent, and they decided to make a stop on that

25 car.  They turned the emergency lights on in their patrol car

1  and got the Dodge pulled over in the City of Charleston.  The

2  officers walked up to the car, identified Mr. Tron Kent as

3  being the driver of that vehicle and asked him or ordered him

4  out of the car and to get on the ground.

5      About the time Mr. Kent got on the ground, Sergeant

6  Moody from the Charleston Police Department drove up.  He

7  walked up to the scene, observed Mr. Kent on the ground on his

8  stomach and walked up and patted him down on his back, rolled

9  him over and patted him down, and he noticed that Mr. Kent had

10  a cellphone holder clipped to his belt but it was empty but

11  there was a cloth and fabric and plastic cellphone holder

12  there.  The officers also noted there was a cellphone in the

13  front driver's seat of the Dodge Intrepid.

14      Those items were seized and Mr. Kent was placed in

15  handcuffs and transported to the Mississippi County Sheriff's

16  Office there in Charleston, along with those items of personal

17  property.  Mr. Kent then signed a receipt saying those were

18  his items, and they were all placed in his Personal Property

19  Log.

20      The officers then ran the vehicle registration on the

21  Dodge to see who owned it, and it came back as registered to a

22  lady who lived in Charleston at 501 South Sixth Street.  Her

23  name is Sally Doyle.

24      So it was past midnight on May the 9th, that early

25  morning of May the 9th that this happened, but the officers

1  decided to go on over to Miss Doyle's house and try and make

2  contact with her to see why Mr. Kent was driving her car.

3          They drove over to Miss Doyle's house and knocked on

4  the door, and Miss Sally Doyle answered.  They informed her

5  that they had arrested Mr. Kent and asked about the car and

6  what her relationship was with Mr. Kent.  Sally Doyle

7  indicated that Tron Kent and her daughter, Amy Doyle, who was

8  16 years old, had a relationship and that Mr. Tron Kent was

9  actually living in her house and had been for the past few

10  months and that they shared a bedroom in Amy Doyle's bedroom

11  back in the house.

12          The officers then made contact with Amy Doyle who was

13  asleep in that bedroom.  She came out and confirmed the same

14  information.  While they were standing there talking, both

15  Amy Doyle and Sally Doyle indicated that the officers could

16  search the bedroom, if they wanted to, and Mr. Moody who was

17  talking to Sally Doyle said that they would like to do that.

18          Now Officer Moody was basically the evidence

19  custodian.  He stood in the doorway of the bedroom while the

20  other two officers searched.  Officers Sutton and Morgan were

21  also there, and they were doing the search of the bedroom.

22          So when all three officers walked back to the house

23  and took their positions, Officer Sutton walked in the bedroom

24  first.  And as soon as he walked in with the light on, he

25  said, "There's a gun right there."  And he pointed to a

1    nightstand which had the door open, and laying in that

2    nightstand was a High Standard .22 caliber revolver.  The

3    officers photographed it in place -- excuse me -- and seized

4    the weapon and delivered it to Officer Moody.  It was checked.

5    The firearm was fully loaded.

6         The firearm in this case as well as the previous case

7    had been manufactured someplace other than Missouri and had

8    affected interstate commerce.

9         The officers seized the firearm after it was

10   photographed, and the search continued.  Officer Morgan then

11   turned to a TV stand in the room and saw a Fila shoebox on top

12   of the TV stand.  He took it down, opened it up.  Inside that

13   shoebox was a Baggie of crack cocaine that contained almost

14   seven grams of crack cocaine and also $540 of various

15   denominations of United States currency.  That box was placed

16   back in its location, photographed and then seized by

17   Officer Moody.

18        The search continued.  Officer Morgan then went to

19   the closet of that room, and he opened the door and there's a

20   top shelf in the closet and a clothes rack below that, but on

21   that top shelf was a brown jewelry box.  Officer Morgan took

22   that jewelry box down and opened it up.  Inside that jewelry

23   box he found four Baggies of crack cocaine that were

24   separately wrapped.  They were all stuffed inside this jewelry

25   box.  Again, it was placed back in its location, photographed

1  and then seized by Officer Moody.

2        The officers also seized some other items of personal

3  property.  They seized a bag of -- a bag of sandwich bags or a

4  box of sandwich bags.  They also seized what looked like a

5  men's jacket and a pair of men's jeans.  They seized an

6  ashtray off the dresser table that had six or seven cigarette

7  butts in it, and that pretty much concluded their search.

8        The next day DEA Agent Larry Gregory, seated at our

9  table, met with Missouri State Highway Patrol Investigator

10  Jeff Heath.  They met at the Mississippi County Sheriff's

11  Office.  Again, this is on May the 9th, actually the next full

12  day.  They decided they were going to try to make contact with

13  Mr. Tron Kent, and they went back and talked with Mr. Kent.

14  He agreed to visit with the officers, and basically Mr. Kent

15  said several things.

16        He first denied that he was ever in Miss Doyle's room

17  and then he said he was only in the living room.  He denied

18  ever being in Miss Amy Doyle's bedroom.  Mr. Kent denied

19  possession of any items in that bedroom.

20        Sergeant or Officer Heath asked if he would give a

21  buccal swab to them and he agreed.  A buccal swab is a device

22  like a Q-Tip that the officers rub on the inside of the mouth

23  of whoever they want to take a sample from.  They obtain DNA

24  cells from the inside of the mouth for later comparison.  And

25  so this buccal swab was taken by Officer Heath from both

1    Mr. Kent and Amy Doyle who shared that particular bedroom.

2          As they were leaving, Officer Gregory spoke up and

3    said, "We're going to also seize your cellphone."  Mr. Kent

4    said, "It's not my phone.  I don't care what you do with it."

5    And so that phone was seized.

6          At the same time that this search or that this

7    conversation was going on, Missouri State Highway Patrolman

8    Don Windham and Officer or Missouri State Highway Patrolman

9    Stolte were back at the Doyle house doing another search.

10   They searched the bedroom again and seized certain items that

11   they wanted to preserve for DNA.  They seized the bed sheets

12   off the bed in Amy Doyle's bedroom.  They seized a pair of

13   men's boots.  Let me go through my list real quickly.  They

14   seized a set of license plates.  They seized an application

15   for a vehicle title.  All these items were in -- The

16   application and the license plates were for a vehicle that

17   Amy Doyle and Tron Kent had purchased.

18         They also picked up some timecards for a place of

19   employment for Mr. Kent with his name on it and dates that he

20   had worked; close to the date of the arrest.  They also picked

21   up a bag of men's clothing, some DVD tapes and VCR tapes along

22   with the sheets and pillow cases.

23         The sheets and pillow cases, the cigarette butts, the

24   crack cocaine bags and several other items were sent to Ruth

25   Montgomery up at the Missouri State Highway Patrol Laboratory

1    for DNA analysis.

2          The cellphone then was examined, and it's a cellphone

3    that -- This is the one that was found in the Dodge Intrepid

4    car, but it was examined for what it contained.  The officers

5    opened it up and turned it on and read off the scroll-off list

6    of telephone numbers that have been reprinted here for your

7    viewing here today.  There's also a phone message recorded --

8    text messages, and there were several messages on there that

9    Amy Doyle will testify they are messages between the two of

10   them, between Tron Kent and Amy Doyle.  And Amy Doyle will

11   testify she was with Mr. Kent when he purchased this

12   particular phone.

13         But this phone also has one other characteristic.  It

14   will take photographs.  And, in fact, if you open it up and

15   turn it on, it has a picture of Mr. Tron Kent as the first

16   photograph that it opens up on but it also had several other

17   photographs.  It had two photographs of Amy Doyle that were

18   taken in states of partial nudity, basically from her back

19   side.  Amy Doyle will testify that those are pictures of her

20   that Mr. Kent took.

21         There is one other photograph that you will see which

22   is a picture of Amy Doyle and Tron Kent having sex with

23   Mr. Kent's penis inserted into Miss Doyle's vagina.

24   Miss Doyle will testify that that's the people in this

25   photograph and that's the scene that it depicts.

1          She will testify that she has had -- that she's had a

2     sexual relationship with Mr. Tron Kent for some time; that she

3     met Mr. Kent in the first part of December of 2005 through a

4     mutual friend, Julie Stevenson, and that over the course of

5     time, they began dating.  That eventually led around

6     Valentine's Day in 2006 with Mr. Kent spending all of his

7     evenings over there with the exception, I believe, of one week

8     when he went to Chicago.

9          During several of these incidents -- or they were

10    having sex on a regular occasion, but Mr. Kent would ask that

11    he be allowed to take pictures of them having sex.  At first

12    Amy Doyle refused, declined to do so, but eventually on

13    February the 25th she agreed that Mr. Kent could take that

14    picture.  He picked up his cellphone, Mr. Kent did, and

15    snapped this particular photograph.  On that date, Amy Doyle

16    was 16 years old.  She was a minor as defined by federal

17    statutes.

18         Amy Doyle will also testify that she has seen

19    Mr. Kent bring crack cocaine into her bedroom; that he used

20    the brown jewelry box to store that crack cocaine in; that

21    she's seen Mr. Kent in possession of a pistol, the revolver, I

22    mean that has -- we talked about earlier that was found in

23    that bedroom; that the first time she saw that pistol was on

24    New Year's Eve; that on that day they were all over at

25    Julie Stevenson's house and Mr. Kent was firing that pistol on

1    New Year's Eve; that he offered to let her shoot it.  She

2    declined.

3          She will even say that Mr. Kent was very careful with

4    the pistol when he would store it in that nightstand where it

5    was found; that he would even take and wipe it on his shirt

6    before he would lay it down in the nightstand.

7          Several of the items that you have heard about were

8    sent to Ruth Montgomery of the Missouri State Highway Patrol

9    Laboratory in Jefferson City.  Miss Montgomery is the person

10   who conducts their DNA examinations on the evidence.  And she

11   starts off with doing a DNA examination on the buccal swabs

12   that were given to her from Mr. Kent and from Miss Doyle.  She

13   developed a DNA signature or a DNA analysis of those two

14   buccal swabs for comparison to other items, and then she

15   compared her results to DNA examinations made to other items.

16         What she found was that the cigarette butts -- she

17   tested two of them, and they both came back as being

18   consistent with Tron Kent's DNA to the probability in the

19   black population of 1 to 16.6 quadrillion.  That's how often

20   you would expect to see these same alleles in a person.

21         She also tested the bed sheets, and she found on the

22   bed sheets that there was a combined DNA sample, and it

23   appeared to be a combined mixture of Tron Kent and Amy Doyle

24   as you might expect.  But there's a process where the DNA

25   examiner can split off the semen, the male semen component of

1  that stain, and she ran this stain through that process and

2  examined only the male component or examined only the

3  component of the semen which is going to be contributed by the

4  male from that sheet and found, again, it was consistent with

5  Mr. Kent's DNA again to the same level of frequency of 1 in

6  16.6 quadrillion.

7          The crack cocaine that was found in the jewelry box,

8  as I told you, was wrapped in four separate Baggies.  Those

9  Baggies were also sent to the Missouri State Highway Patrol

10  Lab for her analysis, and she tested all four of them.  On

11  three of the bags there was no DNA or an insufficient amount

12  to result in the test but on the fourth bag, though, there was

13  DNA material.  Once again, it turned out to be consistent with

14  DNA from more than one individual.  And, again, it appeared to

15  be an overlay of Amy Doyle's DNA and Mr. Tron Kent's DNA.

16          There's a process whereby the examiner can split out

17  the Y-chromosome on the DNA sample just to look at the male

18  component; that in the chromosomal language, women have two

19  X-chromosomes and men have a Y- and an X-chromosome.  So she

20  only looked at the Y-chromosome which is what men inherit from

21  their fathers.

22          When she did that examination, she looked at all the

23  different markers, and they call these markers "alleles," but

24  she looked at all these different markers, and you'll see the

25  chart where they line up.  And Tron Kent has certain alleles

1  that are set out on his chart.  And this -- The crack cocaine

2  Baggie has certain alleles only on the Y-chromosome that are

3  set out on this chart, and they are an exact match.

4        Since it's a combined DNA, Miss Montgomery will only

5  say that he cannot be eliminated as the contributor of this

6  DNA.  That's basically how she's -- or what she's required to

7  say as part of her professional standards, but you will see

8  that the DNA charts all wind up exactly.

9        Ladies and Gentlemen, after we present all of this

10  evidence to you, we will ask that you find Mr. Tron Kent

11  guilty of the offense of being a felon in possession of a

12  firearm on January 20th, 2004; of using that firearm in

13  furtherance of -- or possessing it rather in furtherance of a

14  drug trafficking felony.  And then switching to May the 8th

15  and 9th, that he was a felon in possession of that .22 caliber

16  revolver; that he was possessing that particular firearm in

17  furtherance of a drug trafficking crime, and that he was in

18  possession of more than 50 grams of crack cocaine.  The crack

19  cocaine in the jewelry box weighed almost 69 grams, I believe,

20  but there was more than 50 grams of crack cocaine found in the

21  room.  And that on the same dates, that Mr. Tron Kent was

22  guilty of possessing child pornography and also guilty of

23  distributing or producing child pornography by making it on

24  the cellphone.  And we'll ask that you come back with those

25  verdicts.  Thank you.

1        THE COURT:  Thank you.  Mr. Liszewski?

2        MR. LISZEWSKI:  Thank you, Your Honor.  Ladies and

3  Gentlemen, what I'm going to talk to you about today and

4  tomorrow and possibly Thursday is how preconceived notions can

5  lead to quick and hasty judgments.

6        March 9th, 2006, Tron Kent is arrested.  He's

7  arrested on a warrant unrelated to the present case.  He is

8  arrested, taken to jail.  They frisk him.  Officer Moody, he's

9  a detective with the Charleston Department of Public Safety.

10  He frisked him; found no drugs, found nothing to indicate

11  drugs, found no client list, found no large amounts of money,

12  no denominations, no bills.

13        The cellphone, Mr. Kent said, "I did not own that

14  cellphone.  It's not my phone."  Now he is arrested and he is

15  taken to the Police Station where he is processed, where he is

16  booked.  The police do go to the Doyle residence in

17  Charleston, Missouri.  Now what happens is they ask for

18  permission to search and they get permission to search from

19  the mother, Sally Doyle.  In that house, yes, they found drugs

20  and they found guns.  However, the location where the drugs

21  were found, you're going to see a Size 6-1/2 shoebox for a

22  female women's shoe.  That's where the drugs were found, part

23  of the drugs.  You're going to see a brown jewelry box about

24  yea big, about yea deep.  That's where the drugs were found.

25  You're going to find -- You're going to see a gun.  The gun

1  was found in a nightstand above baseball cards.

2          Now how do we know all that?

3          Amy Doyle was arrested and taken to the Charleston

4  Department of Public Safety for possession of cocaine base and

5  a firearm.  As she's arrested, she meets Agent Gregory and

6  Trooper Heath.  At some point the impetus of cooperation

7  became apparent.  Miss Doyle agreed to cooperate with the

8  Government, admitted that she found -- that the drugs found

9  were in her shoebox, her jewelry box.  The gun was found in

10  her nightstand on her brother's baseball cards.

11          Amy Doyle is not on trial today.  Amy Doyle has never

12  been federally charged.

13          MR. SORRELL:  Objection to the argument, Your Honor.

14          THE COURT:  Sustained.

15          MR. LISZEWSKI:  Today Tron Kent is on trial for the

16  drugs that were found in a shoebox and in a jewelry box which

17  Amy Doyle readily admits were hers.  After Miss Doyle is

18  released, approximately a month later, the police come back

19  and they show her a cellphone.  Miss Doyle at this point is

20  cooperating, and she indicates that that is Tron Kent and her

21  on a cellphone.  This, of course, was after being arrested.

22          Sometime later Amy Doyle meets with Miss Novotny, an

23  agent with the Secret Service.  She's still cooperating.  She

24  says that, of course, the pictures on the cellphone had to be

25  her and Tron Kent; of course.  The Government has taken

1   significant steps to show and to prove Amy Doyle right.  They

2   tried to get fingerprints on the box, the jewelry box where

3   the DNA was.  You're not going to hear any evidence of

4   Tron Kent's fingerprints on that jewelry box.

5          You're going to hear about a shoebox.  That shoebox

6   was not tested for fingerprints.  That shoebox was not tested

7   for DNA.

8          You're going to hear about a plastic bag that

9   Ruth Montgomery is going to talk about.  Ruth Montgomery

10  cannot say to a medical degree or to a scientific degree of

11  certainty that that was Tron Kent's DNA on those bags.

12         Now Tron Kent's not an angel.  He's had problems in

13  the past, and you've heard it today.  Tron Kent has three

14  prior felony convictions.  They're all drug related.

15         At this point Tron Kent was living with Amy in the

16  household.  He was staying there, but he still had a house on

17  Addis Street in Charleston, Missouri.  That's also listed on

18  his booking sheet.  The clothes that were seized from the

19  house, they were seized in a little pile at the corner of her

20  room.  There -- To my knowledge, there were no clothes where

21  the drugs were found or where the gun was found that were

22  Tron Kent's.  There were cigarette butts.  Cigarette butts,

23  there's nothing illegal about smoking cigarettes.

24         And at that point -- Strike that.

25         Essentially the gun -- Excuse me.  The gun itself, no

1    fingerprints on the gun, no DNA on the gun.  Interestingly

2    enough, the one person who has readily admitted to having

3    contact with this gun was Amy Doyle.  She's going to tell you

4    she's had this gun.

5           In this case Amy Doyle also had a previous

6    relationship with a man by the name of Chris Scott.

7    Anthony Moody is going to tell you that Chris Scott was a

8    suspected drug dealer in Charleston.

9           MR. SORRELL:  Judge, let me object to that unless

10   this is evidence that Mr. Liszewski is going to introduce.

11          THE COURT:  Do you want to step up here?

12          (The following proceedings were held at sidebar,

13   outside the hearing of the Jury:)

14          MR. SORRELL:  Basically he's putting on character

15   evidence.

16          THE COURT:  Wait a minute.  Okay.

17          MR. SORRELL:  Basically he's putting on character

18   evidence in his opening statement of another witness that

19   wouldn't be allowed as evidence if that witness were even

20   called.

21          THE COURT:  You want to speak in here?

22          MR. LISZEWSKI:  I'm sorry.  Your Honor, in this case

23   I expect that Officer Moody would testify that Chris Scott was

24   a suspected drug dealer who was living in the house

25   beforehand, before Mr. Kent took up residence there.  Now

1  there is evidence, also, with the DNA of at least a mixture of

2  two individuals on the bed sheets.  So it would be consistent

3  and it would be admissible to argue that it's possibly someone

4  else's drugs.

5        THE COURT:  We're not at a stage of arguing.  We're

6  at a stage of what your evidence is; you know, what evidence

7  is going to be presented.  I don't know if you're going to

8  present any evidence, but unless you're going to call somebody

9  and you're going to produce this stuff, ---

10       MR. LISZEWSKI:  I expected Detective Moody will

11  testify to that on Cross Examination.

12       THE COURT:  Well, I don't think that's something to

13  bring up in Direct unless you have something more to back it

14  up.

15       MR. SORRELL:  Basically Morgan couldn't testify or

16  Moody couldn't either as to the characteristics of that person

17  no matter what.

18       THE COURT:  Obviously, if you're going to get

19  something out of Cross Examination, but I think you better

20  wait because you're planting something that may or may not be

21  admissible.  Obviously, they're going to object.  Even if it

22  can, then that's something you're going to have to argue about

23  if it does get in.

24       MR. LISZEWSKI:  Okay.  That's fine.

25       (The following proceedings were held within the

1  hearing and presence of the Jury:)

2          THE COURT:  Go ahead.

3          MR. LISZEWSKI:  Thank you, Your Honor.  The last

4  thing Miss Montgomery is going to testify to is there is a DNA

5  nonsperm sample that was tested on the bed sheet, and that bed

6  sheet was a mixture.  The DNA profile developed could be

7  characteristic of at least two individuals.  We have no idea

8  other than the testimony of Amy Doyle if anyone else was in

9  that house.

10          Ladies and Gentlemen, I have no idea whose drugs

11  these are, but I'm confident the evidence is going to prove

12  they're not Tron Kent's.  I'm going to ask you to return a

13  verdict of "not guilty" on that.

14          With respect to the gun, I'm going to ask you to

15  return a verdict of "not guilty" on that as well.

16          With the pictures on the cellphone, the only evidence

17  tying that cellphone is Amy Doyle.  And based on that, I'm

18  going to ask you to find Tron Kent "not guilty" on that as

19  well.  Thank you.

20          THE COURT:  Thank you.  Mr. Sorrell, would you call

21  your first witness?

22          MR. SORRELL:  Your Honor, I'll call Joey Henry.  And

23  may I read a stipulation that we've stipulated to?

24          THE COURT:  Certainly; you may.

25          MR. SORRELL:  Mr. Liszewski, I'm going to read the

1  first paragraph.

2            MR. LISZEWSKI:  Sure.  May I?

3            MR. SORRELL:  Yes.

4            MR. LISZEWSKI:  Absolutely.

5            THE COURT:  You may proceed.  Go ahead.

6            MR. SORRELL:  Ladies and Gentlemen, the stipulation

7  reads:  The Defendant, Tron Kent, has been convicted of a

8  felony; that is, a crime punishable by imprisonment for a term

9  exceeding one year and, therefore, was a previously convicted

10 felon under the laws of the State of Missouri on or about

11 January 20, 2004, and May 9, 2006.

12           THE COURT:  Thank you.

13           Sir, do you want to step up here and be sworn?

14                   **OFFICER JOEY HENRY**,

15 HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

16 FOLLOWS:

17           THE COURT:  You may inquire.

18           MR. SORRELL:  Thank you.

19                   DIRECT EXAMINATION

20 QUESTIONS BY MR. SORRELL:

21 Q    Would you state your name, please?

22 A    Joey Henry.

23 Q    Where are you employed?

24 A    Sikeston Department of Public Safety.

25 Q    And what is your rank?

1  A     I'm a Public Safety Officer, PSO.

2  Q     All right.  Basically a police officer?

3  A     Yes, sir.

4  Q     And how long have you been employed in law enforcement?

5  A     Six years, sir; going on six years.

6  Q     All right.  Now were you on duty in Sikeston, Missouri,

7  shortly before midnight on January 20, 2004?

8  A     Yes, sir, I was.

9  Q     And that whole evening?

10 A     Yes, sir.

11 Q     Now did you receive some kind of request from your police

12 dispatcher?

13 A     Yes, sir.

14 Q     And what was that request?

15 A     To go to the area of the 200 block of Westgate; a

16 suspicious black male possibly carrying a loaded weapon

17 wearing a dark colored blue coat.

18 Q     All right.  Did you, in fact, go to that location?

19 A     Yes, sir, I did.

20 Q     Did any other officer go with you?

21 A     Yes, sir; my Sergeant that was on duty.

22 Q     And what's his name?

23 A     Rappert.

24 Q     Sergeant Rappert?

25 A     Yes, sir.

1    Q    And were each of you driving separate patrol cars?

2    A    Yes, sir, we was.

3    Q    Which end of Westgate Street did you approach from?

4    A    I approached from the south end of Westgate.

5    Q    Which end did Officer Rappert approach from?

6    A    From the north end of Westgate.

7    Q    So you were driving toward each other?

8    A    Yes, sir, we were.

9    Q    And if you would, tell the Jury what you saw as you were

10   driving down Westgate Street in Sikeston.

11   A    As I was driving down Westgate, I observed a black male

12   walking south on Westgate which fit the description that

13   Dispatch had given me.  I drove passed him and as I drove

14   passed, Sergeant Rappert, he drove passed me.  We both stopped

15   our vehicle and exited our vehicles.

16   Q    All right.  And if you would tell the Jury what happened

17   as soon as you and Sergeant Rappert got out of your vehicles.

18   A    As soon as we stopped our vehicles and got out,

19   Sergeant Rappert spoke to the gentleman walking and asked him

20   to stop; that he needed to speak with him.  And I stopped and

21   was walking up towards behind him, and he told him why we was

22   there; we was there to investigate someone with a possible

23   handgun.

24   Q    When you say someone was speaking, who was speaking at

25   this time?

1    A    Sergeant Rappert.

2    Q    Okay.  And did he tell the man anything about his hands?

3    A    Yes, sir.  He asked him to remove his hands from his

4    pockets.

5    Q    And did Sergeant Rappert say anything about how long you

6    folks would be there with him?

7    A    Just -- Just long enough to investigate the stop.

8    Q    All right.  And did Officer Rappert then direct the man

9    to do any particular action?

10   A    He directed him to move his hands from his pocket, to

11   step toward his patrol car and place his hands on the hood of

12   the car.

13   Q    Did the man obey?

14   A    Yes, sir, he did.

15   Q    What happened after the man placed his hands on the

16   patrol car?

17   A    At that time I came up from behind him; was coming up

18   from behind him.  I told him that I wanted to pat him down to

19   ensure there was no weapon to be found.  And at that time, as

20   I got close to him, the man moved his hands from the hood of

21   the car; stood upright.  Sergeant Rappert told him to place

22   his hands back on the car, and at that time he didn't.  And by

23   that time, I grabbed a hold of him, pushed him to the car, and

24   started to pat him down.

25   Q    And if you would, tell the Jury what happened during this

1  patdown.

2  A    As I patted him down, I felt what I believed to be was a

3  weapon located in his right front pocket.

4  Q    And what did you do upon -- And how did you make this

5  determination?  What did that object feel like?

6  A    It felt like a metal object or the shape of a gun.

7  Q    All right.  And were you patting the outside of the

8  jacket at this time?

9  A    Yes, sir.

10  Q    And what did you do after you felt this object from the

11  outside of the jacket?

12  A    I basically said, "Gun!"  And I placed my hand in his

13  pocket and removed the weapon from there to get it away from

14  him.

15  Q    And what was the purpose of you saying "Gun" out loud?

16  A    To let my -- To let my Sergeant know that I did find a

17  weapon.

18  Q    All right.  So when you took the handgun out of the right

19  front pocket of this gentleman, where did you place it?

20  A    I placed it -- I placed it on the hood.  I pushed it

21  toward my Sergeant, where he was standing at.

22  Q    And did he take custody of that firearm?

23  A    He took custody of the gun, yes.

24  Q    Did you tell the man anything at that particular point?

25  A    At that time and place I told him that he was placed

1    under arrest for carrying a concealed weapon and I continued

2    the incident for arrest; to search incident to the arrest.

3    Q    If you would, describe the continuation of your search.

4    A    At that time I started to search him.  I located -- In

5    his left front pocket I located what -- a hard object that I

6    believed to be was crack cocaine.  And I removed that from the

7    pocket and I gave it to my Sergeant at that time and continued

8    my search from there.

9    Q    All right.  And did you find anything else of

10   significance on the man that you detained?

11   A    Just the Baggies with the -- They had five hard

12   substances.  One had five white individually wrapped and five

13   yellow individually wrapped.

14        MR. LISZEWSKI:  Your Honor, briefly I would just like

15   to object subject to my Motion in Limine.

16        THE COURT:  Sustained.

17        MR. SORRELL:  Are you basically preserving the

18   objection, Your Honor?

19        THE COURT:  Yeah.

20        MR. SORRELL:  All right.  But the witness may answer?

21   I just didn't want to ---

22        THE COURT:  No, no.  He can answer.  That will be

23   preserved.

24        MR. SORRELL:  All right.

25   Q    (By Mr. Sorrell)  The -- So was the man detained at the

1  scene?

2  A    Yes, sir.

3  Q    Placed in handcuffs?

4  A    Yes, sir, he was.

5  Q    Was he transported then to the Police Department?

6  A    Yes, sir.  I placed him in my police unit and I

7  transported him to headquarters.

8  Q    Did you examine the firearm?

9  A    Yes, sir, I did.

10 Q    And did you note whether the firearm was loaded or

11 unloaded?

12 A    Yes, sir.  I noted it was loaded with one round in the

13 chamber.

14 Q    And what was the position of the safety on this gun when

15 you discovered it?

16 A    Well, sir, the safety, there had been one there but the

17 safety was removed from the weapon, so the weapon was ready to

18 fire.

19 Q    All right.  It was -- basically could not be placed in a

20 safe position?

21 A    Yes, sir.

22 Q    Okay.  And did you take a look at the rocks that you

23 found in the plastic Baggies?

24 A    Yes, sir, I did.

25 Q    And how many different plastic Baggies were there?

1   A     There was -- There was five in a bag, and they was all

2   individually wrapped.

3   Q     And how many bags of five were there?

4   A     There was -- well, ten.

5   Q     Okay.  There were two different bags?

6   A     Yes, sir, two different bags.

7   Q     Okay.  And were you able to finally get an identification

8   on the man that you stopped at Westgate Street on January 20,

9   2004?

10  A     Yes, sir, I was.

11  Q     And who was that man?

12  A     Tron Kent.

13  Q     If you would, pick up Exhibit 1-A from that box, please.

14  And would you take the item out of that bag, please?  Would

15  you tell the Court what Exhibit 1-A is?

16  A     What that is?  It is a Jennings -- It's a Jennings

17  handgun, .380.

18  Q     And does that gun have any significance to the man that

19  you stopped on the street?  On Westgate Street?

20  A     Yes, sir.  This is the weapon that I removed from his

21  pocket.

22          MR. SORRELL:  Your Honor, I'll offer Exhibit 1-A.

23          THE COURT:  1-A is admitted.

24  Q    (By Mr. Sorrell)  Does that weapon have a serial number

25  on it, sir?

1  A    Yes, sir.

2  Q    And would you read that into the record?  That's fine.

3  A    923687.

4  Q    All right.  And was that pistol logged into evidence at

5  the Sikeston Police Station?

6  A    Sir?

7  Q    Was that pistol locked or logged into evidence at the

8  Police Station?

9  A    Yes, sir, it was.

10  Q    And what's the procedure that you take for logging

11  evidence in?  Do you use evidence bags or ---

12  A    Yes, sir, we use evidence bags, too, and a chain of

13  custody.

14  Q    All right.  And if you would, take a look.  In that same

15  packet, I believe, is an exhibit marked as 1-D.  It may be

16  marked on the back side.

17  A    Yes, sir.

18  Q    Would you pull that out, please?  And what is that

19  exhibit?

20  A    This is -- It is the -- It says "1-D"?

21  Q    Yes.

22  A    It is the pistol or paper for the pistol.

23  Q    It's basically the evidence bag.

24  A    Yes, sir.

25  Q    Okay.

1   A    Okay.

2   Q    And with the chain of custody information on it and the

3   other bag and the envelope; is that right?

4   A    Yes, sir.

5   Q    Okay.  And who filled out the evidence tag for that

6   particular bag?

7   A    I did, sir.

8   Q    All right.  And was it filled out at the time that

9   Mr. Kent was arrested?

10  A    Yes, sir.

11  Q    What items were placed in that particular bag?

12  A    What was placed in here was the Jennings .380

13  semi-automatic and the Jennings automatic -- the auto

14  pistol -- the magazine and the ammunition, sir.

15  Q    All right.

16       MR. SORRELL:  Your Honor, I'll offer 1-D.

17       THE COURT:  That's admitted.

18  Q    (By Mr. Sorrell)  Sir, if you would repackage those

19  items, please, just so we don't get them lost.

20       And now, sir, if you would reach in the box and

21  retrieve Exhibit 1-B.  Would you tell the Court what that

22  exhibit is, please?

23  A    It's a magazine for the pistol, sir.

24  Q    That's the same one you seized that night on January 20,

25  2004?

1  A     Yes, sir.

2          MR. SORRELL:  Your Honor, I'll offer Exhibit 1-B.

3          THE COURT:  1-B is admitted.

4  Q    (By Mr. Sorrell)  Sir, if you would, pull out Exhibit

5  1-C.

6  A    Okay.

7  Q    And if you would, tell the Court what that exhibit is,

8  please.

9  A    It's eight rounds for a .380 pistol.

10          MR. LISZEWSKI:  Your Honor, I want to renew my Motion

11  in Limine, Paragraph 4.

12          THE COURT:  You may renew it.  It's overruled.  Go

13  ahead, sir.

14  Q    (By Mr. Sorrell)  Go ahead, sir.

15  A    Yes.  Eight rounds for the .380 pistol.

16  Q    All right.  And are those the rounds that you took from

17  the firearm that night?

18  A    Yes, sir.

19  Q    And is there an evidence card, also, on those rounds?

20  A    Yes, sir.

21  Q    And basically they're placed in an envelope.  Is that

22  right?

23  A    Yes, sir.

24  Q    And were they the correct caliber of ammunition for that

25  pistol?

1    A    Yes, sir, it was.

2    Q    Okay.

3              MR. SORRELL:  I offer 1-C, please.

4              THE COURT:  1-C is admitted.

5    Q    (By Mr. Sorrell)  Officer, would you turn to Exhibit 2-A

6    in the same box, please?  And if you would, would you tell the

7    Court what that particular exhibit is?

8    A    It's the crack cocaine I removed from Mr. Kent's pocket.

9              MR. LISZEWSKI:  Your Honor, I would like to, again,

10   renew Paragraph 4.

11             THE COURT:  You may.

12             MR. LISZEWSKI:  Your Honor, can I have a continuing

13   objection so I don't have to interrupt?

14             THE COURT:  You may.

15             MR. SORRELL:  And I'll agree that that may be

16   continuing.

17             THE COURT:  Fine.  Go ahead, sir.

18   Q    (By Mr. Sorrell)  Would you continue with your answer,

19   please?

20   A    Yes, sir.  It's the items that I removed from Mr. Kent's

21   pockets.

22   Q    All right.  And would you hold that up so the Jury ---

23             MR. SORRELL:  I'll offer Exhibit 2-A, please.

24             THE COURT:  2-A is admitted.

25   Q    (By Mr. Sorrell)  Would you hold that up for the Jury to

1  see?  But basically is the crack cocaine contained in two

2  Baggies?

3  A    Yes, sir, it is.

4  Q    And is there also another Baggie with the lab ground-up

5  sample?

6  A    Yes, sir.

7  Q    Okay.  That's all contained within Exhibit 2-A.  And is

8  there, also, an evidence bag in that exhibit marked 2-B?

9  A    Yes, sir.

10  Q    And what evidence bag is that for or evidence receipt, I

11  mean?

12  A    It's for the small -- the bags -- the items pulled out

13  from Mr. Kent's pocket.

14  Q    Okay.  For the crack cocaine?

15  A    For the crack cocaine.

16  Q    Basically that's just an inventory sheet.  Is that

17  correct?

18  A    Yes, sir; chain of custody.

19  Q    Keeps track of who has the evidence at any one time?

20  A    In the chain of custody, that's right, sir.

21  Q    All right.

22        MR. SORRELL:  Your Honor, I'll offer Exhibit 2-B.

23        THE COURT:  2-B is admitted.

24  Q    (By Mr. Sorrell)  Now are you familiar with

25  semi-automatic pistols similar to the one that's marked as

1   Exhibit 1-A?

2   A     Yes, sir.

3   Q     And are you familiar with how these firearms are loaded

4   and used?

5   A     Yes, sir, I am.

6   Q     In order to fire a round from Exhibit 1, assuming that

7   it's completely unloaded, what steps do you have to take in

8   order to get it to fire a round out the barrel?

9   A     First of all, I have to obtain ammunition, load the

10  magazine, place the magazine into the butt of the weapon,

11  charge the slide handle, let it go forward which would chamber

12  a round into it.  And if this had a safety on it, remove it

13  from safe, to take it off safety, and then place my finger on

14  the trigger and pull the trigger.

15  Q     So you've named six, seven or eight steps.  Is that fair?

16  A     Yes, sir.

17  Q     How many steps were left -- In the condition this pistol

18  was found in, how many steps were left in order to get that

19  pistol to fire when you found it?

20  A     Just to squeeze the trigger, sir, and that was it.

21  Q     All right.  Now do you see the person in the courtroom

22  today that you took the firearm and the crack cocaine -- the

23  crack cocaine Baggies from?

24  A     Yes, sir, I do.

25  Q     And would you identify that person for the Court and the

1    Jury, please?

2    A    He's sitting directly in front of me; hair is in braids;

3    greenish-looking colored shirt; black male.

4          MR. SORRELL:  Would the record reflect that the

5    witness has identified the Defendant?

6          THE COURT:  It may.

7          MR. SORRELL:  Thank you.  Nothing further.

8          THE COURT:  Mr. Liszewski?

9          MR. LISZEWSKI:  I have no questions.

10         THE COURT:  Thank you, sir.  You may step down.

11         MR. SORRELL:  I call John Blakely, please.

12         THE COURT:  Okay.

13                    **DETECTIVE JOHN BLAKELY**,

14   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

15   FOLLOWS:

16         THE COURT:  You may inquire.

17         MR. SORRELL:  Thank you, Your Honor.

18                    DIRECT EXAMINATION

19   QUESTIONS BY MR. SORRELL:

20   Q    Would you state your name, please?

21   A    John Blakely.

22   Q    And would you spell your last name for the court

23   reporter?

24   A    B-L-A-K-E-L-Y.

25   Q    How are you employed?

1  A    I'm a detective and a fireman with the City of Sikeston.

2  Q    What's your current rank?

3  A    Detective.

4  Q    How long have you worked in law enforcement?

5  A    Sixteen years.

6  Q    Always with the Sikeston Police Department?

7  A    No, sir.  I've been with Sikeston now a little over 11

8  years.

9  Q    And where did you work before that?

10  A    Bollinger County and Scott City Police Department.

11  Q    Okay.  Did you have an occasion to meet with Tron Kent

12  after his arrest on January 20, 2004?

13  A    Yes, sir.

14  Q    Where did you meet with Mr. Kent at the first time?

15  A    In the Booking Room at Sikeston City.

16  Q    And at that time did Mr. Kent have any nicknames that you

17  were aware of?

18  A    Yes, sir.

19  Q    And what nickname did he go by?

20  A    TKO.

21  Q    And if you would, describe to the Jury what happened when

22  you saw Mr. Kent in the Booking Room.

23  A    He asked me if we could talk.

24  Q    What did you reply to that?

25  A    I told him as soon as he was done being processed.

1   Q    Was Mr. Kent eventually brought to your office?

2   A    Yes, sir.

3   Q    About how much later?

4   A    About 30 minutes later.

5   Q    Did you interview Mr. Kent in your office?

6   A    Yes, sir.

7   Q    At that time did you take certain steps when you

8   interviewed witnesses or people that you wanted to get

9   recorded statements from?

10  A    Yes, sir.

11  Q    And would you describe that process briefly to the Jury?

12  A    Yes, sir.  At that time I would sit at my computer.  I

13  would have the subject sit near me.  I would then ask him his

14  questions that I needed to know.  Then I would type in the

15  answer that he would give me.  Then after the interview was

16  completed, I would save it to the computer, print the form,

17  show it to the subject, have them read each question and

18  answer, and then put their initials next to it to make sure

19  it's exactly what I said to them and what they responded back.

20  Q    And did you follow those steps with your interview of

21  Mr. Kent?

22  A    Yes, sir.

23  Q    All right.  And are those typed statements made at the

24  time of the interview?

25  A    Yes, sir.

1    Q    And are they kept in the regular course of business at

2    your Police Station?

3    A    Yes, sir.

4    Q    Does the written component of your statement that you

5    made that night, does it accurately reflect the conversation

6    that you had with Mr. Kent and his responses?

7    A    Yes, sir.

8         MR. SORRELL:  May I approach the witness, Your Honor?

9         THE COURT:  You may.

10   Q    (By Mr. Sorrell)  Sir, I've handed you what's been marked

11   as Exhibit 3.  Would you tell the Court what that exhibit is,

12   please?

13   A    It's a -- It appears to be a copy of the statement that I

14   took with Mr. Kent.

15   Q    And does it appear to be unchanged from the original

16   version that you had when you made the first copy or the first

17   printed copy?

18   A    Yes, sir.

19        MR. SORRELL:  Your Honor, I'll offer Exhibit 3.

20        THE COURT:  Exhibit 3 is admitted.

21   Q    (By Mr. Sorrell)  Sir, if you would, would you read

22   that -- or let me go through it first.  First, there are

23   questions and answers on Exhibit 3.  Is that right?

24   A    Yes, sir.

25   Q    And who spoke the questions on that sheet?

1    A    I did.

2    Q    Who spoke the answers?

3    A    Mr. Kent.

4    Q    And are they denoted by a particular symbol for

5    difference between questions and answers?

6    A    Yes, sir.

7    Q    How is that.

8    A    The question has a "Q" and the answer has an "A."

9    Q    And there's basically two pages of questions and answers.

10   Is that fair?

11   A    Yes, sir.

12   Q    Is there any initials on the left-hand side of each

13   question and answer?

14   A    Yes, sir.

15   Q    What are those initials?

16   A    "TK."

17   Q    And who placed the ink on the paper for those initials?

18   A    Tron Kent.

19   Q    Is there a signature at the bottom of that page?

20   A    Yes, sir.

21   Q    And whose signature is that?

22   A    Tron Kent.

23   Q    And who placed the ink on the page for that signature?

24   A    Tron Kent.

25   Q    Was that done after the interview was concluded?

1  A    Yes, sir.

2  Q    If you would, would you read the interview from beginning

3  to end, please?

4  A    Yes, sir.

5           (Q)  State your full name ---

6           MR. LISZEWSKI:  Objection.  The exhibit is the best

7  evidence.  The document speaks for itself.

8           THE COURT:  Overruled.

9  Q    (By Mr. Sorrell)  You may continue.

10  A         (Q)    State your full name, date of birth, SSN,

11  address and phone number.

12           (A)    Tron Kent, 4-6 of '80; 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; 109 South

13  Locust Street, Charleston, Missouri, 63832.

14           (Q)    Have you been read the *Miranda* waiver?

15           (A)    Yes.

16           (Q)    Do you understand the rights that they're read

17  to you?

18           (A)    Yes.

19           (Q)    Do you work at anyplace?

20           (A)    No.  I go to school full-time.

21           (Q)    Were you stopped on Westgate Street by the

22  police?

23           (A)    Yes.

24           (Q)    Were you arrested?

25           (A)    Yes.

1      (Q)   Why?

2      (A)   Because they found a gun on me.

3      (Q)   What type of gun was it?

4      (A)   A black .380.

5      (Q)   Where did you get it?

6      (A)   I bought it off the street for 80.

7      (Q)   How long did you buy it -- How long ago did you

8   buy it?

9      (A)   A month ago in Charleston.

10      (Q)   Do you always carry it with you?

11      (A)   No.

12      (Q)   How come tonight?

13      (A)   I'm not from here and I have heard about this

14   place.

15      (Q)   How much weight of crack did you have on you

16   when you were arrested?

17      (A)   I don't know.  It was a double-ups that I paid

18   $50 for.

19      (Q)   How much profit would you have made?

20      (A)   $50.

21      (Q)   How long have you had the drugs on -- Excuse

22   me.  How long have you had the drugs you had on you?

23      (A)   Two days.  I got it from a guy I know in

24   Charleston.

25      (Q)   Have you dealt with this guy in the past?

1    (A)    Yes; plenty of times.

2    (Q)    Did you know it was wrong for a convicted felon

3    to be in possession of a weapon?

4    (A)    Yes.

5    (Q)    What type of drugs did you have?

6    (A)    Crack cocaine.

7    (Q)    Did you know it was wrong for you to be in

8    possession of crack cocaine?

9    (A)    Yes.

10   (Q)    Is this the only gun that you own?

11   (A)    Yes.

12   (Q)    Do you have steady people you sell crack to?

13   (A)    No; just whoever.

14   (Q)    Do you use crack cocaine?

15   (A)    Yes, I have.

16   (Q)    Was the gun loaded?

17   (A)    Yes.

18   (Q)    Do you know if the gun is stolen?

19   (A)    No.

20   (Q)    Is everything you told me true and correct?

21   (A)    Yes.

22   (Q)    Is there anything else you want to add to this

23   statement?

24   (A)    No.

25   (Q)    Have you been forced or promised anything to

1  give me this statement?

2          (A)    No.

3  Q    Do you see the person in the courtroom who gave you that

4  statement?

5  A    Yes, sir.

6  Q    And would you point him out for the benefit of the Court

7  and the Jury, please?

8  A    It's the gentleman, the black gentleman sitting over here

9  next to his attorney, Ted.

10 Q    All right.  Thank you.

11         MR. SORRELL:  Nothing further.

12         THE COURT:  Mr. Liszewski?

13         (The following proceedings were held at sidebar,

14 outside the hearing of the Jury:)

15         MR. LISZEWSKI:  Judge, I just want to make sure that

16 the Court is noting my 404 objections for the record.  I

17 realize that if I objected every time, it would be somewhat

18 tedious.  I just want to make sure you have no problem with

19 that.

20         MR. SORRELL:  I don't, although this particular

21 evidence is also direct evidence --

22         MR. LISZEWSKI:  Sure.

23         MR. SORRELL:  -- as to his possession of a firearm --

24         THE COURT:  Yeah.

25         MR. SORRELL:  -- in connection with another crime,

1  and that's why we didn't read a 404(b) instruction in at this

2  time.

3              THE COURT:  Yeah.

4              MR. LISZEWSKI:  I understand.

5              THE COURT:  When you come to the 404(b), then I can

6  even pull out the ---

7              MR. SORRELL:  We're going to do that all at one time.

8              THE COURT:  Yeah.

9              MR. SORRELL:  Probably be tomorrow.

10             THE COURT:  Okay.  Just let me know so we can get the

11  instruction ready.

12             MR. LISZEWSKI:  I just want to make sure that the

13  Court notes for the record that, you know, any reference

14  beyond direct evidence on the indictment, anything that would

15  go towards knowledge which the Government's offering, that is

16  preserved.

17             MR. SORRELL:  Oh, yes.

18             THE COURT:  I don't have any problem with continuing

19  the objection.  Okay?

20             MR. LISZEWSKI:  Okay.  That's fine.  I just want to

21  make sure.

22             (The following proceedings were held within the

23  hearing and presence of the Jury:)

24             MR. SORRELL:  Your Honor, we're going to call ---

25             THE COURT:  Wait a minute.  We need some Cross

1    Examination.

2              MR. SORRELL:  Oh, I'm sorry.  I'm sorry.

3              THE COURT:  Go ahead, Mr. Liszewski.

4                       CROSS EXAMINATION

5    QUESTIONS BY MR. LISZEWSKI:

6    Q    Good morning, Detective.

7    A    Good morning.

8    Q    Detective Blakely, you did interview Tron Kent, right?

9    A    Yes, sir.

10   Q    Signed a waiver?

11   A    Yes, sir.

12   Q    You asked him to tell you the truth?

13   A    Yes, sir.

14   Q    Okay.  You wouldn't want him to lie to you and give a

15   statement, would you?

16   A    No, sir.

17   Q    Okay.  You asked him why he was carrying a gun.

18   A    Yes, sir.

19   Q    Okay.  He said he was not from here.

20   A    Correct.

21   Q    Not from Sikeston.

22   A    Yes, sir.

23   Q    Sikeston can be rough in spots.

24   A    At times, yes, sir.

25   Q    Yeah, okay.  Like, say, the Sunset Projects, it can be

1  fairly rough there?

2  A    Yes, sir.

3  Q    Okay.  Some parts of the west side of town can be fairly

4  rough at times.

5  A    Yes, sir.

6  Q    Okay.  And in the west side of town is predominantly the

7  black neighborhoods as well.

8  A    Yes, sir.

9  Q    Okay.  Now looking at your -- looking at these statements

10  you obtained from him, you didn't ask him if he was carrying

11  the gun to protect his dope or anything like that, did you?

12  A    No, sir.

13  Q    Okay.  You asked him why he had it?

14  A    Yes, sir.

15  Q    He indicated it was for protection.

16  A    Yes, sir.

17  Q    You inquired no further.

18  A    No, sir.

19        MR. LISZEWSKI:  No more questions.  Thank you.

20        THE COURT:  Thank you.  Mr. Sorrell, any Redirect?

21        MR. SORRELL:  No Redirect.

22        THE COURT:  Thank you, sir.  You may step down.

23        THE WITNESS:  Thank you.

24        THE COURT:  Would you call your next witness?

25        MR. SORRELL:  Barry Morgan.  And I'd also like to

1    read the second paragraph of our stipulation.

2          MR. LISZEWSKI:  That's fine.

3          THE COURT:  Fine.  Why don't you read the

4    stipulation.

5          MR. SORRELL:  Yes, Your Honor.  That stipulation is

6    that the firearm mentioned in Count I of the indictment, the

7    Jennings .380 caliber pistol, bearing Serial Number 923687, is

8    a firearm as defined by federal statutes.  The pistol was

9    manufactured in a state other than Missouri and affected

10   interstate commerce.

11         THE COURT:  Sir, do you want to step forward and be

12   sworn?

13                        **OFFICER BARRY MORGAN**,

14   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

15   FOLLOWS:

16         MR. SORRELL:  Your Honor, we didn't bring all that

17   evidence up.  Mr. Gregory is going to go down and retrieve

18   that for us.

19         THE COURT:  Okay.

20                        DIRECT EXAMINATION

21   QUESTIONS BY MR. SORRELL:

22   Q    Would you state your name, please?

23   A    Barry Wayne Morgan, Jr.

24   Q    And how are you employed?

25   A    Charleston Police Department.

1  Q    How long have you been employed in law enforcement?

2  A    A little over a year-and-a-half.

3  Q    And what is your rank at this time?

4  A    PSO; just patrol officer.

5  Q    Okay.  And is that what duties that you engage in?

6  Basically just enforcing the state and municipal ordinances of

7  Charleston in Missouri?

8  A    Yes.

9  Q    Okay.  Now were you employed as a Charleston police

10 officer on May 8th, 2006?

11 A    Yes, sir.

12 Q    And on that date were you and the other Charleston

13 officers instructed as to whether there were any felony arrest

14 warrants for Tron Kent?

15 A    Yes.

16 Q    Who told you that information?

17 A    Sergeant Moody at the time.

18 Q    He's your staff Sergeant?  Your --

19 A    Supervisor.

20 Q    -- supervisor?

21 A    Yes.

22 Q    And were you also given any information about what kind

23 of car that Mr. Kent would be driving?

24 A    Yes.

25 Q    What information was that?

1   A    A 2002 Dodge Intrepid, black in color.

2   Q    And was -- Were you on -- or where were you at this

3  particular time?  On foot patrol or car patrol?

4   A    I was in a vehicle, patrol unit.

5   Q    And were you with anyone else?

6   A    Yes.

7   Q    Who was that?

8   A    Bradley Sutton.

9   Q    Now shortly before midnight, were you on any particular

10  street in Charleston, Missouri?

11   A    I was on Marshall Street, West Marshall.

12   Q    And who was driving the patrol car?

13   A    I was, sir.

14   Q    Did you see any car that caught your attention?

15   A    Yes, sir.

16   Q    And about what time was this?

17   A    A little before midnight.

18   Q    About 11:30?

19   A    Right around 11:30.

20   Q    What did you see that caught your attention?

21   A    It was a 2002 black Intrepid.

22   Q    And could you determine who the driver was at that time?

23   A    Not at that time.

24   Q    So what did you decide to do upon seeing this car?

25   A    Get behind it and initiate an investigative stop.

1    Q    And did you do that?

2    A    Yes, sir.

3    Q    Did you turn on your car's emergency lights?

4    A    Yes, sir.

5    Q    And what action did the Dodge Intrepid take as soon as

6    you activated your emergency lights?

7    A    As soon as I activated my emergency lights, the Intrepid

8    made a right onto Grand Street, bearing south, and pulled

9    over.

10   Q    And where did you place your patrol car?

11   A    Behind it.

12   Q    Did you get out of that patrol car?

13   A    Yes, sir.

14   Q    What about Officer Sutton?

15   A    Yes, he did.

16   Q    And what actions did the two of you take after you got

17   out of your patrol car?

18   A    We walked up, guns drawn due to the fact of his arrest

19   warrant.

20   Q    All right.  And did -- did you make contact with the

21   driver of the Dodge?

22   A    Yes, sir.

23   Q    And who did you determine that driver to be?

24   A    Tron Kent.

25   Q    What did -- commands did you give Mr. Kent at that time?

1   A    I asked him to step out of the vehicle and lay face down

2   on the ground.

3   Q    And did Mr. Kent comply?

4   A    Yes, sir.

5   Q    Were there any other individuals in the Dodge?

6   A    Yes.

7   Q    And who were they?

8   A    Antonio Walker and Rico Kent.

9   Q    Did you take any actions with regards to those two

10  individuals right then?

11  A    We detained them.

12  Q    Okay.  Did any officer -- other officer have contact with

13  Mr. Kent?

14  A    Yes.

15  Q    And who was that?

16  A    Sergeant Moody.

17  Q    And how long did it take Mr. Moody to appear on the scene

18  after you got the car stopped?

19  A    No more than 30 seconds, 40 seconds.

20  Q    Did you look at the front seat of the Dodge?

21  A    Yes.

22  Q    And did you see anything lying on the front seat?

23  A    There was a cellphone.

24  Q    A cellphone?

25  A    Yes.

1   Q    Did you have any other action with Mr. Kent that night --

2   that evening at the stop or did you pretty much turn it over

3   to Mr. Moody?

4   A    I turned it over to Sergeant Moody.

5   Q    All right.  And was Mr. Kent taken to a law enforcement

6   center?

7   A    Yes; Mississippi County Detention Center.

8   Q    And where is that office located?

9   A    In Charleston.

10  Q    Was the cellphone taken from that Dodge?

11  A    Yes.

12  Q    And who took that?

13  A    Sergeant Moody.

14       MR. SORRELL:  May I approach the witness, Your Honor?

15       THE COURT:  You may.

16  Q    (By Mr. Sorrell)  Sir, I've handed you Exhibit 7.  Would

17  you tell the Court what that exhibit is?

18  A    It's the cellphone retrieved from the black Intrepid.

19  Q    On the evening of August 8?

20  A    Yes.

21  Q    Okay.

22       MR. SORRELL:  I'll offer Exhibit 7, please.

23       THE COURT:  Exhibit 7 is admitted.

24  Q    (By Mr. Sorrell)  Did the officers check the registration

25  on the Dodge Intrepid to see who owned it?

1   A    Yes, as we conducted the vehicle stop.

2   Q    And who did that registration come back to as the owner

3   of the car?

4   A    Sally Doyle.

5   Q    Is she a resident of Charleston, Missouri?

6   A    Yes, sir.

7   Q    And what address does she live at?

8   A    501 South Sixth.

9   Q    Did you and any other officers go to Miss Doyle's house

10  during that same night?

11  A    Yes, sir.

12  Q    Would it have been the next day actually, on May the 9th?

13  A    Yeah; just shortly after midnight.

14  Q    Okay.  What officers went to the Sally Doyle residence?

15  A    Sergeant Moody and Bradley Sutton.

16  Q    And yourself?

17  A    And myself.

18  Q    All right.  Did you make contact with Sally Doyle?

19  A    Yes.

20  Q    And who did this talking with Miss Doyle?

21  A    Sergeant.

22  Q    Moody?

23  A    Sergeant Moody, yes.

24  Q    Okay.  And were you present and heard their conversation?

25  A    Overhearing it, yes.

1   Q    And during the -- that conversation, did Miss Sally Doyle

2   explain anything about a relationship that her daughter had

3   with Mr. Kent?

4           MR. LISZEWSKI:  Objection; hearsay.

5           MR. SORRELL:  Just explains what the officers are

6   doing.  We're not offering it for the truth of the matter but

7   just to show why they went there.

8           THE COURT:  Overruled.

9           MR. SORRELL:  You may answer.

10          THE COURT:  You may answer.

11  A    I believe that she said that Tron Kent and Amy Doyle had

12  a relationship.

13  Q    (By Mr. Sorrell)  All right.  And did they occupy a

14  particular room in that house?

15  A    Yes, sir.

16  Q    And which room was that?

17  A    Amy Doyle's room.

18  Q    Was there a request or a consent given to search that

19  particular room to the officers?

20  A    Yes.

21  Q    And who gave that consent?

22  A    Sally Doyle and Amy Doyle.

23  Q    Okay.  And was a search actually made?

24  A    Yes.

25  Q    How many officers went to the room to conduct this

1   search?

2   A     I and Bradley Sutton.

3   Q     And did Officer Moody perform any service at this time?

4   A     Just making general conversation with Sally and Amy

5   Doyle.

6   Q     Did he collect the evidence that you found?

7   A     Yes.  Yeah, he did collect the evidence.

8   Q     Where was his normal station while the room was being

9   searched?

10  A     Right in the doorway.

11  Q     And if anything would be found, what would you or

12  Mr. Sutton do with the item?

13  A     When it was located, we would photograph it and

14  Sergeant Moody would open up the bag and we would drop it in

15  there.

16  Q     Okay.  And were you and Officer Sutton wearing anything

17  on your hands when you searched that bedroom?

18  A     Yes.

19  Q     And what were you wearing?

20  A     Gloves; rubber gloves or medical gloves.

21  Q     Okay.  Is that a standard practice on searches that you

22  make?

23  A     Yes.

24  Q     But there were some photographs that were taken of items

25  in that room?

1   A    Yes.

2   Q    And some items were seized from the bedroom?

3   A    Yes.

4   Q    And that is the house on 501 Sixth Street?

5   A    Yes.

6   Q    Okay.  Did Officer Sutton make any comment when he first

7   walked into Amy Doyle's bedroom?

8   A    As we walked in, he said -- he stated, "There's a gun."

9   Q    All right.  And did you happen to determine what

10  Mr. Sutton was talking about?

11  A    Yes.  I was right behind him.

12  Q    And what did you see?

13  A    I saw a .22 revolver laying in a nightstand.

14  Q    And was that firearm seized?

15  A    Yes.

16       MR. SORRELL:  Your Honor, again, may I approach the

17  witness?

18       THE COURT:  You may.

19       MR. SORRELL:  I'm going to set these items up there

20  for him to pull out so I don't have to keep coming back and

21  forth, if I may.

22       THE COURT:  Sure.

23  Q    (By Mr. Sorrell)  Officer, would you look at that group

24  of photographs and pick up the one marked Exhibit 20, please?

25  And would you tell the Court what that exhibit is?

1    A    That's a photograph of the gun laying in the nightstand.

2    Q    Is it in the same condition it was when you first saw

3    that revolver?

4    A    Yes.

5    Q    And is that photograph a fair and accurate representation

6    of the appearance of the revolver as you first saw it?

7    A    Yes.

8         MR. SORRELL:  Your Honor, I'll offer Exhibit 20.

9         THE COURT:  20 is admitted.

10   Q    (By Mr. Sorrell)  Sir, would you hold that exhibit up so

11   the Jury can see it?  And just briefly, would you point out

12   the location of the revolver in that photograph?

13   A    It's right here.

14   Q    And is the photo -- Is the revolver next to a box of

15   cards?  Of baseball cards?

16   A    Yes.

17   Q    And how high is that nightstand that you're referring to?

18   How tall is it?

19   A    It's not very tall.  It's just a regular nightstand.

20   Q    Basically knee high?

21   A    Yeah, about knee high maybe.

22   Q    The door is open in Exhibit 20.  Is that fair?

23   A    Yes.

24   Q    Was the door to that nightstand open when you and Officer

25   Sutton first walked into the room?

1   A     Yes.

2   Q     And so that pistol was immediately visible?

3   A     Yes.

4   Q     Did you change the location of the pistol in any way,

5   shape or form from the time that you saw it until that picture

6   was taken?

7   A     I believe that's the way it was laying when we saw it.

8   Q     All right.  Did you check that firearm to see if it was

9   loaded?

10  A     Yes.

11  Q     And what did you find?

12  A     Nine rounds of CCI short bullets, .22 caliber.

13  Q     Okay.  It was loaded with nine rounds?

14  A     Nine rounds, yes.

15  Q     That's the capacity of the cylinder in that revolver.

16  A     Yes.

17  Q     Is that fair?

18  A     Yes.

19  Q     Sir, if you would, put that photograph on the left side

20  of you and then reach in the box and pull out Exhibit 27-A of

21  the exhibits in the box, please.

22  A     Oh.

23  Q     And would you tell the Court what Exhibit 27-A is?

24  A     The revolver found in the nightstand in Amy Doyle's room.

25          MR. SORRELL:  Your Honor, I'll offer Exhibit 27-A.

1          THE COURT:  27-A is admitted.

2    Q    (By Mr. Sorrell)  And did you say you seized the

3    ammunition that was inside of that particular revolver?

4    A    Yes.

5    Q    Would you look at Exhibit 27-B from that box, too,

6    please?  Would you tell the Court what that exhibit is?

7    A    Nine rounds of CCI .22 bullets found in the revolver.

8          MR. SORRELL:  I'll offer Exhibit 27-B.

9          THE COURT:  27-B is admitted.

10   Q    (By Mr. Sorrell)  Basically those rounds are packaged up

11   in boxes.  Is that correct?

12   A    Yes.

13   Q    In the exhibit?

14   A    Yeah.

15   Q    All right.  But do each of Exhibits 27-A and 27-B have

16   evidence receipts on them?

17   A    Yes, sir.

18   Q    All right.  And they were filled out by Officer Moody to

19   start off with.  Is that fair?

20   A    Yeah.  Yes, sir.

21   Q    May I take the ammunition exhibit back, please?

22   A    Yes.

23   Q    Did you -- Or what item caught your attention next after

24   you saw this revolver and seized it?

25   A    A Fila shoebox.

1   Q    And where was this Fila shoebox located?

2   A    On top of a TV stand.

3   Q    Was it in the same bedroom?

4   A    Yes, same bedroom.

5   Q    Would you -- I believe that that's Exhibit 21 next to you

6   there.

7   A    Yes.

8   Q    Would you tell the Court -- First, turn it around so the

9   Jury can't see it.  I'm sorry.  Would you tell the Court what

10  that exhibit is, please?

11  A    It's a photograph of the Fila shoebox.

12  Q    And is that the Fila shoebox that you saw that night?

13  A    Yes.

14  Q    And can we agree that after your -- that you looked in

15  the shoebox, you placed it up on the stand in its condition

16  that it was and then photographed it?  Is that fair?

17  A    Yes, sir.

18  Q    Okay.  So by the time this photograph has been taken,

19  you've already --

20  A    Yes.

21  Q    -- looked inside?

22  A    Yes, sir.

23  Q    But is Exhibit 21 a fair and accurate representation of

24  the appearance of that Fila shoebox as you first saw it?

25  A    Yes.

1      MR. SORRELL:  I'll offer Exhibit 21, please.

2      THE COURT:  That's admitted.

3  Q   (By Mr. Sorrell)  Would you turn it around for the Jury

4  to see, please?  And point out the Fila shoebox that we're

5  talking about.  It's the top box in that photograph.  Is that

6  fair?

7  A   Yes, sir.

8  Q   Okay.  And the -- Is that a TV stand that it's sitting

9  on?  The black ---

10  A   TV stand type; like the entertainment center type.

11  Q   And how tall is this item?

12  A   About my height.

13  Q   Five or six feet tall at the top?

14  A   Yes.

15  Q   Okay.  Did you have any trouble reaching up and getting

16  that item down?

17  A   No, sir.

18  Q   Now if you would then, put that exhibit down and turn to

19  Exhibit 22.  Would you tell the Court what that exhibit is?

20  A   A photograph of inside the Fila shoebox.

21  Q   And that's what you seen when you first looked into that

22  shoebox?

23  A   Yes, sir.

24  Q   And what did you see when you first looked into that box?

25  A   U.S. currency and a clear plastic Baggie containing an

1  off-white substance.

2  Q    And what did that off-white substance appear to be in

3  your experience?

4  A    Crack cocaine.

5  Q    And did you take a photograph of what that shoebox looked

6  like?

7  A    Yes.

8  Q    The inside of it?

9  A    Yes, sir.

10  Q    And what is Exhibit 22 again?  Is it a photograph of the

11  inside of the box?

12  A    Yes, a photograph of the inside of the Fila shoebox.

13  Q    All right.  And before any items were seized out of it?

14  A    Yes.

15  Q    And is it, again, a fair and accurate representation of

16  the appearance of the inside of that Fila shoebox as you first

17  saw it?

18  A    Yes, sir.

19        MR. SORRELL:  Your Honor, I'll offer Exhibit 22.

20        THE COURT:  22 is admitted.

21  Q    (By Mr. Sorrell)  Would you turn it around to display it

22  to the Jury, please?  And would you point out for the benefit

23  of the Jury the Baggie of suspected crack cocaine?

24  A    Right here close to the top.

25  Q    It's the top part of that photograph.  Is that fair?

1   A    Yes.

2   Q    Okay.  And the currency that's in there in that box, is

3   it of different denominations?

4   A    Yes.

5   Q    5s and 10s and a 50?

6   A    Yes.

7   Q    Just various denominations?

8   A    Yes.

9   Q    Was that money counted at the scene or was it counted

10  later?

11  A    I can't really recall at this time.

12  Q    I believe Officer Moody took control of that.

13  A    Yes.

14  Q    But it was seized, along with the box and the money and

15  the crack cocaine.  Is that fair?

16  A    Yes.

17  Q    Okay.  Would you turn now to Exhibit 11 that's laying out

18  on the floor?  It's a larger bag, a brown bag.  And would you

19  tell the Court what that exhibit is, please?

20  A    An evidence bag containing the blue Fila shoebox.

21  Q    Would you take that shoebox out of the bag, please?

22  First off, the evidence bag, who -- was that filled out at the

23  Charleston Police Department?

24  A    I believe Sergeant Moody filled it out.

25  Q    Okay.  But it's basically just an evidence bag.  Is that

1  fair?

2  A    Yes.

3  Q    And is that Exhibit 11 that you're holding the same Fila

4  shoebox that was taken from the bedroom of Amy Doyle on the

5  night of or morning of May the 9th?

6  A    Yes.

7        MR. SORRELL:  I'll offer Exhibit 11, please.

8        THE COURT:  11 is admitted.

9  Q    (By Mr. Sorrell)  If you would, you can replace that back

10  in the -- If you would, open it for the benefit of the Jury,

11  please, and show them the inside of the box.  And it's empty

12  right now.  Is that fair?

13  A    Yes.

14  Q    Okay.  If you would place it back in the bag and set it

15  to the side.

16        After finding this Fila shoebox, did you turn your

17  attention or your search to another part of the room?

18  A    Yes, sir.

19  Q    And what part of the room was that?

20  A    The closet.

21  Q    And if you would, describe this closet to the Jury.

22  A    Just a regular clothes closet filled with clothes and

23  other items.

24  Q    It actually extends into the bedroom a short distance.

25  Is that right?  I mean it's not built into the wall.  It

1  actually comes out --

2  A    Yes.

3  Q    -- in the room.

4  A    Yes.

5  Q    Okay.  And the closet is closed with a door.  Is that

6  fair?

7  A    I can't really recall.

8  Q    Okay.  That's fine.  But in any event, you looked inside

9  the closet?

10 A    Yes.

11 Q    And were there clothes hanging from a clothes rack in the

12 closet?

13 A    Yes.

14 Q    And was there a -- a shelf on the top of that closet?

15 A    Yes.

16 Q    And what did you notice that caught your attention first

17 in that closet?

18 A    A wooden jewelry box.

19 Q    What color was it?

20 A    Brown.

21 Q    And what did you do when you saw that jewelry box?

22 A    Picked it up and looked inside of it.

23 Q    And what did you see when you opened that jewelry box up?

24 A    Four large bags of off-white substance.

25 Q    And what did that substance appear to be?

1   A    Crack cocaine.

2   Q    Did you replace that jewelry box back in the closet and

3   take a picture of it?

4   A    Yes, sir.

5   Q    Now if you would, take a look at Exhibit 23.  What is

6   that exhibit, please?

7   A    A photograph of the closet where I located the jewelry

8   box.

9   Q    And is that photograph a fair and accurate representation

10  of the appearance of that jewelry box as you first saw it?

11  A    Yes, sir.

12       MR. SORRELL:  I offer Exhibit 23, please.

13       THE COURT:  23 is admitted.

14  Q    (By Mr. Sorrell)  Did the brown jewelry box contain any

15  jewelry?

16  A    Yes, sir.

17  Q    And what type of jewelry was in it?

18  A    I believe some earrings and maybe some rings.

19  Q    Some small pieces of costume jewelry?

20  A    Yes.

21  Q    Is that fair?

22  A    Yes.

23  Q    Okay.  And if you would, turn that photograph around to

24  show it to the Jury, please.  Would you point out the brown

25  jewelry box that is seen in that photograph?  Is that

1   basically on top of the green shelf?

2   A    Yes.

3   Q    Okay.  Is it next to a fan-like device?

4   A    Yes.

5   Q    All right.  And it's underneath a purple cloth in that

6   closet.  Is that fair?

7   A    Yes, sir.

8   Q    Okay.  If you would, turn to Exhibit 14 from the box,

9   please.  Would you tell the Jury what Exhibit 14 is?

10  A    An evidence bag containing the brown jewelry box found in

11  Amy Doyle's closet.

12  Q    And that is the jewelry box we're talking about.  Is that

13  right?

14  A    Yes.

15       MR. SORRELL:  I offer Exhibit 14.

16       THE COURT:  Are you talking about "A" and "B"?

17       MR. SORRELL:  Just "A" right now, Your Honor.

18       THE COURT:  Okay.  14-A is admitted.

19  Q    (By Mr. Sorrell)  Would you, also, pick up 14-B at the

20  same time?

21       MR. SORRELL:  I'm sorry, Your Honor.  I told him

22  Exhibit 14, but there is an "A" and a "B."

23       Oh, I got it.  May I, Your Honor?

24       THE COURT:  You may.

25  Q    (By Mr. Sorrell)  Sir, would you tell the Court what that

1   exhibit is, please?

2   A    An evidence bag.

3   Q    And where was that evidence bag filled out at?

4   A    Charleston Police Department.

5   Q    And what was the purpose of that bag for?

6   A    To secure the evidence.

7   Q    What type of -- What piece of evidence?

8   A    Off-white substance.

9   Q    Okay.  That -- Can we agree that the crack cocaine that

10  was found in the box was taken out of the box and placed in a

11  separate exhibit?

12  A    Yes.

13  Q    Placed in a separate bag?

14  A    Yes.

15  Q    And that's the evidence bag that the crack cocaine was

16  first placed in.  Is that fair?

17  A    Yes.

18  Q    Okay.

19       MR. SORRELL:  I offer Exhibit 14-B.

20       THE COURT:  14-B is admitted.

21  Q    (By Mr. Sorrell)  Would you open up the jewelry box and

22  show it to the Jury, please?  And it still contains the

23  costume jewelry in it.  Is that fair?

24  A    Yes, sir.

25  Q    Okay.  That's fine.

1          MR. SORRELL:  May I approach the witness one more

2    time, Your Honor?

3          THE COURT:  You may.

4    Q    (By Mr. Sorrell) Sir, I've handed you what's been marked

5    as Exhibit 15-A.  Would you -- Would you tell the Court what

6    that exhibit is, please?

7    A    Evidence bag.

8    Q    Containing?

9    A    Yeah, containing the crack cocaine.

10   Q    And that was seized from the brown jewelry box.  Is that

11   fair?

12   A    Yes, sir.

13   Q    And is it in the same condition as it was when you first

14   saw it?

15   A    No, sir.

16   Q    All right.  Has part of it been ground up?

17   A    Yes, sir.

18   Q    But what about the other portion of the part that's not

19   been pulverized?  Are the basic rocks still the same?

20   A    Yes.  Yes, they are.

21         MR. SORRELL:  I'll offer Exhibit 15-A, please.

22         THE COURT:  15-A is admitted.

23   Q    (By Mr. Sorrell) Would you hold that up for the Jury to

24   see, please?

25         And that's the crack cocaine from all four of the

1   Baggies that were in the jewelry box.  Is that right?

2   A    Yes, sir.

3   Q    Okay.  You can set that -- or I'll come -- Let me come

4   and get that, if I may, please.

5        Would you pick up Exhibit 24 from the stack there on

6   the desk, please?  And would you tell the Court what that

7   exhibit is?

8   A    A photograph.

9   Q    And what does it depict?

10  A    The brown -- Inside the brown jewelry box.

11  Q    And does it depict the items that you saw in it when you

12  first opened up the jewelry box?

13  A    Yes, sir.

14  Q    Is it a fair and accurate representation of the

15  appearance of the inside of the jewelry box as soon as you

16  opened it?

17  A    Yes, sir.

18       MR. SORRELL:  Your Honor, I'll offer Exhibit 24.

19       THE COURT:  24 is admitted.

20  Q    (By Mr. Sorrell)  Would you hold that photograph up for

21  the Jury to see, please?

22       And would you point out the different -- or where the

23  cocaine is inside that jewelry box, please?

24  A    Here's a bag here.  Also one here, here and right here.

25  Q    So there's a total of four bags?

1    A    Yes, sir.

2    Q    Is that your hand in that photograph?

3    A    Yes, sir.

4    Q    And is that a hand glove in white plastic?

5    A    Yes.

6    Q    All right.  At the bottom of the picture?

7    A    Yes.

8    Q    All right.  And did someone take control of this jewelry

9    box and its contents?

10   A    Yes, sir.

11   Q    And who was that?

12   A    Sergeant Moody.

13   Q    If you would then turn to Exhibit 25, did you also find

14   some other items in the bedroom that you took?

15   A    Yes; sandwich Baggies.

16   Q    And what is Exhibit 25?

17   A    A photograph of the sandwich Baggies.

18   Q    Is it a fair and accurate representation of the

19   appearance of those sandwich bags before they were seized?

20   A    Yes, sir.

21   Q    Where were those sandwich bags found at?

22   A    Laying on the dresser.

23   Q    In the bedroom?

24   A    Yeah, in Amy Doyle's bedroom.

25        MR. SORRELL:  I'll offer Exhibit 25, please.

1              THE COURT:  Exhibit 25 is admitted.

2    Q    (By Mr. Sorrell)  Would you display that to the Jury,

3    please?  Is there an item beside the sandwich bags?

4    A    Yes.

5    Q    And what is that?

6    A    That's a remote control.

7    Q    And what color is the sandwich bag box or box?

8    A    Yellow.

9    Q    It's basically in the lower center of that photograph?

10   A    Yes.

11   Q    And there's a toothbrush and a medicine bottle, also, it

12   appears.  Is that fair?

13   A    Yes.

14   Q    Okay.  You can set that one down, sir.  But that sandwich

15   bag was seized, wasn't it?

16   A    Yes.

17   Q    By your officers.  And would you pick up Exhibit 16 from

18   the box, please?  And would you tell the Court what that

19   exhibit is?

20   A    Evidence bag containing the sandwich Baggies.

21   Q    That were seized from the room?

22   A    Yes, that were seized.

23   Q    These are the exact sandwich bags?

24   A    Yes.

25   Q    Is there an evidence tag on that exhibit bag, too?

1  A    Yes, sir.

2  Q    And who filled that tag out?

3  A    Sergeant Moody.

4        MR. SORRELL:  Your Honor, I'll offer Exhibit 16.

5        THE COURT:  16 is admitted.

6  Q    (By Mr. Sorrell)  If you would, turn to Exhibit 26 that's

7  in that box, too, please.

8  A    I have 27.

9  Q    Okay.  Look at that one first and then we'll come back.

10  If you'll look at -- first at Exhibit 26, would you tell the

11  Court what that exhibit is?

12  A    A photograph of a glass ashtray.

13  Q    And does the ashtray contain anything?

14  A    Yes.

15  Q    What?

16  A    Seven cigarette butts.

17  Q    And where did you first see those, that ashtray and

18  cigarette butts at?

19  A    On Amy Doyle's dresser.

20  Q    And was that ashtray and cigarette butts taken?

21  A    Yes.

22  Q    Seized by evidence or seized as evidence?

23  A    Yes.

24  Q    Is that photograph a fair and accurate representation of

25  the appearance of the ashtray and the cigarette butts as you

1  first saw it?

2  A    Yes, sir.

3       MR. SORRELL:  And, Your Honor, I'll offer Exhibit 26.

4       THE COURT:  26 is admitted.

5  Q   (By Mr. Sorrell)  Would you display that to the Jury,

6  please?  Which corner is it that these -- that this ashtray

7  and cigarette butts is on?  Which corner of the dresser?

8  A    As you were looking at it, it would be on the right-hand

9  side.

10 Q   Okay.  Would you point out the ashtray and cigarette

11 butts, please?

12      And was that photograph taken before that item was

13 moved?

14 A    Yes.

15 Q   Okay.  Would you turn to Exhibit 17 in the box, please?

16 Would you tell the Court what that exhibit is?

17 A    Evidence bag containing a glass cigarette or ashtray.

18 Q   And the cigarette butts?

19 A    Yes.

20 Q   Okay.  And that is the same ashtray that was seized on

21 the night of May the 9th or the morning of May the 9th?

22 A    Yes.

23      MR. SORRELL:  Your Honor, I'll offer Exhibit 17.

24      THE COURT:  17 is admitted.  Why don't we -- We can

25 take a morning recess.

1          MR. SORRELL:  We can take a morning recess.

2          THE COURT:  Why don't we do that.  Ladies and

3     Gentlemen, we'll take a short morning recess.  Please do not

4     discuss the case among yourselves or with anyone else.  You

5     can proceed to the Jury Room at this point.  You may step

6     down, sir.

7          THE WITNESS:  Thank you.

8          THE COURT:  Court is in temporary recess.

9          (Court recessed from 10:15 A.M. until 10:30 A.M.)

10          (Jury seated by the Clerk.)

11          (The following proceedings were held within the

12     hearing and presence of the Jury:)

13          CLERK:  All rise.  This Court is again in session.

14     Please be seated.

15          MR. SORRELL:  May Officer Morgan take the stand?

16          THE COURT:  Yes, sure.

17          MR. SORRELL:  Thank you.

18     Q    (By Mr. Sorrell)  Officer, do you see Exhibit 56 lying in

19     front of you there?

20     A    Yes.

21     Q    And would you tell the Court what that exhibit is,

22     please?

23     A    Photograph of the top of the dresser.

24     Q    And what dresser are we talking about in that photograph?

25     A    In Amy Doyle's room.

1  Q    And was that the condition of the top of that dresser

2  when you first walked in the room on May the 9th, 2006?

3  A    Yes, sir.

4  Q    Is that photograph an accurate and fair representation of

5  the appearance of that dresser at that time?

6  A    Yes, sir.

7          MR. SORRELL:  Your Honor, I'll offer Exhibit 56.

8          THE COURT:  56 is admitted.

9  Q    (By Mr. Sorrell)  Would you display that to the Jury,

10 please?

11         Officer, there are no items in that photograph that

12 have been seized.  Is that fair?

13 A    Yes, sir.

14 Q    It's just the condition of the top of the dresser.  Is

15 that fair?

16 A    Yes, sir.

17 Q    You can set that down.

18         Did you also seize a jacket and a pair of jeans from

19 the bedroom during that search?

20 A    Yes, sir.

21         MR. SORRELL:  May I approach the witness, Your Honor?

22         THE COURT:  You may.

23 Q    (By Mr. Sorrell)  Sir, I've handed you an exhibit marked

24 Exhibit 18.  Would you look in that bag and tell the Court

25 what that exhibit is, please?

1    A    This is the jacket seized from Amy Doyle's room.

2    Q    And what -- Is the other item inside the same exhibit

3    bag?

4    A    Yes, it's in the evidence bag.

5    Q    Okay.  That's basically the original evidence bag that

6    the items were put in?

7    A    Yes.

8    Q    And is there another item inside Exhibit 18?

9    A    Yes.

10   Q    And what is that, please?

11   A    The pair of pants seized from Amy Doyle's room.

12        MR. SORRELL:  Your Honor, I'll offer Exhibit 18.

13        THE COURT:  Exhibit 18 is admitted.

14   Q    (By Mr. Sorrell)  Would you unfold the pair of pants and

15   hold those up for the Jury, please?

16   A    May I stand up?

17   Q    Yes.

18        THE COURT:  You may.

19   Q    (By Mr. Sorrell)  And what's the -- Would you turn them

20   around so that the brand name can be displayed, please?  I'm

21   not sure what the brand name is on that.  Could you read that

22   on the bottom?

23   A    It's some French name.

24   Q    Basically "Marithe Francois Girbaud"?

25   A    Yes.

1    Q    Okay.  And would you also -- You can lay that down, if

2    you would, please.  Would you also unfold the men's jacket and

3    display it to the Jury, please?

4         Does that jacket have a brand name on it or is it

5    unnamed?

6    A    Koman.

7    Q    "Kogan"?  Would you spell that, please?

8    A    K-O-M-A-N.

9    Q    Oh, Koman.  All right.  And if you would set those items

10   down, please.  I'll take those back from you, along with that

11   exhibit bag.

12        Sir, is there an Exhibit 41 in front of you?

13   A    Yes, sir.

14   Q    Did you help me prepare a penciled exhibit of the outline

15   of the bedroom, of Amy Doyle's bedroom that you searched?

16   A    Yes.

17   Q    And I need you to speak up just a little bit, if you

18   would, please.

19   A    Yes.

20   Q    And did that exhibit list the items of furniture in that

21   bedroom and the approximate location of the things that were

22   seized from the bedroom?

23   A    Yes.

24   Q    And Exhibit 41 is not drawn to scale but just as an aid

25   to the Jury.  Is that right?

1    A    Yes.

2    Q    All right.

3         MR. SORRELL:  Your Honor, I'll offer Exhibit 41.

4         MR. LISZEWSKI:  Your Honor, may I see that, please?

5         MR. SORRELL:  Oh, I'm sorry.

6         THE COURT:  Sure.

7         MR. LISZEWSKI:  That's fine.

8         THE COURT:  Exhibit 41 is admitted.

9         MR. SORRELL:  Your Honor, I'm going to turn that TV

10   on for a short time, if I may, to display this exhibit.

11        THE COURT:  Fine.

12   Q    (By Mr. Sorrell)  Sir, basically this Exhibit 41, as you

13   described, is the room of Amy Doyle.  Is that right?

14   A    Yes.

15   Q    Now at the top of that exhibit, what was the item shown

16   in the very upper left-hand corner of that exhibit?

17   A    Upper left-hand corner would be the TV stand.

18   Q    And does that diagram also display the location where the

19   Fila shoebox was?

20   A    Yes, sir.

21   Q    If I can say that.

22   A    Yes.

23   Q    All right.  And does the exhibit also show where you

24   found the jacket and the jeans that you just testified to in

25   Exhibit 18?

1    A     Yes, sir.

2    Q     And that's basically in the part of the room.  Is that

3    fair?

4    A     Yes.

5    Q     Does the exhibit show where there's a bed in this

6    bedroom?

7    A     Yes.

8    Q     And where is it located?

9    A     Right-hand corner of the room.

10   Q     This item where I'm pointing to at this time?

11   A     Yes.

12   Q     Okay.  And do you also see the nightstand where you found

13   the revolver displayed on this exhibit?

14   A     Yes, sir.

15   Q     And where would it be located?

16   A     On the right-hand side.

17   Q     Middle-way down?

18   A     Middle-way down.

19   Q     Okay.  And is the square drawn for the revolver in the

20   approximate location where the revolver was found?

21   A     Yes.

22   Q     And at the bottom of the exhibit, is there a closet?

23   A     Yes.

24   Q     And does that exhibit also show the approximate location

25   of the jewelry box, where it was found?

1   A    Yes.

2   Q    On the left-hand side of the exhibit, does it display the

3   dresser that we just talked about?

4   A    Yes, sir.

5   Q    And does it also display where the sandwich bags and the

6   ashtray and the cigarette butts were found?

7   A    Yes.

8   Q    And were those the items that were seized during your

9   search of the Doyle bedroom?

10  A    Yes, sir.

11  Q    Okay.  And you didn't make any contact with Mr. Kent

12  afterwards, did you, after that night?

13  A    No, sir.

14  Q    Do you see the man in the courtroom that you stopped on

15  the streets of Sikeston on May the 8th of 2006?

16  A    Yes, sir.

17  Q    And would you point him out for the benefit of the Court,

18  please?

19  A    (Witness pointing).

20  Q    And would you describe what clothes he's wearing?

21  A    It looks like a gray dress shirt with a tie.

22       MR. SORRELL:  And would the record reflect that the

23  witness has identified the Defendant?

24       THE COURT:  It will.

25       MR. SORRELL:  No -- Nothing further.

1          THE COURT:  Mr. Liszewski?

2          MR. LISZEWSKI:  Thank you, Your Honor.

3                    CROSS EXAMINATION

4    QUESTIONS BY MR. LISZEWSKI:

5    Q    Officer Morgan, I want to turn your attention to Exhibit

6    18.  I'm going to ---

7          MR. LISZEWSKI:  May I approach the witness?

8          THE COURT:  You may.

9          MR. LISZEWSKI:  Thank you.

10   Q    (By Mr. Liszewski)  Here you are, sir.

11   A    Yes.

12   Q    Hang onto that, please.

13   A    Yes.

14   Q    Okay.  Sir, I'm handing you what's previously been marked

15   as a pair of pants and a jacket.  Now on Exhibit 41, if I am

16   looking correctly, it looks like that is approximately where

17   you found those, true?

18   A    Yes, approximately.

19   Q    Okay.  So you didn't find them in a dresser.

20   A    No, sir.

21   Q    You didn't find them in a closet.

22   A    No, sir.

23   Q    Okay.  Now I would assume that you did look through the

24   dresser in Amy Doyle's bedroom; true?

25   A    Yes.

1  Q    Okay.  And I would assume that you found clothes of hers.

2  A    Yes.

3  Q    Okay.  You didn't find any clothes in a fair resemblance

4  to Tron Kent's?

5  A    No, sir.

6  Q    Had you found them, you would have seized them.

7  A    Yes, sir.

8  Q    Okay.

9       MR. LISZEWSKI:  May I approach again to take the

10 exhibits back?

11      THE COURT:  You may.

12 Q    (By Mr. Liszewski)  I want to turn your attention now to

13 Government's Exhibit 24.

14      MR. LISZEWSKI:  I can put that on the Elmo, if that

15 would be all right.

16      THE COURT:  Sure.

17 Q    (By Mr. Liszewski)  Now, obviously, that jewelry box is

18 where drugs were, true?

19 A    Yes.

20 Q    And there's costume jewelry.

21 A    Yes.

22 Q    Female costume jewelry.

23 A    Yes, sir.

24 Q    And I believe in Exhibit 23 you found that jewelry box

25 above what appears to be a pink silky or a purple silky

1  garment.  Excuse me.

2  A    Yes, sir.

3  Q    Okay.  Did -- That looks like a negligee or something

4  satin.  You know, I'm not very good with fabrics.  I mean I'm

5  not going to lie to you.

6  A    I believe it was like a bed sheet or something.

7  Q    Okay.  It appears to be feminine in characteristics.

8  A    Yes.

9  Q    Exhibit 21, the blue Fila shoebox where you found a

10  controlled substance, would you read the shoe size on that

11  box?

12  A    I can't see it on the screen, sir.

13  Q    That's okay.  Here you are, sir.  Sir, what's the size on

14  that jewelry box or what's the size shoe on that shoebox?

15  A    6.

16  Q    That would be consistent with being a female shoebox,

17  true?

18  A    Yes, sir.

19  Q    You can put that back in the bag, sir.  I apologize.

20       The last thing I want to talk to you about is Exhibit

21  20.  Exhibit 20 is what appears to be the gun beside some

22  baseball cards.

23  A    (Affirmative gesture).

24  Q    Did you find anything belonging to Mr. Kent in that box

25  or in that nightstand?

1    A     I found a revolver.

2    Q     Okay.  You understand that Mr. Kent is saying that that's

3    not his revolver.

4              MR. SORRELL:  Objection to the testimony by the

5    Defendant, Your Honor.

6              THE COURT:  Sustained.

7    Q     (By Mr. Liszewski)  Did you find anything with Mr. Kent's

8    name on it?

9    A     No, sir.

10   Q     Okay.  Did you find any medicine bottles bearing --

11   bearing ownership to Mr. Kent?

12   A     No, sir.

13   Q     Did you find any clothes that could be attributed to

14   Mr. Kent --

15   A     Repeat the question.

16   Q     -- in the nightstand?  Did you find any clothes in the

17   nightstand that could be attributed to Mr. Kent?

18   A     No, sir.

19   Q     Okay.  So, sir, in sum, you found drugs in a woman's

20   shoebox, in a woman's jewelry box, and presumably Mr. Kent's

21   clothes were sitting in the middle of the bedroom floor.

22   A     Yes.

23   Q     Oh, excuse me; one last thing.  The clothes, is that --

24   How long have you been a police officer in Charleston?

25   A     Over a year-and-a-half.

1   Q    Over a year-and-a-half?

2   A    Yeah.

3   Q    Those are kind of baggy clothes.  Would that be fair to

4   say?

5   A    Yes, sir.

6   Q    Okay.  It isn't entirely inconsistent for black folks to

7   wear clothes like that in Charleston, true?

8        MR. SORRELL:  Objection to the nature of the

9   characterization, Your Honor.

10       THE COURT:  Sustained.

11  Q    (By Mr. Liszewski)  Did you find anything remarkable

12  about the clothes?

13  A    Explain "remarkable."

14  Q    Was there anything remarkable?  Were they extravagantly

15  expensive?  Was there anything unique about them other than

16  being pants and a jacket?

17  A    No, sir.

18       MR. LISZEWSKI:  Thank you, sir.  I have no further

19  questions.

20       THE COURT:  Any Redirect?

21       MR. SORRELL:  No, Your Honor.

22       THE COURT:  Thank you, sir.  You may step down.

23       MR. SORRELL:  I call Officer Moody.

24       MR. FERRELL:  Your Honor, may we approach?

25       THE COURT:  Sure.

1          (The following proceedings were held at sidebar,

2     outside the hearing of the Jury:)

3          MR. FERRELL:  Ready?

4          THE COURT:  Yeah.  Go ahead.

5          MR. FERRELL:  Judge, based upon the couple of

6     comments that were made in opening statement, the Government's

7     concerned Mr. Liszewski may try to introduce some evidence

8     concerning a previous boyfriend of the victim in this case, to

9     Amy Doyle.  From the statements that were made, there was a

10    question -- One of the questions that we anticipated was that

11    Mr. Liszewski would ask Officer Moody the reputation of this

12    other person for being connected with drugs.  And I talked

13    with Mr. Liszewski between the break and I understand he does

14    intend to ask some type of question of that nature.  So with

15    regard to that particular question, the Government would

16    object on the basis that, first of all, reputation evidence is

17    inadmissible.  Rule 404(a) specifically provides that

18    generally reputation evidence is inadmissible.  There's

19    certain limits to specific situations; none of which apply

20    here as to what this gentleman's reputation was.  So that's

21    our first objection is any question to this witness as to what

22    he believes the reputation of the third-party is for being

23    involved in drugs.

24          THE COURT:  Mr. Liszewski, what are you going to ask?

25          MR. LISZEWSKI:  Basically I was going to -- The

1  question I intend upon asking is essentially:  Officer Moody,

2  do you know a gentleman by the name of Chris Scott or is the

3  name familiar?  I anticipate that Chris Scott -- he will

4  answer in the affirmative to that question.  My next question

5  will be:  Does he have a reputation as being a drug dealer in

6  the community?  Is that -- Is that something that you found

7  based on being a member of that community?  Now here's --

8  here's -- Let me finish.

9          MR. FERRELL:  I thought you were finished.

10          MR. LISZEWSKI:  Actually I'm not finished.  Oh, I'm

11  sorry.

12          MR. FERRELL:  Sorry.

13          MR. LISZEWSKI:  404(a), Judge, it actually says

14  nothing about a third-party unless it's a person that you're

15  going to ---

16          THE COURT:  Well, I guess my initial question is:

17  What's the relevance in even getting into the third-party?

18          MR. FERRELL:  That's the issue.

19          MR. LISZEWSKI:  The relevance of that is, Judge, by

20  the Government's own admission, by their own expert later on,

21  they're going to have a person who's going to get up there and

22  say that a nonsemen sample found on the bed could have been a

23  mixture of at least two or more individuals.  Okay?  The

24  plastic bags contained a mixture of at least two or more

25  individuals.

1          THE COURT:  Okay.  But what you're doing is

2    anticipating evidence that the Government is going to put on.

3    So there's no relevance at this point in the case to even

4    bring up that.  The only time that may come into play is if --

5    is after that witness' testimony.  And even then, I don't

6    know.  We'll have to look at the circumstances.  But at this

7    point, what you're asking has no relevance whatsoever to this

8    case so far in this evidence.  You're just anticipating.

9          MR. FERRELL:  We don't intend to introduce that

10   evidence, do we, Keith?

11         MR. SORRELL:  No.

12         MR. FERRELL:  We have no intention of introducing

13   that.

14         THE COURT:  So I don't think at this point ---

15         MR. LISZEWSKI:  Judge, here's my dilemma with this.

16         THE COURT:  You can call Mr. Moody as a rebuttal

17   witness.

18         MR. LISZEWSKI:  I mean that's probably what I'm going

19   to end up doing.

20         THE COURT:  Well, if it's appropriate.  And I'm not

21   ruling at this point whether that would be appropriate or not.

22   But at this point I don't even see the relevance of bringing

23   in a third-party.  We've got nothing in this record that

24   suggests that.

25         MR. LISZEWSKI:  Well, after the expert testifies,

1   she's going to have to testify that it contains a mixture of

2   at least two or more individuals.

3          THE COURT:  Maybe so, but she hasn't ---

4          MR. FERRELL:  We're not offering that at all.

5          THE COURT:  She's not testified, and I don't know

6   what her testimony is, and I'm not going to start saying,

7   Well, I anticipate she's going to do XYZ.  You may be right

8   but until she does it, I have no basis to say your question's

9   appropriate.

10          MR. SORRELL:  Even if she says that DNA also belongs

11   to Chris Scott, you couldn't ask that question because it's

12   still character evidence.  It relates to another witness.

13          THE COURT:  Well, I'm simply saying I think at this

14   point there's no relevance.  Later on, I'm not ruling and

15   saying there's going to be relevance later on or it's

16   appropriate later on.  I'm just saying at this point I don't

17   even see any relevance to it.

18          MR. LISZEWSKI:  That's fine.  I can wait till they

19   bring it up.

20          THE COURT:  Okay.  And we'll take it up at a later

21   time.

22          MR. LISZEWSKI:  Thank you.

23          MR. FERRELL:  Thank you, Your Honor.

24          (The following proceedings were held within the

25   hearing and presence of the Jury:)

1        THE COURT:  Do you want to step forward, sir, and be

2   sworn?

3                    **OFFICER ANTHONY MOODY**,

4   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

5   FOLLOWS:

6        THE COURT:  You may inquire.

7        MR. SORRELL:  Thank you.

8                    DIRECT EXAMINATION

9   QUESTIONS BY MR. SORRELL:

10  Q    Would you state your name, please?

11  A    Anthony Moody.

12  Q    Where do you work, Mr. Moody?

13  A    Charleston Department of Public Safety.

14  Q    How long have you been in law enforcement?

15  A    Approximately 15 years.

16  Q    And what's your rank at this time?

17  A    Captain.

18  Q    Do you supervise other police officers on the Charleston

19  police force?

20  A    Yes, I do.

21  Q    How many officers do you supervise?

22  A    We have ten.

23  Q    Were you involved in an investigation concerning

24  Tron Kent on May the 8th and 9th of 2006?

25  A    Yes, I was.

1   Q    Now were you informed of anything as to whether there was

2   a felony arrest warrant out for Mr. Kent on May the 8th, 2006?

3   A    Yes, I was.

4   Q    And who were you given that information by?

5   A    Our Dispatch.

6   Q    All right.  The dispatcher for the Charleston Police

7   Department?

8   A    Yes.

9   Q    Did you pass that information along to the other police

10  officers in that -- that you supervised?

11  A    Yes, I did.

12  Q    What did you ask those officers to do?

13  A    To try to locate Mr. Kent, take him into custody.

14  Q    All right.  And during that evening, did you start to

15  receive some information about what type of vehicle Mr. Kent

16  might be driving?

17  A    Yes, we did.

18  Q    And what type of information was that?

19  A    The information was that he would be driving a 2002 Dodge

20  Intrepid.

21  Q    And was there any color for that car?

22  A    I believe it was black.

23  Q    All right.  Did you pass that information out to your

24  officers?

25  A    Yes, I did.

1   Q    During that evening, did you receive any information as

2   to whether Mr. Kent had been detained or stopped?

3   A    Yes.  I believe around somewhere around 11:30

4   Officer Morgan and Officer Sutton stopped the vehicle and

5   Mr. Kent.

6   Q    And how did you find out about this traffic stop?

7   A    I overheard it on the radio.

8   Q    And what did you do as soon as you heard this

9   information?

10  A    I proceeded to the traffic stop location.

11  Q    How long did it take you to get to the traffic stop

12  location from where you were at in Charleston?

13  A    Maybe 30, 45 seconds.

14  Q    What did you see when you first arrived on the scene at

15  the traffic stop?

16  A    I observed a black male laying in the roadway at gun

17  point.

18  Q    Did you walk up to that person?

19  A    Yes, I did.

20  Q    And did you identify who that person was?

21  A    I knew him to be Mr. Tron Kent.

22  Q    And you knew him as soon as you saw the man laying on the

23  ground?

24  A    That's correct.

25  Q    Okay.  Was the man laying on his stomach or on his back?

1  A    Stomach.

2  Q    What did you do upon walking up to Mr. Kent?

3  A    I walked up and placed the handcuffs on Mr. Kent.

4  Q    And did you pat him down?

5  A    Yes.  I rolled him over, I believe, on his right side,

6  checked his waistband and rolled him back.

7  Q    Okay.  Was there anything on Mr. Kent's waistband?

8  A    An empty cellphone pouch.

9  Q    All right.  A holder?

10  A    A holder.

11        MR. SORRELL:  May I approach the witness, Your Honor?

12        THE COURT:  You may.

13  Q    (By Mr. Sorrell)  Sir, would you pick up Exhibit 8 that's

14  in front of you?  Would you tell the Court what that exhibit

15  is, please?

16  A    It's a cellphone holder.

17  Q    And have you ever seen that cellphone holder before?

18  A    Yes, I have.

19  Q    Where have you seen it at?

20  A    On Mr. Kent's belt.

21  Q    And is that the cellphone holder that you seized that

22  evening?

23  A    Yes, it is.

24  Q    What did you do with that particular exhibit after you

25  seized it?

1   A    It was placed -- I believe it was placed in his property

2   at the County Jail.

3   Q    At the Mississippi County Sheriff's Office?

4   A    Yes, sir.

5            MR. SORRELL:  Your Honor, I'll offer Exhibit 8.

6            THE COURT:  Exhibit 8 is admitted.

7   Q    (By Mr. Sorrell)  And did you also look in the seat of

8   the Dodge Intrepid that was stopped?

9   A    Yes.  After I placed him under arrest and stepped back a

10  little ways, I observed a cellphone laying in the driver's

11  seat.

12  Q    Did you seize that particular cellphone?

13  A    Yes, I did.

14  Q    Would you look at Exhibit 8, please?  And would you tell

15  the Court what that exhibit is?

16  A    It's a Virgin cellphone.

17  Q    And that's the cellphone that was seized?

18  A    Yes.

19  Q    All right.  Does it fit within the cellphone holder

20  that's shown as Exhibit 7?

21  A    I believe it does.

22  Q    Or do 7 and 8 fit together?

23  A    I believe it does.

24  Q    Okay.  Would you also look at Exhibit 9?  And would you

25  tell the Court what that exhibit is, please?

1  A    It's a set of keys that was taken from Mr. Kent.

2  Q    And were those taken from the car, the Dodge Intrepid,

3  that night?

4  A    Yes, they were.

5         MR. SORRELL:  Your Honor, I'll offer Exhibit 9.

6         THE COURT:  Exhibit 9 is admitted.

7  Q    (By Mr. Sorrell)  Were those also logged in as Mr. Kent's

8  property at the Mississippi County Jail?

9  A    Yes, they were.

10 Q    Later on that same evening did you take any steps to find

11 out who the Dodge Intrepid was registered to?

12 A    Yes, we did.

13 Q    And how did you do that?

14 A    Went to the owner's residence located at 501 South Sixth

15 Street.

16 Q    Were you able to look up or did your police dispatcher

17 look up the registered owner of the car?

18 A    Yeah.  We ran a vehicle check or a registration --

19 Q    Okay.

20 A    -- on the vehicle.

21 Q    And who did that registration come back to?

22 A    Sally Doyle.

23 Q    Who lives at what address?

24 A    501 South Sixth.

25 Q    In Charleston, Missouri?

1    A      Yes.

2    Q      And did you go to that address?

3    A      Yes, we did.

4    Q      And did you make contact with Miss Sally Doyle?

5    A      Yes, I did.

6    Q      Was that the next morning about May the 9th?

7    A      Yes, it was.

8    Q      Okay.  And did you ask Miss Doyle if she had any

9    knowledge of what connection Mr. Kent would have with that

10   Dodge Intrepid?

11   A      I asked did she know where her vehicle was and she stated

12   that she believed Mr. Kent had it.

13   Q      Okay.  Did Miss Doyle say anything about a relationship

14   that her daughter had with Mr. Kent?

15   A      She then advised me that her daughter and Mr. Kent was

16   involved in a relationship.

17   Q      Did she indicate which room they stayed in?

18   A      Just in a bedroom off the living room.

19   Q      Was there any conversation about looking in that room?

20   A      Yes, there was.

21   Q      And what was that conversation?

22   A      I believe during our conversation on the front porch,

23   Miss Doyle advised me I could search the residence.  Then at

24   that time I asked her if officers could search, and she let us

25   into the residence.

1   Q    And did you also make contact with Amy Doyle?

2   A    As we was coming inside the residence, Amy Doyle was

3   coming out of the bedroom.

4   Q    And did Miss Amy Doyle say anything about whether you

5   could look in that room?

6   A    Yeah.  She gave us consent, also.

7   Q    So was the room searched?

8   A    Yes, it was.

9   Q    Who performed the actual search of the bedroom?

10  A    Officer Morgan and Officer Sutton.

11  Q    Did you perform any function during that search?

12  A    I tagged all the evidence.

13  Q    And where were you standing most of the time while the

14  search was being conducted?

15  A    Right outside -- Right outside the door.

16  Q    And did you use any receptacles to place evidence in?

17  A    Our normal evidence bags.

18  Q    Okay.  If you would pick up Exhibit 11, I believe it's

19  down in the box beside you in the larger brown bag, in the

20  brown paper bag.  There you go.

21       Sir, I'll represent to you that's a Fila shoebox.

22  Was that an item seized from the Amy Doyle bedroom?

23  A    Yes.

24  Q    And who would have been the officer that would have

25  logged that particular piece of evidence into evidence?

1    A    I believe it was probably photographed by Mr. Morgan or

2    Officer Morgan and then handed over to me, and I tagged it

3    in --

4    Q    Okay.

5    A    -- and logged it into evidence.

6    Q    All right.  Is Exhibit 12 up there in front of you?  Or

7    do we have it?

8              MR. SORRELL:  May I again approach, Your Honor?

9              THE COURT:  You may.

10   Q    (By Mr. Sorrell)  Sir, would you tell the Court what

11   Exhibit 12 is?

12   A    That's an evidence bag which I placed evidence in this

13   bag and signed my name to it.

14   Q    Okay.  And what is in the evidence bag that's in that

15   exhibit?

16   A    It's a clear plastic Baggie with crack cocaine.

17   Q    All right.  And where was that crack cocaine taken from?

18   A    It was located inside the Fila box.

19             MR. SORRELL:  Your Honor, I would like to offer

20   Exhibit 11.

21             THE COURT:  12?

22             MR. SORRELL:  Actually Exhibit 12.  I'm sorry.

23             THE COURT:  Exhibit 12 is admitted.

24   Q    (By Mr. Sorrell)  And who did you turn the Exhibit 12

25   over to after you were through with it?

1  A    I placed it in the DPS evidence locker and later it was

2  released to Larry Gregory.

3  Q    With the Drug Enforcement Agency?

4  A    That's correct.

5  Q    Okay.  Would you also look and see if Exhibit 13 is in

6  front of you?  Would you tell the Court what that exhibit is,

7  please?

8  A    It's $540 of U.S. currency that was removed from the Fila

9  box, also.

10 Q    And who took custody of that particular piece of

11 evidence?

12 A    It was inside the Fila box at the time that I took

13 custody of it.

14 Q    All right.

15     MR. SORRELL:  Your Honor, I'll offer Exhibit 13.

16     THE COURT:  13 is admitted.

17 Q    (By Mr. Sorrell)  Also, did you take custody of a brown

18 jewelry box?

19 A    Yes, I did.

20 Q    And if you would look in the box and see if you can find

21 Exhibit 14-A.  That's it.  Is that the jewelry box that you

22 took custody of?

23 A    Yes, it was.

24 Q    And did you note whether there were any items inside of

25 that jewelry box when you opened it up?

1   A    Yes, I did.

2   Q    And what was that?

3   A    It was assorted jewelry and four bags of a rock-like

4   substances which I knew to be crack cocaine.

5   Q    All right.  Was the crack cocaine that was in the jewelry

6   box, was it wrapped in anything?

7   A    I believe it was wrapped in plastic.

8   Q    Cellophane bags of some kind?

9   A    Plastic Baggies.

10  Q    And what did you do with all those exhibits, the jewelry

11  box, the crack cocaine and the Baggies it was wrapped in?

12  A    I just left them inside the jewelry box.

13  Q    And did you turn that jewelry box over to someone?

14  A    I turned it -- later turned it over to Larry Gregory,

15  DEA.

16  Q    All right.  And so if those items were separated, they

17  were done by someone else.  Is that fair?

18  A    That's correct.

19  Q    Okay.  But it's fair to say that you took custody of all

20  the crack cocaine, the jewelry box, and the other items that

21  were seized from the Amy Doyle bedroom?

22  A    That's correct.

23  Q    Did you also take custody of a box of sandwich bags that

24  was seized from the bedroom?

25  A    Yes, I did.

1   Q    If you would, look at Exhibit 16.  Is that the sandwich

2   bags that you took custody of?

3   A    Yes, they are.

4   Q    Would you look at Exhibit 17 that's in that same box?

5   And what is that item?

6   A    It's an ashtray with seven cigarette butts.

7   Q    And they were also taken by you and marked into evidence.

8   Is that fair?

9   A    That's correct.

10  Q    And there was an evidence card marked on all of those

11  items?

12  A    That's correct.

13  Q    Okay.  Did you also take the men's jeans and a jacket

14  that's been marked -- and I'm holding up now as Exhibit 18 --

15  from -- take custody of those from the Doyle bedroom?

16  A    Yes, we did.

17  Q    And you were taking custody of those that night and made

18  an evidence tag out on those two?

19  A    Yes.

20  Q    Okay.  And you wouldn't have had any other contact with

21  Mr. Tron Kent that evening, would you?

22  A    No.

23  Q    All right.

24       MR. SORRELL:  That's all I have, Your Honor.  Thank

25  you.

1      THE COURT:  Mr. Liszewski?

2      MR. LISZEWSKI:  Thank you.

3      THE COURT:  You may cross-examine.

4                    CROSS EXAMINATION

5   QUESTIONS BY MR. LISZEWSKI:

6   Q    Captain Moody, you are involved in a lot of drug cases in

7   Charleston and Mississippi County, true?

8   A    That's correct.

9   Q    Now chances are if someone is being investigated for

10  drugs, you'd know that?

11      MR. SORRELL:  Judge, let me object to the nature of

12  the evidence involving any other cases.  It's not relevant to

13  this particular case.

14      THE COURT:  Sustained.

15  Q    (By Mr. Liszewski)  Let me rephrase it.  There was no

16  pending investigation on Tron Kent, was there?

17  A    Drug investigation?

18  Q    Exactly.

19  A    Not to my knowledge.

20  Q    Okay.  Had there been a pending investigation of

21  Tron Kent, you would have been aware of it.

22  A    By our agency?

23  Q    Yes, sir.

24  A    More than likely.

25  Q    Are you sure it's "more than likely"?  Because in prior

1  testimony you said that you would have been aware of it.

2  A    I probably would have been aware of it.

3  Q    Now after the drugs were found in Amy Doyle's bedroom,

4  Amy Doyle was taken to the Police Station, true?

5  A    That's correct.

6  Q    Were you the one that transported her to the Police

7  Station?

8  A    I don't know exactly who transported her.

9  Q    Okay.  It wasn't Sally Doyle, I'd assume.

10 A    I can't recall.

11 Q    Okay.  Did you have -- Were you involved in any

12 questioning of Amy Doyle subsequently to her transport to the

13 Police Station?

14 A    I believe I interviewed her along with the juvenile

15 officer there at the Police Station.

16 Q    Okay.  So you interviewed her first.  Would you describe

17 the context in which that interview took place?

18      MR. SORRELL:  Let me object to that as being outside

19 the scope of the Direct and also calls for hearsay.

20      THE COURT:  Sustained.

21      MR. LISZEWSKI:  It's offered to explain subsequent

22 police conduct.

23      THE COURT:  Sustained.

24      MR. LISZEWSKI:  May I make an Offer of Proof?

25      THE COURT:  Step up here.

1           (The following proceedings were held at sidebar,

2   outside the hearing of the Jury:)

3           MR. LISZEWSKI:  Essentially, Judge -- And I probably

4   feel more comfortable doing a question and answer Offer of

5   Proof.  I'll briefly explain why.

6           THE COURT:  Well, if you want to do it, we can do it

7   another time outside the presence of the Jury.

8           MR. LISZEWSKI:  That's fine.

9           THE COURT:  I'm not going to stop now.  We'll do it

10  at noontime.

11          MR. LISZEWSKI:  Essentially, Judge, what he is going

12  to say is he did an interview and later Amy Doyle was

13  arrested.  She was changed out into jail clothes and she was

14  kept in the jail overnight until Trooper Heath and

15  Larry Gregory went to speak to her.  I believe that I'm

16  allowed to get that out.

17          MR. SORRELL:  Basically it's character evidence, and

18  it's a red herring defense.  He wants to point out that

19  someone else might be guilty of this crime without a

20  sufficient foundation being ---

21          MR. LISZEWSKI:  It's not a red herring.

22          MR. SORRELL:  Well, let me finish first.  It's a red

23  herring defense in that he has to lay a sufficient foundation

24  that there's actually a possibility of someone else being

25  guilty of that crime first.  That's not where we're at today.

1   If he wants to call Mr. Moody as his witness later on, I guess

2   he would be permitted to do so, but it's certainly outside the

3   scope of any Direct that the Government has laid here today.

4          THE COURT:  Yeah.  This has not been something in

5   Direct and, again, I think you're anticipating too quickly.

6   If you've got something, you're going to have to lay a

7   foundation.  But if you want to put this and do a complete

8   Offer of Proof, I'm not going to preclude you, but let's do it

9   at noontime.  Okay?

10         MR. LISZEWSKI:  Judge, there has been sufficient

11  foundation and here's ---

12         THE COURT:  I've made my ruling on this, and you can

13  make your Offer of Proof and maybe you'll persuade me

14  otherwise, but I want to move ahead.

15         MR. LISZEWSKI:  That's fine.

16         THE COURT:  Okay?

17         MR. LISZEWSKI:  That's fine.

18         (The following proceedings were held within the

19  hearing and presence of the Jury:)

20         THE COURT:  Go ahead Mr, Liszewski.

21         MR. LISZEWSKI:  Thank you, Ma'am.

22  Q   (By Mr. Liszewski)  Were you present whenever Detective

23  or -- excuse me -- Trooper Heath and DEA Agent Gregory

24  interviewed Miss Doyle?

25  A   Yes, I was.

1   Q    You were.  Were you there whenever that conversation was

2   videotaped?

3   A    I don't believe I was there during the videotaping.

4          MR. LISZEWSKI:  Thank you, Ma'am.  No more questions.

5   I would like the right to recall Mr. Moody as a witness later.

6          THE COURT:  That's fine.  Mr. Sorrell?

7          MR. SORRELL:  No Redirect, Your Honor.

8          THE COURT:  Thank you, sir.  You may step down.

9          MR. SORRELL:  Your Honor, I have some stipulations

10  that I'd like to finish reading, if I may.

11         THE COURT:  Why don't you go ahead.

12         MR. SORRELL:  May I show them first to Mr. Liszewski?

13         THE COURT:  Sure.

14         (Pause)

15         MR. SORRELL:  May I, Your Honor?

16         THE COURT:  Go ahead.

17         MR. SORRELL:  Thank you.  The parties' stipulations

18  would read as follows:  The firearm mentioned in Count V of

19  the indictment, the High Standard .22 caliber revolver,

20  bearing Serial Number 1089924, is a firearm as defined by

21  federal statutes.  The revolver was manufactured in a state

22  other than Missouri and affected interstate commerce.

23         It is agreed to and stipulated by the parties -- that

24  is, both the Government and the defense -- that:

25         (1) the substance contained in Exhibit 12 is a form

1    of cocaine base known as crack cocaine.  The crack exhibit --

2    crack cocaine exhibit in Exhibit 11 weighs 6.5 grams in total;

3              (2) the substance contained in Exhibit 15-A is a form

4    of cocaine base known as crack cocaine.  The crack cocaine in

5    Exhibit 15-A weighs 65.9 grams in total;

6              (3) the laboratory report of Alexandria Ambriz, dated

7    May 30, 2006, and marked as Exhibit 42 is the laboratory

8    report of the analysis of the cocaine base in Exhibits 12 and

9    15 and may be offered as evidence without any further

10   foundation.

11             The Defendant and the Government do hereby stipulate

12   and agree that the Virgin brand cellular telephone, cellular

13   phone, Serial Number 04EB64D4, identified as Government's

14   Exhibit 7 was manufactured in the country of Korea and,

15   therefore, had been shipped or transported in interstate or

16   foreign commercial and, therefore, the visual depiction

17   contained on the telephone, a copy of which has been

18   identified as Exhibit 31, was produced by materials that had

19   been shipped or transported in interstate and foreign

20   commerce.

21             Your Honor, there's also a jury instruction with

22   stipulated facts.

23             THE COURT:  I'll be reading that at the end of the

24   case.

25             MR. SORRELL:  Okay.  Thank you.

1          THE COURT:  Sir, do you want to step up here and be

2     sworn?

3                        **DONALD HUSK**,

4     HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

5     FOLLOWS:

6          MR. FERRELL:  May it please the Court, Your Honor.

7          THE COURT:  Go ahead.

8                      DIRECT EXAMINATION

9     QUESTIONS BY MR. FERRELL:

10    Q    State your name for the Jury, please, sir.

11    A    Donald A. Husk.

12    Q    Okay.  And, Mr. Husk, you're here today as a result of a

13    subpoena that was issued in this case for your attendance.  Is

14    that correct, sir?

15    A    Yes, sir.

16    Q    Now, Mr. Husk, you were previously a law enforcement

17    officer.  Is that correct?

18    A    Yes, sir.

19    Q    And were you a law enforcement officer for the

20    Mississippi County Sheriff's Department back on the evening of

21    May the 8th of 2006?

22    A    Yes, sir.

23    Q    Would you tell the Jury, please, what your duties were as

24    a law enforcement officer for that department back at that

25    time?

1   A     I was a corrections officer.  I was a med. tech, and I

2   was also a police dispatcher.

3   Q     And as part of your duties, were you involved with the

4   booking in or receiving of prisoners that would be turned over

5   by other law enforcement agencies for detention in your

6   facility?

7   A     Yes, sir.

8   Q     What would basically be the process as followed when an

9   individual is brought to you from another agency to be placed

10  into the County Jail?

11  A     I get the individual's name, date of birth, Social

12  Security Number, and I have the charges.  Then I have them

13  empty all of their pockets and record and log down all items

14  within their possession.

15  Q     All right.  If an officer brings them in and has removed

16  items from that person, what do you do with those items?

17  A     I ask the individual if them items belong to them, if it

18  is their property before I put it on their property sheets.

19  Q     Okay.  Now on the evening of May the 8th of 2006, were

20  you the officer at the Mississippi County Sheriff's Department

21  that booked in the Defendant in this case, Tron Kent?

22  A     Yes, sir.

23  Q     Now did you fill out a sheet with regard to the property

24  that accompanied Mr. Kent?

25  A     Yes, sir.

1       MR. FERRELL:  May I approach the witness, please,

2   Your Honor?

3       THE COURT:  You may.

4   Q   (By Mr. Ferrell)  Now I've handed to you -- It's a

5   plastic envelope containing a piece of paper marked Exhibit

6   19.  Is that correct?

7   A   Yes, sir.

8   Q   And would you, please, remove that exhibit from its

9   container?  And can you identify for the Jury, please, what

10  that exhibit is?

11  A   This is the Property Report from the Mississippi County

12  Sheriff's Department.

13  Q   And is that the report that you filled out when you

14  booked in the Defendant, Tron Kent, into the Mississippi

15  County Jail on the evening of May the 8th, 2006?

16  A   Yes, sir.

17  Q   And does that report accurately reflect the property that

18  was booked in the jail with regard to him?

19  A   Yes, sir.

20  Q   Now there is an item which is listed at the top of your

21  report which says one cellphone, Virgin Mobile CDM 8915.  Is

22  that correct?

23  A   Yes, sir.

24  Q   And did you record that entry?

25  A   Yes, sir.

1   Q    Now right -- just on that counter right in front of you,

2   sir, to the right is a cellular phone in a plastic bag.  Do

3   you see that, sir?

4   A    Yes, sir.

5   Q    And is that marked Government's Exhibit 7?

6   A    Yes, sir.

7   Q    Can you tell the Jury, please, if you've seen that

8   cellular phone before, sir?

9   A    Yes, sir.

10  Q    Where have you seen it?

11  A    This was the cellphone that was brought in with -- by

12  Charleston PDS with the Defendant.

13  Q    All right.  Is that Officer Morgan that turned it over to

14  you?

15  A    Yes, sir.

16  Q    Okay.  And so then you put it into the Defendant's

17  property, is that correct, to be maintained there at the

18  facility?

19  A    Yes, sir.

20  Q    Okay.  Did you record the serial numbers off of that

21  particular phone you booked in that evening?

22  A    Yes, sir.

23  Q    Have you compared the serial number that you recorded

24  that evening to the serial number on Exhibit 7?

25  A    Yes, sir.

1    Q    Okay.  Is that -- Are those one in the same phones?

2    A    Yes, sir.

3    Q    All right.  Now after you got Exhibit 7 from

4    Officer Morgan and you put -- you listed it on this sheet, did

5    you do anything, take any steps to ensure that the prisoner

6    that you're booking in certifies this is all of his property?

7    A    Yes, sir.

8    Q    What do you do, sir?

9    A    I ask the individual to confirm the list of items that I

10   have recorded, and I read them off to the individual, one at a

11   time, and confirm "yes" or "no" that these items are his

12   property.

13   Q    And did you do that in this case?

14   A    Yes, sir.

15   Q    And with regard -- After you read each of those items off

16   which is contained on the exhibit that you've just identified

17   in front of the Jury, what did you do after you read them all

18   off in the presence of the Defendant?

19   A    I asked is this all of his property.

20   Q    And what did Tron say when you asked him if "this is all

21   of your property"?

22   A    Yes.

23   Q    He said "yes."

24   A    (Affirmative gesture).

25   Q    Okay.  And so then did you do anything after he verbally

1    said "yes"?

2    A    I have him sign the Property Report stating that this

3    is -- these items that's on this Property Report are a correct

4    list of all their property.

5    Q    And did he sign Government's Exhibit 19 in your presence,

6    verifying that was his property?

7    A    Yes.

8    Q    There is a signature on the left-hand side from the

9    bottom, the second one up from the bottom.  Can you read that

10   signature?

11   A    Tron Kent.

12   Q    Excuse me, sir?

13   A    Tron Kent.

14   Q    And did Tron Kent put his signature on there?

15   A    Yes.

16   Q    Is that the same Tron Kent that's seated right here at

17   the counsel table?

18   A    Yes.

19   Q    Okay.  Now after he signed -- or excuse me.  In the

20   course of filling this out, I see also that you have your

21   signature over there.  Is that correct, sir?

22   A    Yes.

23   Q    Right across from his signature.

24   A    Yes.

25   Q    I'd like for you to, please, tell the Jury what the

1   language of this document is right before his signature and

2   your signature.

3   A    English.

4   Q    Okay.  And what does it say?

5   A    "I certify the above is a correct list of items removed

6   from my possession at the time I was placed in detention."

7   Q    And then the signature appears, correct?

8   A    Yes.

9   Q    Now you then later turned this particular item, that's

10  the cellphone itself, Government's Exhibit 7, over to Agent

11  Gregory.  Is that correct?

12  A    Yes.

13  Q    And you had him sign this sheet on 5-9 of '06.  Is that

14  correct?

15  A    Yes.

16  Q    That he had got it from you?

17  A    Yes.

18  Q    Okay.

19        MR. FERRELL:  Your Honor, at this time I would offer

20  into evidence Government's Exhibit 19.

21        THE COURT:  That's admitted.

22        MR. LISZEWSKI:  May I see it first?

23        THE COURT:  Oh, I'm sorry.  Go ahead.  19 is

24  admitted.

25  Q    (By Mr. Ferrell) One more question; maybe two.  Do you

1   remember that when the Defendant, Tron Kent, was booked into

2   the jail, did you give him the right to make a phone call?

3   A    Yes.

4   Q    Will you tell this Jury, please, what he did when you

5   told him he could make a phone call?

6   A    I allow all offenders when they come into the facility --

7   if they're cooperative, they're allowed to make one phone

8   call.  And when he came in, he said he could not remember the

9   number.  So I allowed him to use -- to get a number from his

10  cellphone so he could make a phone call from the department

11  phone because they're not allowed to use their personal

12  property once they're in our custody.

13  Q    Are you telling this Jury in order to make his phone call

14  from the jail, he opened up Exhibit 7 and got a phone number

15  off of it?

16  A    Yes.

17          MR. FERRELL:  I have no further questions.  Thank

18  you, Your Honor.

19          THE COURT:  Mr. Liszewski?

20          MR. LISZEWSKI:  Your Honor, may we have a sidebar?

21          THE COURT:  Yeah.

22          (The following proceedings were held at sidebar,

23  outside the hearing of the Jury:)

24          MR. LISZEWSKI:  Judge, I didn't want to object to

25  Mr. Ferrell.  Judge, I have no police reports or anything

1  showing that he allowed him to do that.  Okay?  I have no

2  reports or anything as to the last part of what the witness

3  just said.

4          MR. FERRELL:  There's no report written about letting

5  him use his phone.

6          THE COURT:  Okay.  It's not in a report, so there's

7  no way you could ---

8          MR. LISZEWSKI:  I mean there's no resuscitation if

9  there's no communication of it from the U.S. Attorney's Office

10  to my office.  Judge, I just, you know, in fairness, in

11  giving -- in all fairness, I mean I -- this has just been

12  sprung on me.  I guess my motion at this point is going to be

13  to exclude that.

14          MR. FERRELL:  Judge, we've complied with every

15  conceivable rule of discovery.  We provided any statements of

16  the witness.  This was something that was not written into a

17  report.  There's no obligation for us to interview witnesses

18  and then tell the defense what the people are going to say.

19          THE COURT:  Yeah.  I don't think there's a basis

20  here.

21          MR. LISZEWSKI:  That's fine.  I just need to make my

22  objection.

23          THE COURT:  Okay.

24          MR. LISZEWSKI:  That's fine.

25          THE COURT:  Okay.

1          MR. FERRELL:  Okay.

2          (The following proceedings were held within the

3     hearing and presence of the Jury:)

4          MR. FERRELL:  I have no further questions of this

5     witness, Your Honor.

6          THE COURT:  Thank you.  Mr. Liszewski?

7          MR. LISZEWSKI:  Thank you, Your Honor.  I just have a

8     couple.

9                      CROSS EXAMINATION

10    QUESTIONS BY MR. LISZEWSKI:

11    Q    The statement you just made to Mr. Ferrell that Mr. Kent

12    made a call on that phone, you just remember making that

13    statement, right?

14         MR. FERRELL:  Your Honor, I object.  First of all,

15    it's a mischaracterization.  I don't know if Mr. Liszewski

16    meant that.  He didn't testify that he made the phone call off

17    of that phone.

18         MR. LISZEWSKI:  Looked for a number.  Excuse me.

19         MR. FERRELL:  Yes.  Thank you.

20         MR. LISZEWSKI:  Okay.  That's fine.

21         THE COURT:  Restate your question so the witness

22    understands what you're asking.

23         MR. LISZEWSKI:  Not a problem.  I'll restate it.

24    Q    (By Mr. Liszewski)  You just stated that Mr. Kent

25    obtained a number from that cellphone.

1   A    Yes.

2   Q    Okay.  Did you document that in any meaningful way?

3   A    No.

4   Q    You didn't put that in any police report?

5   A    No.

6   Q    You didn't think that was important to put that in a

7   police report?

8   A    No.

9   Q    You didn't think it was important to put a cellphone that

10  could be at issue in a police report that he made a phone --

11  or looked for a number on it?

12  A    We have done it in the past.

13  Q    I didn't ask you what you've done in your past.

14       MR. FERRELL:  Your Honor, may the witness finish his

15  answer before ---

16       THE COURT:  Let him answer.  You're asking the

17  question.  Let him answer.

18  A    We have allowed them to obtain numbers from their phone,

19  just phone numbers only, to make phone calls to family members

20  or any person thereof to let them know where their whereabouts

21  are at.

22  Q    But you make no report of that.

23  A    No.

24  Q    No recollection of that.

25  A    No.

1  Q    The first time you said anything about this is coming to

2  trial today?

3  A    Yes.

4         MR. LISZEWSKI:  I have no further questions.

5         THE COURT:  Mr. Ferrell?

6         MR. FERRELL:  I have no further questions.  Thank

7  you, Your Honor.

8         THE COURT:  Thank you, sir.  You may step down.

9  Would you call your next witness?

10        MR. SORRELL:  Call Pam Glastetter, please.

11                        **PAM GLASTETTER**,

12  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

13  FOLLOWS:

14        THE COURT:  Go ahead, Mr. Sorrell.

15        MR. SORRELL:  Thank you.

16                      DIRECT EXAMINATION

17  QUESTIONS BY MR. SORRELL:

18  Q    Would you state your name for the record, please?

19  A    Pamela Glastetter.

20  Q    And, Mrs. Glastetter, what's our occupation?

21  A    Circuit Clerk of Scott County.

22  Q    And what are your responsibilities and job duties with

23  that occupation?

24  A    My job is to maintain and to keep true the records of the

25  Circuit Court.

1  Q    Would that include records of felony convictions in the

2  Scott County Circuit Clerk's Office?

3  A    Yes.

4  Q    And those would be convictions that would be handed down

5  by the Scott County Circuit Judge?

6  A    Yes.

7  Q    Who is the Scott County Circuit Judge?

8  A    David A. Dolan.

9  Q    All right.  And are those records of convictions made at

10 or near the time that the conviction is made?

11 A    Yes.

12 Q    For those records of convictions, will they all include

13 the charging information in your record?

14 A    Yes.

15 Q    Would it also include a record of the conviction

16 document?

17 A    Yes.

18 Q    Would it also include for certain classes of felonies a

19 record of the transcript of the case?

20 A    Yes.

21 Q    Of the plea hearing and sentencing hearing?

22 A    Yes.

23 Q    Okay.  And, also, would it include the docket sheets made

24 as part of that case?

25 A    Yes.

1  Q    Okay.  And that would be made in every felony case that

2  comes through your office?

3  A    Correct.

4  Q    Okay.  Are you a custodian of those records?

5  A    Yes, sir.

6  Q    Now ---

7       MR. SORRELL:  May I approach the witness, Your Honor?

8       THE COURT:  You may.

9  Q    (By Mr. Sorrell)  Ma'am, I've handed you what's been

10  marked as Exhibits 4 and 5.  Would you tell the Court what

11  Exhibit 4 is, please?

12  A    Exhibit 4 is the case file of *State v. Tron Kent*.  The

13  case I mean.

14  Q    Would you recite -- Well, let me -- Before you go any

15  further with that, let me ask you this:  Is this case file

16  that you just referred to on Exhibit 4 a case file from your

17  office?

18  A    Yes, sir.

19  Q    And has it been kept in accordance with the standards

20  that you previously testified to?

21  A    Yes, sir.

22  Q    And have there been any alterations or changes made in

23  Exhibit 4?

24  A    No, sir.

25       MR. SORRELL:  Your Honor, I'll offer Exhibit 4.

1        THE COURT:  Exhibit 4 is admitted.

2        MR. LISZEWSKI:  Can I just ask that it be subject to

3   my Motion in Limine?

4        THE COURT:  It may be subject to your Motion in

5   Limine.

6   Q    (By Mr. Sorrell)  Would you read the case number for that

7   particular file into the record?

8   A    04CR744136-01.

9   Q    Would you turn to the felony information, the charging

10  document in that particular case?

11       First off, may I look at that?  Because I don't know

12  if that was -- I just want to make sure I had you read the

13  right place.

14  A    Okay.

15  Q    Would you read Count II of the charging document to the

16  Jury, please.

17  A    In violation of Section 195.200 RSMO, committed a Class B

18  felony of possession of a controlled substance with intent to

19  distribute punishable upon conviction under Section 558.011.12

20  RSMO; in that on or about January the 20th, 2004, in the

21  County of Scott, State of Missouri, the Defendant with the

22  intent to distribute possessed crack cocaine, a controlled

23  substance, knowing of its presence and illegal nature.  Term

24  of years:  Not less than five ---

25  Q    Let me stop you on that.

1   A    Okay.

2   Q    That would be fine.  Would you -- Is there, also, a

3   record of the judgment in that case?

4   A    Yes, sir.

5   Q    And was Mr. Kent convicted of that particular count?

6   A    Yes, sir.

7   Q    Is there also a record of the transcript of the plea

8   hearing in that case in your court file?

9   A    Yes, sir.

10  Q    Would you turn to that transcript, please?

11       Would you turn to Page -- Well, first off, who's the

12  judge in this particular case?

13  A    David A. Dolan.

14  Q    All right.  And would you turn to Page 2 of the

15  transcript, please?  Would you -- Is the transcript noted with

16  "Q" for questions and "A" for answers?

17  A    Yes.

18  Q    And who would be speaking if a question would be asked?

19  A    It would either be the attorney or it could be the

20  prosecuting attorney or the defendant's attorney.

21  Q    All right.

22  A    I'm not ---

23  Q    Would the Judge also be asking questions?

24  A    Yes.

25  Q    And who would the answers be given by?

1    A     The defendant.

2    Q     All right.  Now if you'll look on Page 2, starting with

3    Line 21, there's a question.  Who's asking the questions at

4    that particular point?

5    A     The Court.

6    Q     So Judge Dolan would be speaking?

7    A     Yes.

8    Q     Would you read Line 21 through Line 23, please?

9    A     Okay.  Question:  Your name is Tron Kent.  Is that

10   correct?  Answer:  Yes, sir.

11   Q     All right.  And then would you turn to Page 5 of that

12   exhibit?  And what I'd like you to do is start reading at Line

13   24 on that page and read through Line 10 on the next page.

14   Just through the first full paragraph first.  If you would

15   just read that for me, please.

16   A     Question:  Listen to the facts the prosecutor says she

17   would prove if we had a trial.  If they are different from

18   what you believe them to be, let me know.

19   Q     And then on Line 2 there's another person identified as

20   speaking.  Is that correct?

21   A     Yes, sir.

22   Q     And who is that?

23   A     Miss Weis is the Assistant Prosecuting Attorney.

24   Q     All right.  Would you go ahead and start reading from

25   Line 2 and read through Line 10?

1   A    "Your Honor, in 744136, the facts would be on or about

2   January the 20th of 2004, Mr. Kent was being arrested on an

3   unrelated charge.  During the course of the arrest, he was

4   searched.  Ten pieces of crack cocaine were located in his

5   pocket.  Each was packaged individually for sale.  That was in

6   the 300 block of Westgate Street in the County of Scott, State

7   of Missouri.  Mr. Kent also admitted his intent to sell at

8   that time."

9   Q    All right.  And then on Page 6, if you'll start reading

10  at Line 16 and read through Line 5 of Page 7.  So we'll start

11  with Line 16 and the first five lines of the next page.  And

12  identify the speakers, if you would, please.

13  A         Question:  (This would be from Judge Dolan) Is that

14  basically what happened in these cases, Tron?

15          Answer:  Yes, sir.

16          Question:  Do you remember when I asked you to raise

17  your right hand and promise to tell us the truth, has

18  everything you told us so far today been the truth?

19          Answer:  Yes, sir.

20          Question:  Nobody has asked you to come in and tell a

21  lie or take the blame for somebody else, have they?

22          Answer:  No, sir.

23  Q    Let me -- Let me stop you there.  Yes, go ahead and read

24  through the next five lines on that page.

25  A    Okay.  Question:  Your plea in the Case No. 04CR744136 in

1    Count II of the Class B felony of possession of a controlled

2    substance on or about January the 20th of 2004 in Scott

3    County, are you guilty or not guilty of that offense?

4              Answer:  Guilty.

5    Q    Ma'am, I've also given you an exhibit marked 5 on your

6    table in front of you.  Is that right?

7    A    Yes, sir.

8    Q    And would you tell the Court what that exhibit is?

9    A    That is ---

10   Q    Or let me -- let me ask it in this fashion:  Is it

11   another conviction record in a case called State v. Tron Kent?

12   A    Yes, sir.

13   Q    From Scott County, Missouri?

14   A    Yes.

15   Q    Is that Case Number 04CR744392?

16   A    Yes.

17   Q    All right.  Is that file, Exhibit 5, a -- your actual

18   file from your Clerk's Office?

19   A    Yes.

20   Q    And has it been maintained by you?

21   A    Yes.

22   Q    Is it the actual record of the information, conviction

23   documents, the docket entries and the transcript of that

24   particular case?

25   A    Yes.

1   Q    All right.  No changes have been made in that record to

2   your knowledge, have they?

3   A    No.

4         MR. SORRELL:  Your Honor, I'll offer Exhibit 5.

5         THE COURT:  Exhibit 5 is admitted.

6         MR. LISZEWSKI:  Can we make that subject to my Motion

7   in Limine, Your Honor?

8         THE COURT:  It can be subject to that.

9         MR. SORRELL:  May I approach the witness one more

10  time?

11        THE COURT:  (Affirmative gesture).

12  Q    (By Mr. Sorrell)  And lastly, Ma'am, I've handed you

13  what's been marked Exhibit 6.  Is that a copy of the plea

14  transcript that you just read from?

15  A    Yes, sir.

16  Q    And does it have the Clerk's certificate in the back of

17  that copy?

18  A    It would have the court reporter's certificate.

19  Q    I'm sorry.  You're right.  But that's a copy of what you

20  just read from.  Is that right?

21  A    Right.  It has been stamped "filed" and put in the file.

22  Q    Yes.  All right.

23        MR. SORRELL:  Your Honor, I'll offer Exhibit 6.

24        THE COURT:  Exhibit 6 is admitted.

25        MR. SORRELL:  Nothing further.

1          THE COURT:  Mr. Liszewski?

2          MR. LISZEWSKI:  Judge, I have no questions of

3   Miss Glastetter.

4          THE COURT:  Okay.  Thank you very much, Ma'am.  You

5   may step down.  You want to call your next witness?

6          MR. SORRELL:  Your Honor, may we approach the bench

7   and speak just briefly?

8          THE COURT:  Yeah.

9          MR. SORRELL:  Mr. Liszewski?

10          (The following proceedings were held at sidebar,

11   outside the hearing of the Jury:)

12          MR. SORRELL:  Your Honor, the next witness may be

13   fairly lengthy.

14          THE COURT:  That's okay because I'm going to go till

15   about 12:30.  I have a plea to take at 12:30, so we'll get as

16   far as we can.

17          MR. SORRELL:  It may be longer than that.

18          THE COURT:  That's all right.  We can break for

19   lunch.  That's all right.  I mean I don't want to break for

20   lunch right now.  I want to break for lunch at 12:30.

21          MR. SORRELL:  Okay.  I just wanted to ask.

22          THE COURT:  Yeah.  No; that's fine.  And then what we

23   might do is -- I've got this plea set at 12:30, but right

24   after that, if you want to make your Offer of Proof, we can do

25   that.  I assume we've got the witness here.

1        MR. LISZEWSKI:  I mean if -- What we could do, Judge,

2    just a way to kind of ---

3        MR. SORRELL:  You might even stipulate or write out a

4    stipulation as to what the Offer of Proof would be.

5        THE COURT:  Well, however you want to do it. I mean

6    if you have a preference as to how you want to do it, I'm

7    happy to do it.

8        MR. LISZEWSKI:  What I was going to suggest is why

9    don't I do that whenever -- You know, the Government's

10   position is that it hasn't been introduced yesterday.  Why

11   don't we wait until the Government rests and then I'll -- you

12   know, we'll go from there.

13       THE COURT:  That's fine.  I just want to be sure that

14   if we wind up doing this with the witness, the witness is

15   still here.  I mean I can do it whenever.  I just don't want

16   the Jury waiting for it, but I also want you to have a witness

17   if you ---

18       MR. LISZEWSKI:  Yes, Ma'am.

19       THE COURT:  Okay.

20       (The following proceedings were held within the

21   hearing and presence of the Jury:)

22       MR. SORRELL:  We're retrieving our next witness,

23   Your Honor.  I'm sorry.

24       THE COURT:  Okay.

25       MR. FERRELL:  May we approach just one moment,

1    Your Honor?

2         THE COURT:  Yeah.

3         (The following proceedings were held at sidebar,

4    outside the hearing of the Jury:)

5         MR. FERRELL:  Judge, we didn't anticipate having to

6    call Amy Doyle before lunch.

7         THE COURT:  Okay.

8         MR. FERRELL:  She's the 16-year-old or 17-year-old.

9    She's very nervous.  She's very upset --

10        THE COURT:  Yeah, okay.

11        MR. FERRELL:  -- and that's why I was taking a

12   second.  She's got probably 30 exhibits to identify, and we're

13   going to need to assemble those on the table here at this time

14   and have those ready for her examination.  So that's where we

15   fell short.

16        THE COURT:  Okay.  Well, we can break for lunch, and

17   I'll just have to come back and take this plea.  Actually we

18   can break immediately and you can do your Offer of Proof.

19   I'll send the Jury out.

20        MR. FERRELL:  Judge, I appreciate that.

21        THE COURT:  We'll do the Offer of Proof and then I'll

22   take the plea later.

23        MR. FERRELL:  It would make things go a lot faster

24   when she takes the stand.

25        THE COURT:  Okay.  Why don't we do that.

1          MR. LISZEWSKI:  It looks like the Jury is getting

2    uncomfortable, anyway.

3          THE COURT:  Okay.

4          (The following proceedings were held within the

5    hearing and presence of the Jury:)

6          THE COURT:  Ladies and Gentlemen, because of some

7    scheduling issues that have just arisen, I think what we'll do

8    is break right now for the noon hour.  I would ask you all to

9    come back to the Jury Room by 1:15 this afternoon and we'll

10   proceed with the trial.  Again, please do not discuss the case

11   among yourselves or with anyone, and we will see you this

12   afternoon at 1:15.  Thank you very much.  You're now free to

13   go.  Will the attorneys remain here?

14         (Jury excused from the courtroom.)

15         (The following proceedings were held outside the

16   hearing and presence of the Jury:)

17         THE COURT:  Let the record reflect the Jury is not in

18   the courtroom.  At this time, Mr. Liszewski, do you want to

19   make your Offer of Proof?

20         MR. LISZEWSKI:  I would, Your Honor.  I would prefer

21   to do it in question and answer form, if that would be

22   sufficient.

23         THE COURT:  That's fine.

24         MR. SORRELL:  Who do you need?

25         THE COURT:  Who do you need?

1        MR. LISZEWSKI:  Detective Moody.

2                    **ANTHONY MOODY**,

3    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

4    FOLLOWS:

5              (OFFER OF PROOF)

6         THE COURT:  You're still under oath, sir.  Okay.  Why

7    don't we proceed then with the Offer of Proof.

8         MR. LISZEWSKI:  Thank you, Your Honor.

9                    CROSS EXAMINATION

10   QUESTIONS BY MR. LISZEWSKI:

11   Q    Detective Moody, the topic I want to come back to is

12   Amy Doyle's conversation you had with her and the juvenile

13   officer.

14   A    Okay.

15   Q    Okay?  Now this was after she had been taken back to the

16   Police Station, right?

17   A    Correct.

18   Q    Okay.  And at that point you read her her *Miranda* rights.

19   A    The juvenile officer did.

20   Q    Oh, the juvenile officer.  The juvenile officer read her

21   *Miranda* rights to her?

22   A    That's correct.

23   Q    And she waived those rights?

24   A    That's correct.

25   Q    Was her mother present or did the mother know about the

1  interview as well?

2  A     The mother was present.

3  Q     The mother was present as well?

4  A     Yes.

5  Q     So she consented to you talking to -- or the juvenile

6  officer talking to her daughter?

7  A     That's correct.

8  Q     Okay.  Now she did admit to you that the drugs were found

9  in her shoebox?

10  A     Yes.

11  Q     She did admit to you that the drugs were found in her

12  wooden jewelry box?

13  A     Yes.

14  Q     She did admit to you the gun was found in her nightstand?

15  A     Yes.

16  Q     At that point -- At that point was she arrested?

17  A     Later on she was placed in the Detention Center there,

18  the Juvenile Detention Center.

19  Q     And that involves you changing out her street clothes and

20  putting her into orange and white clothes?

21  A     I don't know what their process is.  We drop them off at

22  the front and then leave.

23  Q     Was she booked in the normal procedure, I guess is my

24  question?

25  A     Yes, sir.

1  Q    My next question, sir, is regarding a gentleman by the

2  name of Chris Scott.  Have you heard that name before in your

3  dealings?

4  A    Yes, sir.

5  Q    What is your understanding of Chris Scott as far as the

6  City of Charleston goes?  Does he have a reputation for being

7  a drug dealer?

8  A    I'm unaware of it.

9  Q    Are you aware of any prior contacts with him or is he

10 suspected in any way of being involved with drugs in

11 Mississippi County or Charleston?

12 A    I know who some of his associates are, but as far as

13 saying he's a drug dealer, I can't say.

14 Q    Okay.  Some of his associates, I take it, may be involved

15 in that.

16 A    That's correct.

17 Q    Okay.

18       MR. LISZEWSKI:  Your Honor, that's all I have for the

19 Offer of Proof of this witness.  I would submit that the Court

20 should allow me to bring that in on my Case in Chief

21 because it ---

22       THE COURT:  To bring what in?  You covered a couple

23 of things.

24       MR. LISZEWSKI:  The evidence regarding the third

25 person and Amy Doyle being arrested.  Essentially there is

1  credible evidence to suggest someone else -- it might have

2  been someone else's drugs or someone else may be involved.

3  And I would just ask that whenever it's my turn to present

4  evidence, the Court allows me to do that.

5          MR. SORRELL:  Your Honor, --

6          THE COURT:  You want to respond?

7          MR. SORRELL:  -- it's just strictly character

8  evidence.  If Mr. Scott were here today testifying in person,

9  you could not ask him a question about his other specific acts

10 of drug dealing.  It's just simply not admissible.  And in

11 this case, it's even more remote because it's not the

12 testimony of the witness himself but a third-party who's not

13 testified, who's not been here, who's certainly not on our

14 witness list; maybe Mr. Liszewski will call him and ask him

15 those questions directly but, again, it's nothing more than an

16 attempt to use a red herring defense without there being any

17 proof that Mr. Scott did these exact acts.

18         THE COURT:  Yeah.  With respect to Mr. Scott, I just

19 don't think, even from the answers elicited here, that we have

20 any basis to be talking about Mr. Scott in this case.  And I'm

21 not about to say you can bring him in on your Case in Chief.

22 I don't know what all is in your Case in Chief, but based on

23 what we now have, I'm not sure even -- Maybe you've got a way

24 of bringing him into this, but if you bring him in directly,

25 you may do that.  I don't know.  That's up to you.  I don't

1    know what your plans are.

2         With respect to Miss Doyle, I'm not sure what that

3    has to do with anything at this juncture.  You know, she'll --

4    she'll be here and testify, but I'm not, you know -- You'll

5    have ample opportunity to cross-examine, but I'm not sure that

6    Mr. Moody's testimony here helps us along as to anything.  I

7    don't know that at this point it's relevant to anything.

8         MR. LISZEWSKI:  I believe it will become relevant

9    later, Judge.

10        THE COURT:  Well, what you want to do in your case --

11        MR. LISZEWSKI:  That's fine.

12        THE COURT:  -- as far as Cross Examination, ---

13        MR. LISZEWSKI:  That's fine.  I just want to make my

14   offer now so in the event you do refuse it, ---

15        THE COURT:  Yeah.  I'm going to deny your Offer of

16   Proof, but you got it in the record.

17        MR. LISZEWSKI:  I guess my question is just for

18   clarification for me, Judge:  When it is my turn to present

19   evidence, will I be allowed to call him or can we revisit this

20   argument after the Government's presented all their evidence?

21        THE COURT:  Well, I think we're going to have to see

22   what else happens in this case.

23        MR. LISZEWSKI:  That's fine.

24        THE COURT:  I can't make a ruling on something when I

25   don't know what the issue is going to be.

1          MR. LISZEWSKI:  That's fine.  I just want to make

2     sure the issue is not foreclosed.

3          THE COURT:  Well, there's -- Wherever an issue is

4     foreclosed, I mean if you have some other -- some basis to

5     raise it in, I'm certainly here to take a look at it.

6          MR. LISZEWSKI:  Okay.

7          THE COURT:  Sure.

8          MR. LISZEWSKI:  That's fine.

9          THE COURT:  Sure.  Sure.  Thank you, sir.  You may

10    step down.

11         Now is anybody going to need Mr. Moody again?  I

12    think we need to tell him if he's going to -- needs to be

13    back.

14         MR. SORRELL:  I do not.

15         MR. LISZEWSKI:  I don't.

16         THE COURT:  Just so he knows.

17         MR. SORRELL:  Do you need any of the other officers

18    to stay?

19         MR. LISZEWSKI:  Not that I'm aware of.

20         THE COURT:  Okay.  Just so they know.

21         MR. SORRELL:  Yes.

22         THE COURT:  Okay.

23         MR. SORRELL:  Thank you.

24         THE COURT:  Okay.  Why don't we just take a -- Why

25    don't we just take a recess, okay, at this point?

1     MR. SORRELL:  Yes.  Thank you.

2     THE COURT:  Okay.

3     (Court recessed from 11:50 A.M. until 1:05 P.M.)

4     (Jury seated by the Clerk.)

5     (The following proceedings were held within the

6     hearing and presence of the Jury:)

7     THE COURT:  Mr. Ferrell?

8     MR. FERRELL:  May it please the Court, Your Honor.

9     The Government would call Amy Jean Doyle.

10                        **AMY JEAN DOYLE**,

11    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

12    FOLLOWS:

13    MR. FERRELL:  May it please the Court, Your Honor.

14    THE COURT:  Okay.

15                    DIRECT EXAMINATION

16    QUESTIONS BY MR. FERRELL:

17    Q     State your name for the record, please, Ma'am.

18    A     Amy Doyle.

19    Q     Okay.  And, Amy, how old are you today?

20    A     17.

21    Q     Would you tell the Jury, please, what your date of birth

22    is?

23    A     7-7-89; July 7th of 1989.

24    Q     July 7th of 1989.  So you turned 17 --

25    A     Last summer.

1  Q    -- last summer.  Okay.  Now, Amy, what is your mother's

2  name?

3  A    Sally Doyle.

4  Q    And how old is your mom?

5  A    She's 47.

6  Q    And your father, what is his name?

7  A    William Doyle.

8  Q    Now, Amy, did your mother and father divorce at an early

9  age?

10 A    Yes.

11 Q    Okay.  About how old were you when your mom and dad

12 divorced?

13 A    4.

14 Q    Pardon me?

15 A    I was 4.

16 Q    Four years old.  And have you lived with your mom ever

17 since?

18 A    Yes.

19 Q    Where have your mom and you lived Amy?

20 A    At 509 South Sixth Street in Charleston, Missouri.

21 Q    So you've lived there all your life?

22 A    Yes.

23 Q    Do you have a half-brother by the name of "Henry"?

24 A    Yes.

25 Q    Okay.  Now has anyone lived with you and your mom at 501

1   South Sixth Street -- any other family members I'm talking

2   about at that residence -- besides you and your mom?

3   A    My brother Henry has lived there.

4   Q    Now Henry lived with you for a period of time?

5   A    Yes.

6   Q    And when was that?

7   A    It was probably about -- up until I was in the sixth

8   grade.

9   Q    Okay.  And he's older than you are.  Is that correct?

10  A    Yes.

11  Q    And is Henry a member of the military, the U.S. military

12  at this time?

13  A    Yes.

14  Q    So he hasn't lived in the home there for quite some time.

15  Is that right?

16  A    Yes.

17  Q    Now tell the Jury, please:  Where did you go to school?

18  Where did you start school?

19  A    When I first started going to school, I was going to

20  Christian Life Community School in Sikeston.  And then in the

21  fifth grade, I started at Charleston Grade School all the way

22  up until my 10th grade year.

23  Q    So Christian Life is a private school?

24  A    (Affirmative gesture).

25  Q    Then you started going to Charleston Grade School.  Is

1  that correct?  In fifth grade?

2  A     At the middle of fifth grade.

3  Q     Okay.  And you went to -- I assume you went on to junior

4  high.

5  A     (Affirmative gesture).

6  Q     And then did you start high school in Charleston?

7  A     Yes.

8  Q     Now I want to talk about your freshman and sophomore year

9  just briefly, but during that period of time, how did you do

10  in school?

11  A     I was an Honor Roll student.

12  Q     Now let's go ahead to the first part of December of 2005.

13  Now I want to ask you:  At that time were you going to school?

14  A     Yes.

15  Q     What grade were you in?

16  A     10th.

17  Q     Okay.  December of 2005, did you have your driver's

18  license?

19  A     Yes.

20  Q     How long had you had it?

21  A     About six months.

22  Q     Since July?

23  A     (Affirmative gesture).

24  Q     When you turned 16?

25  A     (Affirmative gesture).

1    Q    Okay.  Were you working --

2    A    Yes.

3    Q    -- when you were driving to school?

4    A    Yes.

5    Q    Where were you working?

6    A    At Kentucky Fried Chicken in Charleston.

7    Q    Now back in December of 2005, did you have a friend by

8    the name of "Julie Stevenson"?

9    A    Yes.

10   Q    Now how did you meet Julie?

11   A    Well, her mother and her lived next door to me, and she

12   had a cute baby and I seen her baby, and we started being

13   friends and pretty much her baby was my baby.

14   Q    Okay.  What was her baby's name?

15   A    Katelyn.

16   Q    Katelyn.  You came very attached to Katelyn.  Is that

17   correct?

18   A    (Affirmative gesture).

19   Q    Did you all spend time together?  All three of you?

20   A    Yes.

21   Q    Okay.  And Julie was older than you, though, wasn't she?

22   A    Yes.

23   Q    How old was Julie?

24   A    At the time when this happened, she was 25.

25   Q    25, okay.  Now she has -- At the time she had another

1   child by the name of Blake, right?

2   A    (Affirmative gesture).

3   Q    And then there was Katelyn.

4   A    (Affirmative gesture).

5   Q    Okay.  Now there came a point in time that Julie moved.

6   Is that correct?

7   A    Yes.

8   Q    Where did she move to?

9   A    She moved to Locust Street.

10  Q    In Charleston?

11  A    (Affirmative gesture).

12  Q    Okay.  And after she moved to Locust Street, did you go

13  to see her on occasion?

14  A    Yes.

15  Q    Did you see Katelyn?

16  A    Yes.

17  Q    Spend time together.  I want to ask you now at this time

18  whether you know an individual by the name of "Tron Kent"?

19  A    Yes.

20  Q    I'd like for you to tell the Jury, please, how you know

21  Tron Kent.  How was it that you came to meet Tron Kent?

22  A    Well, when Julie moved over there, the second day she

23  lived there, I came over and I met Tron.  He carried some

24  things in for Julie, and that's how I met him.

25  Q    Okay.  So you met him there on your second time that you

1  went to see Julie in December of '05?

2  A    Yes.

3  Q    And after you met him, did you have any reason to believe

4  that Tron Kent might be interested in you as far as a

5  relationship between you?

6  A    Yes.

7  Q    And why is that?

8  A    Julie told me that he said I was cute.

9  Q    Okay.  And what was your reaction to that at that time?

10  A    At first, I was like I really wasn't interested in him

11  because, you know, he was older but, you know, I'd be his

12  friend.

13  Q    Okay.  And what did Julie say?

14  A    She told me I should get to know him.  He's a nice guy.

15  Q    So you -- you -- After that point in time -- At that

16  particular point in time, you were not interested in a

17  relationship with him.  Is that correct?

18  A    Yes.

19  Q    Okay.  Now I'd like to talk to you about what happened

20  then after that.  On the next time that you were at Julie's

21  and you met or saw Tron Kent there, do you remember talking to

22  him?

23  A    Yes.

24  Q    Okay.  And when you were talking to him, was there any

25  reason in your conversation for your age to come up in the

1  conversation?

2  A     Yes.

3  Q     Will you tell this Jury, please, Amy, what that

4  conversation was that you had with Tron Kent?

5  A     Well, we were talking about I had to go to school the

6  next day, and he asked me what grade I was in, and I told him

7  I was in the 10th.  And he asked me how old I was, and I told

8  him I was 16.

9  Q     Now even after you told him you were 16, when you would

10 continue to go over to Julie's, would he spend time talking to

11 you and visiting with you?

12 A     Yes.

13 Q     Would you all hang out together, as the term might be

14 today, over at Julie's house?

15 A     Yes.

16 Q     Now at some point in time you did develop a relationship

17 with Tron Kent that was beyond just meeting him and talking to

18 him as friends.  Is that correct?

19 A     Yes.

20 Q     Okay.  Would you tell the Jury, please, about when that

21 was?

22 A     About around the end of December, the beginning of

23 January we started being boyfriend and girl friend.

24 Q     Okay.  Now, Amy, at the time that you all developed a

25 relationship between boyfriend and girl friend, I want you to

1  tell the Jury whether or not this involved you having sexual

2  relations with Tron Kent.

3  A    Yes.

4  Q    Now when you would go over to Julie's house, did you

5  sometimes spend the night?

6  A    Yes.

7  Q    Now if you'd spend the night at Julie's house, what, if

8  anything, would Tron do?

9  A    He would stay the night, too.

10  Q    So the two of you started spending the night there.  Is

11  that correct?

12  A    Yes.

13  Q    Now after you all began having a sexual relationship, how

14  often did this happen that the two of you engaged in sexual

15  relationship -- sexual acts of some kind?

16       MR. LISZEWSKI:  Objection; relevance.

17       THE COURT:  Overruled.

18  A    Like four times a week.

19  Q    (By Mr. Ferrell)  Okay.  So it was a regular thing.  Is

20  that true?

21  A    Yes.

22  Q    Okay.  Now you were still 16.  Is that right?

23  A    Yes.

24  Q    All right.  Did he tell you how old he was?

25  A    Yes.

1  Q    What did he say?  What did he tell you?

2  A    He told me he was 26.

3  Q    Twenty-six years old.

4  A    Well, he was 25 at the time.

5  Q    Okay.  And so he told you he was 25.  Is that correct?

6  A    Yes.

7  Q    Now I want to go to the end of this month, January the

8  24th, okay, of 2006.  Is that an important day in your mind?

9  A    Yes.

10  Q    Was there something -- some event that happened on that

11  day that caused you to always remember that day?

12  A    Julie had her third baby, Kylie, that day.

13  Q    Okay.  So that's Kylie's birthday.  Is that correct?

14  A    Yes.

15  Q    So when Julie was at the hospital with the baby, did you

16  happen to be over at her house?

17  A    Later on that night, yes.

18  Q    And who else was there?

19  A    Tron.

20  Q    Okay.  That's -- Tron Kent was there.  Did you have a

21  discussion with Tron Kent on January the 24th of 2006?

22  A    Yes.

23  Q    And what did Mr. Kent say to you?

24  A    He told me he loved me.

25  Q    That's the first time that he told you that he loved you.

1   Is that right?

2   A    Yes.

3   Q    And what was your response to him?

4   A    I told him I loved him, too.

5   Q    Did you believe you loved him?

6   A    Yes.

7   Q    Did you believe what he said to you?

8   A    Yes.

9   Q    Amy, you were living with your mom at 501 South Sixth

10  Street.  Is that right?

11  A    Yes.

12  Q    About the end of January, first part of February -- Let's

13  move ahead to the first part of February.  Did Tron begin

14  spending nights at 501 South Sixth Street with you and your

15  mother?

16  A    Yes.

17  Q    After a period of time, a couple of weeks or so, first

18  part of February goes by, let's move to around Valentine's

19  Day, the 14th.  Do you know at or around that time whether or

20  not Tron started spending the night there every night?

21  A    Yes.

22  Q    And did he?

23  A    Yes.

24  Q    So he started spending the night at your house every

25  night after that?

1   A     Yes.

2   Q     Did he spend the night there at your house and some

3   portion of the night from that time all the way up to May the

4   8th?

5   A     Yes.

6   Q     Now at your house, how many bedrooms do you have?

7   A     Three.

8   Q     And your mom had one bedroom?

9   A     Yes.

10  Q     And you had a bedroom?

11  A     Yes.

12  Q     Where did Tron Kent stay when he stayed all night at your

13  house?

14  A     He slept in my bedroom.

15  Q     Now would you tell the Jury, please, what would a typical

16  day be like as far as who left the house and went where on a

17  typical day?  And we're talking from the time after Tron Kent

18  moved in until May the 8th.

19        What would a typical day be like for you all?

20  A     Well, I would go to school, and he would go to work if he

21  worked the day shift.  And when I'd come home -- We'd come

22  home about 5:00 and then take a shower or whatever and go back

23  to Sikeston.

24  Q     Okay.  So let's start out in the morning.  You went to

25  school.

1  A    (Affirmative gesture).

2  Q    He worked where?

3  A    Ruby Tuesday.

4  Q    Ruby Tuesday's.  And how would you get to school?

5  A    Either he would take me or my mom would take me.

6  Q    Didn't you have a car?

7  A    Yes.

8  Q    What kind of car did you have?

9  A    An Intrepid.

10 Q    A Dodge Intrepid?

11 A    Yes.

12 Q    What did your mom drive?

13 A    A van.

14 Q    Okay.  So why did you have to be taken to school?

15 A    Because I let him drive my car.

16 Q    You let him have your car?

17 A    Yes.

18 Q    So he drove your car and you got rides to school?

19 A    Yes.

20 Q    Now once you would get to school, obviously, you had to

21 find a way home.

22 A    (Affirmative gesture).

23 Q    How would you get home?

24 A    Either my friends would give me a ride home or I would

25 walk home.

1   Q    And once you got home in the evening, at some point in

2   time he would arrive home.  Is that right?

3   A    Yes.

4   Q    And driving your Dodge Intrepid.  Is that right?

5   A    Yes.

6        MR. FERRELL:  Your Honor, from time to time may I

7   have permission to approach the witness with exhibits?

8        THE COURT:  You may.

9        MR. FERRELL:  Thank you, Your Honor.

10  Q    (By Mr. Ferrell)  I've handed you what has been marked as

11  Government's Exhibit 9, and I'd like for you to identify that

12  for the Jury, if you can, please.

13  A    These are the keys to my car and the key to my house.

14  Q    These are -- This particular set of rings, key rings

15  rather, was identified as being taken from the car on May the

16  9th.  Now would you know why Tron Kent would have those keys?

17  A    Because he drove my car.

18  Q    Okay.  Whose keys -- Whose keyring was this originally?

19  A    My mother's.

20  Q    Your mother's keyring?

21  A    (Affirmative gesture).

22  Q    So at some point in time Mr. Kent got your mother's key

23  rings.  Is that correct?

24  A    Yes.

25  Q    I assume that's voluntarily.  We don't want to imply it

1   wasn't.  So he was given your mother's keys.  Is that right?

2   A    Yes.

3   Q    Now does that set of keys have a key to your house over

4   on Sixth Street?

5   A    Yes.

6   Q    So did Tron Kent have a key to the house himself at that

7   time?

8   A    Yes.

9   Q    Okay.  Now you've looked -- It's fair to say before you

10  came in today, we showed you all of these exhibits, didn't we?

11  A    Yes.

12  Q    Okay.  So I know that I've showed you what's been marked

13  as Government's Exhibit 39.  Government's Exhibit 39 is --

14  contains some pink sheets with some pillow cases.  Is that

15  correct?

16  A    Yes.

17  Q    And do you recognize Government's Exhibit 39?

18  A    Yes.

19  Q    And what is it?

20  A    The sheets and the pillow cases from my bed.

21  Q    Excuse me.  I'm sorry.

22  A    The sheets and pillow cases from my bed.

23  Q    From your bed, okay.  Now did sometimes you sleep with

24  sheets, sometimes without sheets?

25  A    Yes.

1   Q    Okay.  Now during the time that we're talking about, from

2   February until May, did Tron Kent tell you -- continue to tell

3   you he loved you?

4   A    Yes.

5   Q    And you were continuing to have a sexual relationship

6   with him.  Is that correct?

7   A    Yes.

8   Q    Okay.  Now did you -- and can you tell the Jury if you

9   and Tron Kent at any time had sexual relations on those

10  sheets, Government's Exhibit 39?

11  A    Yes.

12  Q    Now did Tron Kent keep any of his things there at the

13  house?

14  A    Yes.

15  Q    Like what kind of things would he keep there?

16  A    His clothes and his shoes and things of that nature.

17  Q    All right.  Now did he keep all of his stuff there at the

18  house?

19  A    No.

20  Q    Okay.  Did he do his laundry there at the house?

21  A    (Negative gesture).

22  Q    Where did he do his laundry?

23  A    At his mother's house.

24  Q    If he had to do any -- Did he do any laundry there at

25  your house?

1  A    Like if he had to have his work clothes, I would do it

2  there, but ---

3  Q    You would do his laundry?

4  A    Yes.

5  Q    But for the most part, he took it out to his mother's?

6  A    Yes.

7  Q    Now you have a relatively small bedroom.  I mean it's not

8  a huge, big bedroom.  You had your closet.  Was it pretty well

9  full?

10  A    Yes.

11  Q    Okay.  And where would Mr. Kent throw his things when he

12  came into the room?

13  A    They were sometimes in a bag underneath my clothes in the

14  closet.

15  Q    Okay.  Otherwise, just scattered kind of around the room?

16  A    Yeah.

17  Q    Now did anyone else live at your residence from February

18  to May of 2006 besides your mother and you?

19  A    Tron did.

20  Q    Okay.  Did anyone else stay in your bedroom from February

21  to May of 2006 except for you and Tron Kent?

22  A    No.

23  Q    Did anyone ever keep anything in that bedroom during that

24  period of time besides you and Tron kept?

25  A    No.

1  Q    Now let's move ahead just a little bit into March, okay,

2  of 2006.  Was there a time in March of 2006 when you thought

3  you were pregnant?

4  A    Yes.

5  Q    And why is that?

6  A    Because I took a pregnancy test and it was positive.

7  Q    When that happened, did you talk to Tron Kent?

8  A    Yes.

9  Q    Why did you talk to Tron Kent?

10  A    Because if I was pregnant, I didn't want, you know, my

11  kid's father in jail.  So I didn't want him to sell drugs, you

12  know.

13         MR. LISZEWSKI:  Objection.  Can we have a sidebar?

14         THE COURT:  Yes.

15         (The following proceedings were held at sidebar,

16  outside the hearing of the Jury:)

17         MR. LISZEWSKI:  None of these conversations have been

18  disclosed to me.  I have heard nothing about this.  This is

19  the first time I'm hearing today about her having

20  conversations with him about selling dope.

21         MR. FERRELL:  And the point of your objection is

22  what?

23         MR. LISZEWSKI:  My objection is that this is clearly

24  not comporting with discovery.  At some point this had to be

25  memorialized at some point.

1          MR. FERRELL:  No, it didn't.

2          THE COURT:  No, I don't know that it did.  I mean

3     what's your basis for asserting that?

4          MR. LISZEWSKI:  The question -- These questions don't

5     pop out of thin air.  You guys have had this for a while.

6          MR. FERRELL:  You know, whenever -- Every statement

7     that we have, everything that was written down or any summary

8     of any statement we have you.  Obviously, in preparation for

9     trial, I'm going over the facts in much more detail than just

10    simply just what some agent or officer wrote when he talked to

11    her.

12         MR. LISZEWSKI:  Okay.  Then that means someone is

13    talking to her and getting additional statements beyond what's

14    in those reports.

15         MR. FERRELL:  That's correct, --

16         MR. LISZEWSKI:  Okay.

17         MR. FERRELL:  -- which would be me.  I interviewed

18    her.

19         MR. LISZEWSKI:  That's fine.  But that's -- Her

20    statements are not work product.

21         MR. FERRELL:  Well, you're -- First, they're not work

22    product but they're not a statement.  You're entitled to any

23    written statement or any verbatim transcript which she has

24    adopted.  A verbatim statement or any statement she has

25    adopted or her own statement, and you have every one of those.

1          MR. LISZEWSKI:  I have the written statements, yes.

2    The fact of the matter is once you guys interviewed her and

3    you obtained more statements from her and you memorialized

4    those two written statements ---

5          MR. FERRELL:  They were not memorialized.  There's

6    the problem.  That's the first issue.

7          MR. LISZEWSKI:  So you've memorized -- you've

8    memorized these for the past four months?

9          MR. FERRELL:  Yes.  I've written out my questions

10   based upon my interviews with her, but I have not written down

11   any statement from her, nor have I had her look at statements,

12   nor have I had her adopt any statements.

13         MR. LISZEWSKI:  So you have written down those

14   statements with the answer that she provided you?

15         MR. FERRELL:  No.

16         MR. LISZEWSKI:  You just said ---

17         MR. FERRELL:  First of all, Judge, I've made my

18   point.  I'm not going to be put through a cross-examination.

19         THE COURT:  Okay.

20         MR. FERRELL:  I've interviewed her in the same manner

21   I've interviewed every witness I've ever had.

22         THE COURT:  What is your precise objection?

23         MR. LISZEWSKI:  My precise objection is I'm not being

24   provided discovery.  All these statements, I only have half of

25   what she's saying.

1     THE COURT:  What discovery have you not received that

2  you now discovered you have not received it?

3     MR. LISZEWSKI:  Apparently the conversation about her

4  selling drugs or him selling drugs.

5     THE COURT:  Well, what we've heard here is the

6  Government has given you statements, and the statements she's

7  just made are not statements in discovery.

8     MR. FERRELL:  They're not written statements.

9     MR. LISZEWSKI:  I'm getting statements based off an

10  examination that an investigator had.  I don't have the right

11  to do depositions.  You know, --

12     THE COURT:  Now that's -- Now that's the federal

13  rules.  I can't help you there.

14     MR. FERRELL:  I think that's the problem.

15     THE COURT:  This is not state court.

16     MR. LISZEWSKI:  But here's my dilemma, Judge.  I'm

17  trying to make sure Tron Kent has a fair trial.

18     THE COURT:  I understand.

19     MR. LISZEWSKI:  And this is coming off, this trial,

20  by ambush.  I'm not saying that Mr. Ferrell is doing anything

21  unethical.  I'm not saying that at all.

22     MR. FERRELL:  I understand, yeah.  This is different

23  between the state system and the federal system.  The

24  witnesses you call, if you've interviewed them, I don't have a

25  report from them, and that's the way the system works.

1          MR. LISZEWSKI:  I understand that.  I've read the

2     rules.  I'm very familiar with the rules.

3          MR. FERRELL:  Okay.

4          THE COURT:  I can't change the rules now.  That's

5     Congress.

6          MR. LISZEWSKI:  I know that, Your Honor.

7          THE COURT:  I can't change it.

8          MR. LISZEWSKI:  But, Judge, out of some fundamental

9     fairness, I got to know what's coming.  If I'm getting zinged,

10    I'm going to at least have to take the time to, after this is

11    done, to have time to talk to my client.  This is the first

12    time I ever heard this.

13         MR. FERRELL:  I'm sure we may have it recur.  The

14    testimony is going to be pretty lengthy.  We may be at that

15    point, Judge.

16         THE COURT:  Yeah.  I mean there's not much I can do.

17    You wish you'd had a chance to take depositions.  That's not

18    provided for under the federal rules and I can't change it for

19    you here.

20         MR. LISZEWSKI:  I just wish I had the oral

21    statements.

22         THE COURT:  Well, unless you can tell me under what

23    rule I can order that, --

24         MR. LISZEWSKI:  I guess the only thing I can think

25    of, Your Honor, ---

1          THE COURT:  -- that's something to preserve for

2    appeal.

3          MR. LISZEWSKI:  I'm trying to.  The only thing I can

4    think of is under the Sixth Amendment rights.

5          THE COURT:  Well, I'm going to have to overrule --

6          MR. LISZEWSKI:  That's fine.

7          THE COURT:  -- whatever the objection is.

8          MR. LISZEWSKI:  That's fine.

9          (The following proceedings were held within the

10   hearing and presence of the Jury:)

11         THE COURT:  Go ahead, Mr. Ferrell.

12         MR. FERRELL:  Thank you.

13   Q   (By Mr. Ferrell)  Amy, I believe we were to the point

14   where I was asking you -- You had discussion with Tron Kent

15   after you thought you were pregnant, and I asked you why.  And

16   you can correct me if I'm wrong, but you said that you didn't

17   want the father of your baby to be in jail for dealing drugs.

18   Is that correct?

19   A    Yes.

20   Q    So did you talk to him about that?

21   A    Yes.

22   Q    And what did he say?

23   A    He said he wasn't going to do it anymore.

24   Q    Okay.  Said he would not -- wasn't going to do it

25   anymore.  As it turned out, Amy, did you end up going to the

1    doctor?

2    A    (Affirmative gesture).  Yes.

3    Q    And what did you find out when you went to the doctor?

4    A    I wasn't pregnant.

5    Q    Now you said you were 16 years old back at this time.

6    Okay?  I suppose you had a cellphone.

7    A    Yes.

8    Q    Okay.  Most everybody, you know, your age has one, I

9    guess.

10   A    Yes.

11   Q    And do you recall what your cellphone number was?

12   A    It was 838-8877.

13   Q    Now can you tell the Jury, please, whether or not

14   Tron Kent had a cellphone?

15   A    Yes.

16   Q    And tell us about that cellphone a little bit.  What kind

17   was it?

18   A    A Virgin Mobile phone.

19   Q    The brand was a Virgin Mobile phone?

20   A    (Affirmative gesture).

21   Q    And had you -- Did you know anything about how he

22   acquired the phone or where he bought it or how he got it?

23   A    I think he bought it at Wal-Mart.

24   Q    Okay.  Can you explain the reason why you feel that?

25   A    Because he had one like that before and it was damaged,

1  and he wanted me to take that one back and I had the receipt,

2  and I took it to Wal-Mart but we couldn't take it back because

3  we didn't have the box and all that, so.

4  Q    So you couldn't take it back there.

5  A    No.

6  Q    Okay.  So he got another phone then.

7  A    (Affirmative gesture).

8  Q    A Virgin brand.

9  A    Just like the first one.

10  Q    Just like the first one.

11  A    Yeah.

12  Q    Now do you know remember what his cell phone number was

13  then?

14  A    931-9432.

15  Q    913 ---

16  A    931.

17  Q    Oh, excuse me.  931-9432.  Okay.  Now your home phone

18  number back at that time was what?

19  A    683-3278.

20  Q    Now I'm going to hand something to you.  It's identified

21  as Government's Exhibit 7, and I'd like to ask you if you can

22  identify this for the Jury, please?  What is Government's

23  Exhibit 7?

24  A    That's Tron's phone.

25  Q    Okay.  Now you've looked at that phone.  We've shown it

1  to you.  Is that correct?

2  A    Yes.

3  Q    How are you sure that that's Tron's phone?

4  A    It has pictures that I've seen in it and text messages

5  and pictures of him in it.

6  Q    Okay.  You've taken a look, opened that up, worked it,

7  pulled the pictures up and the text messages.  Is that

8  correct?

9  A    Yes.

10  Q    Okay.  And does it put the phone number right across the

11  front when you open it up?

12  A    Yes.

13  Q    Was that Tron's phone number --

14  A    Yes.

15  Q    -- that you just recalled?

16  A    Yes.

17  Q    Okay.  Now when you looked on there, you looked at the

18  text messages.  Some are kept in there.  Is there a way to

19  delete text messages?

20  A    Yes.

21  Q    Okay.  If you don't delete them, they're going to stay in

22  the in-box or the out-box.  Is that right?

23  A    Yes.

24  Q    Did you look in the cellphone to examine the text

25  messages?

1   A     Yes.

2   Q     Did you see text messages in there that you knew from

3   your own recollection were text messages that you and he had

4   sent to one another?

5   A     Yes.

6   Q     There's also pictures on that.  Is that correct?

7   A     Yes.

8   Q     And could you identify the pictures -- one of the

9   pictures as being a picture of Tron Kent?

10  A     Yes.

11  Q     Now what other names did Tron Kent go by between you and

12  he?  What names?

13  A     Like Boo-Boo, Boozie.

14  Q     Excuse me.  You said "Boo-Boo" and then what was the

15  other one?

16  A     Boozie.

17  Q     Boozie and?

18  A     And KO, TKO.

19  Q     KO and TKO.  Okay.  I'd like to hand you what has been

20  marked as Government's Exhibit 32-A, and this is a -- I ask

21  you if you can identify this for the Jury, please?

22  A     Okay.

23  Q     What is Exhibit 32-A?

24  A     It's the contact list of the phone --

25  Q     Okay.

1    A    -- and text messages.

2    Q    Okay.  These are, first, the contact list that was on the

3    phone and then the text messages.  Is that correct?

4    A    Yes.

5    Q    Now you have looked at the phone yourself and you have

6    looked at Exhibit 32-A.  Is that correct?

7    A    Yes.

8    Q    And is Exhibit 32-A a fair and accurate transcript of the

9    actual contents of that phone?

10   A    Yes.

11        MR. FERRELL:  Judge, I'd offer Exhibit 32-A into

12   evidence.

13        THE COURT:  32-A is admitted.

14   Q    (By Mr. Ferrell)  Now for purposes of the testimony here

15   today, I'm going to ask you to take a look at a couple of

16   phone messages, one on March the 6th and one on April the

17   26th.  So first, I want to give you Exhibit 32-B.  Can you

18   tell the Jury, please, what Exhibit 32-B is?

19   A    Text messages between us.

20   Q    Okay.  And these are text messages, and what are the

21   dates on the text messages?

22   A    March the 6th and April the 26th.

23   Q    Okay.  And that's of 2006?

24   A    Yes.

25   Q    Okay.  Now those were taken off Exhibit 7, the cellphone.

1    Is that correct?

2    A    Yes.

3    Q    Okay.  Now again, are -- Is Exhibit 32-B a fair and

4    accurate summary of the text messages between you and

5    Tron Kent on March the 6th and April the 26th?

6    A    Yes.

7    Q    And what we've done in this exhibit, is it fair to say

8    that you have just matched up the in-box and out-box

9    conversations so that it just makes one continuous

10   conversation?  Is that correct?

11   A    Yes.

12        MR. FERRELL:  Your Honor, at this time I'd offer into

13   evidence Government's Exhibit 32-B.

14        THE COURT:  32-B is admitted.

15   Q    (By Mr. Ferrell)  Now I would like to go over some of the

16   information that's contained on that particular exhibit.

17        Now let's go first to the phone message dated March

18   the 6th, the text message.  Okay?  The first message, is that

19   from you to him or him to you?

20   A    From me to him.

21   Q    Pardon me?

22   A    From me to him.

23   Q    Okay.  And in that text message, you begin it off by

24   saying what?

25   A    "Hey, Boo-Boo."

1  Q    Okay.  And what else did you tell him?

2        And first of all, I want to say, Amy, I know this is

3  very hard for you.  Okay?  You didn't intend for these

4  conversations to be between anyone else.  Is that correct?

5  A    Yes.

6  Q    Okay.  I know it's difficult, but we will have to go

7  through some of these things here today.  Okay?  So everyone

8  understands, you're just repeating what was said in the text

9  messages.  Okay?

10  A    (Affirmative gesture).

11  Q    All right.  And the response, Amy, that's contained on

12  32-B or actually not the response but part of this next

13  statement after you said, "Hey, Boo-Boo," you said, "Just

14  thinking about your big sexy head butt; texting to ask when we

15  going to get some more good dick?"  Isn't that -- And then you

16  said, "Just playing."  Isn't that right?

17  A    Yes.

18  Q    Now can you tell the Jury, please, after you text that

19  message to Tron Kent, what response did you get?

20  A    You want me to read his response?

21  Q    Yes, Ma'am.

22  A    "You not playing.  You know you want this dick.  No.  I

23  mean love stick."

24  Q    Okay.  That was the response on March the 6th.  Is that

25  right?

1   A    Yes.

2   Q    Okay.  Now, Amy, after you got that response back from

3   Tron Kent, you sent him a response.  Is that correct?

4   A    Yes.

5   Q    And did you say, "Yeah, you know I wasn't playing.  You

6   know I" -- and then you said "LUC" but you meant "LUV," right?

7   A    Yes.

8   Q    You had a typo, LUC.

9   A    Yes.

10  Q    "I love your love stick with your freaky big butt.  You

11  know we're going to get freaky again tonight, Boo-Boo."  Is

12  that what you sent?

13  A    Yes.

14  Q    Now when you said, "We're going to get freaky again

15  tonight," what did that mean?

16  A    We're going to have sex again tonight.

17  Q    Okay.  And did you get together again --

18  A    Yes.

19  Q    -- following that?

20  A    Yes.

21  Q    In fact, later on, one of the photographs was taken on

22  that day.  Is that correct?

23  A    Yes.

24  Q    Well, let's move ahead to the next conversation on April

25  the 26th, Amy.  And on that particular exhibit, this

1  conversation of April the 26th, you recognize that message

2  between you and Tron Kent.  Is that correct?

3  A    Yes.

4  Q    Now did this start out with you to him or him to you?

5  A    Me to him.

6  Q    And what did you say?

7  A    I said, "Hey, Boozie, what are you doing?  I'm just

8  sitting in P.E.  Do you have to work today?  I hope you're not

9  looking at porn.  Got to go.  Text back."

10 Q    Okay.  So where were you at when you sent that text

11 message?

12 A    At school.

13 Q    Okay.  In P.E. class?

14 A    Yeah.

15 Q    You sent it to him.  You said that "I hope you're not

16 looking at porn."  Is that right?

17 A    Yes.

18 Q    Now why did you say that?  What would cause you to say

19 that?

20      MR. LISZEWSKI:  Objection; relevance.

21      THE COURT:  Overruled.

22 Q    (By Mr. Ferrell)  What would cause you to say that?

23 A    Because he watched porn.

24 Q    Okay.  So we have what's been marked as Government's

25 Exhibit No. 40.  Amy, this is obviously a brown paper bag and

1    it contains a number of items which you've looked at these

2    before.  Is that correct?

3    A    Yes.

4    Q    And can you identify what those are?

5    A    Tron's porn tapes.

6    Q    Okay.  And those were the tapes that you were talking

7    about.  Is that correct?

8    A    Yes.

9    Q    Where did he keep those porn tapes?

10   A    In the room.

11   Q    Okay.

12        MR. FERRELL:  Your Honor, at this time I would offer

13   Government's Exhibit 40 into evidence.

14        THE COURT:  Exhibit 40 is admitted.

15   Q    (By Mr. Ferrell)  Now going back to the exchange and the

16   conversation on April 26th, all right, after you told him, "I

17   hope you're not looking at the porn tapes," would you tell the

18   Jury, please, what his response was?

19   A    "No, I ain't yet.  Your mom is still here."

20   Q    Now who's "mom"?

21   A    My mom.

22   Q    Okay.  And so did you respond back to him?

23   A    Yes.

24   Q    Okay.  And what did you say back to him?

25   A    "You're nasty as hell but I still love your cute butt."

1    Q    Okay.  And did he respond back to you?

2    A    Yes.

3    Q    What did he say?

4    A    "I know, babe.  I love you, too."

5    Q    So he told you he loved you, too.  Is that right?

6    A    Yes.

7    Q    Then did you give another response to him?

8    A    Yes.

9    Q    What did you say?

10   A    "I know you have to love your mom.  Now be a good boy and

11   don't watch that porn or you'll be in trouble when I get

12   home."

13   Q    Okay.  Now when you say, "You have to love your mom," who

14   were you referring to then when you said "mom"?

15   A    Me.

16   Q    Okay.  Is that something that you commonly did was call

17   yourself "mom" to him?

18   A    Yes.

19   Q    And did he call himself "dad" to you?

20   A    Yes.

21   Q    Now did you respond -- or excuse me.  Did he respond to

22   your telling him not to watch the porn or he would be in

23   trouble --

24   A    Yes.

25   Q    -- when you got home?

1    A    Yes.

2    Q    And what did he say?

3    A    "I don't know what to tell you -- tell you about that

4    because that's kind of hard to do."

5    Q    Now, Amy, now you indicated that you recognized some of

6    the photographs that were pulled up that you examined on

7    Exhibit 7, correct?

8    A    Yes.

9    Q    Now, Amy, I've handed you four photographs at this time.

10   These are enlarged photographs, Exhibits 29 -- actually 28

11   through 31; 28, 29, 30 and 31.  You have seen those.  Is that

12   correct?

13   A    Yes.

14   Q    And those are enlargements, but other than the fact that

15   those are enlargements, are those fair and accurate copies of

16   the photographic images that you saw on Government's Exhibit

17   7, the cellphone, when you looked at it with the agents here?

18   A    Yes.

19   Q    And is it fair to say that one of the photographs is a

20   photograph of Tron Kent?  The other three photographs are

21   photographs of you; one actually has a portion of you and

22   Tron.  Is that correct?

23   A    Yes.

24   Q    Okay.

25        MR. FERRELL:  Your Honor, I'd offer into evidence

1    Government's Exhibits 28 through 31.

2              THE COURT:  Those are admitted.

3              MR. LISZEWSKI:  Subject to my Motion in Limine,

4    please.

5              THE COURT:  Subject to that.

6              MR. LISZEWSKI:  Or pretrial.  Excuse me.

7    Q    (By Mr. Ferrell)  Now what I'm showing here at this time

8    is Government's Exhibit 28.  Okay?  Now Government's Exhibit

9    28 is what?

10   A    Tron Kent.

11   Q    Okay.  And is -- Do you recognize that as being a

12   photograph of Tron Kent?

13   A    Yes.

14   Q    And that was on the cellphone, Exhibit 7.  Is that

15   correct?

16   A    Yes.

17   Q    Now Government's Exhibit 31, just so you know which

18   number this is, Amy, this is Exhibit 31.  Okay?  You recognize

19   Exhibit 31.  Is that correct?

20   A    Yes.

21   Q    And what is Government's Exhibit 31?

22   A    Me and Tron having sex.

23   Q    Now, Amy, for a moment I'm going to have to -- Let me

24   first ask you, Amy:  Government's Exhibit 31, when did you

25   first see it?

1  A    After we took it.

2  Q    Okay.  And who actually took the picture, Government's

3  Exhibit 31?

4  A    Tron.

5  Q    Now, Amy, I'm going to have to show this photograph for a

6  moment.  Okay?  So this is a photograph, Government's Exhibit

7  31.  Okay?  Now you've identified this as a photograph of you

8  and Tron Kent having sex.  Is that correct?

9  A    Yes.

10  Q    Okay.  Now I want to talk to you about that more, Amy,

11  but this is, again, a fair and accurate copy of what was on

12  that cellphone, Government's Exhibit 7?

13  A    Yes.

14  Q    Now I'd like to talk to you about the circumstances under

15  which that particular photograph was taken.  Okay?  Now you

16  stated that you and the Defendant began having sex in January

17  of 2006.  Is that correct?

18  A    Yes.

19  Q    Did he ever talk to you about taking a photograph of the

20  two of you having sex?

21  A    Yes.

22  Q    And the first time that he brought that up, what did you

23  say, Amy?

24  A    "No."

25  Q    Okay.  And was that the end of it?

1   A     No.

2   Q     Did it ever come up again?

3   A     Yes.

4   Q     On one occasion or more than one occasion?

5   A     More than one.

6   Q     Okay.  Did you continue to say, "no," that you did not

7   want him to take a picture of you all having sex?

8   A     Yes.

9   Q     Now, obviously, there came a point in time at which this

10  picture was taken.  Is that right?

11  A     Yes.

12  Q     Now did you agree for the picture to be taken?

13  A     Yes.

14  Q     Now did he ask you if he could take that picture?

15  A     Yes.

16  Q     And did you tell him "yes"?

17  A     Yes.

18  Q     And did he then take the picture?

19  A     Yes.

20  Q     Now, again, I apologize but we're going to have to cover

21  this a little bit.  Amy, how was the picture taken?

22  A     We were doing it and he asked me if he could take it.

23  Oh, how were we?

24  Q     Yeah.  I want to say:  How was it physically taken?  How

25  was the picture taken?

1   A    Well, he was behind me and he, you know, took the

2   picture.

3   Q    You all were having sexual intercourse.  Is that correct?

4   A    Yes.

5   Q    He was behind you?

6   A    Yes.

7   Q    All right.  And what did he use to take the photograph?

8   A    His phone.

9   Q    His cellphone?

10  A    Yes.

11  Q    So he held the cellphone out and took a picture of your

12  middle area and his.  Is that right?

13  A    Yes.

14  Q    Now after he took the photograph, did you look at it?

15  A    Yes.

16  Q    And so you knew it was on his cellphone after that point.

17  Is that right?

18  A    Yes.

19  Q    And that photograph shows him with his penis partially

20  inserted into your vagina.  Is that a fair statement?

21  A    Yes.

22  Q    Okay.  Now, obviously, you can't -- you don't see the

23  faces of the people, but that is -- those two people in that

24  picture are you and he.  Is that correct?

25  A    Yes.

1   Q    Now is that the only photo that he took that day?

2   A    No.

3   Q    How many -- Did he take another photograph?

4   A    Yes.

5   Q    And was that before or after you had sex?

6   A    After.

7   Q    Okay.  And where was the photograph taken?

8   A    At my house.

9   Q    Okay.  Where in your house?

10  A    In the bedroom.

11  Q    Okay.  And were you laying on the bed?

12  A    Yes.

13  Q    So did he ask to take that photograph?

14  A    Yes.

15  Q    Okay.  Amy, I just want you to identify Government's

16  Exhibit No. 29.  Is that a photograph that Tron Kent took of

17  you on that day?

18  A    Yes.

19  Q    Now we've covered Exhibits 28 and 29.  We've covered 31.

20  I'll come back at a little bit later time to Government's

21  Exhibit 30.  But other than just to identify this, was there

22  another occasion when a photograph was taken?

23  A    Yes.

24  Q    And was that on March the 6th?

25  A    Yes.

1   Q     Later on?

2   A     Yes.

3   Q     Okay.  And I'll show you what's been marked as

4   Government's Exhibit 30.  And is that a photograph taken by

5   Tron Kent of you?

6   A     Yes.

7   Q     And that's in your bedroom?

8   A     Yes.

9   Q     And the sheets under there is part of your comforter, one

10  of your comforters.  Is that correct?

11  A     Yes.

12  Q     And it's reversible.  Is that right?

13  A     Yes.

14  Q     Okay.  One side has checks on it?

15  A     Yes.

16  Q     What does the other side have?

17  A     It's all green.

18  Q     It's all green?

19  A     (Affirmative gesture).

20  Q     We're going to come back to that Exhibit 30 a little bit

21  later, but let's go ahead to the events of May the 9th.  Okay?

22  I want to talk to the Jury about May the 9th of 2006.  Now do

23  you recall that date?

24  A     Yes.

25  Q     Do you recall where you were living?

1   A     Yes.

2   Q     And you were living at the same address, obviously.

3   A     Yes.

4   Q     Over on Sixth Street.  Anyone living with you at that

5   time, May the 9th?

6   A     My mom and Tron.

7   Q     Tron was staying there every night since February you

8   said.  Is that correct?

9   A     Yes.

10  Q     Now was -- When we go to the date of May the 9th, was

11  there anything in your room that did not belong to either you

12  or to Tron Kent?

13  A     No.

14  Q     When was the last time that you saw Tron Kent before the

15  morning of May the 9th, 2006?

16  A     In the afternoon of May the 8th.

17  Q     And was that right after school?

18  A     Yes.

19  Q     What happened when you came home after school on May the

20  8th?

21  A     Our usual day.  He came home from work and took a shower

22  and told me he was going to Sikeston.

23  Q     And that was his kind of typical way to spend his time.

24  Is that right?

25  A     Yeah.

1    Q    Now when would he normally come back to the house when he

2    would leave to go to Sikeston?

3    A    Around 3:00 in the morning.

4    Q    Okay.  So you recall going to bed on the evening of May

5    the 8th?

6    A    (Affirmative gesture).

7    Q    And were you awakened by someone at the door?

8    A    Yes.

9    Q    Was it the early morning hours now of May the 9th?

10    A    Yes.

11    Q    When you woke up, what did you do?

12    A    I went to the door and I seen the flashlights but I

13    didn't have my contacts in, so I thought somebody was just

14    playing, you know.  So I went and got my mom, and my mom

15    answered the door and I went and laid back down, and she said,

16    "It's the police; you need to get up."

17    Q    Okay.  Your mother came in and she told you it was the

18    police?

19    A    (Affirmative gesture).

20    Q    Okay.  Were you advised that Tron had been arrested?

21    A    Yes.

22    Q    Were you asked to give consent to search your room?

23    A    Yes.

24    Q    Okay.  Did they tell you you didn't have to give consent?

25    A    Yes.

1   Q    But you gave it, anyway?

2   A    Yes.

3   Q    Did you have anything in that room that you thought was

4   illegal that you had?

5   A    No.

6   Q    Nothing that you shouldn't have had; is that right?

7   A    No.

8   Q    Now were you worried or concerned that there might be

9   some things in that room that were illegal?

10  A    Yes.

11  Q    What were you worried about?

12  A    Drugs and a gun.

13  Q    And did you have reason to think or to hope maybe they

14  wouldn't be there?

15  A    Yes.

16  Q    Why is that?

17  A    Because usually when he leaves he takes the gun with him

18  and most of the time the drugs.

19  Q    Okay.  When you say usually he takes the gun and most of

20  the time the drugs, when you say "he," who are you referring

21  to?

22  A    Tron.

23  Q    And when you say "when he leaves," you're talking about

24  leaving, going where?

25  A    To Sikeston.

1    Q    Okay.  Do you ever go with him to Sikeston?

2    A    No, but sometimes I do drop him off over there.

3    Q    Okay.  You took him.  Okay.  Now the officers, obviously,

4    found some things in that room that they collected.  Is that

5    -- Is that correct?

6    A    Yes.

7    Q    I'm going to show you a list of items, Government's

8    Exhibits 17, 18, 37, 38, 36, 35 and 34.  Okay?  And I want you

9    to identify those for the Jury, please; 17, 18, 37 and 38.

10         Let's take a couple at a time, 17 and 18.  Now I've

11   handed you what's marked first as Government's Exhibit 17.

12   You recognize that, don't you?

13   A    Yes.

14   Q    And what is Government's Exhibit 17?

15   A    An ashtray that was in my bedroom.

16   Q    And Government Exhibit 17 you said is an ashtray in your

17   bedroom that evening?

18   A    Yes.

19   Q    There were some cigarette butts in that ashtray.  Is that

20   correct?

21   A    Yes.

22   Q    I'm going to hand you what's been marked as Government's

23   Exhibit 26; ask you if you can identify that.  It's a

24   photograph, is it not?

25   A    Yes.

1    Q     And what is it a photograph of?

2    A     The ashtray with the cigarette butts in it.

3    Q     Okay.  And that was in your room the morning that the

4    officers searched.  Is that correct?

5    A     Yes.

6    Q     On May the 9th?

7    A     Yes.

8    Q     Now who smoked those cigarettes in that ashtray, if you

9    know, Amy?

10   A     Tron.

11   Q     Tron Kent?

12   A     Yes.

13   Q     Now Government's Exhibit 18 is a paper bag that contains

14   some clothes, and you've looked at these clothes.  Is that

15   correct?

16   A     Yes.

17   Q     Okay.  And these clothes are contained in 18, a pair of

18   jeans and a black shirt.  Is that correct?

19   A     Yes.

20   Q     Or a sweater; I should say jacket.  Do you recognize

21   those jeans and jacket?

22   A     Yes.

23   Q     Whose jeans and jacket are those?

24   A     Tron.

25   Q     They were in your room?

1   A     Yes.

2   Q     Now Government's Exhibit No. 37, okay, we're not going to

3   open these up, but this is a plastic bag containing a lot of

4   different clothes.  Is that correct?

5   A     Yes.

6   Q     Different colors and things?

7   A     Yes.

8   Q     Now you've looked through those clothes.  Is that

9   correct?

10  A     Yes.

11  Q     And whose clothes are those?

12  A     Tron's.

13  Q     Did it come out of your house that day?

14  A     Yes.

15  Q     Now including -- Like, for instance, you recognize each

16  one?  All of those clothes?

17  A     Yes.

18  Q     And including his work shirt?

19  A     Yes.

20  Q     Okay.  Now Government's Exhibit 37 -- excuse me -- 38,

21  I'm opening up a paper bag marked Government's Exhibit 38.

22  Government's Exhibit 38 is a pair of shoes.  Do you recognize

23  those shoes?

24  A     Yes.

25  Q     Whose shoes do those belong to?

1   A     Tron.

2   Q     Tron Kent.  And they were in your house on the morning of

3   May the 8th or May the 9th.  Is that correct?

4   A     Yes.

5   Q     Now you said that Tron Kent worked at Ruby Tuesday's.  Is

6   that correct?

7   A     Yes.

8   Q     I'd like to hand you at this time what has been marked as

9   Government's Exhibit 36.  Can you identify Government's

10  Exhibit 36 for the Jury?

11  A     Yes.

12  Q     What is Government's Exhibit 36?

13  A     Tron's timecards.

14  Q     From work?

15  A     Yes.

16  Q     And you've looked at those.  Is that correct?

17  A     Yes.

18  Q     And is the most recent one around May the 3rd or

19  thereabouts or at least one of them is?

20  A     Yes.

21  Q     Okay.  Now what did he do with these timecards or

22  receipts when he would come in from work?

23  A     Set them on the little nightstand.

24  Q     The nightstand where?  Where is the nightstand located?

25  A     Right by the bed.

1   Q     In your bedroom?

2   A     Yes.

3   Q     So that would not be uncommon for him to put the receipts

4   there.  Is that correct?

5   A     No.

6   Q     Your answer is "no"?

7   A     Yes.  It wouldn't be uncommon.

8   Q     Not uncommon, okay.  That wasn't a very good question.

9   Thank you.

10        Now, also, I'd like for to you identify Government's

11  Exhibit 35 and 34.  And you've looked at these again, have you

12  not?

13  A     Yes.

14  Q     Now Government's Exhibit 35 is some pink papers contained

15  in a sealed envelope there.  You've looked at that.  Is that

16  right?

17  A     Yes.

18  Q     Would you tell the Jury, please, what Government's

19  Exhibit 35 is?

20  A     It's a title application for a car that we bought.

21  Q     Okay.  It's a title application for a car?

22  A     (Affirmative gesture).

23  Q     Now was that in the room on the morning of May the 9th?

24  A     Yes.

25  Q     Okay.  Now that title application is for a car to be --

1   What kind of car, by the way?

2   A    An '88 Oldsmobile Delta 88.

3   Q    All right.  Now let's talk about this particular car.

4   Who came up with this car?

5   A    Tron.

6   Q    Okay.  And you needed to get a license.  Is that true?

7   A    Yes.

8   Q    Now was Tron able to get a license on his own?

9   A    No.

10  Q    Did he come and ask you for help?

11  A    Yes.

12  Q    What did he ask you to do?

13  A    To put my name on the title, too, with his and get the

14  insurance in my name and get it licensed.

15  Q    You were how old?

16  A    16.

17  Q    Did you put your name on the title to his car to help

18  title it in your name?

19  A    Yes.

20  Q    And did -- After you agreed to do this, what happened as

21  far as trying to acquire this title?

22  A    I went and got the insurance and the license.

23  Q    You got the insurance and the license?

24  A    (Affirmative gesture).

25  Q    Okay.  After you got the insurance and the license -- I

1  should have you identify, if you would, Exhibit 34.  This was

2  actually the license that you picked up.  Is that correct?

3  A     Yes.

4  Q     And those were in your -- in the room, in the bedroom,

5  when the officers came and searched that morning.  Is that

6  right?

7  A     Yes.

8  Q     And that car belonged then, as it's titled, to you and

9  Tron Kent.  Is that right?

10  A     Yes.

11  Q     Now did you ever get the car license to put on?

12  A     I never put those license plates on them.

13  Q     Did something happen to the car?

14  A     Yes.

15  Q     Okay.  But in any event, the license never actually got

16  put on the car.  Is that right?

17  A     Yes.

18  Q     Okay.  I want to show you some of the photographs, if we

19  will, that were taken during the execution of the search of

20  your room and ask you to identify these for the Jury, please.

21  They were taken at that time and a few of them taken at

22  different times, but let me give you Exhibit 43, first of all.

23         Actually, I'm going to give you Exhibits 43, 44, 45,

24  46, 47, 48, 49, 50 and 51.  Is it fair to say that

25  Government's Exhibits 43 through 51 are all photographs of

1    your residence and/or your room when the officers did the

2    search?

3    A    Yes.

4    Q    Those photographs fairly and accurately depict the scene

5    that's shown on them.  Are they fair and accurate?

6    A    Yes.

7         MR. FERRELL:  Your Honor, at this point in time I'd

8    offer into evidence Government's Exhibits 43 through 51.

9         THE COURT:  Those are admitted.

10   Q    (By Mr. Ferrell)  I'm going to show these to the Jury,

11   please, Amy, and I want you to just describe very briefly what

12   each one of these are.  Okay?

13        Here's Exhibit 43.  Do you recognize that?

14   A    Yes.

15   Q    And what is Exhibit 43?

16   A    That's my front porch and the front door.

17   Q    Okay.

18   A    My bedroom door.

19   Q    Okay.  This is the door to your bedroom?

20   A    (Affirmative gesture).

21   Q    Okay.  Is that correct?

22   A    Yes.

23   Q    What color is that paint?

24   A    The paint?

25   Q    Yes, Ma'am, in your room.

1   A   On the door?

2   Q   No.  I'm sorry.  Inside the room you can see the paint.

3   A   It's green.

4   Q   Okay.  Is your screen a little black and white?

5   A   It's not black and white but it's blurry.

6   Q   Not clear, okay.  Your color is a rather bright green.

7  Is that correct?

8   A   Yes.

9   Q   Okay.  Now Exhibit 45, what is that, Amy?

10   A   That's my closet.

11   Q   Okay.  That's -- Is that the only closet in the room?

12   A   Yes.

13   Q   Okay.  Those are all your clothes?

14   A   Yes.

15   Q   Okay.  Exhibit 46, what is that?

16   A   Tron's clothes.

17   Q   Some of his clothes in the bag there with his shoes?

18   A   Yes.

19   Q   And were those there in the room that night?

20   A   Yes.

21   Q   Exhibit 47?

22   A   My bed.

23   Q   Okay.  And that was your bed as it appeared that morning

24  when the officers came in --

25   A   Yes.

1  Q    -- as to the different covers?  Is the pink sheets on

2  there that you just told us about earlier?

3  A    No.  I can't see.

4  Q    They're not?

5  A    I can't see.

6  Q    You can't tell the colors?  Okay.  Exhibit 48?

7  A    That's some clothes.

8  Q    Okay.  That's some more of the clothes that were bagged

9  up.  Is that right?

10  A    Yes.

11  Q    Exhibit 49?

12  A    The license plates.

13  Q    That's where they were laying.  Well, they were laying in

14  your room, not laying there on the bed but laying in your

15  room?

16  A    Yes.

17  Q    Now Exhibit 50, what are those documents in Exhibit 50?

18  A    Receipts.

19  Q    Okay.  Those are the receipts -- If you need to see a

20  copy, those are -- that's the receipts laying on your dresser.

21  That's the receipts from work.  Is that right?

22  A    Yes.

23  Q    Okay.  And finally, Exhibit 51, is that also a photograph

24  of your room?

25  A    Yes.

1    Q     Now, Amy, there were a couple of other items that were

2    photographed and removed from your room that we haven't talked

3    about here today.  First of all, I'm going to hand you what's

4    marked Government's Exhibit 27-A.  I'm going to take this out

5    of the package.  Actually it's laying on the front.

6                MR. FERRELL:  And, Your Honor, this particular

7    firearm has been tagged, so it's rendered safe.  It can't be

8    discharged.

9    Q     (By Mr. Ferrell)  I'll hand to you what I said has been

10   marked as Government's Exhibit 27-A.  Do you recognize that

11   gun?

12   A     Yes.

13   Q     Okay.  Is that gun yours?

14   A     No.

15   Q     Do you know whose it is?

16   A     Yes.

17   Q     Whose is it?

18   A     Tron's.

19   Q     Now I'm also going to show you what's marked as

20   Government's Exhibit 24 and ask you if you can recognize what

21   Government's Exhibit 24 is?

22   A     That's my jewelry box.

23   Q     It's your jewelry box.  The items that were in it, was

24   that shown to you there that night by the law enforcement

25   officers?

1    A    Yes.

2    Q    Is the contents, those white rocks that are contained in

3    there, are those yours?

4    A    No.

5    Q    Whose are they?

6    A    Tron's.

7    Q    We're going to talk about that a little bit later on.

8    Let's talk about what happened after the officers found this

9    in the room.  Okay?  When the officers found this in your

10   room, what happened to you?

11   A    I went to jail.

12   Q    Okay.  Where did you go to jail?

13   A    The Juvenile Center down there in Charleston.

14   Q    And you were 16?

15   A    Yes.

16   Q    And were you interviewed by Officer Moody?  Were you

17   asked some questions about the -- Did he ask you some

18   questions about the crack and the gun?

19   A    Yes.

20   Q    And what did you tell him?

21   A    I told him I didn't know anything about it.

22   Q    Okay.  Is that the truth?

23   A    No.

24   Q    Did you lie to Officer Moody --

25   A    Yes.

1    Q    -- when he showed you the gun and the crack there at the

2    house?

3    A    Yes.

4    Q    Now you also were interviewed down at the station, down

5    at the Juvenile Center.  Is that correct?

6    A    Yes.

7    Q    Okay.  And did you tell them that these were not your

8    drugs?

9    A    Yes.

10   Q    Had you ever handled these drugs?

11   A    No.

12   Q    Had you ever sold drugs?

13   A    No.

14   Q    Have you ever used cocaine?

15   A    No.

16   Q    Or crack cocaine?

17   A    No.

18   Q    Have you ever weighed out cocaine or crack cocaine on the

19   scales?

20   A    No.

21   Q    Have you ever bagged it up in Baggies like you saw in

22   that picture?

23   A    No.

24   Q    Amy, in what amounts are crack cocaine sold?

25   A    I don't know.

1   Q    Have you ever bought any crack cocaine?

2   A    No.

3   Q    Ever sold any crack cocaine?

4   A    No.

5   Q    Have you ever watched it being sold?

6   A    (Negative gesture).

7   Q    Ever collected any money from the sale of crack cocaine?

8   A    No.

9   Q    Do you have any idea how much it takes to use crack

10  cocaine?  What a typical use amount is?

11  A    No.

12  Q    Now let's talk about your jewelry box.  Okay?  Where did

13  you get your jewelry box, Exhibit 14?

14  A    My mom's boss gave it to me for Christmas that year.

15  Q    I'm holding up here what's marked as Exhibit 14.  This is

16  the jewelry box that we're talking about.  Is that right?

17  A    Yes.

18  Q    Now you told us that your mom's boss had bought it for

19  you.  Is that right?

20  A    Yes.

21  Q    Do you remember when that was?

22  A    Christmas that year.

23  Q    Christmas.

24  A    '05.

25  Q    Christmas of '05?

1    A     Yes.

2    Q     So you had it for like a year?

3    A     Yes -- No.  No; a couple of months.

4    Q     I'm sorry.  '05, just before all these things happened in

5    '06.

6    A     Yes.

7    Q     I'm sorry.  Now where did you keep that?

8    A     In the closet at my house.

9    Q     Okay.  I'll ask you if you can identify Exhibit 23 for

10   us, please.  What is Exhibit 23?

11   A     The jewelry box at the top of the closet.

12   Q     Is that a fair and accurate representation of the jewelry

13   box, where it would have been kept when you went to bed on May

14   the 8th?

15   A     Yes.

16   Q     Okay.

17        MR. FERRELL:  Your Honor, I'd offer Exhibit 23 if

18   it's not been offered.

19        THE COURT:  23 has been admitted.

20        MR. FERRELL:  Okay.  Thank you.

21   Q     (By Mr. Ferrell)  Now what did you keep in your jewelry

22   box?  What did you keep in it?

23   A     My earrings.

24   Q     Okay.  So when you first bought it, you started keeping

25   earrings in it?

1   A    Yes.

2   Q    Did you spend a lot of money for the earrings?

3   A    No.

4   Q    Are these expensive earrings?

5   A    No.

6   Q    Okay.  And so you kept your earrings in them.  And would

7   you from time to time go to them, obviously, and get your

8   earrings out of them?

9   A    Yes.

10  Q    Okay.  Now there's some earrings contained in Exhibit 14.

11  Does that jewelry all belong to you?

12  A    Yes.

13  Q    Pardon me?

14  A    Yes.

15  Q    Okay.  Those items that are in there, it's all items of

16  yours.  Is that correct?

17  A    Yes.

18  Q    Okay.  Is there anything in there worth very much money?

19  A    No.

20  Q    Okay.  Now when the officers interviewed you about

21  Government's Exhibit 14, what did you tell them?

22  A    I told them that I had lost it back in January.

23  Q    You had lost it in January and then it appeared back in

24  your house.

25  A    Yeah.

1   Q     Is that right?

2   A     Yes.

3   Q     Now when you told the officers that you had lost it in

4   January and it appeared back in your house, was that the

5   truth, Amy?

6   A     No.

7   Q     Did you lie to those officers at that time?

8   A     Yes.

9   Q     You had seen it since December or January, hadn't you?

10  A     Yes.

11  Q     Okay.  Where had that box been kept since January of '06?

12  A     Till?

13  Q     Till May.  Between January and May, where did that box

14  stay?

15  A     At my house in the closet.

16  Q     Okay.  In the same place that's shown in that photograph?

17  A     Yes.

18  Q     Okay.  Now did you continue to use that box yourself from

19  January till May?

20  A     No.

21  Q     Well, did something happen that caused you to quit using

22  that particular box?

23  A     Yes.

24  Q     Okay.  Would you share with the Jury, please, what it was

25  that caused you to quit using your jewelry box?

1    A     I let Tron use it to put the drugs in it.

2    Q     All right.  Let's talk about that.  How did this happen?

3    This is your jewelry box.  Is that right?

4    A     Yes.

5    Q     How did it happen that his crack cocaine got in your

6    jewelry box?

7    A     He asked me if he could use it for that and I said "yes."

8    Q     So you knew that he was going to put crack cocaine in it.

9    A     Yes.

10   Q     And you told him he could.

11   A     Yes.

12   Q     And did he?

13   A     Yes.

14   Q     Did you see him put crack cocaine in it?

15   A     Yes.

16   Q     From the point in time that he first put crack cocaine in

17   your jewelry box, did you ever open that jewelry box again?

18   A     No.

19   Q     Did anyone -- Did you ever use the jewelry that was in

20   that box ever again?

21   A     No.

22   Q     Why not?  Why didn't you use your earrings?

23   A     Because I didn't -- I didn't want that on me.

24   Q     Okay.  After he had the crack cocaine in it, you didn't

25   even want to wear the earrings.

1  A    No.

2  Q    Now did anyone get into your jewelry box after the crack

3  cocaine was put into it --

4  A    Yes.

5  Q    -- that you saw?

6  A    Yes.

7  Q    Who did you see get into that jewelry box?

8  A    Tron.

9  Q    And what was he doing?

10  A    Either putting it in or taking it out.

11  Q    So you have seen him put crack cocaine in there like that

12  on other occasions?

13  A    Yes.

14  Q    You seen him take crack cocaine out?

15  A    Yes.

16  Q    When would -- What would be the circumstances when you

17  would see him taking crack cocaine out?

18  A    I didn't see him take it out all of the time but, you

19  know, once a week or so I'd see him, but I wasn't always in

20  the bedroom either, so.

21  Q    Okay.  The once-a-week or so that you would actually see

22  him taking crack cocaine out, where did he go after he took it

23  out of there?

24  A    He'd leave.

25  Q    He'd be gone?

1   A     Yeah.

2   Q     Now around when was it that he -- you first let him put

3   his crack cocaine in that jewelry box?

4   A     Like the end of February.

5   Q     Okay.  Of '06?

6   A     Yes.

7   Q     So did he continue to use it to store his drugs between

8   February, this date in February, until May the 8th?

9   A     Yes.

10  Q     Now when you were interviewed by the officers, you didn't

11  tell them that -- that you had seen that happen, did you?

12  A     No.

13  Q     Did you tell them that you -- it wasn't yours and so you

14  thought it was Tron's?  Is that right?

15  A     Yes.

16  Q     Okay.  Was there any doubt in your mind about whether or

17  not it was Tron's?

18  A     No.

19  Q     Now with regard to the cocaine that was actively seized,

20  the 60 grams or so of cocaine we've had identified, had you

21  ever seen that much in the jewelry box before?

22  A     No.

23  Q     Is that the most that you had ever seen him with?

24  A     Yes.

25  Q     And did you know from your own personal knowledge -- I

1   think you've already testified to this, but whether or not

2   between February and May of '06 Tron Kent was selling crack

3   cocaine?

4   A    Yes.

5   Q    You know that yourself?

6   A    Yes.

7   Q    Now we've talked about two occasions.  Excuse me.

8   There's one particular occasion that you talked to Tron about

9   his drug dealing when you thought you might be pregnant.

10  Okay?

11  A    Yes.

12  Q    Was there another occasion around Kylie's birth when you

13  talked to him?

14  A    Yes.

15  Q    Did you discuss -- What did you discuss with him about

16  his drug dealing on that occasion?

17  A    Well, when Kylie was born, she was born with crack in her

18  system, and Julie told me about it and she told me that Tron

19  was selling to her.

20          MR. LISZEWSKI:  Objection; hearsay, Judge.

21          MR. FERRELL:  Judge, I'll strike the remark, but ---

22          THE COURT:  The Jury will disregard the last comment.

23  Q    (By Mr. Ferrell)  What I want to know, you indicated you

24  had a conversation with Tron Kent.  Is that right?

25  A    Oh, yes.

1  Q    And did Tron talk back to you after you said something to

2  him?

3  A    Yes.

4  Q    And with what he said back to you, did it have to do with

5  his dealing drugs?

6  A    Yes.

7  Q    What did you say to him before he gave you a response

8  about his drug dealing?

9        MR. FERRELL:  And, Judge, I'll offer this not for the

10 truth of the matter asserted but to explain the response that

11 Tron Kent gave only.

12 A    I told him not to sell to Julie anymore and he told me he

13 wouldn't.

14 Q    (By Mr. Ferrell)  Now -- So that we understand, what did

15 you say to him that caused him to say that?

16 A    Because if she hadn't -- Her kids was already tooken away

17 that day, but she had to quit doing drugs and go to rehab,

18 too.

19       MR. LISZEWSKI:  Objection, Your Honor.

20       MR. FERRELL:  I'll rephrase it, Judge.

21       MR. LISZEWSKI:  Motion to strike and ask the Jury to

22 disregard that.

23       THE COURT:  The Jury will disregard that comment.

24 Restate your question.

25       MR. FERRELL:  Yeah.

1  Q    (By Mr. Ferrell)  I was wanting you to tell just what you

2  had said to Tron that caused his response.  And have you

3  adequately said that to us?  Told us what you said?

4  A    Yes.

5  Q    And what did he say when you told him not to sell drugs

6  to Julie anymore?

7  A    He told me he wouldn't.

8  Q    Okay.  Did you believe him at that time?

9  A    Yes.

10 Q    Now did something happen later on -- Well, let me

11 rephrase that.

12      On this occasion that you talked about before where

13 you thought you were pregnant and you had this discussion with

14 him, did you later on after that discussion have reason to

15 believe from what you personally saw that he was selling

16 again?

17 A    Yes.

18 Q    Did you confront him about that?

19 A    Yes.

20 Q    What did he say when you confronted him about continuing

21 to deal drugs after that occasion?

22      MR. LISZEWSKI:  Your Honor, objection.  Can we have a

23 sidebar, please?

24      THE COURT:  Yeah.

25      (The following proceedings were held at sidebar,

1   outside the hearing of the Jury:)

2        MR. LISZEWSKI:  This is exactly what I was talking

3   about with the previous 404(b) evidence that there's been no

4   notice of.  That was Motion No. 6 in my Motion in Limine.

5   She's going to get up there and allege another drug sale that

6   I have no notice about.  There's no way that I can defend it.

7   She's getting up here and rattling off things, conversations

8   with people about drugs that have been sold, specifically

9   prior bad acts.  All of this has not been noticed.  Judge, I

10  got to ask for a mistrial.

11       THE COURT:  Any response?

12       MR. FERRELL:  Judge, I don't offer this under 404(b).

13  This was at or near the time, relatively close in time to his

14  possession of the drugs.  The question is whether or not he

15  intended to distribute those drugs, and her testimony will be

16  that he told her he was going to make enough money dealing

17  drugs so they would not have to worry about money again.  That

18  was his intentions.

19       THE COURT:  Well, I'm going to let you make one more

20  opportunity to elicit it and be very, very careful.  I'm going

21  to overrule your objection.

22       MR. FERRELL:  This will be the only question I'll

23  ask, Judge.

24       (The following proceedings were held within the

25  hearing and presence of the Jury:)

1  Q    (By Mr. Ferrell)  What did he say when you confronted him

2  as to whether or not he was dealing at that time?

3  A    That he was just going to do this, trying to make it

4  where we wouldn't have to do anything anymore and then he's

5  going to stop.

6  Q    So when he said that, you knew that he was going to be

7  having drugs in the house?

8  A    Yes.

9  Q    Now this particular gun that they showed you, we've seen

10  this gun before.  I showed it to you before.  Government's

11  Exhibit 27, okay?  And you recognize that, correct?

12  A    Yes.

13  Q    Now I want you to tell the Jury, please, whether you seen

14  that gun before.

15  A    Yes, I have.

16  Q    Now where have you seen the gun?

17  A    At my house and Tron had it.

18  Q    Pardon?

19  A    At my house and he had it.

20  Q    Okay.  And you've seen it at your house?

21  A    Yes.

22  Q    Where have you seen it at your house?

23  A    In the nightstand.

24  Q    Okay.  And whose gun was this?

25  A    Tron's.

1  Q    The first time, can you remember, Amy, independently, in

2  your own mind, the first time you ever saw that gun?

3  A    Yes.

4  Q    Where was that?

5  A    At Julie's house.

6  Q    Okay.  And why were you at Julie's house?

7  A    Because it was New Year's Eve.

8  Q    And who else was there with you?

9  A    Tron.

10  Q    Tron Kent was there.  So it's New Year's Eve.  It's at

11  Julie's house.  Tell the Jury, please, what was going on about

12  the time you saw the gun.

13  A    Well, he came inside and, you know, everybody was outside

14  shooting their gun.

15  Q    You were hearing the shots outside?

16  A    Yes.

17  Q    Okay.  So then he came inside.  What happened then?

18  A    Well, I gave him a hug or whatever, and I felt it and I

19  was like, "What's that?"  And he showed it to me and asked me

20  if I wanted to shoot it but I said "no."

21  Q    What did you tell him when he asked you if you wanted to

22  shoot Government's Exhibit 27-A?

23  A    "No."

24  Q    You said "no"?

25  A    Yes.

1    Q    Did you shoot it?

2    A    No.

3    Q    Have you ever shot it?

4    A    No.

5    Q    Have you ever shot a gun like this before?  A handgun of

6    any kind?

7    A    No.

8    Q    Other than -- Have you ever even personally held a

9    handgun in your life?

10   A    No.

11   Q    Do you know much about guns, Amy?

12   A    No.

13   Q    Well, this particular gun, do you know whether that's a

14   revolver or not?

15   A    No.

16   Q    Of your own knowledge, you don't even know if that's a

17   revolver.  Is that right?

18   A    Right.

19   Q    Okay.  Let me ask you:  This particular gun, it has

20   something on it.  I'm going to point to that in the middle

21   here; this thing.  What do you call that?

22   A    Spinning thing.

23   Q    A spinning thing?

24   A    Yeah.

25   Q    Is that -- Do you know -- On this particular gun, Amy,

1  would you know how to load that gun?  Where the -- How you put

2  the bullets in it?

3  A    No.

4  Q    Do you know how to cock the gun so it will shoot?

5  A    I think you pull that thing, you know, the thing back

6  there.

7  Q    This thing?

8  A    Yeah.

9  Q    What do you call that?

10 A    I don't know.

11 Q    Okay.  Well, you pull that back and then you pull the

12 trigger.  Is that correct?

13 A    Yes.

14 Q    Okay.  Now is there any safety on that kind of a gun?  Do

15 you know?

16 A    I don't know.

17 Q    Do you know what caliber it is?

18 A    No.

19 Q    Do you -- That's okay.  After the occasion that you saw

20 him on New Year's Eve with this gun in his pants -- Is that

21 where it was?

22 A    Yes.

23 Q    Okay.  Front, back or do you remember?

24 A    Front.

25 Q    In the front of his pants?

1   A     Yes.

2   Q     Okay.  Now after you saw it in the front of his pants,

3   did you -- where did you see the gun again after that?

4   A     I seen it at Susie's house one more time after that.

5   Q     You saw it on a table once at Susie's house?

6   A     Yes.

7   Q     And did you -- And when you saw it you said at your

8   house, where was it kept?

9   A     In the nightstand.

10  Q     I'm going to show you what's been marked as Government's

11  Exhibit 20.  Let's talk about that.  Is that where the gun was

12  normally kept?

13  A     Yes.

14  Q     Now who would you see put the gun in the cabinet?

15  A     Tron.

16  Q     Did you ever put it in the cabinet?

17  A     No.

18  Q     Did you ever take it out of the cabinet?

19  A     No.

20  Q     Who did you see take it out of the cabinet, if anyone?

21  A     Tron.

22  Q     I'd like to talk to you about when you would see him take

23  it out of the cabinet.  What would be the typical kind of

24  occasion when you would see him take that gun out of the

25  nightstand cabinet?

1  A    Well, he didn't take it every day but he would usually

2  take it when he goes to Sikeston.

3  Q    Okay.  So he would be leaving when he took it?

4  A    Yes.

5  Q    When you would see him put it in the cabinet, what would

6  be the circumstances?

7  A    He'd be coming home, getting ready to get in bed, and

8  he'd wipe it off and then put it in there.

9  Q    I want to talk to you about that.  You would see that he

10  would have the gun with him when he came back home at times?

11  A    Yes.

12  Q    And then what would he do with the gun?

13  A    Wipe it off and then put it in there.

14  Q    What do you mean by "wipe it off"?

15  A    Like wipe the handle part off and wipe the trigger off.

16  Q    And when you say the handle part that he would wipe off,

17  are you referring to this part right here?

18  A    Yes.

19  Q    Okay.  So he would wipe it off.  What would he wipe it

20  off with before he would put it away?

21  A    His shirt.

22  Q    And then the other part you described as the trigger

23  part.  Is that correct?

24  A    Yes.

25  Q    This part right in here?

1    A    Yes.

2    Q    You would see him wipe it off.  Okay.  After he had wiped

3    off the handle and the trigger, what would he do with it?

4    A    Put it in the nightstand.

5    Q    Okay.  Now the nightstand that this particular gun was

6    found in, how far away from your closet is that nightstand?

7    A    Not very far.  Like if you open the closet door, you

8    would hit the nightstand.

9    Q    Now the closet is where the crack cocaine was.  Is that

10   correct?

11   A    Yes.

12   Q    And if you open the closet door, you hit the nightstand?

13   A    Yes.

14   Q    Now they also showed you a photograph of some money or

15   actually they showed you a box, a shoebox, containing some

16   money and some more of those little white rocks, didn't they?

17   A    Yes.

18   Q    Okay.  I'll show you what's been marked as Exhibit 22.

19   Can you identify that for the Jury, please?

20   A    Yes.  That's my shoebox.

21   Q    Okay.  That's the -- That's a shoebox, a blue shoebox,

22   and it contains some money and some more of those rocks.  Is

23   that your money?

24   A    No.

25   Q    Is that your white rocks that are bagged up in those

1   Baggies?

2   A    No.

3   Q    Now when you saw that that night, had you ever seen it in

4   that box before?

5   A    No.

6   Q    Whose shoebox was that?

7   A    My shoebox.

8   Q    Okay.  When's the last time you'd been in that shoebox?

9   A    When I bought the shoes.

10  Q    How long ago was that?

11  A    About a month before that.

12  Q    So you hadn't looked in it in the last month?

13  A    (Negative gesture).

14  Q    Now there was other shoeboxes there close to that one,

15  wasn't there?

16  A    Yes.

17  Q    Were any of them Tron Kent's shoebox?

18  A    There was one on the floor that was his.

19  Q    Okay.  So he had one box on the floor that was his, one

20  box was yours.  Is that correct?

21  A    Yes.  I had one underneath that one that was mine, too.

22  Q    Okay.  Well, let's look at Exhibit No. 26.  Can you tell

23  what that is a photograph of?

24  A    Tron's shoebox.

25  Q    That's his shoebox at the end of the counter or table

1  there?  Dresser --

2  A    Yes.

3  Q    -- you call that?  And it wasn't in his shoebox, was it?

4  A    No.

5  Q    It was in yours?

6  A    Yes.

7  Q    Had he asked you about putting it in that box?

8  A    No.

9  Q    Now, Amy, you've admitted that after you were arrested,

10  that you didn't tell the whole truth.  In fact, you lied to

11  law enforcement officers at times.  Isn't that true?

12  A    Yes.

13  Q    When you were arrested and confronted by the officers

14  with this evidence, did you have feelings for Tron Kent?

15  A    Yes.

16  Q    How did you believe you felt for Tron Kent at that time?

17       MR. LISZEWSKI:  Objection; relevance.

18       THE COURT:  Overruled.

19  A    Can you repeat the question?

20  Q    (By Mr. Ferrell)  How did you feel about Tron Kent at

21  that time?

22  A    I cared about him.

23  Q    Did you want him to be in trouble?

24  A    No.

25  Q    Did you want to be in trouble yourself?

1   A    No.

2   Q    Did you believe that he loved you?

3   A    Yes.

4   Q    Were you scared?

5   A    Yes.

6   Q    Were you scared to death?

7   A    Yes.

8   Q    Were you afraid at that time of telling the truth?

9   A    Yes.

10  Q    What were you afraid of?

11  A    That something would happen to me and my mom.

12  Q    What do you mean "something happen to you"?

13  A    Like something bad happen to us.

14  Q    For telling the truth?

15  A    (Affirmative gesture).

16  Q    Are you still scared?

17  A    (Affirmative gesture).  Yes.

18  Q    But you're under oath here today.  Isn't that true?

19  A    Yes.

20  Q    Amy, I've just got a few more questions for you; just a

21  few more minutes, but I would like to ask you if you recall

22  the last time you took a picture of Tron Kent?

23  A    About a week before this.

24  Q    Would you say that again, please, Amy?

25  A    About a week before all of this happened.

1   Q    Where did you take that picture?

2   A    In my bedroom.

3   Q    Did I ask you to bring us a copy of that picture?

4   A    Yes.

5   Q    And did you do that?

6   A    Yes.

7   Q    I've handed to you what's been marked as Government's

8   Exhibit 58.  Can you identify that for the Jury, please?

9   A    Yes.  It's a picture of Tron standing in my doorway.

10  Q    And you took that picture just before all of this

11  happened.  Is that right?

12  A    Yes.

13  Q    Is it a fair and accurate representation of Tron Kent --

14  A    Yes.

15  Q    -- as he stood there in the doorway of your bedroom

16  within a few days of the time that this occurred?

17  A    Yes.

18       MR. FERRELL:  I'd offer Government's Exhibit 58,

19  Your Honor.

20       THE COURT:  Exhibit 58 is admitted.

21  Q    (By Mr. Ferrell)  Now we have shown the Jury Government's

22  Exhibit 58.  Do you recognize the outfit that he is wearing?

23  A    Yes.

24  Q    Is that the outfit that he was wearing that day?

25  A    Yes.

1    Q    Is that an outfit you're familiar with?

2    A    Yes.

3    Q    Okay.  And whose picture is that on there?

4    A    Scarface.

5    Q    Now he is standing at your doorway.  Is that correct?

6    A    Yes.

7    Q    Now you have looked at this particular photograph and you

8    have also looked at some of the photographs that were taken

9    that night.  Is that correct?

10   A    Yes.

11   Q    Now the area that's depicted in this photograph includes

12   the dresser or whatever we would call this right as you come

13   in the door.  Is that correct?

14   A    Yes.

15   Q    Now do you also recognize some of the items which are

16   shown on that counter on Government's Exhibit 58?  Do you also

17   recognize them on Government's Exhibit 56 and 25?  And I'll

18   show you these two.

19   A    Yes.

20   Q    Let's talk about these.  On Government's Exhibit 58, what

21   is this item that I'm pointing to right here?

22   A    A box of sandwich bags.

23   Q    Okay.  I'm going to now show you Government's Exhibit 25,

24   a photo that was taken the night of the execution of the

25   search warrant.  And what is this?

1   A      A box of sandwich bags.

2   Q      Setting on the same counter?

3   A      Yes.

4   Q      Now Exhibit 58 -- excuse me -- Exhibit 58, can you tell

5   from your photograph what that item is, the gray item which is

6   located just by the Baggie?  Okay.  I'm going to hand this up

7   there to you so you can see it better.

8   A      Oh.  The remote.

9   Q      The remote to your TV there in the room?

10  A      Yes.

11  Q      And it's right there by the Baggie.  Is that correct?

12  A      Yes.

13  Q      I want to show you on Exhibit 25, taken the night of the

14  execution of the search warrant.  What do you see there beside

15  that Baggie?

16  A      The remote.

17  Q      Same remote that you see beside the Baggie in Exhibit 58?

18  A      Yes.

19  Q      Now in Exhibit 56, can you tell the Jury, please, what

20  this is that I'm pointing to at this time?

21  A      A Hennessy bottle.

22  Q      That's a Hennessy bottle of liquor?

23  A      Yes.

24  Q      Is that correct?

25  A      Yes.

1   Q    Whose bottle was that?

2   A    Tron's.

3   Q    I want to show you on Government's Exhibit 58 that you

4   took.  What is this that I'm pointing to here?

5   A    The Hennessy bottle.

6   Q    The same Hennessy bottle on the table; is that correct?

7   A    Yes.

8   Q    Now, also, I will show you on Exhibit 56 behind this

9   Corona bottle is a pink item.  Do you recognize what that is?

10  A    Yes.

11  Q    And what is that?

12  A    A perfume box.

13  Q    Okay.  I'm going to ask you on Exhibit 58.

14  A    A box that perfume comes in.

15  Q    Okay.  On Exhibit 58, can I ask you what this item is

16  right here?  Can you tell?

17  A    The perfume box.

18  Q    And, also, I'd like to show you on Exhibit 56.  What is

19  this that I'm pointing to here?

20  A    A bag of cough drops.

21  Q    And on Exhibit 58, what is this I'm pointing to here?

22  A    A bag of cough drops.

23  Q    Now, Amy, it's been a year since May the 9th; over a

24  year.  Did you finish school?

25  A    No.  I had finished out my sophomore year after this

1   happened and then I went and got my GED.

2   Q     You didn't go back to school.

3   A     No.

4   Q     And why not?

5   A     Because ---

6             MR. LISZEWSKI:  Objection; relevance, Your Honor.

7             THE COURT:  Overruled.

8   A     Because everybody knew what happened.

9   Q     (By Mr. Ferrell)  So you did not go back to school to

10  continue your education.  Is that correct?

11  A     Yes.

12  Q     Did you -- Have you continued it on your own?

13  A     Yes.

14  Q     In what way?

15  A     I got my GED and now I'm enrolled in college.

16  Q     And you're how old now, Julie?

17  A     I'm Amy.

18  Q     Amy, I'm sorry.  I apologize.

19  A     I'm 17.

20  Q     17.  I have just a few final questions right now.  And I

21  want you to tell this Jury if you know the fact that you are

22  under oath here today and subject to the penalties of perjury?

23  Are you aware of that?

24  A     Yes.

25  Q     Do you know that perjury is a felony offense and if you

1  lie about a material or important fact here today, that you

2  yourself could be prosecuted?

3  A    Yes.

4  Q    Do you understand that?

5  A    Yes.

6  Q    I have -- The crack cocaine that was found in your box --

7  in the box belongs to who?

8  A    Tron.

9           MR. LISZEWSKI:  Objection; asked and answered.

10          THE COURT:  Overruled.

11          MR. FERRELL:  I'm about to finish.

12          THE COURT:  Go ahead.

13          MR. FERRELL:  Thank you.

14  Q    (By Mr. Ferrell)  The cellphone -- we covered Exhibit

15  7 -- belongs to who?

16  A    Tron.

17  Q    The gun that I've shown to you and you've seen several

18  times belongs to who?

19  A    Tron.

20  Q    The person that took this picture, Exhibit 31, on Exhibit

21  7, that cellphone, who is that?

22  A    Tron.

23  Q    Amy, the person that you've identified as Tron Kent, the

24  Tron Kent that you identified that had the gun, the cocaine

25  and the cellphone and took this picture, is he here in the

1  courtroom today?

2  A     Yes.

3  Q     I'd like for you to point him out to this Jury, please.

4  A     He's right over there.

5  Q     And what is he wearing?

6  A     He's sitting over there with the gray-looking shirt on

7  and the tie.

8  Q     And the tie?

9  A     (Affirmative gesture).

10        MR. FERRELL:  Your Honor, may the record reflect this

11  witness has identified the Defendant, Tron Kent?

12        THE COURT:  It may.

13        MR. FERRELL:  I have no further questions of this

14  witness, Your Honor.

15        THE COURT:  At this time I think we'll take a short

16  recess.

17        Again, Ladies and Gentlemen, please do not discuss

18  this case among yourselves or with anyone else.  We'll take a

19  short recess and then resume testimony later.  You may leave

20  the courtroom.

21        You may step down.  Court is in temporary recess.

22        (Court recessed from 2:40 P.M. until 3:00 P.M.)

23        (Jury seated by the Clerk.)

24        (The following proceedings were held within the

25  hearing and presence of the Jury:)

1      THE COURT:  You may cross-examine.

2      MR. LISZEWSKI:  Thank you, Your Honor.

3                    CROSS EXAMINATION

4  QUESTIONS BY MR. LISZEWSKI:

5  Q    Miss Doyle, we have at least two occasions where you told

6  lies to the police.

7  A    Yes.

8  Q    Are you aware that lying to the police is a crime?

9  A    Yes.

10  Q    What's your understanding of lying to a police officer?

11  About making a false statement on a case?

12  A    I'm really not for sure.

13  Q    That's a crime punishable up to six months in jail at a

14  state ---

15      MR. FERRELL:  Your Honor, I object to that as counsel

16  is testifying at this point.  It's not a question but a

17  statement.

18      THE COURT:  Sustained.

19  Q    (By Mr. Liszewski)  First thing, let's talk about what

20  you lied about.  According to you, you have never touched this

21  gun.

22  A    Yes.

23  Q    It's not what you told Agent Gregory at an interview, is

24  it?

25  A    Well, I did ---

1   Q     "Yes" or "no"?

2   A     Yes.

3   Q     And, in fact, you told Agent Gregory you had touched this

4   gun on at least one occasion, didn't you?

5   A     Yes.

6   Q     You also told Agent Gregory that the way you saw that gun

7   was on a kitchen table when Tron Kent wasn't holding it, true?

8   A     Yes.

9   Q     Today at trial you're saying you hugged Tron Kent and you

10  felt the gun on him.

11  A     That was the first time I seen it.

12  Q     My question for you was:  When you discussed the case

13  with Agent Gregory, you indicated you saw the gun on the

14  table?  "Yes" or "no"?

15  A     Yes.

16  Q     You said nothing about hugging Tron Kent and feeling a

17  gun, did you?

18  A     No.

19  Q     You said nothing about Tron Kent having a gun in the

20  house, did you?

21  A     No.

22  Q     Whenever you talked about your jewelry box, you said you

23  took your jewelry box over to Julie Stevens' house.

24  A     Yes.

25  Q     And then you lost it.

1   A     Yes.

2   Q     Then it comes back and then there's drugs in it.

3   A     Yes.

4   Q     You're saying the drugs in the shoebox -- You said the

5   drugs -- You had never checked that shoebox since you bought

6   those shoes.

7   A     No, I didn't.

8   Q     And you're here at trial testifying to that.

9   A     Yes.

10  Q     Let's go ahead and talk about that.  You're actually not

11  charged with this offense, are you?

12  A     No.

13  Q     Even though they found drugs in your jewelry box.

14  A     No.

15  Q     Even though they found a gun in your nightstand.

16  A     No.

17  Q     Even though they found a gun in your shoe -- or drugs in

18  your shoebox.

19  A     No.

20  Q     You aren't charged?

21  A     No.

22  Q     You never retained a lawyer.

23  A     No.

24  Q     You never appeared in court on these charges.

25  A     No.

1   Q    You got this dismissed without the aid of counsel.

2         MR. FERRELL:  Well, Your Honor, objection.  There's

3   no charges.  We haven't seen a charge being filed.

4         MR. LISZEWSKI:  That's my point; there's no charges.

5         MR. FERRELL:  They were simply dismissed.

6         THE COURT:  I'm going to sustain that.  Go ahead with

7   your next question.

8   Q    (By Mr. Liszewski)  No charges were ever filed.

9   A    No.

10  Q    Now I want to talk to you -- When the police arrested

11  you, they found the drugs -- When they found the drugs in your

12  room, they arrested you.

13  A    Yes.

14  Q    They took you to the station.

15  A    Yes.

16  Q    They handcuffed you.

17  A    Yes.

18  Q    They fingerprinted you.

19  A    Yes.

20  Q    They booked you.

21  A    Yes.

22  Q    They processed you.

23  A    Yes.

24  Q    And then the police wanted to talk to you.

25  A    Yes.

1  Q    And the -- Who brought up the name "Tron Kent"Kent first?

2  A    The police.

3  Q    Which police officer brought up Tron Kent's name first?

4  A    Moody; Anthony Moody.

5  Q    What did Detective Moody tell you?

6  A    He told me that Tron was arrested and asked me about the

7  drugs and the gun and the money and all that that was in the

8  room.

9  Q    Okay.  And so naturally at that point, you knew that they

10 thought Tron Kent was the one who had those drugs.

11 A    Yes.

12 Q    So you said, "They're not mine."

13 A    Yes.

14 Q    Now when you talked to Detective Moody, you weren't

15 entirely truthful with him either.

16 A    No.

17 Q    You lied about the gun.

18 A    Yes.

19 Q    You lied about the box.

20 A    Yes.

21 Q    You lied about the shoebox.

22 A    Yes.

23 Q    You lied about your actual knowledge of these supposed

24 drugs.

25 A    Yes.  I didn't lie about the shoebox.

1   Q    You agreed to cooperate with the police, didn't you?

2   A    Yes.

3   Q    Basically they wanted to know if Tron Kent was involved

4   and you gave them that?

5   A    Yes.

6   Q    And because of that, you got to go home.

7   A    Yes.

8   Q    You went home after Agent Gregory and after Sergeant

9   Stolte talked to you and videotaped a confession with you.

10  A    Yes.

11  Q    At that confession you were in jumpsuit orange.

12  A    Yes.

13  Q    And you blamed it on Tron Kent.

14  A    Yes.

15  Q    And you still lied.

16  A    Yes.

17  Q    So you lied to -- You lied to Detective Moody.  You lied

18  to Agent Gregory.  How in the world can we expect you to tell

19  the truth today?

20       MR. FERRELL:  Your Honor, I'll object to that as

21  being argumentative.

22       THE COURT:  Sustained.

23       MR. FERRELL:  Thank you.

24  Q   (By Mr. Liszewski)  Now according to you, Miss Doyle, a

25  day in the life of Mr. Kent would be that he would go to work

1   and he would come home at about -- in the evening-ish before

2   the sun went down and go to Sikeston.

3   A     (Affirmative gesture).

4   Q     That's your story.

5   A     Yes.

6         MR. LISZEWSKI:  May I approach Your Honor?

7         THE COURT:  You may.

8         MR. LISZEWSKI:  I'm showing the Government what's

9   been marked as Exhibit 36.

10  Q     (By Mr. Liszewski)  Miss Doyle, Exhibit 36, the receipt

11  on the far left, would you, please, read the date as well as

12  the time as it corresponds to "in"?

13  A     "Wednesday, April 19th, 5:00 PM."

14  Q     Next line as it corresponds to "out."

15  A     "Wednesday, April 19th, 11:41 PM."

16  Q     That's almost midnight.

17  A     Every -- He did not work days every day.

18  Q     Okay.  Let's go to ---

19  A     And when he worked nights, he stayed in Sikeston until

20  3:00 in the morning and then came home.

21  Q     Miss, I asked you the question.

22  A     I'm sorry.

23  Q     The answer is "yes" or "no."

24  A     Yes.

25        MR. FERRELL:  Your Honor, I object.  He's arguing

1 with the witness.  I don't think it's "yes" or "no."

2          THE COURT:  Ask your next question.

3 Q   (By Mr. Liszewski)  Let's look at the fourth one here,

4 "Sunday, April 23rd, 4:54 PM."  Did I read that correctly?

5 A   Yes.

6 Q   Out Sunday April 23rd, 10:24 PM.  Did I read that

7 correctly?

8 A   Yes.

9          THE COURT:  Mr. Liszewski, stand at the lectern.

10 Q   (By Mr. Liszewski)  So when you say that Tron Kent was

11 out galavanting around Sikeston every night, that's a bid

12 disingenuous, isn't it?

13          MR. FERRELL:  Your Honor, I'm going to object to this

14 again.  It's argumentative with this witness.

15          THE COURT:  Overruled.

16 Q   (By Mr. Liszewski)  Let me reask the question.  When you

17 said earlier Tron Kent was in Sikeston every night, --

18 A   Yes.

19 Q   -- you seen these receipts, and you see that's clearly

20 not the case.

21 A   He wasn't -- When he worked nights, he stayed in Sikeston

22 until 3:00 in the morning.

23 Q   But you just told us on Direct Examination that you would

24 take him to Sikeston and drop him off.

25 A   Not always.  Sometimes I did.

1    Q    Oh, so sometimes he did it and then other times he

2    doesn't.

3    A    When he worked the days, I would sometimes.

4    Q    Is that what you're saying?

5    A    Yes.

6    Q    Tell me, Miss Doyle, these clothes:  Where were these

7    clothes found?

8    A    In my room.

9    Q    They weren't found in your closet, were they?

10   A    No.

11   Q    They were found on your floor.  "Yes" or "no"?

12   A    Yes.

13   Q    Interestingly enough, you told Mr. Ferrell on Direct

14   Examination that Tron would keep a bag of clothes in your

15   closet on occasion.

16   A    Sometimes.

17        MR. LISZEWSKI:  May I approach once again,

18   Your Honor?

19        THE COURT:  You may.

20   Q    (By Mr. Liszewski)  Showing the Government what's marked

21   as Government's Exhibit 5.

22        THE COURT:  Well, if you got a picture, why don't you

23   use the Elmo.

24   Q    (By Mr. Liszewski)  Miss Doyle, do you see any clothes of

25   Tron Kent's in that closet?

1    A    No, sir.

2    Q    I see a bunch of women's clothes.  Would that be fair to

3    say?

4    A    Yes, sir.

5    Q    Those are your clothes.

6    A    Yes, sir.

7    Q    That's your little negligee sash thing sitting on the top

8    in the blue or purple, right?

9    A    Yes.  That's my sheet.

10   Q    That's your sheet?

11   A    Yes.

12   Q    That was the sheet that was over the little jewelry box

13   here that was holding the dope.

14   A    Yes.

15   Q    That held your jewelry.

16   A    Yes.

17   Q    That you lied about and said you lost.

18   A    Yes.

19   Q    Next thing I want to talk to you about, you just told us

20   today that you have had conversations with Tron Kent about

21   dealing drugs.

22   A    Yes.

23   Q    So I'm sure you told Mr. Gregory about it the day that he

24   interviewed you.

25   A    No.

1  Q    No.  Because you were lying, right?

2  A    I lied that day, yes.

3  Q    Okay.  Sergeant Moody, you didn't tell him about that

4  either, did you?

5  A    No.

6  Q    When did you come to this revelation and who did you

7  tell?

8  A    About two weeks ago.

9  Q    Really?  Who did you tell two weeks ago?

10  A    Larry Gregory and Larry Ferrell.

11  Q    Okay.  So that is the first time that you've come up with

12  this statement that you had talked to Tron about selling dope.

13  A    That's the first time I told them.

14  Q    That's the first time you told anyone.

15  A    Yes.

16  Q    And I would assume that police officers have asked you in

17  the past to tell the truth about a case, haven't they?

18  A    Yes.

19  Q    At what point did you get to go home after you decided to

20  cooperate with the police?

21  A    About 5:00 the next day.

22  Q    So you were in jail for less than 24 hours after 60 grams

23  of dope were found in your room.

24  A    Yes.

25  Q    After a gun was found in your room.

1   A    Yes.

2   Q    After you lied to the cops twice.

3   A    Yes.

4   Q    So clearly, Miss Doyle, when you spoke with ---

5         MR. LISZEWSKI:  Give me just a second, Your Honor.

6   Q    (By Mr. Liszewski)  When you spoke to Agent Novotny, you

7   didn't mention anything about these drug sales of Tron Kent,

8   did you?

9   A    No.

10  Q    And I want to come back to these pictures of you on this

11  cellphone which allegedly my client took.  Government's

12  Exhibit 29, you identified this picture with State Patrol

13  sometime after you got out of jail, right?

14  A    Yes.

15  Q    After you had indicated you would cooperate with the

16  police.

17  A    Yes.

18  Q    After you got to go home after drugs and a gun were found

19  in your room.

20  A    Yes.

21  Q    Did they mention Tron Kent's name to you as well?

22  A    Yes.

23  Q    And I suppose the same would be for Government's 30; the

24  first time it was mentioned to you was after you were out of

25  jail.

1  A    Yes.

2  Q    The same for Government's 31.  This was mentioned to --

3  You mentioned this to the police after you got out of jail.

4  A    Yes.

5  Q    There was no -- You weren't doing this out of the

6  goodness of your heart.  You were doing this to save your

7  behind.

8       MR. FERRELL:  Your Honor, may I ask:  When he says

9  "doing this," may we get some clarification as to what he

10  means by what "doing this" means?

11      MR. LISZEWSKI:  That's fine.  I'll rephrase it.

12  Q    (By Mr. Liszewski)  You weren't blaming Tron Kent out of

13  the goodness of your heart to help society.  You were doing

14  this to save your behind.

15  A    It wasn't mine.  So why would I say that it was mine?

16  Q    After you had been arrested, after they found dope on you

17  and after you were cuffed -- You're going to have to say "yes"

18  or "no".

19      MR. FERRELL:  Judge, I object.

20      THE COURT:  I think you ought to restate your

21  question.  It's a little vague.

22  Q    (By Mr. Liszewski)  The nightstand where the gun was

23  found, those were your brother's baseball cards, right?

24  A    Yes.

25  Q    Okay.  Miss Doyle, has there been any indication that

1  charges could be potentially filed on you in this case in the

2  future by the Government?

3  A    No.

4  Q    Has there been any indication that charges could be filed

5  against you for lying to the police on what we know of at

6  least two separate occasions?

7  A    Yes.

8  Q    They are going to file charges?

9  A    Oh, no.  They ---

10 Q    Exactly.

11 A    They said if I lie today, I'll ---

12 Q    So no one's indicated that for lying, you're not going to

13 face any charges?

14 A    No.

15 Q    In other words, you're going to get away with it.

16        MR. FERRELL:  Your Honor, I object to that as

17 argumentative.

18        THE COURT:  Sustained.

19 Q    (By Mr. Liszewski)  Because you cooperated, you're at

20 home, right?

21 A    Yes.

22        MR. LISZEWSKI:  All right.  I have nothing further of

23 her right now, Your Honor.  I may wish to recall her at a

24 later point.

25        THE COURT:  Any Redirect?

1        MR. FERRELL:  Just a couple of questions.

2                    REDIRECT EXAMINATION

3    QUESTIONS BY MR. FERRELL:

4    Q    Amy, the word "cooperation" has been thrown around out

5    here in the Cross Examination.  Did you enter into any kind of

6    cooperation agreement with the Government?

7    A    No.

8    Q    Okay.  Did the Government -- Has the Government asked you

9    with regard to your testimony to say anything false?

10   A    No.

11   Q    Has the Government at any time indicated to you that

12   they -- or tried to tell you what to say at any point in time?

13   A    No.

14   Q    Has anybody ever promised you, Amy, that you will not be

15   charged with anything?

16   A    No.

17   Q    No one's made any deals with you.  Isn't that true?

18   A    That's true.

19   Q    Now is it fair to say, Amy, that you'd rather not have

20   had to go through this today?

21   A    Yes.

22        MR. FERRELL:  I have no further questions, Judge.

23   Thank you.

24        THE COURT:  Thank you, Ma'am.  You may step down.

25        Would you call your next witness?

1          MR. SORRELL:  Your Honor, we call Jeff Heath.

2          THE COURT:  Sir, do you want to step up here and be

3     sworn?

4          MR. SORRELL:  Excuse me, Your Honor.  I'm doing a

5     little bit of housekeeping.

6          THE COURT:  That's okay.  Go ahead.

7                         DIRECT EXAMINATION

8     QUESTIONS BY MR. SORRELL:

9     Q    Would you state your name, please?

10    A    Jeffrey Heath.

11    Q    What office do you work for?

12    A    I'm a Sergeant for the Missouri State Highway Patrol.

13    Q    And what duties do you perform in your -- in connection

14    with your job?

15    A    I'm assigned to the Division of Drug & Crime Control.

16    Q    And you investigate different crimes that occur in the

17    State of Missouri?

18    A    Yes, sir.

19    Q    Do you have a particular territory that you work?

20    A    Predominantly I work the 13 counties in Southeast

21    Missouri.

22    Q    And did you have some contact or perform some work in the

23    investigation of this particular case involving Mr. Tron Kent?

24    A    Yes, sir.

25    Q    Now as part of your duties, were you contacted in regard

1  to this case when Mr. Kent was arrested?

2  A    Yes, sir.

3  Q    And who contacted you?

4  A    Anthony Moody, Charleston policeman.

5  Q    All right.  Did you make contact after that notice with

6  Mr. Tron Kent?

7  A    Yes, sir.

8  Q    And was anyone else present when you made contact with

9  him?

10  A    Yes, sir.

11  Q    Who was that?

12  A    DEA Agent Larry Gregory.

13  Q    Who's seated here at this table?

14  A    Yes, sir.

15  Q    Where was that contact made?

16  A    At the Mississippi County Sheriff's Department.

17  Q    Were there any other people present during this contact?

18  A    Myself, Agent Gregory and Tron Kent.

19  Q    Okay.  Did Officer Moody check in from time to time or

20  did he not come in at all?

21  A    No, he did not come in at all --

22  Q    All right.

23  A    -- on that particular interview.

24  Q    All right.  And if you would, would you tell the Jury

25  what happened during that contact?

1   A    I contacted Mr. Tron Kent at the Sheriff's Office.  I

2    advised him of his *Miranda* rights, using a Missouri State

3    Highway Patrol Notification & Waiver of Rights form.  He

4    verbally stated he understood it.  He also initialed each and

5    every notification and signed the form and then signed the

6    waiver of rights, stating that he was willing to talk to me.

7   Q    All right.  And so you did interview Mr. Tron Kent?

8   A    Yes, sir, I did.

9   Q    Did you also ask him for a buccal mouth swab?

10   A    Yes, sir, I did.

11   Q    And if you would, explain to the Jury what that

12    particular item is.

13   A    It's basically a sterile swab or large Q-tip that you rub

14    on the inside side of someone's cheek, which is a buccal.

15    That's your buccal, and that's what the lab gets your DNA

16    from.

17   Q    Did -- I'm sorry.  Did you do that process for Mr. Kent?

18    That is, rub this buccal swab in his cheek.

19   A    Yes, I did.

20   Q    Okay.  And that was on the same day as this interview.

21    Is that correct?

22   A    Yes, sir.

23       MR. SORRELL:  Your Honor, may I approach the witness?

24       THE COURT:  You may.

25   Q    (By Mr. Sorrell)  Sir, one of the exhibits I've given you

1   is Exhibit 52.  Would you take a look at that exhibit and tell

2   the Court what that is, please?

3   A    This is a Missouri State Highway Patrol evidence bag

4   which I completed and placed the buccal swab I took from Amy

5   Jean Doyle and sent it to the Missouri State Highway Patrol

6   Crime Lab.

7   Q    All right.  Is that Exhibit 52 or 53?

8   A    That's 52.

9   Q    Okay.  And would you look at the next exhibit?  What it

10  is?

11  A    I'm sorry.  52 my mistake.

12  Q    All right.

13  A    52 was the buccal swab I took from Tron Kent --

14  Q    All right.

15  A    -- and sent to the Crime Lab.  53 is the buccal swab I

16  took from Amy Doyle.

17  Q    Who provides the buccal swabs for you to use on those

18  particular cases?

19  A    They're provided by the Missouri State Highway Patrol.

20  Q    And are they kept in a sterile condition prior to their

21  use?

22  A    Yes, sir, they are.

23  Q    Is there a -- Do you seal those up in anything special or

24  do you seal them up in the envelope when you send them off?

25  A    I seal them up in the envelope.

1  Q    All right.  And that was done in this case.  Is that

2  fair?

3  A    Yes, sir.

4       MR. SORRELL:  Your Honor, I'll offer Exhibits 52 and

5  53, please.

6       THE COURT:  Those are admitted.

7  Q    (By Mr. Sorrell)  Who did you send those exhibits to?

8  A    The Missouri State Highway Patrol Crime Lab.

9  Q    And do you know which of the chemists in that lab

10 actually received these exhibits?

11 A    Yes, sir, I do.

12 Q    And who was that?

13 A    Ruth Montgomery.

14 Q    Did you talk to Mr. Kent any at all about how he met

15 Amy Doyle?

16 A    Yes, sir.

17 Q    And what was his response?

18 A    Said he meant her through a mutual friend by the name of

19 Julie Stevenson.

20 Q    Did he say when that meeting occurred?

21 A    January of 2006.

22 Q    Did you ask Mr. Kent anything about whether he had been

23 to Amy Doyle's house at 501 South Sixth Street in Charleston?

24 A    Yes, sir.

25 Q    What did Mr. Kent say?

1  A    Initially he told me he had never been to her house, and

2  then later on in the conversation he told me that, well, he

3  had been to her house but only three or four times and when he

4  was at her house, he had never went to her bedroom and only

5  was in her front room.

6  Q    Okay.  Did you ask Mr. Kent whether he had any property

7  at the Amy Doyle house?

8  A    Yes, sir, I did.

9  Q    What was Mr. Kent's response?

10 A    He stated he did not have any property.  And then I went

11 through, "Did you have any clothing?"  He said, "no."  I said,

12 "Did you have any drugs?"  "No."  "Did you have any guns?"

13 "No."  That sort of thing.

14 Q    All right.  Did Agent Gregory advise Mr. Kent anything

15 during this conversation about the cellphone that was seized

16 from Mr. Kent?

17 A    Yes, sir, he did.

18 Q    What was that?

19 A    He told Mr. Kent that he was going to seize the cellphone

20 that was in Mr. Kent's property there at the Sheriff's Office.

21 Q    Did Mr. Kent have any response to that comment?

22 A    Yes, sir.

23 Q    What was that?

24 A    He said he didn't care.

25 Q    All right.  Did you also collect some evidence in this

1    case to send it off to the Missouri State Highway Patrol Lab

2    and to Ruth Montgomery?

3    A    Yes, sir.

4    Q    And if I may have that larger bag, please.  What items

5    did you send to Ruth Montgomery?

6    A    I sent the buccal swabs we already talked about.  I sent

7    an ashtray containing cigarette butts, and I believe there

8    were probably some ashes in there, also; a Fila shoebox, a

9    jewelry box containing earrings, and four plastic bags and an

10   unidentified piece of black material.

11   Q    All right.  And did you send all those items in one

12   particular bag?

13   A    Yes.  The way the Highway Patrol wants it packaged is

14   they want -- If you're going to send a big bag like this, they

15   want all the items within it in their own separate bags, if

16   you will.

17   Q    All right.  And the bag you're holding up there, does

18   that contain the items you just testified about that you sent

19   to the Highway Patrol Lab?

20   A    Yes, sir, they do.

21   Q    And is that bag Exhibit 57?

22   A    Yes, sir.

23        MR. SORRELL:  Your Honor, I'll offer Exhibit 57.

24        THE COURT:  57 is admitted.

25   Q    (By Mr. Sorrell)  Sir, did you also send some pillow

1  cases and sheets that were seized from the Doyle house to the

2  Highway Patrol Lab?

3  A    Yes, sir, I did.

4  Q    Sir, let me hand you what's marked as Exhibit 39.  And

5  would you tell the Jury what that exhibit is, please?

6  A    This is a large Texas evidence bag which I received from

7  Sergeant Don Windham of the Missouri State Highway Patrol

8  which contained bed sheets and pillow cases from Amy Doyle's

9  bedroom.

10 Q    All right.  And was that also sent to the Crime Lab --

11 A    Yes, sir, it was.

12 Q    -- by you?  By yourself?

13 A    Yes, sir.

14 Q    Okay.

15      MR. SORRELL:  Your Honor, I'll offer Exhibit 39.

16      THE COURT:  39 is admitted.

17 Q    (By Mr. Sorrell) If you would, also, then turn to an

18 exhibit that's marked 15-B in front of you, please.  And would

19 you tell the Jury what that exhibit is, please?

20 A    These are the plastic bags which I -- that contained the

21 crack cocaine.  The crack cocaine was removed and possession

22 was kept by Agent Larry Gregory.  And I sent these plastic

23 bags to the Missouri State Highway Patrol Crime Lab.

24 Q    All right.  Agent Larry Gregory removed the substances

25 that were inside those Baggies.  Is that right?

1   A    Yes, sir, right in front of me at the Sikeston Service

2   Center.

3   Q    And which container were these Baggies found in?  The

4   brown jewelry box?

5   A    Yes, sir.

6   Q    Okay.  And so basically they're just separated out and

7   just the bags were sent to the Highway Patrol Lab.  Is that

8   fair?  Just the Baggies themselves that were seized?

9   A    Yes; not the crack cocaine.

10  Q    Yes.  Is that fair?

11  A    Yes, sir.

12  Q    Okay.

13          MR. SORRELL:  Your Honor, I'll offer Exhibit 15-B.

14          THE COURT:  15-B is admitted.

15  Q    (By Mr. Sorrell)  And when Miss Montgomery was finished

16  with her examination of those items, she just sent them back

17  to you.  Is that right?

18  A    No, sir.

19  Q    Or she sent them back here for our safekeeping, I guess.

20  A    Actually they were sent to the Troop B Evidence Tech,

21  Evidence Officer.  He places them in the Highway Patrol Troop

22  B Evidence Locker for safekeeping.

23  Q    When the Missouri State Highway Patrol Lab finishes with

24  an item, do they reseal it in some particular fashion?

25  A    Yes, they do.

1   Q   And how do they do that?

2   A   If I could, just this bag here.

3   Q   Yes.

4   A   The blue tape -- I seal it with the red tape and initial

5   it with my initials and badge number and date.  When the Lab

6   opens them and reseals them, they use the blue tape.

7   Q   All right.  And blue tape appears on all the evidence

8   bags that you testified about that's been sent to the Highway

9   Patrol?

10  A   Yes, sir.

11  Q   Indicating that that's been resealed by that lab and sent

12  back; is that fair?

13  A   Yes, sir.

14      MR. SORRELL:  All right.  That's all I have.  Thank

15  you.

16      THE COURT:  Mr. Liszewski?

17      MR. LISZEWSKI:  You have to excuse me, Judge.  My

18  printer went on the fritz this morning.

19                  CROSS EXAMINATION

20  QUESTIONS BY LISZEWSKI:

21  Q   Trooper Heath, I just have a very few questions for you

22  actually.  When you did visit Tron Kent, he did agree to give

23  you a buccal swab, buccal swab.  I'm not sure what the proper

24  pronunciation of it is.

25  A   I've heard it said both ways.  I don't know why.

1   Q    Okay.  At that point he did deny ownership of a gun.

2   A    Yes, sir.

3   Q    He denied ownership of drugs.

4   A    Yes, sir.

5   Q    He denied ownership of the money that was found.

6   A    Yes, sir.

7   Q    Told Agent Gregory, "I don't care if you take the phone;

8   it's not my phone."

9   A    He said he didn't care if he took it, yes, sir.

10  Q    Okay.  Now I want -- What I want to talk to you next

11  about is the interview of Amy Doyle at the Sikeston Service

12  Center.  Do you remember that?  Were you part of that with

13  Sergeant Stolte?  I believe is his name.

14  A    "Stolte"?

15  Q    Stolte, yes, sir.

16  A    Yes, sir.

17  Q    Okay.  So that interview, I would assume she was out of

18  jail.

19  A    Yes, sir.

20  Q    Meaning she was not dressed in Mississippi County dress

21  orange.

22  A    Correct.

23  Q    Okay.  And at that point she was cooperating with the --

24  with law enforcement, right?

25  A    I'd say yes.

1  Q    Now at that point the two of you showed her some

2  pictures.

3  A    Yes.  I had talked to her before that.

4        MR. SORRELL:  Just let me object to what happened

5  during this interview as the nature is hearsay.  It's not this

6  witness' statement.

7        MR. LISZEWSKI:  Judge, it's not hearsay for him to

8  say what he did.

9        MR. SORRELL:  If he's going to ask Miss Doyle's

10  response to him showing her evidence, then that's going to be

11  a hearsay response.

12        THE COURT:  Well, Miss Doyle's response.

13        MR. SORRELL:  Okay.

14        THE COURT:  But if he's asking what this witness did,

15  that's -- All right.

16        MR. SORRELL:  Okay.

17        THE COURT:  Go ahead.  Ask your next question.

18  Q    (By Mr. Liszewski)  Now with respect to the -- with the

19  pictures that were found, you gave -- you gave her an

20  opportunity to look at those.

21  A    Yes, sir.

22  Q    Okay.  And this was after she was out of jail.

23  A    Yes, sir.

24  Q    And this was after no charges had been filed for the

25  drugs or guns found in her house.

1   A    Yes, sir.

2   Q    Okay.

3        MR. LISZEWSKI:  Thank you.  I have no further

4   questions.

5        THE COURT:  Any Redirect?

6        MR. SORRELL:  No, Your Honor.

7        THE COURT:  Thank you, sir.  You may step down.

8        THE WITNESS:  Thank you.

9        THE COURT:  Would you call your next witness, please?

10       MR. SORRELL:  Don Windham, please.

11       THE COURT:  Do you want to step up here, sir, and be

12  sworn?

13                        **DONALD WINDHAM**,

14  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

15  FOLLOWS:

16                    DIRECT EXAMINATION

17  QUESTIONS BY MR. SORRELL:

18  Q    Sir, would you state your name, please?

19  A    Don Windham.

20  Q    What agency do you work for?

21  A    Missouri Highway Patrol.

22  Q    What's your position with that agency?

23  A    I'm a criminal investigator.

24  Q    How long have you been employed by the Missouri State

25  Highway Patrol?

1  A     Twenty-one years.

2  Q     Do you have a particular rank?

3  A     Sergeant.

4  Q     And what are your general duties?

5  A     Criminal investigations ranging from homicide, robberies,

6  stealing, rapes.

7  Q     All right.  Did -- On May the 9th of 2006 did you have an

8  occasion to go to the house in Charleston, Missouri, of

9  Sally Doyle and Amy Doyle?

10  A     Yes, I did.

11  Q     And what was your purpose in going to that house?

12  A     Looking for evidence related to a sex case involving a

13  juvenile, Amy Doyle, and the Defendant.

14  Q     Did you inquire as to Miss Amy Doyle and Mrs. Sally Doyle

15  as to whether or not you could seize items from Amy Doyle's

16  bedroom?

17  A     Yes, I did.

18  Q     And what response did you get from that request?

19  A     Both of them gave us consent.

20  Q     And did you actually go in the room and take some items?

21  A     Yes, I did.

22  Q     Was anyone else with you when you made this search?

23  A     Sergeant Stolte.

24  Q     And what Sergeant or what agency does he work with?

25  A     He's also an investigator with the Highway Patrol.

1  Q    Okay.  Did you also take photographs?

2  A    Sergeant Stolte did.

3  Q    Okay.  All right.  And who identified the room that was

4  the bedroom of Amy Doyle's?

5  A    Her mother, Sally Doyle.

6  Q    And do you recall specifically what items that you took

7  or would you need to have your memory refreshed by the

8  exhibits themselves?

9  A    Two sheets and a -- or two pillow cases and a sheet, some

10  clothes, men's clothing in a plastic bag, some VCR tapes, a

11  pair of boots, license plates, a title application for a

12  vehicle, and some timecards in Tron Kent's name.

13  Q    All right.  Did you seize those particular items from

14  that bedroom and take possession of them yourself?

15  A    Yes, I did.

16  Q    If I may approach just for a second, I'd like for you to

17  look at Exhibits 43 through 51.  Would you tell the Jury what

18  that group of photographs are?

19  A    These are pictures of items taken from the room in the

20  room itself.

21  Q    All right.  During the search of the house; is that

22  right?

23  A    That's correct.

24  Q    It also shows the outside of the house.  Is that fair?

25  A    Yes, it does.

1    Q    Okay.  And these pictures fairly and accurately depict

2    the things that you seized in that room.  Is that fair?

3    A    Yes.  I don't see a picture of the sheets in this group

4    or a picture of the VCR tapes but the others are there.

5    Q    Yes, sir.  Now if I may start off with an Exhibit 34, I'm

6    going to open up that exhibit and display a set of license

7    plates in it.  And do you recall where these license plates

8    came from?

9    A    Out of Amy Doyle's bedroom.

10   Q    And is that an item that you seized from the bedroom?

11   A    Yes, it is.

12   Q    And when you seize an item like that, do you place it in

13   a particular kind of receptacle?

14   A    Yes, I do; a brown paper bag and then I place evidence

15   tape over the top to seal it.

16   Q    And do you sign that bag?

17   A    You sign that bag, yes.

18   Q    And that was down in this case.  Is that fair?

19   A    Yes, sir.

20   Q    Okay.

21        MR. SORRELL:  I offer Exhibit 34, please.

22        THE COURT:  34 is admitted.

23   Q    (By Mr. Sorrell)  Did you also -- Well, let me hand you

24   Exhibit 35.  Would you tell the Court what that exhibit is,

25   please?

1   A    It's an application for a Missouri title and license for

2   a vehicle.

3   Q    Where did you find that item at in the Kent -- or I mean

4   in the Doyle bedroom?

5   A    Yes.  It was in Amy's bedroom.  I believe it was on the

6   dresser.

7   Q    All right.  And is that -- Does that application contain

8   any names on it as far as who the owners of that vehicle are?

9   A    Yes, it does.

10        MR. SORRELL:  And, first, let me offer Exhibit 35,

11   please.

12        THE COURT:  That's admitted.

13   Q    (By Mr. Sorrell)  Would you tell the Jury what the names

14   are on the top of that exhibit?

15   A    Tron Kent and Amy Doyle.

16   Q    Did you have an occasion to run the registration on those

17   particular -- on that particular application?

18   A    I didn't.  Sergeant Heath may have done that.

19   Q    All right.  And does the Missouri State Highway Patrol

20   keep records of the -- or actually it's the Department of

21   Revenue -- keep records as to the vehicle registration?

22   A    Yes, they do.

23   Q    And that's an archival that you can obtain.  Is that

24   fair?

25   A    Yes.

1    Q    All right.  I've handed you what's been marked as Exhibit

2    33.  Can you tell the Court what that is?

3    A    This is information that would have been run off of a

4    computer through the Police Department, Highway Patrol, and

5    basically shows the owner, title and registration of a

6    vehicle.

7    Q    All right.  And how does Exhibit 35, 36 or 33, the

8    exhibit you're holding there, and 34, the license plates, and

9    35, the title application, how do they correlate?

10   A    The vehicle license plate here is 644 ZTN.  It is to the

11   owners Tron Kent and Amy Doyle, and it's on an Olds 1988

12   four-door.

13   Q    Basically it's all for the same car.  Is that fair?

14   A    Yes.

15   Q    Okay.

16        MR. SORRELL:  Your Honor, I'll offer Exhibit 33.

17        THE COURT:  That's admitted.

18   Q    (By Mr. Sorrell)  Sir, I've handed you Exhibit 36 in that

19   envelope on the bottom.  Would you tell the Court what that

20   exhibit is, please?

21   A    It says "Tron Kent" and "timecards;" in/out time for --

22   It looks to me like employment for work.

23   Q    Basically is that an item you seized from the Doyle

24   bedroom?

25   A    Yes, it is.

1  Q    And it was maintained in your custody until it's been

2  here today?

3  A    No.

4  Q    Or okay.

5  A    I seized it and turned it over to the Charleston Police

6  Department.

7  Q    That's fair.

8  A    Okay.

9  Q    And -- But you're the seizing officer.  Is that right?

10  A    Yes, sir.

11  Q    All right.

12        MR. SORRELL:  Your Honor, I'll offer Exhibit 36.

13        THE COURT:  36 is admitted.

14  Q    (By Mr. Sorrell)  And below you on the ground is a

15  plastic bag marked Exhibit 37.  Do you recall seeing that bag

16  before?

17  A    Yes.

18  Q    And would you tell the Court what that is?

19  A    It's a bag of men's clothing.

20  Q    Where was it seized from?

21  A    Amy Doyle's bedroom.

22  Q    Do you recall about where?

23  A    On the floor as you walk in the door by the dresser or to

24  the left there as you go into the bedroom.

25  Q    Were the clothes already in the bag that you see here

1   today?

2   A     Yes, they were.

3   Q     All right.  So you basically just pick up the bag and

4   all?

5   A     Just seize the bag and all.

6   Q     All right.

7         MR. SORRELL:  Your Honor, I'll offer Exhibit 37.

8         THE COURT:  37 is admitted.

9   Q     (By Mr. Sorrell)  And, sir, there's an Exhibit 38 in

10  front of you, for the bag that contains the boots.  Have you

11  ever seen that exhibit before?

12  A     Yes, I have.

13  Q     What is that?

14  A     This is the boots seized from Amy Doyle's bedroom that

15  were on the bedroom floor.

16        MR. SORRELL:  Your Honor, I'll offer Exhibit 38.

17        THE COURT:  38 is admitted.

18  Q     (By Mr. Sorrell)  Sir, I've handed you Exhibit 40.  Would

19  you tell the Court what that exhibit is?

20  A     Six VCR tapes and six DVDs seized from Amy Doyle's

21  bedroom.

22  Q     All right.  And, again, you took custody of those items

23  on May the 9th, 2006?

24  A     That's correct.

25  Q     Okay.  What about Exhibit 39 down below?  Could you tell

1    the Court what that exhibit is?

2    A    Yes.  This is the sheets and pillow cases we found on the

3    bed in the room.

4    Q    And, again, you seized those items?

5    A    Yes.

6    Q    And who did you turn the sheets and pillow cases over to?

7    A    Sergeant Heath with the Highway Patrol, and he sent them

8    to the Highway Patrol lab for analysis.

9    Q    All right.

10         MR. SORRELL:  Your Honor, I believe 39 and 40 are

11   already admitted.

12         THE COURT:  They're admitted.

13         MR. SORRELL:  Thank you, Officer.  That's all.

14         THE COURT:  Mr. Liszewski?

15         MR. LISZEWSKI:  Your Honor, I don't believe I have

16   any questions right now.  I would like to reserve the right to

17   recall him in the event it becomes necessary in the trial.

18         THE COURT:  Thank you, sir.  You may step down.

19         MR. SORRELL:  May we retrieve those exhibits?

20         THE COURT:  Sure.

21         MR. SORRELL:  Also, Your Honor, I would like to offer

22   Exhibit 42 which is the DEA lab report that's already been

23   identified in this parties' stipulation.

24         THE COURT:  Okay.  And that is admitted by

25   stipulation.

1              MR. SORRELL:  Thank you.

2              THE COURT:  Would you call your next witness?

3              MR. FERRELL:  Your Honor, the Government would call

4    Jeremy Hodges to the stand.

5              May we approach the bench, Your Honor?

6              THE COURT:  Sure.

7              (The following proceedings were held at sidebar,

8    outside the hearing of the Jury:)

9              THE COURT:  Is this your 404(b)?

10             MR. FERRELL:  We're moving into 404(b).  I have an

11   instruction prepared.  This instruction will cover the event

12   which occurred on November 21st, 1999, and then the second

13   event which we're about to hear testimony on from Gregory --

14   not Gregory, but Hodges of finding a gun and crack cocaine on

15   him and the plea to that.  And then on May the 12th, we're

16   going to hear testimony from Officer Blakely about a

17   controlled purchase and a plea of "guilty" to sale on that

18   one.  So those are the two that are going to be upcoming at

19   this time.

20             THE COURT:  Okay.

21             MR. FERRELL:  We would like to read this instruction

22   which tells them they're about to hear this evidence at this

23   time.

24             THE COURT:  Yeah.  Did you see that?

25             MR. LISZEWSKI:  Not yet.  How much further are you

1   anticipating on going?  We have Blakely and Hodges.

2         MR. FERRELL:  That's the next two witnesses, Blakely

3   and Hodges.  And we have the court reporter -- I mean the

4   Court Clerk from Scott County.

5         MR. LISZEWSKI:  Okay.

6         MR. FERRELL:  I don't know that -- Judge, I don't

7   know how long you want to go; what's your time?

8         THE COURT:  I'm fine.  If we're out of witnesses, ---

9         MR. FERRELL:  We're so far ahead.  After ---

10        MR. LISZEWSKI:  I don't anticipate a fairly lengthy

11  Case in Chief at all on my part.  I don't.

12        THE COURT:  Well, we can get into that later.  Who

13  else have you got?  You got these two guys and the court

14  reporter.

15        MR. FERRELL:  Yes.  And we have the -- of course, the

16  DNA expert and we have Larry Gregory.

17        THE COURT:  Yeah.

18        MR. LISZEWSKI:  It's my understanding you guys are

19  calling the DNA expert tomorrow.

20        MR. FERRELL:  Yeah.  She's here now and we could

21  almost get her in today, but if it's too much, ---

22        MR. LISZEWSKI:  You call her tomorrow.

23        THE COURT:  Well, we'll see where we are today.  We

24  got a late start.

25        MR. FERRELL:  That might be lengthy.  We'll have

1  testimony, Judge, to take us through today.

2       THE COURT:  Okay.

3       MR. FERRELL:  We'll be able to send this to the Jury

4  about noon or 1:00 tomorrow probably.

5       MR. LISZEWSKI:  Yeah, that's what I was thinking.

6       THE COURT:  Well, we'll talk about all that later.

7  We might do the instructions tonight after we send the Jury

8  home.  Okay.

9       MR. FERRELL:  Thank you, Judge.

10      THE COURT:  Yeah.

11      MR. LISZEWSKI:  Hey, Judge, can we make sure -- Let

12  me wait for Larry to come back.  I just want to make sure that

13  for the record my 404(b) objection's preserved.  I am making

14  an objection to that.

15      THE COURT:  That's fine.

16      MR. LISZEWSKI:  Okay.

17      THE COURT:  I'm never sure because you want to have a

18  continuing one, which I don't have a problem with, and then

19  you keep getting up here.

20      MR. LISZEWSKI:  Well, I just ---

21      THE COURT:  It's fine.  I mean do whatever you want

22  to do to protect your record, but I'm agreeable to continue

23  it.

24      MR. LISZEWSKI:  Okay.  That's fine.

25      THE COURT:  Yeah.

1          (The following proceedings were held within the

2     hearing and presence of the Jury:)

3                          **JEREMY HODGES**,

4     HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

5     FOLLOWS:

6          THE COURT:  Ladies and Gentlemen, before we proceed

7     with the next witnesses, I want to read an instruction to you.

8          You are about to hear a certain category of evidence

9     called "similar acts evidence."  Here, that evidence is that

10    the Defendant, Tron Kent, possessed cocaine base and a Ruger

11    semi-automatic pistol on November 21, 1999, in East Prairie

12    Missouri, and that on May 12, 2003, he distributed crack

13    cocaine in Sikeston, Missouri.

14         You may not use this similar acts evidence to decide

15    whether the Defendant carried out the acts involved in the

16    crime charged in the indictment.  In order to consider similar

17    acts evidence at all, you must first unanimously find beyond a

18    reasonable doubt that the Defendant -- based on the rest of

19    the evidence introduced, that the Defendant carried out the

20    acts involved in the crimes charged in the indictment.  If you

21    make that finding, then you may consider similar acts evidence

22    to decide motive, intent, preparation, plan, knowledge or

23    absence of mistake or accident.

24         Similar acts evidence must be proven by a

25    preponderance of the evidence.  That is, you must find that

1   the evidence is more likely true than not true.  This is a

2   lower standard than proof beyond a reasonable doubt.  If you

3   find this evidence is proven by a preponderance of the

4   evidence, then you should give it the weight and value you

5   believe it is entitled to receive.  If you find that it is not

6   proven by a preponderance of the evidence, then you shall

7   disregard such evidence.

8           You may proceed, Mr. Ferrell.

9           MR. FERRELL:  Thank you, Your Honor.

10                  DIRECT EXAMINATION

11  QUESTIONS BY MR. FERRELL:

12  Q    State your name for the Jury, please, sir.

13  A    Jeremy Lee Hodges.

14  Q    And what is your profession, sir?

15  A    Police officer.

16  Q    And where are you a police officer, Officer Hodges?

17  A    City of Portageville.

18  Q    And can you tell the Jury, please, basically what your

19  duties are with the Portageville Police Department?

20  A    School resource officer.  I work at the school during the

21  school year and then I work the streets during the summer.

22  Q    Now you joined them in about January of this year.  Is

23  that correct?

24  A    Yes, sir.

25  Q    Now prior to that time, you had previous law enforcement

1  experience.  Is that correct, sir?

2  A    Yes, sir.

3  Q    Okay.  Where did you begin your law enforcement career

4  and training?

5  A    I started in '99 with the City of East Prairie.

6  Q    Okay.  And was that following your training at the

7  Southeast Missouri State University Police Academy?

8  A    Yes, sir.  I went there for my 480 Certification and I

9  attended Shawnee Community College and got my Associate's

10 Degree in Criminology.

11 Q    All right.  You say your "480," the folks may not be

12 familiar with that term.

13 A    Police officer certification so you can be a police

14 officer.

15 Q    Four hundred and eighty hours of training?

16 A    Of training, yes, sir.

17 Q    Okay.  Now you indicated that after you graduated and got

18 your degree and graduated from the Academy, you began working

19 with the East Prairie Police Department.  Is that correct?

20 A    Yes, sir.

21 Q    Approximately when was that, Officer Hodges?

22 A    It was around October 1st of '99.

23 Q    Around -- Excuse me.  You said August of '99?

24 A    October the 1st of '99, roughly.

25 Q    I'm sorry.  October the 1st of 1999.  And how long did

1   you stay with that department?

2   A    Around three years.

3   Q    Okay.  After you left that department, you also had

4   experience as a law enforcement or corrections officer for the

5   Missouri Department of Corrections.  Is that correct?

6   A    Yes, sir.

7   Q    And approximately how long were you an officer for the

8   Missouri Department of Correction?

9   A    Roughly about three years.

10  Q    So I want to go back to where you began.  You said you

11  began at the East Prairie Police Department October or so of

12  1999.  Let's go to November the 21st of 1999, a couple of

13  months after you started for them.

14  A    Yes, sir.

15  Q    All right?  Do you recall that date, November the 21st,

16  1999?

17  A    Yes, sir.

18  Q    Okay.  Now that's seven, eight years ago almost.  Do you

19  remember that date today?

20  A    Yes, sir, very well.

21  Q    Were you working for the East Prairie Police Department

22  that day, sir?

23  A    Yes, sir.

24  Q    And were you on routine patrol at approximately 2:10 AM

25  that morning?

1    A    Yes, sir.

2    Q    Okay.  Where were you patrolling, sir?

3    A    The housing authority.  When I worked for the City of

4    East Prairie, I was the housing authority officer, so that was

5    my primary patrol area.

6    Q    And as you were patrolling that area at 2:10 in the

7    morning, did you see anything which caught your eye or aroused

8    your suspicion as a police officer?

9    A    I seen an older model Oldsmobile Cutlass pull into the

10   area and it had defective equipment.

11   Q    What was wrong with it?

12   A    The license plate light was out.

13   Q    All right.  Did you follow the car?  Where it went?

14   A    It actually pulled in.  As soon as it pulled into the

15   parking spot, I pulled in behind it.

16   Q    And when you pulled into the -- pulled in behind this

17   car, it was in the driveway of one of the apartments.  Is that

18   correct?

19   A    Yes, sir.

20   Q    Okay.  And did you call in your traffic stop --

21   A    Yes, sir.

22   Q    -- as you were taught to do?

23   A    Yes, sir.

24   Q    So after you did that, what did the driver and

25   passenger -- Well, let me ask you:  How many people were in

1  the car?

2  A    There were two occupants, two males.  The passenger got

3  out and he walked up towards the residence.  I got out of my

4  patrol car, and then the driver got out of the vehicle and was

5  getting some stuff out of the vehicle.

6  Q    Okay.  So the passenger went up to a residence.  Is that

7  correct?

8  A    Yes, sir.

9  Q    Okay.  And did you approach the driver?

10 A    Yes, sir.

11 Q    What did you do when you approached the driver?

12 A    I identified myself.  I noticed he kept sticking his hand

13 where I couldn't see it.  At that time I told him to place his

14 hands where I could see them.

15 Q    Okay.  Did you ask him for his license at some point?

16 A    Not at that point.  When he -- Actually when I approached

17 him, he just kept sticking his hand back there where I

18 couldn't see it and turned away from me.

19 Q    All right.  So this ---

20 A    So my main priority was ---

21 Q    My apologies.  I spoke too soon.

22 A    My main priority was my personal safety at that time.

23 Q    All right.  So were you focusing on his hand that was

24 being taken out of view?  His arm?

25 A    Yes.

1    Q    Trying to see that area.  Do you remember if it was his

2    left arm or his right arm that he was taking out of view?

3    A    His left.

4    Q    His left arm.  What did you tell him to do at that point

5    when he was taking his left arm out of your view?

6    A    I told him to place his hands on top of the vehicle where

7    I could see them.

8    Q    And did he do so?

9    A    Yes, sir.

10   Q    Okay.  So when he placed his hands on top of the vehicle,

11   could you tell if he had anything in the left hand?

12   A    Yes, sir.  He had a beer in the left hand and something

13   else kept having his hand cupped after he sat the beer down,

14   and then he put his right arm up there and when he did, his

15   jacket raised up on his right side.

16   Q    Okay.  So when he put his right arm up on the car, you

17   saw his jacket raise up?

18   A    Yes, sir.

19   Q    When his jacket raised up, can you tell this Jury what,

20   if anything, you saw?

21   A    I saw the butt of the Ruger pistol in his waistband.

22   Q    Well, what did you do when you stopped this vehicle at

23   2:10 AM in the morning and you see that the person that raised

24   their arm has a Ruger pistol?

25   A    I drew my weapon and told him to keep his hands where I

 1  could see them.

 2  Q    And did he -- did he do so?

 3  A    He kept bouncing around.  He was real jittery, and I told

 4  him to back up; advised him to put his hands behind his head.

 5  Q    That's the comment; you put your fingers together behind

 6  your head?

 7  A    Lock your fingers behind your head.

 8  Q    All right.  Did he do that?

 9  A    He brought his hands back like this and then he jetted to

10  the left of the vehicle.

11  Q    By "jetting," I assume ---

12  A    He took off running to the left of the vehicle.

13  Q    -- you mean he took off running.  Okay.  So when he took

14  off running, had any of your support gotten there by this

15  time?

16  A    No, sir.  No, sir.

17  Q    Okay.  So he took off running.  What did you do?

18  A    I pursued him around the back of the set of apartments.

19  As he went around the back corner, it was really dark.  I

20  turned back around and ran to the front of the apartments

21  where I caught back up with him and chased him around a few

22  more sets of apartments.

23  Q    So you got behind him and chased him at that point?

24  A    Yes, sir.

25  Q    Okay.  Was there -- Was there a point at which you

1  confronted him again out there with your weapon?

2  A    Yes, sir.  He came around a set of another apartments,

3  and when he turned, he reached back to where his waistband --

4  to where the weapon was, and I stopped and told him to stop or

5  I'd shoot him.  He seen me stop, and he hit the ground, and

6  about that time my other partner arrived.

7  Q    All right.  Now you said -- You motioned -- You said the

8  gun was in his waistband?

9  A    Yes, sir, right-hand side.

10  Q    Okay, right-hand side.  Front?  Back?

11  A    About the center.

12  Q    About the center.

13  A    Right in here.

14  Q    Okay, of your side.  All right.  So -- And he dropped to

15  his knees.  And then at that time did your support arrive?

16  A    Yes, sir.

17  Q    And was he handcuffed?

18  A    Yes, sir.

19  Q    Okay.  And so did you look for the firearm at that

20  moment?

21  A    After he was cuffed, we did a search, a pat search of him

22  and to locate the weapon.

23  Q    The gun wasn't there anymore.

24  A    No, sir.

25  Q    Was there a point in time in which the gun -- in which he

1   left your sight when you were chasing him?

2   A    When he went around the corner of the back building, of

3   the first building I pursued him around, that's when I

4   stopped, turned around and went to the front.  That's the only

5   time I lost sight of him.  So we went back to that area to

6   search.

7   Q    Okay.  And was one of the officers that helped you there

8   Officer Massey?

9   A    Yes, sir.

10  Q    And, in fact, after this person was arrested, Officer

11  Massey put him in his patrol car.  Is that correct?

12  A    Yes, sir.

13  Q    So while he's in the patrol car, do you go back to the

14  area, the route that you ran, looking for the weapon?

15  A    Yes, sir.

16  Q    And what, if anything, did you see or hear Officer Massey

17  do?

18  A    Officer Massey said, "I found it."  He then pulled a P95

19  Ruger nine-millimeter out of the grass and dropped the clip,

20  ejected one out of the magazine or took one out of the

21  chamber, unloaded it.  He unloaded the weapon.

22  Q    So it was a Ruger --

23  A    P95.

24  Q    -- P95.

25  A    Yes.

1    Q    And what size gun was this?

2    A    Nine-millimeter.

3    Q    Nine-millimeter gun.  And it was loaded with one in the

4    chamber?

5    A    Yes, sir.

6    Q    So when you picked up the gun, did you discover anything

7    else at that location?

8    A    He discovered -- I believe it was two Baggies of a white

9    substance.

10   Q    Okay.  And did you see him discover it there or pick it

11   up?

12   A    I seen him when he picked it up out of the grass by the

13   weapon.

14   Q    So we found two Baggies of white substance.  And what did

15   that -- Based upon your training and experience in law

16   enforcement, what did that appear to be?

17   A    It appeared to be cocaine.

18   Q    So was the cocaine and gun taken into evidence?

19   A    Yes, sir.

20   Q    Okay.  And at this particular point in time, did you see

21   the person that was in the car?  That had been placed in the

22   patrol car?  Did you see him?

23   A    Yes, sir.

24   Q    And what was he doing?

25   A    He was -- He had done -- By that time, when I come back

1   around the apartments, he had crawled out of the -- over the

2   patrol car.  We didn't have cages in our car.  He had crawled

3   out of the back seat and through the window in the front of

4   the patrol car and he was running through the apartment

5   complex.

6   Q    So he was running on foot again.

7   A    Yes, sir.

8   Q    Did you catch him again?

9   A    Yes, sir.

10  Q    Now, again, you said that you collected the evidence; the

11  gun at hand and what appeared to be crack cocaine to you.  Is

12  that correct?

13  A    Yes, sir.

14  Q    All right.  Did you ask this person his name that you

15  chased and caught?

16  A    Yes, sir.

17  Q    What name did he tell you?

18  A    He identified himself as Tron Kent.

19  Q    And just -- The last question for you.  The man that

20  stepped out of that maroon car that night that had that

21  fully-loaded cocked nine-millimeter in his waistband, do you

22  see him here in the courtroom today?

23  A    Yes, sir.

24  Q    Would you point him out for the Jury, please?

25  A    Right there.

1    Q    And would you describe him, please?

2    A    The man in the green shirt.

3    Q    At the counsel table here?

4    A    Yes, sir.

5         MR. FERRELL:  Your Honor, may the record reflect that

6    the witness has identified this Defendant, Tron Kent?

7         THE COURT:  It may.

8         MR. FERRELL:  Thank you, Your Honor.  I have no

9    further questions of this witness.

10        THE COURT:  Mr. Liszewski?

11        MR. LISZEWSKI:  No questions.

12        THE COURT:  Thank you, sir.  You may step down.

13        Would you call your next witness?

14        MR. FERRELL:  John Blakely.

15                      **JOHN BLAKELY**,

16   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

17   FOLLOWS:

18        MR. FERRELL:  May it please the Court, Your Honor.

19                    DIRECT EXAMINATION

20   QUESTIONS BY MR. FERRELL:

21   Q    State your name for the Jury, please, sir.

22   A    John Blakely.

23   Q    You testified previously in this case already once today,

24   haven't you, sir?

25   A    Yes.

1   Q    Today you're testifying about a different matter than

2   what you testified to this morning, correct?

3   A    Yes, sir.

4   Q    Okay.  Now you're a detective for the Sikeston Department

5   of Public Safety?

6   A    Yes, sir.

7   Q    Okay.  What I want to talk to you about at this time is

8   an incident which occurred back on the date of May the 12th of

9   2003.  Do you recall that day, sir?

10  A    Yes, sir.

11  Q    And you were working as a detective for the Department on

12  that occasion.  Is that correct, sir?

13  A    Yes, sir.

14  Q    Now as a detective for the Sikeston Department of Public

15  Safety, did you have occasion to work in the field of

16  narcotics and drug investigation?

17  A    Yes, sir.

18  Q    On this particular date and time, May 12th of 2003, can

19  you tell the Jury if you were involved in any particular

20  investigation on that day?

21  A    Yes, sir.

22  Q    And what was the nature of your investigation there, sir?

23  A    With the use of a confidential informant, I made a

24  controlled buy from Tron Kent, also known as "TKO."

25  Q    Now when you use the term "confidential informant," what

1  do you mean by that, sir?

2  A    Somebody that's been signed up to make controlled buys

3  either for monetary gain or to help lessen an offense that

4  they've been charged with.

5  Q    And this confidential informant was going to assist you

6  in making a controlled buy.  What is a "controlled buy"?

7  A    It's where I provide the informant with money that's

8  copied to make the purchase of whatever, which in this case it

9  was crack cocaine.  The location where the controlled buy's

10 going to take place is pre-established.  The amount of drugs

11 that's going to be purchased is pre-established, and then the

12 informant is searched prior to and afterwards and then taken

13 to or watched as they go to the location where the purchase is

14 going to take place.

15 Q    All right.  And did you search your confidential

16 informant and maintain a watch over them as they went to the

17 intended location?

18 A    Yes, sir.

19 Q    And that location was where, sir?

20 A    133 Cardinal in Sikeston.

21 Q    And the person with which you expected to purchase the

22 controlled substances on that day was who?

23 A    Tron Kent.

24 Q    And after you followed your confidential informant to 133

25 Cardinal, did the confidential informant come out?

1   A    Yes.

2   Q    And did you follow your confidential informant and meet

3   with him?

4   A    Yes, sir.

5   Q    And what, if anything, did you do once you met with the

6   confidential informant?

7   A    They handed me the substance that was purchased which was

8   later field tested as crack cocaine.  And then the informant

9   was searched again to make sure they didn't have anything on

10  them they shouldn't have.

11  Q    All right.  And the money you had given him was gone.  Is

12  that correct?

13  A    Yes, sir.

14  Q    Okay.  Now this particular case, was a charge filed

15  against Tron Kent?

16  A    I believe in 2004, yes, sir.

17  Q    So when that case filed, that would be in the Circuit

18  Court of Scott County, Missouri.  Is that correct?

19  A    Yes.

20  Q    And was a charge filed against him for the Class B felony

21  of distribution of a controlled substance?

22  A    Yes, sir.

23  Q    And did you field test this controlled substance?

24  A    Yes, sir, I did.

25  Q    And what did it test positive for?

1    A    Cocaine.

2    Q    Now was it powder cocaine or crack cocaine?

3    A    It was crack cocaine.

4    Q    Now you are familiar with the progression of that case in

5    the Circuit Court of Scott County, are you not, sir?

6    A    Yes.

7    Q    And as a matter of fact, I've had you take a look at

8    what's been marked as Government's Exhibit 6 which has

9    previously been identified as a transcript of two separate

10   proceedings in the Circuit Court of Scott County, Missouri, on

11   April 22nd, 2004, one of them being your case.  I'm going to

12   hand this to you, and I would like to ask you some questions

13   about the transcript of the proceedings relating to your case.

14   A    Yes, sir.

15   Q    I'd like for you, if you would, please, to turn to Page 4

16   of those proceedings.  Actually turn to Page 5, if you would.

17   I'm sorry.  Now at Line 24 there's a question that was asked

18   by the Court at this -- or a statement by the Court at this

19   particular point in time.  Is that correct?

20   A    Yes, sir.

21   Q    Can you read to the Jury, please, Lines 24 and 25 of Page

22   5 and then the first line of Page 6?

23   A    Yes, sir.

24        MR. LISZEWSKI:  Objection; Best Evidence Rule, Judge.

25   The Jury can read for themselves.

1          THE COURT:  Overruled.

2          MR. FERRELL:  Thank you.

3    A    It says:  "Question of Q:  Listen to the facts the

4    prosecutor says she would prove if we had a trial.  If they

5    are different from what you believe them to be, let me know."

6    Q    (By Mr. Ferrell)  And then the prosecuting attorney,

7    Mr. Weis, made a statement to the Court as to what the facts

8    were.  Is that correct?

9    A    Yes.

10   Q    I'd like to refer you to Lines 11, beginning with

11   Mr. Kent, through Line 15.  Would you read that for the Jury,

12   please?

13   A    Yes, sir.  "Mr. Kent, in the County of Scott, State of

14   Missouri, at 133 Cardinal Street, was approached by Informant

15   0221 in which the Informant bought crack cocaine from

16   Mr. Kent.  And, again, what happened -- And, again, that

17   happened in the State of Missouri."

18   Q    Okay.  And there's a response by Mister -- by the Court.

19   Is that correct?

20   A    Yes, sir.

21   Q    And what response did the Court make?

22   A    "Is that basically what happened in this case, Tron?"

23   Q    Okay.  And does the record reflect at Line 18 what

24   Tron Kent said?

25   A    Yes, sir.

1  Q    Now at that point in time the Court -- I would like for

2  you to read simply Lines 19 through 25 of the transcript as to

3  what immediately followed after Mr. Kent said, "Yes, sir."

4  A    "Do you remember when I asked you to raise your right

5  hand and promise to tell the truth?  Is everything you told us

6  so far today been the truth?"

7       "Yes, sir."

8       "Nobody asked you to come in and tell a lie or take

9  the blame for somebody else, have they?"

10      "No, sir."

11 Q    And then at that point in time did Mr. Kent introduce a

12 plea of "guilty" to that charge?

13 A    Yes, sir, he did.

14      MR. FERRELL:  I have no further questions of this

15 witness, Your Honor.

16      THE COURT:  Any Cross-Examination?

17      MR. LISZEWSKI:  I have no questions on this issue.

18      THE COURT:  Thank you, sir.  You may step down.

19      You may call your next witness.

20      MR. FERRELL:  I'm sorry, Your Honor.  We call Agent

21 Larry Gregory to the stand.

22                    **AGENT LARRY GREGORY**,

23 HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

24 FOLLOWS:

25      MR. FERRELL:  May it please the Court, Your Honor.

1    DIRECT EXAMINATION

2    QUESTIONS BY MR. FERRELL:

3    Q    I'd like you to state your name for the Jury, please,

4    sir.

5    A    My name is Larry Gregory.

6    Q    Okay.  And what is your profession, sir?

7    A    I'm a Special Agent with the Drug Enforcement

8    Administration.

9    Q    How long have you been a Special Agent for the DEA, sir?

10   A    Since September of 1988.

11   Q    Would you share with the Jury, please, what your law

12   enforcement experience was prior to becoming a Special Agent

13   for the Federal Drug Enforcement Administration?

14   A    I started as a police officer in February of 1979 in

15   Sikeston, Missouri.  I left Sikeston in 1983 and became a

16   trooper with the Missouri State Highway Patrol.  In 1986 I

17   began working undercover narcotics with the Highway Patrol

18   within the Division of Drug & Crime Control.  In 1988 I left

19   the Highway Patrol and became an agent with DEA.

20   Q    Now, Agent Gregory, you're the case agent in this

21   particular case.  Is that correct, sir?

22   A    Yes, sir.

23        MR. FERRELL:  May I approach the witness, Your Honor?

24        THE COURT:  You may.

25   Q    (By Mr. Ferrell)  You were first called in this

1  particular case to go to Charleston, Missouri, to meet with

2  law enforcement officers there and to collect some evidence,

3  is that correct, as part of your duties?

4  A    Yes, sir, that's correct.

5  Q    Do you recall when you went to the -- to Charleston,

6  Missouri, to assist in this investigation?

7  A    May the 9th.

8  Q    Okay.  And on May the 9th did you receive certain

9  evidence into your possession?

10 A    Yes, sir, I did.

11 Q    Would that include the cocaine which was taken from the

12 Doyle residence there on Sixth Street as well as -- Well, as

13 far as drug evidence, would it include the evidence taken from

14 that residence?

15 A    No, sir.  Actually I received the drug evidence on May

16 the 10th.  The evidence that I received on May the 9th was the

17 cellphone and the car keys.

18 Q    I see, sir.  And let's go on.  We're going to skip to the

19 10th and just go ahead and take care of the drug evidence, if

20 you will.

21 A    Yes.

22 Q    You received two exhibits.  Who did you receive them

23 from?

24 A    Sergeant Moody with the Charleston Police Department.

25 Q    And when Sergeant Moody turned the drug exhibits over to

1  you, they were in what condition, sir?

2  A    They were in the same condition as he had discovered them

3  in the -- I'm sorry.

4  Q    That's okay.  And he placed them into a bag?

5  A    Yes, sir, he did.

6  Q    Okay.  And had he sealed the bag?

7  A    Yes, sir, he did.

8  Q    Okay.  When the items were turned over to you, were they

9  still in the sealed bag with this tape?

10  A    Yes, they were.

11  Q    You took the sealed bag with the evidence, and what did

12  you do with it, sir?

13  A    I met with Sergeant Heath with the Highway Patrol at the

14  Highway Patrol satellite station in Sikeston.  And from there,

15  we opened the bags and removed the crack cocaine.

16  Q    Okay.  And when you removed the crack cocaine from the

17  paper bags that the officer had them seized in or packaged in,

18  what did you do with them?

19  A    The crack cocaine was then resealed in one of my evidence

20  bags and sent to our lab in Chicago for analysis.

21  Q    Okay.  Now if I could, at this time I would like to

22  approach you and hand you two exhibits.  One is marked Exhibit

23  15-A and one is marked Exhibit 12.  Can you identify those two

24  for us, sir?

25  A    Yes, sir.

1   Q    And what are Exhibits 12 and 15-A?

2   A    15-A is the evidence bag which holds the crack cocaine

3   that was removed from the four plastic Baggies in the brown

4   jewelry box.  Exhibit 12 is the evidence that was removed from

5   the -- from the shoebox.

6   Q    And once you took them out of that bag that the officer

7   had given to you, you said you placed them in heat-sealed

8   packages.  Is that correct?

9   A    Yes, sir.

10  Q    Are those the packages that I just handed to you?

11  A    Yes, sir, they are.

12  Q    And why do you place them in the heat-sealed package?

13  A    To maintain custody and to allow the chemist to see

14  what's in them once they receive them there at the lab.

15  Q    All right.  So you on that date -- or you sealed the

16  bags.  You put the evidence in there and you sealed the bags

17  and put your initials on there; marked it.  Is that correct?

18  A    Yes, sir, that's correct.

19  Q    Okay.  And along with the -- Now the heat-sealed

20  container with the two exhibits, do you fill out a chain of

21  custody sheet which is forwarded along to the drug chemist?

22  A    Yes, sir, I do.

23  Q    I'd like to hand you what's been marked as Exhibit 42 and

24  ask if you can identify that for the Jury, please?

25  A    Yes, sir, I can.

1    Q    And what is Exhibit 42?

2    A    This is what's referred to as a "DEA 7."  It's a lab

3    report which is submitted with the evidence to the lab.  Upon

4    receipt of this, the lab acknowledges that they received the

5    drugs, and they use it later to record their analysis of the

6    drugs.

7    Q    And so you generate that item first.  Is that correct?

8    A    Yes, sir.

9    Q    And you sign off on it when you send it off, along with

10   the drugs, to the chemist.

11   A    Yes, sir.

12   Q    And, again, the drugs are sent in that heat-sealed

13   envelope.  Is that correct, sir?

14   A    Yes, sir.

15   Q    All right.  And then you have received them back from the

16   lab for purposes of trial here today.  Is that correct?

17   A    Yes, sir, that's correct.

18   Q    And is there an indication that that heat-sealed envelope

19   has been opened?

20   A    Yes, sir.

21   Q    And how do you know that?

22   A    The evidence tag from the lab is evident here at the

23   bottom of the heat-sealed package.

24   Q    After they examine it, they seal it back and put their

25   initials on it.  Is that correct?

1   A    Yes, sir, that's correct.

2   Q    I would like to ask you:  You've indicated that you

3   collected a cellphone in connection with this case.  Is that

4   correct?

5   A    Yes, sir.

6   Q    Okay.  I'm going to -- Before I ask you about that

7   cellphone, I want to take just a moment to ask you if in the

8   course of your investigation you had an occasion to be

9   present, along with Sergeant Heath, to conduct an interview of

10  the Defendant, Tron Kent?

11  A    Yes, sir.

12  Q    And where and when was that, sir?

13  A    It was on May the 9th at the Mississippi County Jail in

14  Charleston.

15  Q    And during that particular interview, did you make -- did

16  you ask Mr. Kennedy -- excuse me -- did you ask Mr. Tron Kent

17  whether or not he had ever been to the Doyle residence on

18  Sixth Street in Charleston?

19  A    Yes.  Actually Sergeant Heath asked most of the questions

20  from Mr. Kent, but I was present during the entire questioning

21  and answers.

22  Q    And was he asked specifically if he ever lived there?

23  A    Yes, sir, he was.

24  Q    And what was his response?

25  A    No.

1  Q    He said "no."  Did -- Was he asked -- Did he ask if he

2  had ever been there?

3  A    Yes.

4  Q    And initially, what was Tron Kent's response when you

5  asked him, "Have you ever been to the Doyle residence on Sixth

6  Street in Charleston?"

7  A    He had stated that he had never been there.

8  Q    He had never been to the residence.

9  A    Yes, sir, that's correct.

10 Q    Well, did you pursue that based upon the information that

11 you had?

12 A    Yes, sir.

13 Q    And as you continued to ask him questions, did he change

14 his statement?

15 A    Yes, sir, he did.

16 Q    What did he say with regard to whether or not he had ever

17 been there?

18 A    He then stated that he had been three or four times.

19 Q    Okay.  Did he tell you where he had been in the

20 residence?

21 A    Yes, sir, he did.

22 Q    And what did he say?

23 A    He stated that he had been in the front room of the

24 residence.

25 Q    Only the front room of the residence?

1   A     That's what he stated.

2   Q     Okay.  Did -- At some point in time did he change that

3   statement at all or did he stay with that one, he had only

4   been in the front room of the residence?

5   A     He stayed with that statement.

6   Q     Said he never had been in the bedroom ever; is that

7   correct?

8   A     That's correct.

9   Q     So during the course of this questioning of the

10  Defendant, did you ask him -- did Officer Heath ask him if he

11  kept -- had any property or clothes or anything at all there

12  at the Doyle residence?

13  A     Yes, he did.

14  Q     And what did he say?

15  A     Mr. Kent said he had nothing there at the residence.

16  Q     Did you -- You mentioned earlier that you had acquired a

17  cellphone.  Is that correct?

18  A     Yes, sir.

19  Q     I'd like to show you what has been marked as Government's

20  Exhibit 7 and ask if you've seen this before?

21  A     Yes, sir, I have.

22  Q     And what is Government's Exhibit 7?

23  A     It's a Virgin mobile cellular telephone.

24  Q     And where have you seen that phone before, sir?

25  A     This was the telephone that I removed from Mr. Kent's

1   property on May the 9th.

2   Q    Who did you get that from?

3   A    From the Mississippi County Deputy that was apparently

4   handling the intake for the prisoners that day.

5   Q    Was that Donald Husk who was here earlier today?

6   A    Yes, sir, it was.

7   Q    So you got the cellphone from him?

8   A    Yes, sir.

9   Q    And did you ask Mr. Kent if that was his cellphone?

10  A    I told Mr. Kent that I was seizing a cellphone that I was

11  aware that was in his property.  He stated that he didn't

12  care.  The initial questioning had been when Sergeant Heath

13  had asked him if he had a cellphone number, and Mr. Kent said

14  he didn't have a cellphone.

15  Q    Said he didn't have a cellphone.

16  A    That's right.

17  Q    Okay.  So you went ahead and collected this particular

18  cellphone into evidence.  Is that correct?

19  A    Yes, sir.

20  Q    All right.  You have examined this cellphone since you've

21  had it in your custody.  Is that correct, sir?

22  A    Yes, sir.

23  Q    Is it fair to say that there are a number of photographs

24  and images that are contained on that cellphone?  Is that

25  correct?

1   A     Yes, sir, there is.

2   Q     Now did you pull the pictures up on the cellphone so that

3   you could look at them, sir?

4   A     Yes, sir.

5   Q     With regard to Exhibit 31 which has previously been

6   identified by Amy Doyle as a photograph of sexual intercourse

7   between she and the Defendant, this exhibit, you can see it

8   better this way, but this particular exhibit, did you locate

9   that on Exhibit 7, the cellphone?

10  A     Yes, sir.

11  Q     And was the date reflected on the cellphone of which that

12  had taken place?

13  A     Yes, sir.

14  Q     And what was that?

15  A     The date in regards to that particular photo is February

16  the 25th.

17  Q     Okay.  Now did it state the time?

18  A     1:51 PM.

19  Q     Okay.  Now I'd like to show you what has been marked as

20  Government's Exhibit 29 and ask you if you were able to see

21  that photograph on the cellphone, No. 7?

22  A     Yes, sir.

23  Q     And were you able to obtain the time on the cellphone

24  stamp itself as to when that picture was taken?

25  A     Yes, sir.

1   Q     And when was that?

2   A     It was also February the 25th.

3   Q     And the time?

4   A     At 1:55 PM.

5   Q     Now there's a third photograph which is Exhibit 30.  Were

6   you able to locate that photograph on the cellphone?

7   A     Yes, sir.

8   Q     And were you able to identify the time and date or the

9   time of that particular photograph?

10  A     Yes, sir.

11  Q     Okay.  And what was the date and time, if you recall?

12  A     It was on March the 6th at 4:59 PM.

13  Q     4:59 PM, okay.  Now this particular phone -- First of

14  all, in your field as an investigator for the Drug Enforcement

15  Administration office, you've had many occasions to review

16  cellphones.  Is that correct?

17  A     Yes, sir.

18  Q     Is it fair to say that that cellphone evidence or records

19  and cellphones come into play in your cases on a regular

20  basis?

21  A     Yes, sir, it does.

22  Q     Okay.  Now going back a few years back, okay, were most

23  of the cellphone records or most of the cellphones obtained

24  through companies like Cingular or Ameritech?

25  A     Yes, sir, they were.

1  Q    And when you obtain phones there, does it generate a

2  record of the phone calls or who purchaseed the phone, whose

3  name it's in, where the phone calls went, the time and

4  everything?

5  A    Yes, sir.  We were able to routinely get a subscriber and

6  get long distance and local cell time records.

7  Q    Well, is that very helpful to you in your investigation?

8  A    Yes, sir.

9  Q    And over the course of the years, did you routinely rely

10  on that information in the prosecution of drug traffickers?

11  A    Yes, sir, we did.

12  Q    Okay.  At some point in time did that change as far as

13  the ability in many of the cases to obtain cellular records?

14  A    Yes, sir, it has.

15  Q    How did that change, sir?

16  A    The phone -- The telephone companies have now issued

17  telephone services through these prepaid phones.  I think

18  they're called "track phones;" also, through prepaid telephone

19  cards that you can buy at -- you can get them at Wal-Mart,

20  K-Mart, a lot of the discount stores.  You can actually obtain

21  what they call a prepaid telephone card which enables the

22  purchaser to buy so many minutes for their cellular telephone.

23  Q    So they do not -- do they -- Or I'm asking you, sir:  Do

24  they then generate records of who uses them, when they use

25  them, when the phone call's made, things of that nature?

1    A    No, they don't.

2    Q    Is that useful in the drug trafficking trade not to have

3    those records?

4    A    It creates no record of who they're talking to on the

5    phone.

6    Q    So did you make an effort to obtain the subscriber

7    information and everything for this particular phone that you

8    have?

9    A    Yes, I did.

10   Q    And did you find that this is one of what you referred to

11   as track phones?

12   A    Sprint/Nextel advised me that they had no record in

13   regards to this phone.

14   Q    So you're unable to gather any records concerning the use

15   of the phone.  Is that correct?

16   A    Yes, sir, that's correct.

17   Q    Now I've got some questions that I want to ask you, but

18   before I ask you those questions, I want to first talk to you

19   a little bit or to the Jury about your experience and where

20   you draw your opinions.

21        You said that you have been with DEA since 1988,

22   correct?

23   A    Yes, sir.

24   Q    And before that, you worked for the Missouri State

25   Highway Patrol as an undercover officer.  Is that correct?

1    A    Yes, sir, for nearly three years.

2    Q    Three years.  Can you share with the Jury, please, what

3    you're -- what you do as an undercover narcotics officer?

4    A    Basically you become friends with the drug dealers.  And

5    through your association with these people, you try to obtain

6    enough evidence in order to bring charges against them so that

7    they go to jail.

8    Q    Okay.  You pose as a drug buyer sometimes.  Is that

9    correct?

10   A    Yes, sir.

11   Q    Sometimes as a drug seller?

12   A    Yes, sir.

13   Q    Now you spent three years undercover.  You came to the

14   DEA.  Basically what have your duties been with the DEA since

15   that time?

16   A    Most of my investigations with the DEA has been of Covert

17   nature where I actually handle criminal investigations in

18   regards to cases that may have been initiated by another

19   agency, much like this one here in regards to Charleston, and

20   the Highway Patrol actually being the agencies that contacted

21   me in regards to assisting them in furthering this

22   investigation.

23   Q    All right.  In the course of your years since 1988, is

24   it -- nearly 20 years with the -- in an undercover capacity or

25   as a DEA agent, do you have any idea as to the number of

1   controlled substance investigations you've conducted over all

2   that period of time?

3   A    It would be several -- several hundred cases that I've

4   been involved in.  There was probably at least two -- two

5   hundred cases I was involved in while working undercover with

6   the Highway Patrol.

7   Q    Before you left the patrol, --

8   A    Yes, sir.

9   Q    -- it was at least 200?

10  A    Yes, sir.

11  Q    Okay.  Now -- So is it fair to say that you've a very

12  extensive exposure to the drug distribution networks?

13  A    Yes, sir.  I've been around for a while.

14  Q    Have you talked to the people who have admitted that they

15  were drug traffickers?

16  A    Yes, sir, I have.

17  Q    People that you have prosecuted?

18  A    Yes, sir.

19  Q    Have you had informants that you debriefed and talked to

20  at length?

21  A    Yes, sir.

22  Q    Okay.  Have you put together cases over all this period

23  of years to show how these drugs were distributed?

24  A    Yes, sir, I have.

25  Q    And based upon your experience and your training, are you

1   familiar with the way in which cocaine base or crack cocaine

2   is generated and distributed?

3   A    Yes, sir, I am.

4   Q    Let's start out, first of all, sir:  How does the cocaine

5   originate into this country?

6   A    Most of it is grown in South America in the countries of

7   Columbia, Peru, Bolivia, from the coca plant.  They're able to

8   process it so that it becomes a cocaine paste.  And from

9   there, it's -- through chemicals, it's chemically altered so

10  that it's powder, and normally it's the kilos of powder that

11  get shipped up into this country.

12  Q    And a kilo is 2.2 pounds.  Is that correct?

13  A    Yes, sir, that's correct.

14  Q    It's kilos at the time.  Okay.  Once it gets sent to the

15  United States in the kilo quantities, how is it then

16  distributed or sold?  How is it broken down?

17  A    It depends upon what the customer base is for the people

18  that are selling it.  Sometimes the cocaine powder is left in

19  the powder form and sold.  Other times it is altered to

20  cocaine base because, again, that is what the customer base

21  requires.

22  Q    Okay.  With cocaine powder or cocaine base, are they sold

23  in individual user amounts at some point in time on the

24  street?

25  A    Yes, sir, they are.

1  Q    Okay.  And, obviously, we got to get from that kilo to

2  the user amounts.  Can you tell the Jury, please, what the

3  basic breakdown is as far as how cocaine is broken down into

4  quantities for resale?

5  A    Normally from the kilo-size packages, it's divided up

6  into ounces.  From the ounces then, they go down to the

7  smaller quantities, the grams, the half-ounce basis.  And,

8  again, depending on the customer base, it will determine how

9  the -- how small the packages are broken down.

10 Q    Okay.  If you break down a kilo in ounces, how many

11 ounces are there in a pound?

12 A    There's 16 ounces in a pound.  There's 2.2 pounds in a

13 kilo.

14 Q    Now are kilos sometimes broken down into like half kis,

15 quarter kis, eighth of a ki?

16 A    Yes.

17 Q    Sold that way, too?

18 A    Yes, sir.

19 Q    And would that be for individual use?

20 A    No, sir.  That would still be for distribution purposes.

21 Q    Okay.  If we break it down into ounce quantities, an

22 ounce is how many grams, sir?

23 A    28.3.

24 Q    Okay.  So we have ounce quantities.  Just so we may

25 illustrate to the Jury, what would be a typical dose -- a

1    dosage unit for someone that was ingesting powder cocaine or

2    crack cocaine?

3    A    Probably -- Probably a quarter gram.

4    Q    Okay.

5    A    Probably the easiest way to think about it is the sugar

6    packets, the Sweet & Low packets.  Those are normally a gram

7    in size.  A person that was ingesting it for personal use

8    would probably do a quarter of that at a time.

9    Q    So personal consumption, we're looking at a quarter of a

10   gram, correct?

11   A    Yes, sir.

12   Q    And how much -- How is it sold on the street for personal

13   consumption?  How much would you expect to pay for the crack

14   cocaine?

15   A    A quarter of a gram is usually $25.  A gram is a hundred

16   dollars.  Sometimes the quarters are even -- if it's crack

17   cocaine or made even smaller into what they would call 10 and

18   20-dollar rocks.

19   Q    So it's sold on the street at $100 a gram.  Is that

20   correct?

21   A    Yes, sir.

22   Q    And the dosage units, you'd have like typically four

23   dosage units in a gram of cocaine?

24   A    Yes, sir.

25   Q    Now if -- Crack cocaine is different than powder cocaine,

1  correct?

2  A    Yes, sir.

3  Q    How is crack cocaine different from powder cocaine?

4  A    What they do is they take the powder cocaine and with a

5  mixture of baking soda and water, they manufacture crack

6  cocaine.  Crack cocaine is normally ingested by smoking it.

7  And what that does, it gives the user a more intense high than

8  what the use of the powder either through snorting it or

9  through a syringe.

10 Q    And what amounts is crack cocaine sold for individual

11 assumption?

12 A    Again, a lot of times -- most of the time they're at 10

13 and 20-dollar blocks.  Occasionally if the customer is out

14 here trying to generate his own money as well as being able to

15 get high, he'll buy larger quantities.

16 Q    And so the crack cocaine we're selling that -- You say

17 $10 rocks.  Would that be roughly a tenth of a gram?

18 A    Yes, sir.

19 Q    So it's a hundred dollars a gram for crack cocaine,

20 correct?

21 A    Yes, sir.

22 Q    And a $10 rock, individual rock -- Excuse me.  An

23 individual rock for personal use might be around $10?

24 A    Yes, sir.

25 Q    Okay.  Now how is it -- how is it packaged when it's to

1  be sold on the street?  How do you see it normally packaged?

2  A    Different ways.  Sometimes the rock will be handed to the

3  customer.  Other times the distributor will take the time to

4  wrap it in a knotted plastic Baggie and sell it that way.

5  Some people use tin foil.  It just depends on what's handy at

6  the time sometimes as to what they will put them in.

7  Q    If I can show you at this time what's been marked as

8  Government's Exhibit 22.  It's a photograph that's previously

9  been identified as money and a bag of crack cocaine found in a

10  shoebox in the Doyle residence.  Now that's one of the

11  exhibits that you sent off to the lab.  Is that correct?

12  A    Yes, sir, that's correct.

13  Q    And it weighed approximately how much?

14  A    That would be what I referred to as Exhibit 2, and that

15  weight was six-and-a-half grams.

16  Q    So 6.5 grams.  So in a tenth-gram dosage, that would make

17  how many -- how many doses could you get out of six-and-a-half

18  grams?

19  A    Well, 6.5 times 10 is -- Put a zero on the end, so you've

20  got 65.

21  Q    Okay.  Out of that one container; is that correct?

22  A    Yes, sir.

23  Q    Now based upon your experience and training, even that

24  amount that you have in front of you there, would you consider

25  that to be consistent with possession for the purpose of

1    distribution or for personal consumption?

2    A    No.  It would definitely be for distribution.

3    Q    Now the other exhibit that we have, the cocaine that you

4    have in front of you, the larger quantity of cocaine, --

5    A    Yes, sir.

6    Q    -- how many grams of cocaine was that, sir?  I'll show

7    you what's depicted in Government's Exhibit 24.  How many

8    grams of cocaine do we have there, crack cocaine?

9    A    65.9 grams.

10   Q    65 grams?

11   A    65.9 grams.

12   Q    So nearly 70 grams.

13   A    Yes, sir.

14   Q    Okay.  If that was -- Excuse me.

15   A    Well, nearly 66.

16   Q    I'm sorry.  It's 65.9.  Nearly 66 grams?

17   A    Yes, sir.

18   Q    Okay.  If you sold that out in the tenth-gram quantities

19   as is typically ingested, how much money would that generate?

20   A    Over $6000 dollars; close to $6600.

21   Q    Now based upon your experience and training, sir, is the

22   possession of the crack cocaine, packaged in the manner it is

23   there, in the amounts and quantities that it is there, valued

24   at over $6000, consistent with possession for personal

25   consumption or possession with the intent to distribute?

1   A    Possession with the intent to distribute.

2   Q    I have just one more area of questions for you, Agent.

3   Based upon your experience and training, this many years of

4   law enforcement experience that you have, sir, have you come

5   to find an association between firearms and drug trafficking

6   activities?

7   A    Yes, sir.

8   Q    What is the association that your experience has led you

9   to find between firearms, guns, and drugs?

10  A    That the weapons have now become like a tool of the trade

11  for the drug dealer.  Most of them are carrying guns now to

12  protect their drugs, protect their money and protect

13  themselves.

14  Q    Well, these drugs are worth a lot of money.  Is that

15  correct?

16  A    Yes, sir.

17  Q    And if they get stolen from you, what kind of position

18  does that put the drug dealer in if his large quantity of

19  drugs is stolen from him?

20  A    He won't be going and reporting it to the police.  That's

21  for sure.

22  Q    That's what I was going to ask you, sir.  When a drug

23  dealer is out on the street or wherever, his house or home,

24  whatever, and he has large quantities of crack cocaine, how

25  can he protect that cocaine?

1   A    He has to use a weapon.

2   Q    Have you in your experience ever had a drug dealer call

3   the police and ask them to come protect him from somebody

4   trying to take his drugs?

5   A    No.

6   Q    It's never happened?

7   A    (Negative gesture).

8   Q    That's what they use the guns for.

9   A    Yes, sir.

10          MR. FERRELL:  I have no further questions.  Thank

11  you.

12          THE COURT:  Any Cross-Examination?

13          MR. LISZEWSKI:  (Affirmative gesture).

14                    CROSS EXAMINATION

15  QUESTIONS BY MR. LISZEWSKI:

16  Q    Agent Gregory, if you would, please tell me and the Jury

17  what a case supervisor does.  How does the red tape work?

18  What do you do?  Do you put the case together for the

19  Government?  Do you recommend charges are filed?  What exactly

20  is your job with respect to that position?

21  A    Probably a combination of all of what you just mentioned.

22  This case, in particular, the state and locals reached out to

23  me and asked for assistance in regards to investigating this

24  incident.  What I have done since then was try to make sure

25  that the prosecutors had the evidence that they needed to

1    present the case in court.

2    Q    At any point did you make a recommendation with regard to

3    Mr. Kent to seek a federal charge on that?  Seek federal

4    charges?

5    A    The evidence was presented to the U.S. Attorney's Office

6    and then they decided to seek an indictment.

7    Q    Has any evidence been presented concerning Miss Doyle to

8    the U.S. Attorney's Office by your office or any other officer

9    you know?

10   A    Not that I'm aware of.

11   Q    Who's responsible for getting Amy Doyle out of jail?

12   A    I'm not sure.

13   Q    Okay.  Was it -- But it wasn't you?

14   A    No, sir.

15   Q    Okay.  Did you make any recommendation with respect to

16   that?

17   A    No, sir.  She's a juvenile.

18   Q    Now you are aware at the present time that Amy Doyle has

19   told you several inconsistencies, true?

20   A    She initially didn't tell us the truth, that's correct.

21   Q    Okay.  And she's done that with you as well as Sergeant

22   Moody, correct?

23        MR. FERRELL:  I'm going to object to this line of

24   questioning if it's an attempt to impeach her credibility.

25        MR. LISZEWSKI:  I'm not intending to impeach.  I'm

1    going to tie it in with my next question.

2              THE COURT:  Okay.

3              MR. FERRELL:  I would object to it as irrelevant,

4    Your Honor.

5              THE COURT:  Well, I will give you one more question.

6    Tie it in now.

7              MR. LISZEWSKI:  I'm sorry.  What was your ruling?

8              THE COURT:  Tie it in now.

9              MR. LISZEWSKI:  Okay.  That's fine.

10   Q   (By Mr. Liszewski)  My question's this:  When she

11   indicated that she, Tron Kent and her mother were the only

12   people in the house, did you follow up with anyone else to

13   verify that or substantiate it aside from her word?

14   A    Yes.

15   Q    With whom?

16   A    Her mother.

17   Q    Aside from her mother, anyone else?

18   A    No.

19   Q    And I would assume that -- I would assume her mother

20   wanted her out of jail.

21   A    I think most mothers do not like to see their children in

22   jail.

23   Q    Sure.  It's common sense.  Mothers don't want to see

24   their kids in jail, do they?

25   A    That's correct.

1   Q    Okay.  Let me ask you this:  In the drug trade involving

2   weapons, in every case will a person carry a drug or carry a

3   gun to protect themselves or their drugs?

4   A    No.

5   Q    Okay.  So sometimes people -- I understand that sometimes

6   it's difficult for you to inquire in the minds of others, but

7   on occasion people aren't carrying weapons to protect their

8   drugs, true?

9   A    True.

10  Q    Okay.  On occasion they might just be protecting

11  themselves, true?

12  A    True.

13  Q    Okay.  And as a former law enforcement officer in

14  Sikeston, you are aware of the area, aren't you?

15       Do you know the people down there?  Do you know -- Do

16  you know the reputation in some parts of Sikeston?

17  A    Yes, I do.

18  Q    Okay.  So you, obviously, heard Detective Blakely talk to

19  us today about some very rough areas in Sikeston, true?

20  A    Yes, sir.

21  Q    Would you agree with that assessment?

22  A    Yes, sir.  I used to patrol there, also.

23  Q    I guess my last question for you, Mr. Gregory, is this:

24  The evidence tech. that you spoke to at the Mississippi County

25  Jail regarding the cellphone, Mr. Husk?

1    A    Yes, sir.

2    Q    Okay.  Did he indicate that ---

3         MR. FERRELL:  Your Honor, I'm going to object to what

4    Mr. Husk said.  He's calling for hearsay.

5         MR. LISZEWSKI:  It's impeachment, Judge.

6         MR. FERRELL:  Judge, he can't impeach -- May we

7    approach the bench?

8         THE COURT:  Yeah.

9         (The following proceedings were held at sidebar,

10   outside the hearing of the Jury:)

11        THE COURT:  You're impeaching who?

12        MR. LISZEWSKI:  I'm impeaching Donald Husk's

13   testimony by omission.  No such statements were ever made to

14   Mr. Gregory.  No reports were ever made.

15        THE COURT:  You can't impeach his testimony like

16   this.

17        MR. FERRELL:  You have to first question the witness

18   as to whether or not they made the statement or not.  They

19   have to be given an opportunity on the stand to admit it or

20   deny it before you try to bring in extrinsic evidence.

21        MR. LISZEWSKI:  Sure.  And I asked him on the stand.

22        MR. FERRELL:  What?

23        MR. LISZEWSKI:  I asked him when did he make

24   the statement; who did he make the statement to; did he do any

25   reports.  He's had an opportunity to deny it.

1          MR. FERRELL:  What?  I don't understand.  What is it

2     you're asking?  You want to ask him did Husk lie?

3          MR. LISZEWSKI:  Yeah -- No.  I don't want to know if

4     he lied.  I just want to know if he said anything about him

5     using the phone.

6          THE COURT:  Wait a minute.  You want to know what?

7          MR. LISZEWSKI:  I want to know from Agent Gregory if

8     Mr. Husk ever indicated that Mr. Kent used that phone while

9     being booked.

10          THE COURT:  What's the impeachment here?  I'm missing

11     something.

12          MR. LISZEWSKI:  What I'm driving at, Judge, is today

13     we get to trial.  We have no reports, no nothing from Mr. Husk

14     about Mr. Kent using this phone potentially related in a drug

15     investigation, potentially related for these child sex

16     offenses.  He comes to trial.  He says, "Oh, yeah; Mr. Kent

17     got some numbers out of the phone."  So I want to know if he

18     has ever said that to Mr. Gregory.

19          MR. FERRELL:  If you had asked Mr. Husk, "Have you

20     ever said this to Agent Gregory," and he said "no," then you

21     could be entitled to impeach him with that statement.

22          MR. LISZEWSKI:  I believe the question that I asked

23     him was did he convey this to anybody and his answer was "no."

24          MR. FERRELL:  So that's going to be consistent.

25     That's not impeachment.

1          THE COURT:  Yeah, that's not impeachment.  You didn't

2  set it up for something he said or denied that he said to this

3  witness.

4          MR. FERRELL:  It's going to be consistent.

5          MR. LISZEWSKI:  That's fine.

6          THE COURT:  So I don't think that's -- Yeah, okay.

7          MR. LISZEWSKI:  Thank you, Your Honor.

8          THE COURT:  Yeah.

9          (The following proceedings were held within the

10  hearing and presence of the Jury:)

11          THE COURT:  Go ahead.

12  Q    (By Mr. Liszewski)  My last question is this:  You

13  centered your investigation around Mr. Kent based on the

14  evidence -- well, it's actually a couple of last questions.

15          This case with respect to Counts III through VII stem

16  from the drugs that were found in the Doyle household, true?

17          Or actually VI and VII stem from the cellphone but

18  III, IV and V, they stem from the drugs found in the home as

19  well as the gun.

20  A    That's correct.

21  Q    Okay.  And the gun and the drugs were found in objects

22  which were clearly Miss Doyle's.

23          MR. FERRELL:  Your Honor, I'm going to, again, object

24  to this unless there's a foundation.  He was not one of the

25  seizing officers --

1          THE COURT:  Sustained.

2          MR. FERRELL:  -- in this case.

3    Q    (By Mr. Liszewski)  The only person on trial today is

4    Mr. Kent, right?

5    A    Yes, sir.

6          MR. LISZEWSKI:  That's all I have.  Thank you.

7          THE COURT:  Any Redirect?

8                    REDIRECT EXAMINATION

9    QUESTIONS BY MR. FERRELL:

10   Q    Yes.  I just have a couple of follow up questions; very

11   quickly, Agent.  Mr. Liszewski said that based on your

12   experience in law enforcement, there's some people who carry

13   guns just for protection, right?

14   A    Yes, sir.

15   Q    And there's some people who carry guns and it's not to

16   protect drugs, right?

17   A    Yes, sir.

18   Q    Isn't that what he said?

19   A    Yes.

20   Q    Well, based on your experience in law enforcement, do any

21   of those people that carry guns for their own protection and

22   only their own protection have a pocketful of crack cocaine in

23   their ---

24         MR. LISZEWSKI:  Objection; argumentative, Judge.

25         THE COURT:  Overruled.

1  Q    (By Mr. Ferrell)  Do any of them have a pocketful of

2  crack cocaine out on the streets of our city in the middle of

3  the morning?

4  A    No, sir.

5  Q    If it was just to carry it for their own protection?  Did

6  you ever find anything like that?

7  A    No, sir.

8  Q    Have you ever found anything in any case that you've been

9  involved in where people just carry guns for their own

10 protection or have the guns for their own protection in a

11 residence that's got $6500 to $7000 worth of crack cocaine in

12 it?

13 A    No, sir.

14      MR. FERRELL:  I don't have any further questions.

15 Thank you, Judge.

16      THE COURT:  Thank you, sir.  You may step down.

17      Ladies and Gentlemen, at this time we are practically

18 at 5:00, and we will recess for this evening.  Again, I

19 caution you do not discuss the case among yourselves or with

20 anyone else.

21      I would ask that you come to the Jury Room by 8:30

22 tomorrow morning and we will proceed with the evidence.  It

23 appears that we may well be submitting this case to you

24 tomorrow.  Don't hold me to that but I think that may be

25 happen.  That may help you in organizing your own schedule.

1    So I would ask you to come by 8:30 tomorrow morning.

2          Please have a nice evening and we'll see you

3    tomorrow.  Will the attorneys remain here?

4          (Jury excused from the courtroom.)

5          (The following proceedings were held outside the

6    hearing and presence of the Jury:)

7          THE COURT:  Let the record reflect the Jury has left

8    the courtroom.  What further evidence is there?  I know

9    there's the expert witness on the DNA.

10         MR. SORRELL:  I'm sorry?

11         THE COURT:  Who are the witnesses left that the

12   Government has in your case?

13         MR. SORRELL:  I believe there will be two final

14   witnesses; the Mississippi County Clerk --

15         THE COURT:  Okay.

16         MR. SORRELL:  -- with the conviction record, another

17   404(b) piece of evidence, and the DNA expert which is

18   Ruth Montgomery.

19         THE COURT:  Okay.  And then do you anticipate putting

20   on right now -- and I know that could change.  Do you

21   anticipate any witnesses?

22         MR. LISZEWSKI:  It's too early to say.

23         THE COURT:  Okay.  Assuming that you would put on

24   everybody you're considering, how long do you think your case

25   might take?

1          MR. LISZEWSKI:  Maybe an hour or two.

2          THE COURT:  Okay.  I would ask that you all come and

3     we are starting at 8:00.

4          MR. LISZEWSKI:  My apologies, Judge.  I apologize.

5          THE COURT:  Because what I would like to do is go

6     through -- I received some proposed instructions from the

7     Government today and I assume you did, too, Mr. Liszewski.

8          MR. LISZEWSKI:  I have seen -- What it looks like is

9     the verdict director and the elements and just a copy of the

10    indictment as well.

11         THE COURT:  Well, I realize that, but it's what

12    they're submitting.

13         MR. LISZEWSKI:  Sure.

14         THE COURT:  I don't know if you have any or not.  If

15    you do, please bring them tomorrow --

16         MR. LISZEWSKI:  That's fine.

17         THE COURT:  -- if you've got some and be ready

18    because at 8:00 I want to go through these.  And if you have

19    any -- If you have some that you're thinking about, I suggest

20    you e-mail them to the prosecutors tonight --

21         MR. LISZEWSKI:  That's fine.

22         THE COURT:  -- so they'll have a chance to look at

23    it.

24         MR. LISZEWSKI:  Okay.

25         THE COURT:  So I'd like to go through those.  So if

1   we have to make changes, which we might, or make additions,

2   whatever, we can do that tomorrow.

3            MR. LISZEWSKI:  Okay.

4            THE COURT:  And then I would assume that, unless we

5   run into unforeseen problems, we'll be submitting this

6   tomorrow.  Okay.

7            I would say, given the nature of this, I'm going to

8   give 25 minutes.  I know we've got seven counts.  I'm going to

9   give each side 25 minutes.  How would you all like to split

10  that time?

11           MR. FERRELL:  Judge, would the Court consider 30?

12           THE COURT:  No.

13           MR. FERRELL:  It's for seven counts.

14           THE COURT:  I know it is, but you can group them.

15           MR. FERRELL:  Judge, I'll just have to ask for 13 and

16  12; take my time off.

17           THE COURT:  Okay.  And what kind of warning do you

18  want?

19           MR. FERRELL:  I'd like a two-minute warning on each

20  end.

21           THE COURT:  And then what kind of warning would you

22  want, Mr. Liszewski?

23           MR. LISZEWSKI:  I'll take 24 with a one-minute

24  warning.

25           THE COURT:  24 and a one-minute, okay.  Then I'll see

1    you all at 8:00 tomorrow and we'll go through these

2    instructions.

3              (Court adjourned at 4:46 P.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Deborah A. Kriegshauser, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 339 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 28th day of September, 2007.

_____

/s/ Deborah A. Kriegshauser

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR

Official Court Reporter