UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:06-CR-00088(JCH) |
| | ) | |
| TRON KENT, | ) | |
| | ) | |
| Defendant. | ) | |


TRIAL PROCEEDINGS -- VOLUME II

BEFORE THE HONORABLE JEAN C. HAMILTON
UNITED STATES DISTRICT JUDGE

May 30, 2007


APPEARANCES:

For Plaintiff:      KEITH D. SORRELL, ESQ.
                    LARRY FERRELL, ESQ.
                    OFFICE OF U.S. ATTORNEY
                    325 Broadway, 2nd Floor
                    Cape Girardeau, MO  63701
                    (573) 334-3736


For Defendant:      THEODORE LISZEWSKI, ESQ.
                    11860 Lackland Road
                    St. Louis, MO  63146
                    (314) 450-7028


REPORTED BY:        DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                    Official Court Reporter
                    United States District Court
                    111 South Tenth Street, Third Floor
                    St. Louis, MO  63102
                    (314) 244-7449

1                          <u>INDEX</u>

2    JURY INSTRUCTION CONFERENCE . . . . . . . . . . . . .    3

3    RUTH MONTGOMERY --

4        Direct Examination by Mr. Sorrell  . . . . . . . .   24

5        Cross Examination by Mr. Liszewski . . . . . . . .   66

6    CIRCUIT CLERK LEANN COLSON --

7        Direct Examination by Mr. Ferrell  . . . . . . . .   74

8    JURY INSTRUCTION CONFERENCE . . . . . . . . . . . . .   83

9    CLOSING ARGUMENT BY MR. FERRELL . . . . . . . . . . .   89

10   CLOSING ARGUMENT BY MR. LISZEWSKI . . . . . . . . . .  106

11   REBUTTAL ARGUMENT BY MR. FERRELL  . . . . . . . . . .  116

12   JURY INSTRUCTIONS BY THE COURT  . . . . . . . . . . .  120

13   JURY VERDICTS . . . . . . . . . . . . . . . . . . . .  142

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings began at 8:00 A.M.)

2          (The following proceedings were held outside the

3   hearing and presence of the Jury:)

4          THE COURT:  Good morning.

5          MR. FERRELL:  Good morning, Your Honor.

6          THE COURT:  Let the record reflect the Jury is not in

7   the courtroom at the present time.  And at this time I'd like

8   to go through the instructions.  Have the parties had an

9   opportunity to review these instructions?

10         MR. FERRELL:  Yes, Ma'am, Your Honor.

11         THE COURT:  Okay.  Mr. Liszewski, --

12         MR. LISZEWSKI:  Good morning, Your Honor.

13         THE COURT:  -- have you had a chance to go through

14   the instructions submitted by the Government?

15         MR. LISZEWSKI:  I've had a chance to go through most

16   of them.

17         THE COURT:  Do you have any instructions that you are

18   offering the Court?

19         MR. LISZEWSKI:  Your Honor, actually I do have one

20   instruction that I would request.  I submitted three on the

21   ECF last night.

22         THE COURT:  Well, I'm afraid I didn't know that.  So

23   do you have extra copies of those?

24         MR. LISZEWSKI:  I do.  For the record, Mr. Ferrell

25   has submitted two of the three of these instructions.  The

1  only instruction I am requesting that's different from the

2  instructions the Government's proposed is the 401 instruction

3  that there can be no -- "There is no burden upon a defendant

4  to prove that he or she is innocent.  According to the fact

5  the defendant did not testify must not be considered by you in

6  any way or even discussed in arriving at your verdict."

7        That's taken from the last paragraph of Instruction

8  3.06, the model instructions.

9        THE COURT:  Okay.  Do you have any objection to that,

10  Mr. Ferrell?

11        MR. SORRELL:  No, Your Honor.

12        THE COURT:  Okay.

13        MR. LISZEWSKI:  And I have three dirty copies and a

14  clean copy that I'll give to you.

15        THE COURT:  Yeah.  If you can hand me the clean copy,

16  one of each probably, that would be fine.  Okay.  I will -- We

17  will -- I will give that to the Jury.

18        Let me run through these instructions, the one that I

19  plan to give -- the ones that I plan to give.  And if in the

20  course of that there's any objections to language or the

21  instruction itself, speak up and we can certainly -- we'll

22  certainly discuss that.

23        MR. FERRELL:  Your Honor, if I may.

24        THE COURT:  Yeah.

25        MR. FERRELL:  There's one additional instruction from

 1   the Government.

 2          THE COURT:  Okay.

 3          MR. FERRELL:  We have submitted the 404(b)

 4   instruction.  It's being given with regard to the two prior

 5   uncharged incidents.  The evidence of the Defendant's

 6   possession of a firearm on Count I and cocaine in that

 7   incident can be used as 404(b) with regard to the subsequent

 8   firearm and drug counts, Counts III and IV and V.  So we

 9   prepared an instruction which says that "As far as the

10   evidence concerning the possession of the handgun, the .38

11   caliber handgun and cocaine base on January 20th, as far as

12   Counts I and II go, you consider that just as any other

13   evidence.  But as far as Counts III, IV -- III and IV and V,

14   that you have to consider that under Rule 404(b)."  So it's a

15   404(b) instruction but it was just modified because they can't

16   consider that evidence as direct evidence in Counts I and II.

17          THE COURT:  Okay.

18          MR. FERRELL:  It's the same thing.

19          THE COURT:  Do you have a separate instruction?

20          MR. FERRELL:  Yes, Ma'am.

21          THE COURT:  Why don't you hand one to Mr. Liszewski

22   so he can take a look at it.

23          MR. LISZEWSKI:  I have it, Your Honor.

24          THE COURT:  You have a copy of it, okay.  And other

25   than your general objection to all the 404(b), ---

1          MR. LISZEWSKI:  Just my general instruction.  Just in

2     addition to that, I would submit Count I and II have yet to be

3     decided.  So my position is that you should not be able to

4     consider Counts I and II and then factor in Counts III, IV and

5     V.

6          THE COURT:  Okay.  I need to look at the precise

7     language.  I haven't even read it yet.

8          MR. FERRELL:  Judge, for some reason at this moment

9     I'm not putting my hand on the unmarked copy.  I apologize.

10    It doesn't have the reference to the 208.

11         THE COURT:  Okay.

12         MR. FERRELL:  You need a clean copy, and I don't

13    have -- can't put my hands on that just at this moment for

14    some reason.  I'm just letting the Court know.

15         THE COURT:  Well, wait a minute.  I've got a clean

16    copy.

17         MR. FERRELL:  Oh.

18         THE COURT:  The first copy -- The top copy is a clean

19    copy.

20         MR. FERRELL:  Oh, I'm sorry.  It is, okay.

21         THE COURT:  Yeah.

22         MR. FERRELL:  My mistake then.  That's why I couldn't

23    find it, Judge.

24         THE COURT:  You're ahead of yourself this morning.

25    Okay.  Let me take a minute to read through this.

1          (Pause).

2          Okay.  I will go ahead and give this.  Then let me

3   begin -- Now I'm looking at this from the standpoint of the

4   unmarked copies, so I'm not going to be reading off the

5   precise one --

6          MR. FERRELL:  Okay.

7          THE COURT:  -- just so I -- because I want this copy

8   -- this set to be in good order to give to the Jury.

9          The first instruction begins "Members of the Jury."

10          The next instruction -- The next two instructions

11   that were offered by the Government here, "It is your duty to

12   find from the evidence," and then "I've mentioned the word

13   evidence," I have already given those in my opening

14   instructions.

15          Is there any need to give those again?  Those were

16   read.  Does anybody have a strong feeling about that?

17          MR. FERRELL:  Judge, I don't.  It doesn't matter at

18   all to the Government.

19          THE COURT:  Mr. Liszewski?

20          MR. LISZEWSKI:  I really have no position on it.

21          THE COURT:  Okay.  I mean they've got it and they're

22   instructed to follow all of the instructions I've given.

23          MR. LISZEWSKI:  Well, they're going to get -- they'll

24   get the pretrial instructions as well.

25          THE COURT:  No, they won't get those in writing.

```
 1          MR. LISZEWSKI:  Okay.

 2          THE COURT:  I hate to emphasize it by reading it

 3   twice, but I mean it's sort of innocuous stuff, but I

 4   generally don't give it twice.

 5          MR. LISZEWSKI:  Whatever the Court wants to do.

 6          THE COURT:  Okay.  I'm not going to give those.  They

 7   have been given, and certainly you all can refer to them in

 8   your argument in any way.

 9          So the next one, the Government and the Defendant

10   have stipulated.  That's the stipulation.  Then the ---

11          MR. FERRELL:  I'm sorry, Your Honor.  I apologize.

12          THE COURT:  Go ahead.  The one on stipulations.

13          MR. FERRELL:  Yes, Ma'am.  I'm trying to -- Here it

14   is.  Okay.  Thank you.

15          THE COURT:  All set?

16          MR. FERRELL:  Yes, Ma'am.

17          THE COURT:  Then the next is credibility in deciding

18   what the facts are.  And right after that ---

19          MR. LISZEWSKI:  Which instruction is that?

20          THE COURT:  Pardon me?

21          MR. FERRELL:  She doesn't have the numbers.  So

22   credibility ---

23          THE COURT:  Credibility in deciding what the facts

24   are; "You may have to decide what testimony you believe and

25   what testimony you do not believe."  Do you all have that?
```

1        MR. FERRELL:  Yes, Ma'am.  Yes, we have it.  Just

2   sometimes it's hard to find it, so I apologize.

3        THE COURT:  No.  That's okay.  Now right after that I

4   will give the defense instruction; "There's no burden upon the

5   defendant to prove that he or she is innocent."

6        MR. FERRELL:  Okay.

7        THE COURT:  Okay?  Then following that is the one

8   describing the indictment.  "The indictment in this case

9   charges that -- charges the Defendant with seven different

10  crimes."

11       MR. FERRELL:  Yes, Ma'am.

12       THE COURT:  That's got two pages.  It goes into the

13  second page.

14       Okay.  Then following that -- let's see -- is

15  reasonable doubts.  "A reasonable doubt is that based upon

16  reason and common sense."

17       MR. FERRELL:  Yes, Ma'am.

18       THE COURT:  Then the next is expert -- "You have

19  heard testimony from persons described as experts."

20       MR. FERRELL:  Yes, Ma'am.

21       THE COURT:  Okay.  Then I think after that I'm going

22  to put in this 404(b).  "You've heard evidence that the

23  Defendant possessed a .38 handgun."  Are you with me?

24       MR. FERRELL:  Judge, Mr. Liszewski is looking for

25  4.10 in his package here; that you have heard testimony ---

1          MR. LISZEWSKI:  There it is.

2          THE COURT:  Got it?  Okay.  And that's the next one.

3    Then we'll -- The following instruction will be the reading of

4    the indictment.

5          MR. LISZEWSKI:  So that it will be the 404(b)

6    instruction and the indictment?

7          THE COURT:  And then the indictment after that.

8    Okay?

9          MR. LISZEWSKI:  Okay.

10          THE COURT:  All set?

11          MR. LISZEWSKI:  The indictment after that?

12          THE COURT:  Right.  Then following the indictment, we

13    go into the statutes, Section 922, 924 and 2252.  All set?

14          MR. LISZEWSKI:  Yeah.  922(g)(1)?

15          THE COURT:  Right.  That goes through the statutes

16    involved.

17          MR. LISZEWSKI:  Okay.

18          THE COURT:  Following the statutes instruction is the

19    one, "The indictment charges offenses committed in or around

20    or on or about."

21          MR. LISZEWSKI:  That's fine.

22          THE COURT:  Okay.  Then we get into the verdict

23    directors beginning with Count I, the elements.  Does

24    everybody have that, just giving the elements for Count I?

25          MR. LISZEWSKI:  Yeah, we do have that.

1          THE COURT:  Okay.  And then the elements -- The next

2     one is the elements for Count II.

3          MR. LISZEWSKI:  All right.

4          THE COURT:  Wait a minute.  I seem to have ---

5          MR. LISZEWSKI:  Your Honor, the only request I would

6     make for the record is with respect to Count II.

7          THE COURT:  Yeah.

8          MR. LISZEWSKI:  I've read the model instruction.  The

9     last sentence of the -- one, two, three -- fourth paragraph,

10    "The firearm must facilitate or must have the potential to

11    facilitate the offense."

12         THE COURT:  Right.

13         MR. LISZEWSKI:  My position is that is actually

14    different than the element in Element 2 where actually it

15    alleges the Defendant knowingly possessed the firearm in

16    furtherance of that crime.  There's nothing in the elements

17    about the potential to facilitate the offense with a weapon.

18    I would just ask that we strike that portion of it from the

19    instruction.

20         MR. FERRELL:  Judge, that's verbatim from the Eighth

21    Circuit model instruction.  It's defining "possessed in

22    furtherance of;" what it means, so.

23         THE COURT:  Yeah.  I think it seems to fit in with --

24    going with what "in furtherance of that crime" means.

25         MR. FERRELL:  Yes, Ma'am.

```
 1              THE COURT:  I seem to have -- Wait a minute.  I seem

 2   to have two copies of this for Count II.

 3              MR. FERRELL:  Count -- Count II and Count IV will be

 4   924(c).  I don't know if that's ---

 5              THE COURT:  No.  This seems to be that Count II, I've

 6   got two copies.  It seems to be the same thing.

 7              MR. FERRELL:  Okay.  I may have handed you an extra

 8   copy or something.

 9              THE COURT:  I may -- Yeah, it looks like it because

10   it's the same -- you know, it's the same date.  It's January

11   20th, 2004.  Yeah.

12              Okay.  So we've got Count II.  I'll overrule that

13   objection with respect to Count II, Mr. Liszewski.

14              Okay.  Then Count III is the next one, the elements

15   for Count III.

16              MR. LISZEWSKI:  Count III is the cocaine base charge?

17   Yes.

18              THE COURT:  Yeah.

19              MR. LISZEWSKI:  All right.

20              THE COURT:  I'm not sure.  You've got -- You have a

21   sentence at the end of this which you don't have at the end of

22   the other verdict directors about "record your verdict on the

23   verdict form" which I don't think we need in there.

24              MR. FERRELL:  Which is -- Which instruction,

25   Your Honor?
```

1          THE COURT:  The one for Count III; the verdict

2    director for Count III.

3          MR. FERRELL:  Yes, Your Honor, I see.  And actually

4    in both the 924(c) counts, I noticed this morning and I'm

5    having it changed; just to point that there is one word which

6    is -- there's a typo.  On Counts -- Counts II and IV in the

7    part of the instruction that says -- Excuse me.  It would be

8    Count -- Yes, Your Honor.  It's Counts III and V.  I

9    apologize.  With the 924(c) counts, --

10          THE COURT:  Yeah.

11          MR. FERRELL:  -- the second -- the main -- what would

12    be the paragraph that starts with the phrase "possessed in

13    furtherance of means"?

14          THE COURT:  Wait a minute.  On III?

15          MR. FERRELL:  Yes, Ma'am.  Well, you have the first

16    paragraph.  Then you have the two elements and then this

17    paragraph, the phrase ---

18          THE COURT:  Wait a minute.  Are you on Count III?

19          MR. FERRELL:  It's the same in Count III as in Count

20    V, yes, Ma'am; III and V.

21          THE COURT:  But what paragraph?

22          MR. FERRELL:  No.  I'm sorry.  I apologize, Judge.

23    That's an error.  That would be Counts -- It is Count V is the

24    924(c) count and Count II.

25          THE COURT:  Okay.

1              MR. FERRELL:  Counts II and V.

2              THE COURT:  Okay.  On Count II, what are we talking

3    about?

4              MR. FERRELL:  On Count II, it's the same sentence

5    after you go through the first paragraph and then the two

6    elements.

7              THE COURT:  Okay.  The phrase, "possessed in

8    furtherance of"?

9              MR. FERRELL:  Yes.  Yes, Ma'am.  The second sentence,

10   it says, "must have some purpose of effect," and it should be

11   "purpose or effect."

12             THE COURT:  Purpose or effect, okay.  Can we run that

13   off and get clean copies?

14             MR. FERRELL:  Yes, Ma'am.  I left that for my

15   secretary this morning.  She should be there at 8:30.

16             THE COURT:  Okay.

17             MR. FERRELL:  So that will be changed.

18             THE COURT:  Okay.  Then I think we need on Count

19   III --

20             MR. FERRELL:  Yes, Ma'am.

21             THE COURT:  -- to delete that last sentence about

22   "record your determination on the verdict form."  We don't

23   need that.  Or if we're going to do it, we have to do it on

24   each verdict director.

25             MR. FERRELL:  We'll delete it from that one,

1    Your Honor.

2              THE COURT:  Yeah, okay.  So we'll just run that.

3    Yeah.

4              Okay.  So except for that, anything further on Count

5    III?

6              MR. FERRELL:  No, Your Honor.

7              THE COURT:  Okay.  Then the next would be the verdict

8    director for Count IV.  Any problems?

9              MR. FERRELL:  No, Ma'am.

10             THE COURT:  Do you have that one, Mr. Liszewski?

11             MR. LISZEWSKI:  Yes, I do.

12             THE COURT:  Okay.  Then the next one, verdict

13   director for Count V.  And here we've got the same thing, "or

14   effect," right?

15             MR. FERRELL:  Yes, Ma'am.

16             THE COURT:  Yeah.  Okay.  And then the final verdict

17   director -- Wait a minute; not final.  I'm sorry.  The one for

18   Count VI, any problems with that one?

19             MR. LISZEWSKI:  It looks like it's fairly accurate.

20             THE COURT:  Okay.  And the final verdict director for

21   Count VII, any problems with that one?

22             MR. LISZEWSKI:  No.  I've read this one.  That's

23   fine.

24             THE COURT:  Okay.  Then following that, we have the

25   definition of "to distribute" and then the definition of a

1    "controlled substance."  And then the instruction on the kinds

2    of possession.  And the definition of "knowingly."  And that's

3    followed by the instruction on intent or knowledge.  And the

4    final instruction is the one beginning "In conducting your

5    deliberations and returning your verdict."

6           Now could we run this off?  Because I don't read those

7    forms.  So on the second page there's this business -- I mean

8    we can leave it.  I'm just not going to read the forms for

9    them.

10          MR. FERRELL:  Okay.  Yes, Ma'am.

11          THE COURT:  So if we could delete that.

12          MR. FERRELL:  You want me to have a copy done just to

13   strike that out.

14          THE COURT:  Yeah, do that.  Just delete that.

15          MR. FERRELL:  Okay.

16          THE COURT:  I figure the Jury can read that form on

17   their own time.  They're going to have them all.  So if we can

18   get that one, we'll be done.  Are there any -- Okay.

19          And following that, we have the verdict form for each

20   of the seven counts.

21          Now are there -- Other than the corrections that

22   we've talked about being made, are there any other objections

23   or corrections to any of these -- any of these instructions or

24   the verdict form?

25          MR. LISZEWSKI:  The verdict form?  No objection to

1    the verdict form.

2         THE COURT:  Okay.

3         MR. FERRELL:  Judge, I have one issue that I need to

4    check, if I may.

5         THE COURT:  Yeah.

6         MR. FERRELL:  Something that I -- It will take me a

7    moment to make sure it's correct here.  I'm just going to make

8    sure that the count -- the number on the counts on the verdict

9    directors matches the verdict form.

10        THE COURT:  Okay.

11        MR. FERRELL:  And I want to make sure that we didn't

12   get a count off here.  Count I is possession of the firearm.

13   And then Count II is the 924(c).

14        THE COURT:  Furtherance.

15        MR. FERRELL:  924(c) on January 20th.  It's Count II.

16   And then the third count is the 30 grams or more.

17        THE COURT:  Possession.

18        MR. FERRELL:  Here's where I had a question.  Then

19   there's Count IV.  There is an error, Judge.

20        THE COURT:  Oh.  They should be switched?

21        MR. FERRELL:  Yes, Your Honor, the count numbers.

22        THE COURT:  Okay.  IV is felon in possession and V is

23   in furtherance?

24        MR. FERRELL:  Yes.

25        THE COURT:  Okay.

1          MR. FERRELL:  I got it right here.

2          THE COURT:  Count V is in furtherance.

3          MR. FERRELL:  Count IV should be 924(c) and ---

4          THE COURT:  Count V should be the firearm in

5    furtherance of a drug trafficking.

6          MR. FERRELL:  Yes, Ma'am.  Those numbers are ---

7          THE COURT:  Okay.  If you can get those changed

8    around, that would be great.

9          MR. FERRELL:  Yes.  The verdict forms are correct but

10   in the verdict directors, --

11         THE COURT:  The titles.

12         MR. FERRELL:  -- IV and V should be changed.

13         THE COURT:  Okay, yeah.  You've got it in the forms

14   themselves.  Yeah, okay.

15         MR. LISZEWSKI:  So are you going to change the ---

16         THE COURT:  Just transpose those.

17         MR. FERRELL:  Just change the number on the verdict

18   director for IV and V.  They just need to be reversed.

19         THE COURT:  Yeah.

20         MR. FERRELL:  The felon in possession of a firearm is

21   V and 924(c).

22         THE COURT:  Oh, wait a minute.  Felon in

23   possession -- No; just the opposite.

24         MR. LISZEWSKI:  Yeah.  V is in felon in possession of

25   furtherance.

1          THE COURT:  Wait a minute.  Let me get ---

2          MR. FERRELL:  No.  I think I had it right.

3          CLERK:  Here's Count IV, and that's the drug

4    trafficking crime.

5          MR. FERRELL:  Yeah.  That's 924(c).

6          CLERK:  That's IV.  And V is felon in possession.

7          MR. FERRELL:  Felon in possession.

8          THE COURT:  Okay.  So it is correct.

9          MR. FERRELL:  Judge, it is correct.  Maybe it's not

10   correct on the verdict forms.

11         THE COURT:  Well, it's not correct on how we've done

12   the verdict.

13         MR. FERRELL:  Yeah.  I apologize.  Somewhere I

14   realized it's off one, so.

15         THE COURT:  Wait a minute.  Okay.

16         MR. FERRELL:  No.  The verdict form is right.

17         MR. LISZEWSKI:  No.  The verdict form is right.  Are

18   you sure the indictment ---

19         THE COURT:  The verdict -- Yeah.  The verdict forms

20   follow the indictment because Kathy just checked those.  What

21   I think we've got wrong is the verdict directors.

22         MR. FERRELL:  Maybe we got them all right, Judge.

23         THE COURT:  Because you've got Count V in the verdict

24   -- Wait a minute.  Wait a minute.  Count V ---

25         MR. FERRELL:  It is.

1          THE COURT:  Yeah, the verdict directors.

2          MR. FERRELL:  The verdict directors has Count V as

3   felon in possession of a firearm.  We have it as Count V.

4          THE COURT:  No.  The verdict director has --

5          MR. FERRELL:  Oh, sorry.

6          THE COURT:  -- has Count V as in furtherance of the

7   drug trafficking crime in the verdict director.

8          MR. FERRELL:  Your Honor, I think that's -- there's

9   our error.

10          THE COURT:  There's the problem.  So we need to ---

11          MR. FERRELL:  So that should be the felon in

12   possession.

13          THE COURT:  Right.  We need to change these.  So what

14   you now have as the verdict director for IV is the verdict

15   director for V, and the verdict director for V should be the

16   verdict director for IV.  Does that make sense?

17          MR. FERRELL:  Judge, let's ---

18          MR. LISZEWSKI:  Okay.  In your instruction for the

19   director with respect to Count IV, Count IV you have felon in

20   possession here.  And in your indictment instruction, you have

21   Count IV as being in furtherance of a drug trafficking

22   offense.

23          CLERK:  I'm printing the indictment.

24          THE COURT:  I've got a copy here.

25          MR. FERRELL:  I've got a copy of the indictment.

1          THE COURT:  I think the confusion is we've got them

2    mislabeled as verdict directors.  I think the verdict forms

3    match the indictment.  The verdict directors are transposed.

4    Hang on here.

5          In the indictment Count IV is the drug trafficking.

6          MR. FERRELL:  Yes, Ma'am.  Count V is felon in

7    possession.

8          THE COURT:  And Count V is felon in possession.

9          MR. FERRELL:  So that's ---

10          THE COURT:  So it's the verdict -- I mean the verdict

11    directors that need to be changed.

12          MR. FERRELL:  So our verdict director should be, as

13    it currently stands, Count II?

14          THE COURT:  No.  Count II is fine.  Wait a minute.

15          MR. FERRELL:  What is labeled as Count IV under the

16    verdict director should be 924(c) and it is 924(c) in the

17    verdict director, Count IV.  Nope.  I'm sorry.  Count IV is --

18    I apologize, Judge.  It is felon in possession.  Okay?

19          THE COURT:  Yeah.  Let's just -- Let's get away from

20    the numbers.

21          MR. FERRELL:  Yes.

22          THE COURT:  The verdict director that you have for

23    Count IV is felon in possession, and that's really Count ---

24          MR. FERRELL:  V.

25          THE COURT:  That really should be Count V.

1          MR. FERRELL:  Yes, Ma'am.

2          THE COURT:  So that should be Count V.  And what you

3    have as Count V right now as the verdict director should be

4    Count IV.

5          MR. FERRELL:  That's correct.

6          THE COURT:  And that's the furtherance.  Okay?

7          MR. FERRELL:  Those two numbers were transposed,

8    Judge, and I think that's created all the problem.

9          THE COURT:  Yeah.  So if we can get those redone.

10          MR. FERRELL:  That's -- Yeah.

11          THE COURT:  And we needed to get one of them redone,

12   anyway, because of that other typo.

13          MR. FERRELL:  We got it, Judge.

14          THE COURT:  And then the verdict forms are correct

15   and they're labeled correctly.  It's the verdict directors

16   that we need to change.

17          MR. FERRELL:  Yes, Ma'am.  The only error were those

18   two Roman numerals that caused all these problems.

19          THE COURT:  Yeah, it caused all the problems.  So if

20   we get those transposed, then we'll be okay.  I won't number

21   these until I get the correct set, and we'll do that later.

22          Okay.  If we can get those corrections made.  Thank

23   your secretary for me.

24          MR. FERRELL:  I will, Your Honor.  Thank you.  I

25   apologize for the error.

```
 1              THE COURT:  No.  That's okay.  It gets confusing.

 2              MR. FERRELL:  It's so much confusion.

 3              THE COURT:  Okay.  I'll -- Once we get the corrected

 4    forms on all this stuff, I'll actually number the

 5    instructions, but I think we're okay.

 6              Now are we ready then to move in -- Does the

 7    Government just have one more or two more witnesses?

 8              MR. SORRELL:  Two.

 9              THE COURT:  Who's the second one?  The expert and?

10              MR. SORRELL:  The Mississippi County Clerk.

11              THE COURT:  That's right.  I had forgotten.  Okay.

12              Mr. Liszewski, do you know if you're going to have

13    evidence this morning or not?

14              MR. LISZEWSKI:  I've spoken to my client briefly

15    about it.  We're going to -- What I was going to request is

16    ten minutes after the Government rests so I can file my

17    judgment of acquittal motion and we can make a final decision.

18              THE COURT:  Well, we'll probably be doing the motion

19    up here, depending on what time we complete it.

20              MR. LISZEWSKI:  That's fine.

21              THE COURT:  Okay.  Do you need a couple of minutes?

22    Take a couple more minutes.

23              MR. FERRELL:  If I may, to make these changes.

24              THE COURT:  Yeah.  No problem.

25              MR. FERRELL:  Thank you, Judge.  See you in a couple
```

1    of minutes.

2              (Court recessed from 8:34 A.M. until 8:45 A.M.)

3              (The following proceedings were held outside the

4    hearing and presence of the Jury:)

5              THE COURT:  Are we ready?  Are we ready to bring the

6    Jury in?  Are we ready to bring the Jury in?

7              MR. FERRELL:  Yes, Ma'am.

8              THE COURT:  Okay.  Why don't we go ahead.

9              (Jury seated by the Clerk.)

10             (The following proceedings were held within the

11   hearing and presence of the Jury:)

12             THE COURT:  Please be seated.  Good morning, Ladies

13   and Gentlemen.

14             Mr. Sorrell, would you call your next witness?

15             MR. SORRELL:  I call Ruth Montgomery, please.

16             THE COURT:  Ma'am, would you step forward and be

17   sworn?

18                        **RUTH MONTGOMERY**,

19   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

20   FOLLOWS:

21             THE COURT:  You may proceed.

22                        DIRECT EXAMINATION

23   QUESTIONS BY MR. SORRELL:

24   Q    Would you state your name, please?

25   A    Ruth Ann Montgomery.

1    Q    What agency do you work for?

2    A    The Missouri State Highway Patrol.

3    Q    Do you work in a particular division of that agency?

4    A    The Crime Laboratory Division.

5    Q    Where is that division located at?

6    A    In Jefferson City, Missouri.

7    Q    And what are your job duties in your position?

8    A    I'm a criminalist in the DNA Case Working Section.

9    Q    Do you handle any particular kind of duties in your job

10   as a Criminalist?

11   A    Yes, I do.

12   Q    And what are those?

13   A    My duties are to locate and identify biological stains on

14   evidentiary samples, to develop DNA profiles from these

15   biological stains and touch or trace DNA as well.

16   Additionally, to do comparisons between the profiles developed

17   from the evidentiary samples and profiles developed from known

18   reference standards.

19   Q    So would it be fair to say that you handle known samples

20   from individuals, like buccal swabs?

21   A    Yes, sir.

22   Q    And would you handle other samples that would contain

23   unknown biological fluids, like clothing and so forth?  Is

24   that fair?

25   A    Yes, sir.

1   Q     Okay.  And in terms of developing DNA profiles, do you

2   develop a DNA profile for the known sample?  The buccal swab?

3   A     Yes.

4   Q     And do you also then try to develop a DNA sample from the

5   unknown sample, the clothing or whatever the sample is?

6   A     Yes.

7   Q     Okay.  And how long have you worked in this particular

8   division?

9   A     Just over four-and-a-half years.

10  Q     And what's your educational background?

11  A     I hold a Bachelor of Arts in Biology from Westminster

12  College in Fulton, Missouri.

13  Q     And are there standards that you must adhere to in the

14  performance of your duties in obtaining DNA samples?

15  A     Yes.

16  Q     And who are those standards set out by?

17  A     The DNA Advisory Board and the ASCLD or the American

18  Society of Crime Lab Directors Association.  Our lab is

19  accredited.

20  Q     Accredited by which agency?

21  A     ASCLD.

22  Q     And in order to be accredited, what steps must be taken?

23  A     It means that you're subject to audits or inspections

24  where experts from the field in all disciplines that are

25  contained within our crime lab come in and do an inspection or

1    an audit of the lab to ensure that you are adhering to all

2    standards and meet all standards.

3    Q    Is it comparable to a peer review by other people who are

4    familiar with those techniques and use those techniques?

5    A    Yes, it is.

6    Q    Okay.  And do they issue written reports?

7    A    Yes, they do.

8    Q    And have -- Has your agency been subjected to that review

9    during the four, four-and-a-half years that you have worked

10   there?

11   A    Yes, it has.

12   Q    And has your agency always passed those particular

13   reviews?

14   A    Yes, it has.

15   Q    Have you testified in other cases concerning DNA

16   profiling and testing?

17   A    Yes.

18   Q    Approximately how many times have you testified?

19   A    Approximately 20 times.

20   Q    In state court?

21   A    In the state court.

22   Q    All right.  Would that be mostly be in Missouri or all in

23   Missouri?

24   A    All in Missouri.

25   Q    Okay.  And if you would, tell the Jury:  What is DNA?

1    Let's start off with that.

2    A    DNA, or deoxyribonucleic acid, is a molecule found in

3    nearly every cell of the body; cells like skin cells, white

4    blood cells and sperm cells.  It is the molecule that

5    determines such things as hair color, eye color, height.  For

6    that reason it's often called the blueprint of life.

7    Q    And is it fair to say that DNA is only present in a cell

8    that has a nucleus?

9    A    Yes.

10   Q    Would a red blood cell have DNA in it?

11   A    No, because red blood cells do not have nuclei.

12   Q    And what about white blood cells?

13   A    White blood cells do have nuclei.

14   Q    And skin cells?

15   A    Skin cells, yes.

16   Q    Okay.  And if you would, describe to the Jury the types

17   of -- or let me back up for just a second.

18           How is DNA transferred from a person's body to an

19   object that you're testing?

20   A    By coming in contact with that object.

21   Q    By "contact with that object," do you mean by a

22   particular part of the body?  A hand or ---

23   A    By touching.  DNA is also transferred in body fluids such

24   as semen and blood, that type of thing.

25   Q    Could it also be a component of vaginal fluid from a

1   female?

2   A     Yes, it is.

3   Q     Okay.  If -- Are DNA cells or skin cells transferred

4   simply as a matter of a person touching a particular item,

5   like this exhibit with my hand?

6   A     It can be, yes.

7   Q     All right.  And is that called "touch DNA"?

8   A     That is called "touch" or "trace DNA."

9   Q     Is there a term calmed "tertiary DNA"?

10  A     "Tertiary transfer"?

11  Q     Tertiary transfer.

12  A     Yeah.  There are basically three stages of transferring

13  DNA.  When you make direct contact with an object or another

14  person, when I touch this table, that's called a "primary

15  transfer" because my DNA is being transferred directly to that

16  object.

17        There's also "secondary transfer."  If I were to

18  shake someone's hand and their skin cells were left on my hand

19  and then I touched this object and I leave both my DNA and

20  their DNA on this object, that would be secondary transfer of

21  their DNA.

22        There's also "tertiary transfer" where if an

23  individual touches an object, for instance, someone else

24  touched this table, I came along and then I touched the table

25  and then I touched another object, say the chair, and I

1    transferred their DNA to the chair, that would basically be

2    tertiary transfer.  It just means that you removed from the

3    direct object basically three steps.

4    Q    And so a form of tertiary transfer can be a person had

5    vaginal fluid on their hands and touched an object?

6    A    That would be secondary.

7    Q    Secondary.

8    A    There's only two steps in that transfer.

9    Q    I'm sorry.  All right.  And the cells that you're

10   testing, are they visible to the naked eye?

11   A    No.

12   Q    And, of course, the DNA is a smaller component of each

13   individual cell.  Is that right?

14   A    That's right.

15   Q    And does your test that you perform, does it also measure

16   the relative strength of the DNA components that you test?

17   We'll get into that a little bit later, but ---

18   A    Yes.  Based on the intensity -- as you'll see later, the

19   intensity of the peek height in what is called an

20   electrical -- electropherogram indicates somewhat the quantity

21   of DNA that's in that sample.

22          MR. SORRELL:  Your Honor, may I approach the witness

23   from time to time?

24          THE COURT:  You may.

25   Q    (By Mr. Sorrell)  Ma'am, I've handed you what's been

 1    marked as Exhibit 60.  Would you tell the Court what that

 2    exhibit is, please?

 3          MR. SORRELL:  And, Your Honor, I have added four

 4    exhibits to the exhibit list.

 5    A    It appears to be a photocopy of electropherograms that I

 6    generated in our laboratory while conducting testing in this

 7    particular case.

 8    Q    (By Mr. Sorrell)  Okay.  So these are basically

 9    computer-generated charts of your DNA test work.  Is that

10    fair?

11    A    Yes.

12    Q    Okay.  Because I'm going to refer to these a little bit

13    later on.  If you would, would you describe -- generally give

14    an overview of the steps you take to develop a DNA profile

15    using both the known sample and an unknown sample?

16    A    Okay.  When evidentiary samples come into our laboratory,

17    I would retrieve the evidence from an evidence locker.  I

18    would take it to my work station.

19          The first thing that I would do would be a visual

20    inspection.  I would look at the evidence very carefully to

21    determine if there are any stains that are visible to the

22    naked eye, such as a blood stain, sometimes a semen stain but

23    more often semen stains are located by using the aid of an

24    alternate light source, something like a black light because

25    it will fluoresce under that.

1          After the visual examination, then if there are

2     stains observed, then I would do chemical testing to confirm

3     what those stains might be.  In our laboratory we confirm the

4     presence of blood and semen.

5          First, I would take a small sample on a piece of

6     filter paper from a given semen stain or a blood stain, and I

7     would subject it to testing with a reagent that would cause a

8     color change.  That would be a presumptive test.

9          If that was positive, then it would go on to the

10    confirmatory test which is another test that is more specific

11    for that biological fluid.  One of the tests -- For instance,

12    semen is tested.  One of the components of semen that we test

13    for is done in a small cartridge, like a pregnancy test, and a

14    positive result would be indicated by two pink lines.

15         After I confirm that there were fluids there or in a

16    case where I'm just going to do touch or trace DNA and I'm

17    just trying to collect any cells that may be left behind by

18    someone that came into contact with that object, I would take

19    a direct sampling from that object, usually in the form of

20    swabbing the object with a cotton swab, a cotton tip

21    applicator, a lot like a Q-tip on one end.

22         After I collected the stains or the cells, then the

23    cells are put into a test tube and they're treated with

24    chemical reagents to lyse open or break open the cell.  Once

25    the cell is broken open, then the DNA is released.

1          After the DNA is released, then it's subjected to

2     more chemical reagents which clean up the DNA which allows us

3     to actually go on to the next step which would be PCR or

4     preliminary chain reaction amplification.  You need many, many

5     copies of the DNA in order to get it to a stage where it can

6     be visualized by any type of equipment.

7          So as these copies are made during this PCR reaction,

8     fluorescent tags are attached to the DNA.  So when it is --

9     The next step is that it's sent through a genetic analyzer and

10    as it's sent through the genetic analyzer, the fluorescent

11    tags are detected by this analyzer and that is converted into

12    data called an electropherogram, the graph that we were

13    talking about earlier.

14         That is done first for unknown samples.

15         Then if I have known reference standards in a case,

16    which I almost always do, a buccal swab, for instance, which

17    is a swab taken of the inside of the mouth of the cheek cells,

18    I would go through the same process of getting the DNA out of

19    the cell and making many copies of the DNA and sending it

20    through a genetic analyzer and getting an electropherogram

21    result.

22         Then the results of both of the tests are compared to

23    each other to determine if they are similar or dissimilar.

24    Q    And are the steps that you've just described generally

25    accepted in the scientific community for developing DNA

1    profiles?

2    A    Yes.

3    Q    All right.  And they're also the steps that you testified

4    to in other cases where you've been nominated as an expert?

5    A    Yes.

6    Q    The electropherogram that you referred to, basically it's

7    a chart, isn't it, that represents certain information that

8    the machinery has picked up?

9    A    Yes.

10   Q    And what do you call the spikes and peaks on that chart?

11   A    The peaks on that chart are called "alleles."  Human DNA

12   is contained within the human -- Excuse me.  The DNA molecules

13   in humans is contained in 46 chromosomes which are like

14   strands of beads basically.  And on those strands of beads are

15   what is called "genes."  And your genes determine such things

16   as hair color and eye color, but there are versions of those

17   genes; you know, there are versions for brown eyes and blue

18   eyes and green eyes.  And the versions of those are called

19   "alleles."  So each peak would represent an individual allele

20   or version.

21   Q    And basically are you measuring a particular spot on a

22   chromosomal chain?

23   A    That's correct.

24   Q    How many chromosomes does a human cell have that -- that

25   a human cell would have DNA in it?

1   A      It has 46 chromosomes; 23 pairs.

2   Q      And where are the pairs contributed from?

3   A      You get 23 from your mom and 23 from your dad.

4   Q      And is that true for every cell that has a nucleus in

5   your body?

6   A      Yes.

7   Q      And are those cells identical from one cell to the next

8   and -- within that person's body?

9   A      Barring any genetic anomalies, they should be, yes.

10  Q      All right.  And those would be extremely, extremely rare.

11  A      Yes.  It can also happen in case of blood transfusion,

12  bone marrow transfusion, that type of thing.

13  Q      All right.  Now on these chromosomes, are they formed --

14  even though they're microscopic size, are they formed in

15  what's known as a "chain"?

16  A      Yeah.

17  Q      All right.

18  A      Yes.

19  Q      And are the -- Does the chain have links that are called

20  "base pairs"?

21  A      Yes.  The individual components of the chain would be

22  called a base pair.

23  Q      All right.  And so of this whole DNA chain, how many

24  different base pairs would there be on that chain?

25  A      There's approximately 3.3 billion.

1  Q    And out of those 3.3 billion pairs, how many of those are

2  similar from each -- are similar to all the people in the

3  world?

4  A    Approximately 99.99 percent are the same from person to

5  person.  It's what makes us all human.  It's the .1 -- It's

6  the .01 percent difference that makes us unique individuals.

7  Q    And for purposes of your testing, do you look

8  specifically at those individual characteristics on the DNA

9  chain?

10  A    Yes.  We look at the difference -- differences.

11  Q    And over time, has the scientific community designated

12  certain particular areas for -- they're accepted for testing

13  for identification purposes?

14  A    Yes.

15  Q    And why have these particular sections been picked out?

16  A    The core loci or locations that we look at were picked

17  out by the FBI when STR, or Short Tandem Repeat Analysis,

18  started back in the early '90s.  They were picked out for

19  their genetic diversity because they are very different from

20  person to person.

21  Q    All right.  And so these are basically the component

22  parts of a person's DNA that would not have any relationship

23  to maybe whether they were just susceptible to a disease or

24  their race or so forth?

25  A    There's no information contained within this data that

1    would reveal to you anything about a person's health or

2    identity or anything of that nature.

3    Q    And is that why these particular items are used for

4    testing for your purposes?

5    A    It is one of the reasons that it is used.

6    Q    All right.  And how many different locations on the DNA

7    chain are generally accepted as being looked at for DNA

8    identification purposes?

9    A    It depends on what type of analysis that you're looking

10   at.  In our lab we use 16 different locations in one kit,

11   what's called a "kit."  And then we have another area where we

12   look at just the Y-chromosome, and we look at 12 locations

13   there.  But the standard set across the industry is what is

14   called the "CODIS Core 13 Loci."  Those are what's required by

15   the FBI.

16   Q    And does -- Your testing, is it designed to separate out

17   those -- if you're just looking first at the 16 loci, would

18   you just simply -- does your test separate out those

19   particular portions of the DNA?

20   A    Yes, it does.

21   Q    And that's what you've done on Exhibit 60.  Is that

22   right?

23   A    That's correct.

24   Q    May have I that exhibit back, please?

25   A    Yes.

1          MR. SORRELL:  Your Honor, I'll offer Exhibit 60.

2          THE COURT:  Exhibit 60 is admitted.

3    Q    (By Mr. Sorrell)  Ma'am, at the top of that Exhibit 60,

4    can you tell the Court what that first chart is, the very top

5    chart as -- Is your screen on?

6    A    No.

7    Q    I'm sorry.

8    A    At the very top is what is known as an allelic ladder.

9    What that is is a composition of all the common known possible

10   alleles within each location or loci that we look at.

11   Q    Okay.  So for -- What is the heading at the top of this

12   chart?  The words or numbers DS -- D3S1358, what does that

13   mean?

14   A    That's the name of the location.  And in that particular

15   one it refers to a specific location on Chromosome 3, D3.

16   Q    And do all of the 16 locations that you look at have

17   different names?

18   A    They have different -- Yes.  They are 16 different and

19   separate locations.

20   Q    And would all 16 of those locations be displayed on

21   Exhibit 60 for the tests that you have done?

22   A    Yes.

23   Q    Okay.  And so, for example, on the first side of this

24   particular exhibit on Exhibit 60, under the marker for DS or

25   D3 S1 358, can you tell the Jury how many different

1    possibilities of alleles there are in that -- in that one

2    setting?

3    A    At that one location, it appears that there are nine

4    common alleles that are possible within a person's DNA.

5    Q    All right.  And so there are different numbers

6    represented by different areas on the DNA chain.  Is that

7    right?

8    A    That's correct.

9    Q    For example, under D21S11, there is a large number of

10   alleles possible.

11   A    Yes.

12   Q    And do -- do people in your profession use these numbers

13   to determine probabilities of occurrences?  That is, the

14   probabilities that a person's DNA will appear at that location

15   on this chain.

16   A    The number of observations within a sample set,

17   population sample set, from this would be used to determine

18   the statistics.

19   Q    And what -- I'm sorry.  Did I interrupt you?

20   A    No.

21   Q    Oh, okay.  Do you keep a database in your office that you

22   use for these comparison purposes?

23   A    We use the FBI PopStats database to do our statistical

24   analysis.

25   Q    So the FBI keeps the database that you use?

1    A    They are the owner but we actually have it in our

2    laboratory.

3    Q    Yes.

4    A    Yes.

5    Q    Okay.  And -- So how do you use that particular

6    information to determine a statistical sample of seeing this

7    particular DNA marker?

8    A    It's very automated and computer generated, but basically

9    the underlying principle is each allele has a frequency within

10   a population; that is, how often it's seen within that

11   population.  And that frequency number determines how common

12   or how rare that allele is.

13        And so to get statistical analysis, you would

14   multiply -- in this case you would multiply each different

15   location, one against the other, to come up with the numbers

16   that are arrived at in our statistical analysis.

17   Q    All right.  Ma'am, did I prepare some subsets of exhibits

18   from Exhibit 60?

19   A    Yes, you did.

20   Q    And let me show you what I've marked as 60-A, B, C and

21   60-G, H and I.  Could you tell the Court where these exhibits

22   came from?

23   A    Yes.  They are portions of the electropherograms that I

24   generated in our laboratory.

25        MR. SORRELL:  Your Honor, I'll offer the Exhibits

1  60-A, B, C and 60-G, H, I.

2        THE COURT:  Those are admitted.

3  Q   (By Mr. Sorrell)  Ma'am, could I ask you to hold that

4  exhibit up, please?  Or would it be better if I ---

5        MR. FERRELL:  There's a flip chart there.

6        MR. SORRELL:  Okay.  Thank you.

7        MR. LISZEWSKI:  Your Honor, would it be okay if I

8  moved over there.

9        THE COURT:  Sure, step over.

10  Q   (By Mr. Sorrell)  Ma'am, did you obtain a buccal swab

11  from an individual known as Tron Kent in this particular case?

12  A   Yes, I did.

13  Q   Ma'am, I've handed you what's been marked as Exhibit 52.

14  Would you tell the Court what that exhibit is, please?

15  A   Yes.  It is the buccal swab standard from Tron Kent.

16  Q   And did you perform a DNA profile on Exhibit 52?

17  A   I did develop a DNA profile from that buccal swab.

18  Q   And is part of that profile shown at the top line of

19  Exhibit 60-A?

20  A   Yes.

21  Q   And is it headed "Buccal Standard from Tron Kent"?

22  A   Yes, it is.

23  Q   There are four charts on Exhibit 60-A.  Is that right?

24  Four different allelic charts?

25  A   There are portions of four different profiles that I

1    developed from different items.

2    Q    Yes.  And how many different allelic or different markers

3    on the DNA chain are present on Exhibit 60-A?

4    A    There are five locations or loci within this portion of

5    the profile.

6    Q    All right.  What's the first one that you see on Mr. Tron

7    Kent's -- his standard profile?

8    A    The first locus or location is called "amelogenin."  It

9    is an area of the DNA, a portion on the X-chromosomes.

10   X-chromosomes are indicative.  Women have two X-chromosomes.

11   Men have an X- and Y-chromosome.  So the amelogenin locus is

12   looked at to determine -- for a sex determining factor.

13   Q    So on this particular sample it turned out that Mr. Tron

14   Kent's buccal swab indicated that he was a male.

15   A    That's correct.

16   Q    Because he had an X- and Y-chromosome.

17   A    That's correct.

18   Q    So then moving on to the next loci, would you identify

19   that particular portion of the DNA chain for the Jury?

20   A    Yes.  That's the location called "VWA."

21   Q    And did your work that you performed determine any

22   allelic ladders for Mr. Kent's sample on that particular

23   section of the DNA chain?

24   A    At this locus, the profile from Mr. Kent shows a 15

25   allele and a 17 allele.

1    Q    Would you tell the Jury what those numbers mean in terms

2    of size or strength?

3    A    A 15 allele indicates that within that area or location

4    on a gene, there's 15 repeats.  And he has one version that

5    has 15 repeats and he has another version that has 17 repeats.

6    What it -- What it indicates there is -- Another indication is

7    based on the peak heights.  The even peak heights is that it's

8    a single source profile which would be expected coming from

9    someone's individual buccal swab standard.  You would not

10   expect to get a mixture in there.  So it's a single source

11   profile.  At VWA it has Alleles 15 and 17.

12   Q    All right.  And according to our chart, if I can find it

13   correctly, Ma'am, is that VWA chart that I'm pointing my

14   finger to on your screen to your right, is that the same chart

15   that you're referring to on Mr. Kent's sample?

16   A    You're talking about on the allelic ladder?

17   Q    Yes.

18   A    I can hardly see it on the screen but it appears to be.

19        (Hard copy of exhibit brought up to witness.)

20        Yes, it is.

21   Q    All right.  And so -- So for what you're referring to

22   there, it looks like there are one, two, three, four, five,

23   six, seven, eight, nine, ten, eleven, twelve, thirteen

24   possible common factors for that one portion of the DNA chain.

25   A    That's correct.

1    Q    And Mr. Kent has two of those.

2    A    He does.

3    Q    All right.  And did you make this same comparison going

4    out all the way through all 16 locations on Mr. Tron Kent's

5    buccal swab?

6    A    Yes, I did.

7    Q    And those are displayed on 60-B and 60-C.  Is that right?

8    A    Yes.

9    Q    All right.  Then having completed your work on the buccal

10   swab, did you turn to particular pieces of evidence that were

11   submitted to you?

12   A    Actually the evidentiary samples were worked.  These

13   evidentiary samples were worked subsequent to the buccal swab,

14   yes.  And the first profile is from a sperm fraction from a

15   fitted sheet.

16   Q    Ma'am, I've handed you what's been marked as Exhibit 39.

17   Have you seen that exhibit before?

18   A    Yes, I have.

19   Q    And how do you recognize it?

20   A    By my initials and date on the bag.

21   Q    And is there any kind of blue tape on that bag?

22   A    Yes, there is.

23   Q    And what's the function of that tape?

24   A    The blue tape is indicative that it's been in the

25   Missouri State Highway Patrol Crime Laboratory and it's been

1    sealed by an agent of that laboratory.

2    Q    Does your laboratory also acknowledge receipt of exhibits

3    when they're received by your lab?

4    A    Yes.

5    Q    And how -- how is that noted on the bag?

6    A    It is bar coded and --

7    Q    All right.

8    A    -- and given a laboratory number which appears right

9    there on this bar code.

10   Q    All right.  So it's both noted when it's received and

11   sealed with special tape and it's sent out?

12   A    That's correct.

13   Q    So did you perform a -- a DNA sample or a profiling

14   sample from the sheets that are inside Exhibit 39?

15   A    Yes, I did.  I did both stain identification and DNA --

16   DNA analysis on the sheets.  The sheets were examined under a

17   light source for the possible presence of semen.  There were

18   stains that were indicated that they were possibly semen.  At

19   least two stains were tested with presumptive testing.  Both

20   of those were positive.  A portion of one of the stains was

21   confirmed to be consistent with semen.  A portion of that same

22   stain was also taken on to DNA analysis.

23         From that stain, a differential extraction was

24   performed.  When I told you earlier about breaking open the

25   cell and getting out the DNA, in cases where sperm are

1    involved, sperm are a little bit different in that you can

2    separate them out from any other common type of cell.  So it's

3    a differential extraction to separate the sperm from any other

4    cells that may be there.  Generally, you're separating the

5    male component from the female component within a sexual

6    mixture.

7    Q    And so this second chart on Exhibit 60-A of the second

8    allelic ladder chart basically is only the male sperm

9    component that was analyzed from the fitted sheets.

10   A    That's correct.

11   Q    And what do you do to the fitted sheets to get the sample

12   off of it?

13   A    I take a cutting from the fitted sheet, and that cutting

14   of the stain itself is actually placed into the test tube.

15   Q    Is that then destroyed during the process?

16   A    Yes, it is.  It's consumed during the process.

17   Q    All right.  So for this particular sample for the bed

18   sheet, did you run it through the same tests that you've

19   described earlier for arriving at a DNA profile for

20   Tron Kent's buccal swab?

21   A    Yes, I did.

22   Q    And did you turn out with an allelic ladder chart for a

23   DNA profile for the fitted sheet for a male?

24   A    I developed a DNA profile from the fitted sheet that was

25   consistent with the profile from Tron Kent.

1    Q    And why would you make that conclusion that it's

2    consistent?

3    A    Because when I did the comparisons and I looked across

4    the profile at all 16 loci, the markers were exactly the same

5    between Tron Kent's buccal swab standard and the profile

6    developed from the sperm fraction from the bed sheet.

7    Q    Can you point out those similarities to the Jury on the

8    top half of the chart marked 60-A, please?

9    A    Sure.  If I move across here from location to location

10   and then down to this next sample, Tron Kent's has a 15, 17.

11   This sample has a 15, 17.

12   Q    And that's in what marker on the DNA chain?

13   A    VWA.  At D8 -- At the D8 locus, Tron Kent's reference

14   sample has a 12 allele and a 14 allele; that the sperm sample

15   from the fitted sheet has a 12 allele and a 14 allele.

16        The next locus, being the TPOX locus, the alleles are

17   6 and 8.  The reference standard, they are 6 and 8 in the

18   sample from the bed sheet.

19        And when I move across to the last location titled

20   FGA, you see one peak there, one peak indicating that he has

21   two copies of No. 23, one contributed by his mom, one

22   contributed by his dad.  That is also consistent with the

23   sample from the bed sheet.

24   Q    May I place -- Actually that's -- We've been looking at

25   60-C, haven't we?

1   A     Yes.  It's the last one.

2   Q     All right.  Well, let me have you look at Exhibit 60-B.

3   Is 60-B just the same chart but different locations on the

4   chromosome chain?

5   A     It is.  It's looking at different -- different

6   chromosomes, different locations.  This one is on Chromosome

7   5.  The buccal standard from Tron Kent yielded an 11 and a 13.

8   The profile from the sperm fraction also yielded an 11 and a

9   13.

10           Next is the D13 locus on Chromosome 13.  He had a 12

11   allele.  Once again, it means he has two copies of the 12.  It

12   comes up as one peak.  That is consistent with the

13   fractions -- the sperm fraction from the fitted sheet.

14           Next is the D7 Chromosome.  We looked at a spot on

15   Chromosome 7.  The alleles from Mr. Kent are 10 and 12.  The

16   alleles from the sperm fraction are 10 and 12.

17           Next, we looked at a spot on Chromosome 16.  The

18   alleles from Mr. Kent's are 9 and 12.  The alleles from the

19   sperm fraction are 9 and 12.

20           Next is a location called "CSF."  Once again, there's

21   one peak.  It's an 11 from Mr. Kent's standard.  There's also

22   one peak in the sperm fraction from the fitted sheet.

23           Next is Penta-D.  There are two peaks there; a 10

24   allele and an 11 allele in Mr. Kent's standard.  There are

25   also a 10 allele and an 11 allele in the profile developed

1    from the sheet.

2    Q    And I know this is a lot of trouble, but I would like to

3    go through the last chart.  Does the chart marked 60-A then

4    complete the count of 16 different locations on the chromosome

5    chain that you analyzed?

6    A    It does.

7    Q    Would you go ahead and point those similarities out for

8    the Jury, please?

9    A    The first location is on Chromosome 3.  The alleles in

10   Mr. Kent's reference standard are 13 and 15.  The alleles from

11   the sperm fraction are 13 and 15.

12        The next location I looked at is O1.  The alleles are

13   7 and 8.  In the reference standard they are also 7 and 8 and

14   in the profile from the sheet.

15        Next is a location on Chromosome 21; one peak again

16   and it's a 28 allele.  There's also a 28 allele in the profile

17   from the bed sheet.

18        The next location is D18 which means Chromosome 18.

19   The alleles from Mr. Kent are 16 and 19.  The alleles from the

20   sperm fraction of the bed sheet are also 16 and 19.

21        And the last location is named Penta-E; once again,

22   one peak.  It's a 14 which is consistent with the peak in the

23   profile from the sperm fraction from the bed sheet.

24   Q    Now when you compared these two samples, that is the

25   buccal swab sample and the sperm fraction from the bed sheet,

1   is that what allowed you to express your opinion that the

2   sperm sample from the sheet is consistent with the DNA on

3   Mr. Kent's buccal swab?

4   A    Yes.

5   Q    Now when you say it's consistent with, is that the

6   highest expression of an opinion that you're allowed to give

7   in your agency?

8   A    That -- Yes.

9   Q    Okay.  That's the highest confidence that you're allowed

10  to express?

11  A    Yes.

12  Q    Now using the same information, did other experts express

13  their opinions differently?

14  A    Yes.

15  Q    Using the same information that you've looked at here?

16  A    Yes.

17  Q    For example, does the FBI do DNA profiling?

18  A    Yes, they do.

19  Q    For this same information, how would they express their

20  opinion?

21  A    They would make an identity statement.

22  Q    Which is what?

23  A    They would say that the DNA from the fitted sheet

24  actually came from Tron Kent.

25  Q    But you're not permitted to do that by your standards.

1  A    Our laboratory protocols and procedures do not allow us

2  to make identity statements.

3  Q    All right.  Now did you also continue with your

4  examination for a DNA profile on some cigarette butts?

5  A    I did.

6  Q    Ma'am, I've handed you what's been marked as Exhibit 17.

7  Have you seen that exhibit before?

8  A    Yes, I have.

9  Q    And would you describe to the Court what that is?

10  A    It's an ashtray containing cigarette butts.

11  Q    And did you perform a DNA profile on a portion of the

12  evidence contained within Exhibit 17?

13  A    Yes, I did.  I took cuttings from two of the cigarette

14  butts from this ashtray.

15  Q    And did you run those two cuttings through the same tests

16  that you described earlier to generate a DNA profile?

17  A    Yes, I did.  I developed profiles from both of those

18  cuttings independently.

19  Q    And did you make any determinations about any DNA that

20  you observed from your tests on these two cigarette cuttings?

21  A    I did.  The profiles developed from each of the

22  individual cigarette butts are consistent with the profile

23  from Tron Kent.

24  Q    Now are -- The two cigarette butts that you tested, are

25  there allelic charts also on Exhibit 60-A, B and C?

1    A     The profile, yes, is contained on this exhibit.

2    Q     And those are the bottom two charts.  Is that fair?

3    A     This is from Cigarette Butt 1 and this is from Cigarette

4    Butt 2.

5    Q     Would you describe the similarities to Mr. Tron Kent's

6    buccal swab with the cigarette butts which are identical?

7    A     If you look across each location and then you compare

8    Mr. Kent's profile from his reference standard, they -- they

9    are the same alleles at every single locus.

10   Q     That would be the same alleles that you testified earlier

11   concerning the sperm fraction from the fitted sheet?

12   A     That's correct.

13   Q     Are there any additions -- that is, any extra alleles --

14   that you found from the three items that you tested there?

15   A     Not within this profile.

16   Q     Were there any deletions?  That is, were there any --

17   A     Dropouts?

18   Q     -- dropouts?

19   A     No.

20   Q     All right.  So it's basically identical from top to

21   bottom.

22   A     Yes.

23   Q     Okay.  Let me just take those from you for right now.

24   Did you generate a report as to the probability that you would

25   see this particular pattern of allelic markers in an

1    individual within the Caucasian population and the black

2    population?

3    A    I generated statistics stating the frequency of

4    occurrence of this particular profile.

5    Q    Yes.  May I hand you Exhibit 61?

6    A    Yes.

7    Q    Would you tell the Jury what Exhibit 61 is, please?

8    A    61 -- Exhibit 61 is the statistical report from PopStats,

9    a photocopy of which was contained in my copy of the case file

10   for this case.

11   Q    And does it contain the final report of statistical

12   analysis, showing the frequency you would expect to see this

13   allelic ladder in any individual within a given population?

14   A    The frequency?

15   Q    Or a sample population?

16   A    It is.  It is.  It's a report that contains the frequency

17   of occurrence of this profile.

18   Q    All right.

19          MR. SORRELL:  May I offer Exhibit 61, please?

20          THE COURT:  61 is admitted.

21   Q    (By Mr. Sorrell)  I'm going to display this on the

22   screen, if I may.

23   A    Okay.

24   Q    Ma'am, on Exhibit 61, are all of the 16 different

25   locations that you found allelic markers for your evidence

1    that you sampled shown on Exhibit 61?

2    A    They are.

3    Q    And does it also separate out where the allelic factors

4    were found in the second column on that exhibit?  That is,

5    on -- For example, the first locus, D3S1558, there's an

6    allelic marker at 13?

7    A    Yes.

8    Q    All right.  And does the -- That's the same for every one

9    of the allelic markers?

10   A    That's correct.  On this report you will see the

11   location -- the names and locations just like at the top of

12   this chart.  And then you will see the allele CAU directly

13   across from that.  For instance, for D3 on this chart, you

14   should see a 13 and then you should see the D3 locus named

15   again and then you should see a 15.

16   Q    And on the right side of this chart, do you have a

17   representation of the mathematical probability of seeing that

18   individual allelic marker in different pop -- race

19   populations?

20   A    Various populations, yes.

21   Q    And what is the first chart on the left that's under the

22   heading "CAU"?

23   A    That's the frequency of occurrence of that particular

24   allele within the Caucasian population.

25   Q    And what about the "BLK"?

1   A    That's the black population.

2   Q    And the "SEH"?

3   A    The Southeast Hispanic population.

4   Q    All right.  And under the "SWH" at the bottom?

5   A    The Southwest Hispanic population.

6   Q    And do you -- You use a computer program in order to

7   develop a number that gives you the frequency of probability

8   of seeing this exact profile --

9   A    This ---

10  Q    -- or does this generate itself?

11  A    This computer program that you see, when this entry is

12  done, PopStats actually does the mathematical analysis and

13  reports out the frequency of the occurrence.  It's a product

14  of the multiplication of the frequency of occurrence of each

15  individual allele.

16  Q    And is that mathematical calculation accepted by the

17  scientific community that performs DNA testing?

18  A    Yes, it is.

19  Q    And did you actually perform that test to find out what

20  the probability of seeing that particular marker for the

21  bottom three charts on this particular test?

22  A    That's what this is.

23  Q    All right.

24  A    This is the actual statistical calculation.

25  Q    Turning to Page 2 of this exhibit, is that opinion

1    expressed at the bottom of this particular chart?

2    A    Yes, it is.

3    Q    And this opinion, would it be expressed for each, the

4    sperm fraction, Cigarette Butt No. 1 and Cigarette Butt No. 2?

5    Is that fair?

6    A    Because -- Yes, because that profile is identical in each

7    marker, and the math is dependent upon each marker or allele

8    up here.  It would be the same for that profile.

9    Q    And within the black persons population, what is the

10   frequency that you would expect to see this particular chain

11   of numbers?  Of allelic markers?

12   A    The frequency of the occurrence of this particular

13   profile is 1 in 16.6 quadrillion.

14   Q    Now I don't use quadrillion much as a number, but first

15   we have millions and then say a thousand million is a billion.

16   Is that right?

17   A    Yes.  Quadrillion is actually 15 zeroes behind the

18   number.

19   Q    Okay.

20   A    It's a quadrillion.

21   Q    So we go from millions to billions to trillions; then

22   quadrillions; then quintillions.

23   A    That's correct.

24   Q    And if you were looking at the Caucasian population for

25   this same allelic marker, how -- what would be the frequency

1   that you would see this particular chain?

2   A    2.277 quintillion.

3   Q    Which is the next sequence of numbers above --

4   A    Eighteen zeroes.

5   Q    -- quadrillion.

6   A    That's right.

7   Q    All right.  A fairly large number.

8   A    Yes.

9   Q    So in order to see this allelic chain twice, you would

10  expect that there would be -- it would be in a population of

11  your sample size of 33.2 quadrillion in the black population?

12  A    You would not expect to see this profile any more than 1

13  in 16.6 quadrillion people.

14  Q    Okay.  That could be multiplied out by however many that

15  you wanted for the number of suspects, but you wouldn't expect

16  to see the second one until this larger number?

17  A    Based on -- Yes.

18  Q    All right.  Did you also examine other items for DNA

19  evidence?

20  A    Yes, I did.

21  Q    Did you examine a revolver?

22  A    Yes, I did.

23  Q    Did you find any DNA on it?

24  A    I actually had -- I developed a profile that was

25  insufficient for comparison purposes which means that I

1    only -- it only generated data at one of the 16 locations

2    which is not enough data points to say anything about that

3    profile.

4    Q    All right.  Did you also examine a brown jewelry box?

5    A    I did.

6    Q    And did you find any DNA on that jewelry box?

7    A    It was not enough DNA to proceed to DNA analysis.

8    Q    Ma'am, I've handed you what's been marked as 15 --

9    Exhibit 15-B.  Have you seen that exhibit before?

10   A    I've seen the individual Baggies before, yes.

11   Q    That's fine.  We've got them contained within a larger

12   plastic bag.  And in what case did you see these particular

13   Baggies in?

14   A    In this same case; our Laboratory Number 223801.

15   Q    And did you receive those samples or those Baggies from

16   any individual officer?

17   A    I received them from an evidence locker.

18   Q    Okay.  All right.  That's fine.  But did you perform any

19   DNA analysis on those particular Baggies?

20   A    Yes, I did.

21   Q    Did you find any DNA on Baggies 1, 2 and 3?

22   A    I did not find a sufficient quantity on Baggies 1, 2 or 3

23   to proceed to DNA analysis.

24   Q    And did you find any DNA on Baggie No. 4?

25   A    Yes, I did.

1  Q    And would you tell the Jury what you found on Baggie No.

2  4?

3  A    The bag was swabbed for possible skin cell transfer or a

4  trace DNA.  That yielded an amount of DNA that I could take on

5  to DNA analysis, and I developed a DNA profile from that.

6  That profile was characteristic of a mixture of at least two

7  individuals which means that at least two people and possibly

8  more contributed DNA to the profile that was developed.

9  Q    And do you have a process that tries to split out and

10  analyze whether the components are contributed by a male or a

11  female?

12  A    Yes.  We look at the amelogenin marker to determine.  If

13  there's a Y there, you know you have a male contributor.  If

14  there's no Y there, you know it's only a female contributor.

15  Q    And in this particular case, did you find both Y- and

16  X-chromosomes?

17  A    I did.

18  Q    And did you -- Is there a test then to further refine the

19  Y-chromosome to determine a genetic or a DNA profile?

20  A    Yes.  A profile can be developed just from the

21  Y-chromosome.  It's called "Y-chromosome DNA analysis," and it

22  looks at different locations but all of those locations are

23  contained on the Y-chromosome.

24  Q    Those locations are all named but have different names

25  than you've just referred to earlier.  Is that fair?

1   A     That's correct.

2   Q     Okay.  And, again, is this particular type of test

3   scientifically -- generally accepted within the scientific

4   community for this purpose?

5   A     Yes, it is.

6   Q     And did you come to a conclusion or come to a result

7   after you run this particular examination?

8   A     On the first examination or the subsequent?

9   Q     The subsequent.  I'm sorry.

10  A     On the Y-chromosome analysis?

11  Q     Yes, on the Y-chromosome.

12  A     The Y-chromosome analysis profile developed from the bag

13  was consistent with the profile developed from Tron Kent.

14  Q     All right.  And that's expressed in another allelic

15  ladder chart.  Is that right?

16  A     That's correct.

17  Q     Ma'am, I've placed a chart labeled 60-G in front of you.

18  If you would briefly describe what that chart is.  It's

19  already been introduced, but ---

20  A     It's an electropherogram generated from a Y-chromosome

21  DNA profile.  The profile on top was generated from the

22  reference standard from Tron Kent.  The profile on the bottom

23  was generated from the swabbing from the Baggie.  These were

24  subjected to testing with what is called a Powerplex-Y Kit.

25  It's the kit that actually amplifies or makes copies of the

1    DNA on the Y-chromosome.

2            As you can see, when you look across each location,

3    now it's named with the first letters of "DYS," indicating

4    that they all come from the Y-chromosome; at various places on

5    the Y-chromosome.  This profiling in its entirety would

6    contain 12 locations that we look at.  These are four of the

7    locations.  If you look at the two profiles and compare them

8    location by location, they are consistent with one another.

9    So the profile from the Baggie is consistent with the profile

10   from Tron Kent.

11   Q    How many different locations did you look at on the

12   Y-chromosome for this particular test?

13   A    12.

14   Q    And in all 12 cases were male Y-chromosome markers of

15   Mr. Kent's found on the Baggie, No. 4?

16   A    The alleles at all 12 locations from the profile from the

17   Baggie was consistent with the profile from Mr. Kent.

18   Q    Handing you Exhibit H, if I don't drop it, is that a

19   continuation of the Y-chromosomal allelic markers?

20   A    Yes, it is.

21   Q    And, again, they are the same as the -- from the buccal

22   swab as the Baggie, No. 4?

23   A    That's correct.

24   Q    And would the same response be for the chart marked

25   Exhibit 60-I?

1    A    That's correct.  In addition, you see an extra peak here,

2    and there was an extra peak back on the first chart, I

3    believe.  That is stated in my report as additional allelic

4    activity insufficient for comparison purposes.

5    Q    Is that why there's a 13 marker on the bottom of Exhibit

6    60-I?

7    A    Right.  That's correct.

8    Q    And there's a little bump on the top part of the chart

9    for the buccal swab.  Is that right?

10   A    That's correct.

11   Q    And why is that one not given an assigned marker?

12   A    Because that is in what is called a stutter position

13   which means when the DNA is copied over and over, sometimes it

14   can slip, and so you get copies that are just one repeat unit

15   shorter than the actual allele.  This 13 could possibly be

16   stutter as well, but we have stutter percentage cutoffs.  The

17   ratio of that peak to the taller peak, if it's not within our

18   ratios, then it -- it would be allowed to stay in the profile

19   and be called DNA that could be possibly contributed from a

20   second person.

21   Q    Now we're talking about a person's Y-chromosome on these

22   latest charts.  Is that right?

23   A    That's correct.

24   Q    Now would a person's Y-chromosome be the same from an

25   individual to his father to his grandfather to his great

1   grandfather?

2   A    The Y-chromosome is passed in the paternal link which

3   means it's passed on the father's side.  It is passed from

4   generation to generation, virtually unchanged.  So barring any

5   genetic anomalies, I would expect a grandfather, a father, a

6   son, a grandson, all the uncles from that father's side of the

7   family, to have the exact same Y-chromosome profile be noted.

8   Q    Would that also include the brothers?

9   A    Brothers.

10  Q    Paternal uncles?

11  A    Paternal uncles.

12  Q    All right.  Anyone in the male side of that family?

13  A    That's correct.

14  Q    But can we agree that the person who put this DNA on

15  plastic Baggie No. 4, had to have access to that plastic

16  Baggie?  I mean as a matter of reason.

17  A    Yes; had to have come in contact with the bag at some

18  point.

19  Q    All right.  Do you express your opinion slightly

20  differently when you're analyzing your final opinion for

21  Y-chromosome evidence?

22  A    The statistic is performed differently because it is a

23  lineage marker.  Because all the males within a family line

24  would have that marker, the statistics are done very

25  differently.  It's called "simple statistics," and it's

1   basically from a population database.  They look at a number

2   of profiles, and it's just reported as how many times that

3   profile's been observed within that database.

4   Q    And did you do that for this particular sample?

5   A    Yes, I did.

6   Q    And what did you determine?

7   A    I determined that it has been observed zero times out of

8   the database of 4004 individuals.

9   Q    All right.  Did you, also, express an opinion as to

10  whether or not Mr. Kent could be excluded or -- as a

11  contributor of this DNA on Baggie No. 4?

12  A    He could not be excluded because the profile was

13  consistent with the profile from his reference standard.

14  Q    And, again, that's the highest level of confidence that

15  you can express, given the fact we're looking at Y-chromosome

16  analysis.  Is that fair?

17  A    That's correct.

18  Q    Okay.  Turning back just real briefly to the other

19  allelic charts, looking at Exhibit 60-A, have you had occasion

20  to look at DNA samples from people who were closely related,

21  like brothers?

22  A    Yes, I have.

23  Q    That was a poorly worded question.

24  A    Not in this particular case.

25  Q    I understand.  But -- Now we understand the Y-chromosomes

1    will be the same if a person has the same father, but what

2    about -- and the evidence that you're looking at there or the

3    final opinions, would the chromosomal allelic markers be the

4    same for brothers?

5    A    Only if they were identical twins.

6    Q    But let's assume that there's not identical twins but

7    just for brothers.

8    A    No.

9    Q    And what would the changes be?  How would that be

10   expressed on your allelic ladder for a brother?  Would they be

11   in different places?

12   A    They would be -- They would be different.  If this sperm

13   fraction, for instance, had come in a brother, one of these

14   alleles could be either a 13 or a 15 but in all likelihood one

15   of them could not.  They could both be different.

16   Q    Yes.  But there would be differences throughout the

17   chart.

18   A    Yes.  I would not expect to obtain a profile from a

19   brother that was consistent with the profile from the other

20   brother.

21   Q    All right.  And that's basically based on your work and

22   the publications that have been expressed in the field?

23   A    That's based on the statistics, yes.

24   Q    All right.  Did you also express your opinions in the

25   form of a writing?

 1  A    I did.

 2  Q    Let me hand you what's been marked Exhibits 62 and

 3  Exhibit 63.  Would you tell the Court what those exhibits are?

 4  A    Those are copies of the reports that I issued in this

 5  case, two different reports that I issued, pertaining to the

 6  DNA analysis that I performed in this case.

 7  Q    Basically it contains a written summary of the opinions

 8  you've expressed here today?

 9  A    Yes, sir, it is.

10  Q    All right.

11       MR. SORRELL:  Your Honor, I'll offer Exhibits 62 and

12  63.

13       THE COURT:  Those are admitted.

14       MR. SORRELL:  Nothing further.

15       THE COURT:  Mr. Liszewski?

16       MR. LISZEWSKI:  Thank you.

17                  CROSS EXAMINATION

18  QUESTIONS BY MR. LISZEWSKI:

19  Q    Good morning, Doctor.

20  A    I'm not a doctor, sir.

21  Q    Oh.  Well, okay.  The first question for you:  The

22  numbers on the far left-hand side of your charts, it looks

23  like there's a 0, 100, 1800 and 2700.  Can you explain what

24  that is to us?

25  A    Yes.

1   Q    Okay.  Could you do that, please?

2   A    On the Y-axis or this bar that he's talking about, it is

3   a measure of the peak height, how high that is in RFU or

4   relative fluorescent units.  It's associated with the degree

5   of intensity of the fluorescence from that peak; generated

6   from that peak.

7   Q    So would it be fair to say that the higher a peak is on

8   the fluorescence, the higher the frequency is or ---

9   A    It would be safe to say the higher that a peak is, the

10  more DNA that you have at that specific location.  The

11  intensity has to do with the quantity of the DNA in the

12  sample.

13  Q    And more DNA is always more helpful than less DNA

14  whenever testing, true?

15  A    It can go in both directions.  You can have too much DNA;

16  you can also have too little DNA.

17  Q    Okay.  Now let me ask you this:  You mentioned to us

18  earlier about the cigarette butts, the 1 in 16 quadrillion,

19  and we had talked about random match probabilities before.

20  What is the -- What is your last random match probability for

21  mixtures?

22  A    I did not perform a random match probability for a

23  mixture in this case.

24  Q    Okay.  Do you have a random match probability for

25  mixtures at all?

1    A    I do not do statistical analysis on mixtures unless

2    they're a clear major and minor component.

3    Q    So your lab doesn't do that.

4    A    No, it does not.

5    Q    And, again, as you stated earlier, what makes us alike is

6    the fact that 99.9 percent of our DNA is pretty much alike.

7    A    Right.

8    Q    Let me ask you this:  Why do you have standards for

9    saying that something is consistent or inconsistent?  Why has

10   your lab developed those standards?

11   A    Because the evidence is of no value without something to

12   compare it to.

13   Q    Okay, exactly.  The reason that you have standards and

14   you can say it crosses this threshold, it crosses your

15   standards, is because of the value of the evidence

16   intrinsically without ---

17   A    I'm sorry.  I misunderstood your question.

18   Q    Let me reask it.  It was an awkward question.

19   A    When you said "standards," I thought you meant a

20   reference standard.

21   Q    I'm asking in general; your standards.

22   A    Okay.  My standards as in a minimum threshold?

23   Q    Exactly.

24   A    Is that what you're going off of now?

25   Q    Yeah.  Thank you.  You're helping me out here.  Why do

1    you have a minimum and a maximum threshold standard?

2    A    To ensure the quality of the profile that's developed.

3    Q    Okay.  So the lower the standard, would it be safe to say

4    that the quality might not be as high as, say, a higher

5    standard?

6    A    It depends on the individual instrumentation.  Are you

7    talking to me about laboratories that set their thresholds at

8    different values?

9    Q    No.  What I'm asking you -- Let me.  I'm trying to be as

10   clear as I can --

11   A    Okay.

12   Q    -- but this is an area I'm completely unfamiliar with.

13   The lower a standard is -- Let me ask you this:  If you have

14   something that just barely meets your threshold, some sample

15   that barely meets your threshold versus a sample that is well

16   above your threshold, would you consider the standard well

17   above your threshold more reliable?

18   A    No.  That's what a threshold is.  It determines the level

19   at which you will have confidence in that sample, --

20   Q    Okay.

21   A    -- the peaks that you're seeing in that sample.

22   Q    Okay.  And what if it just barely misses your threshold?

23   A    If it barely misses the threshold, then it's not

24   included.

25   Q    Okay.  So you wouldn't have confidence in that sample if

1    it doesn't meet your threshold.

2    A     I wouldn't say anything about it.  I would not say

3    anything about a portion of that sample that fell below the

4    threshold.

5    Q     Let me ask you this:  The plastic bag in which you

6    determined that there was DNA on that, did you determine if

7    there was a difference in the peak heights at the 23 and 24

8    allele?  You can feel free to look at your reports, please.

9    A     Thank you.  Now are you referring to the profile that was

10   developed with the PowerPlex 16?

11   Q     Yes.

12   A     Okay.  And at which locus were you asking me about, sir?

13   Q     I was asking at Locus 23 and 24 for the FGA locus.

14   A     FGA, okay.

15   Q     I guess that would be the 541 and 542 respectively.

16   A     Okay.  At FGA there is Allele 23 and Allele 24.  And your

17   question again?  Is there a difference in the peak height?

18   Q     Yes, Ma'am.

19   A     Absolutely.

20   Q     Absolutely, okay.  Now could that be the result of a

21   technical artifact, say a primer binding site mutation?

22   A     I would not expect that at the ratios at which -- the

23   differences between the peak heights.  That is not displayed

24   up here.

25   Q     I'm asking if it's possible.  It's a "yes" or "no"

1    question.

2    A     It's a possibility.

3    Q     Okay.  Can you explain to the Jury what a primer binding

4    site mutation is?

5    A     Yes, I can.  When the DNA is amplified by preliminary

6    chain reaction, what happens is there's a sequence of DNA that

7    matches the human DNA that you want to amplify.  That sequence

8    lays down in order to amplify that DNA to make another copy of

9    it.  When there's a primer binding mutation, that means

10   there's a difference between the person's DNA and the primer

11   that's supposed to match it.  So it will not bind.  Generally

12   it does not start to amplify at all.

13   Q     Okay.  Is another possibility that the alleles could be

14   different is because there could be more than one contributor?

15   A     There is more than one contributor.

16   Q     Okay.  Thank you.  And, again, you can't tell when one

17   contributor came into contact with this Baggie versus another.

18   A     No.

19   Q     Is there any way you can determine how the sample was

20   left on there?  Can you determine if it was by tertiary

21   transfer, secondary transfer or primary transfer?

22   A     No.

23   Q     Okay.  My next question is this:  Is there any -- Let me

24   rephrase that.

25         You did not put a number, a statistical number, on

1    the evidence found on the fourth Baggie, true?

2    A    That is correct.

3    Q    Okay.  Is there a reason that your lab would not allow

4    that particular ratio to -- Why does it not have that ratio?

5    A    Our -- No. 1, our laboratory does not perform likelihood

6    ratios which would be a statistic developed from calculating

7    the frequency for every allele that was found in that mixture.

8    In order for us to do a statistic, there has to be a clear

9    major and minor component.  So no statistic was performed on

10   that.

11   Q    So you -- I'm trying to make sure -- I don't want to put

12   any words in your mouth.  If it comes off that way, correct

13   me.  So there was no major or minor component?

14   A    That's correct, sir.

15   Q    Okay.  That's what I want to make sure about.  And,

16   again, you cannot say to a reasonable degree of scientific

17   certainty that Tron Kent's DNA is on that Baggie.

18   A    I believe my report stated that he could not be

19   eliminated as a contributor to the profile that was developed

20   from that bag; he or Amy Doyle.

21   Q    Okay.  And let me ask you this.  I want to come back to

22   the pillow cases that you tested and the sperm sheet or the

23   sheets that you tested.

24   A    Okay.  I did not test the pillow cases and I did not test

25   the flat sheet.  I only tested the fitted sheet.

1  Q    Okay.  Did you test for a nonsperm fraction on that?

2  A    I did.

3  Q    Okay.  And that was actually at least a characteristic of

4  at least two individuals?

5  A    It was.

6  Q    Okay.  So -- Let's see.  And, Ma'am, how many times have

7  you ever testified for a defense case?

8  A    At least twice.

9  Q    You've testified twice?

10  A    Yes, sir.

11  Q    And you currently work for the State, true?

12  A    Yes, sir, I do.

13  Q    Okay.

14        MR. LISZEWSKI:  Thank you, Ma'am.  I have no further

15  questions.

16        THE COURT:  Any Redirect, Mr. Sorrell?

17        MR. SORRELL:  I'm sorry, Your Honor?

18        THE COURT:  Any Redirect?

19        MR. SORRELL:  Nothing further.

20        THE COURT:  Thank you, Ma'am.  You may step down.

21        MR. SORRELL:  Your Honor, we'll call the clerk,

22  Mississippi County Clerk.

23        THE COURT:  Okay.

24        MR. SORRELL:  May I retrieve my exhibits?

25        THE COURT:  You may.

1              **LEEANN COLSON**,

2     HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3     FOLLOWS:

4              THE COURT:  You may inquire.

5     Q    State your name for the Jury, please, Ma'am.

6     A    Leeann Colson.

7     Q    Can you spell your last name, please?

8     A    C-O-L-S-O-N.

9     Q    Miss Colson, what is your profession, Ma'am?

10    A    I'm the Circuit Clerk for Mississippi County.

11    Q    All right.  How long have you been a Clerk for

12    Mississippi County?

13    A    Since January.

14    Q    January of this year?

15    A    Yes, sir.

16    Q    All right.  You're here today and have brought with you a

17    file from the official court records of the Circuit Clerk --

18    excuse me -- the Circuit Court of Mississippi County at our

19    request.  Is that correct?

20    A    That's correct.

21    Q    All right.

22            MR. FERRELL:  May I approach the witness, Your Honor?

23            THE COURT:  You may.

24    Q    (By Mr. Ferrell)  I have handed you what has been marked

25    as Government's Exhibit 10.  Could you identify that for the

 1    Jury, please?

 2    A     This is the case *State of Missouri v. Tron Kent*.

 3    Q     Okay.  And that is Case No. CR299-720FX.  Is that

 4    correct?

 5    A     Yes, sir.

 6    Q     All right.  Now you maintain that record in your office.

 7    Is that correct?

 8    A     Yes, sir.

 9    Q     All right.  I'd like to ask you just a few questions

10    about this particular document.

11          Does this document contain the charge which was filed

12    or what is called the "Information"?

13    A     Yes, sir.

14    Q     All right.  Could you locate that in your documents,

15    please?

16    A     Okay.

17    Q     All right.  And is there a charge which is referred to

18    within the Information as a possession of a controlled

19    substance charge?

20    A     Yes, sir; Count I.

21    Q     Yes.  And could you read what that says, please?

22    A     "Committed the Class B felony of possession of a

23    controlled substance with the intent to distribute; punishable

24    upon conviction under Section 558.011.1, Subsection 2, RSMO;

25    in that on or about November 21st, 1999, in the County of

1   Mississippi, State of Missouri, the Defendant, with the intent

2   to distribute, possessed numerous individual wrapped Baggies

3   containing crack cocaine, a controlled substance, knowing of

4   its presence and illegal nature."

5   Q    All right.  And can you -- Would your records reflect

6   whether or not Tron Kent entered a plea of "guilty" to that

7   particular charge?

8   A    Yes, sir, he did.

9   Q    And when would that have been?

10  A    March 14th, 2000.

11         MR. FERRELL:  I have no further questions of this

12  witness, Your Honor.  Thank you.

13         THE COURT:  Mr. Liszewski?

14         MR. LISZEWSKI:  No questions.

15         THE COURT:  Thank you, Ma'am.  You may step down.

16  Thank you.

17         MR. FERRELL:  Your Honor, may I ask:  Can she take

18  the file with her?  Do you need the file for anything?  To

19  examine it?

20         MR. LISZEWSKI:  No.

21         MR. FERRELL:  Thank you.  Is it okay, Your Honor, if

22  she takes it with her?

23         THE COURT:  That's fine.

24         MR. FERRELL:  Thank you, Your Honor.

25         MR. SORRELL:  Your Honor, I couldn't remember if I've

1   offered Exhibit 62 and 63 but I would at this time, if I

2   haven't.

3           THE COURT:  You have and those are admitted.

4           MR. SORRELL:  I'm sorry?

5           THE COURT:  They're admitted.

6           MR. SORRELL:  All right.  May we approach the bench,

7   Your Honor, just real briefly?

8           THE COURT:  Sure.

9           (The following proceedings were held at sidebar,

10  outside the hearing of the Jury:)

11          MR. SORRELL:  Your Honor, before we rested, I just

12  want to make sure that all of my exhibits have been offered

13  and accepted.

14          THE COURT:  Yeah.  I think we've got everything.  She

15  testified to that.

16          MR. SORRELL:  Yes, just now.

17          THE COURT:  Yeah.  I think I've got everything here.

18          MR. SORRELL:  I do.

19          THE COURT:  And you've got 62 and 63 and you got 60-A

20  through A, B, C, G, H, I.

21          MR. SORRELL:  Yeah.

22          THE COURT:  I think we got everything.

23          MR. SORRELL:  And you got 60.

24          MR. FERRELL:  Yes.

25          THE COURT:  I have 60.

```
 1          MR. SORRELL:  All right.  Just wanted to check before

 2   we closed.

 3          THE COURT:  Okay.  While you're up here, are you

 4   going to have any evidence?

 5          MR. LISZEWSKI:  I don't think so.

 6          THE COURT:  Okay.

 7          MR. LISZEWSKI:  What I was going to ask for is five

 8   minutes to use the bathroom because this cup of coffee is

 9   going through me.

10          THE COURT:  Yeah.  We'll take a break.  What I'd like

11   to do is we'll make a record on that, you know, just whether

12   or not, --

13          MR. LISZEWSKI:  Right.

14          THE COURT:  -- and you've got a motion, I assume.

15          MR. LISZEWSKI:  I do have a motion.  I'm going to

16   make it orally.  The other thing I'm going to ask for is I'd

17   like to make my record with respect to my client outside the

18   presence of the Government as to whether or not he's going to

19   testify.

20          THE COURT:  Yeah.  That's fine.

21          MR. LISZEWSKI:  Okay.

22          THE COURT:  I don't have any problem.  So we'll take

23   that, and then I assume we've got the corrected instructions.

24          MR. FERRELL:  Yes, Ma'am.  They're back over here.

25          THE COURT:  Okay.
```

1          MR. FERRELL:  We just need to get that.

2          THE COURT:  So we'll take a break and then after

3   that, we'll move into closing arguments.  We'll take a

4   sufficient break so we can get all of this stuff done.

5          MR. LISZEWSKI:  Okay.

6          MR. SORRELL:  Thank you, Your Honor.

7          MR. FERRELL:  Thank you, Your Honor.

8          (The following proceedings were held within the

9   hearing and presence of the Jury:)

10          THE COURT:  Does that conclude the Government's case?

11          MR. SORRELL:  It does, Your Honor.  The Government

12   rests.

13          THE COURT:  Ladies and Gentlemen, at this time we

14   will take a morning recess.  I have a number of some matters

15   to take up with the attorneys so it may be a little bit longer

16   than normal.  I do anticipate that we will be submitting the

17   case to you.  So, again, please do not discuss the case among

18   yourselves or with anyone.  And you can now proceed to your

19   morning break.  Thank you.  Will the attorneys remain here?

20          (Jury excused from the courtroom.)

21          (The following proceedings were held outside the

22   hearing and presence of the Jury:)

23          THE COURT:  Let the record reflect the Jury has left

24   the courtroom.  Why don't we take about a five-minute break

25   and then we'll come back and make the record and hear the

1    motion and go through the instructions again.

2              MR. FERRELL:  Thank you.

3              THE COURT:  Okay?  Court is in temporary recess.

4              MR. SORRELL:  Thank you.

5              (Court recessed from 10:01 A.M. until 10:19 A.M.)

6              (The following proceedings were held outside the

7    hearing and presence of the Jury:)

8              CLERK:  All rise.  This Court is again in session.

9    Please be seated.

10             THE COURT:  Why don't we start with Defendant's

11   motion.  We'll do that and then move into instructions.

12             MR. LISZEWSKI:  Your Honor, --

13             THE COURT:  Go ahead.

14             MR. LISZEWSKI:  -- for the record I am going to make

15   a Motion for Judgment of Acquittal at this point.  It's our

16   position the State has not proved their case.  We just want to

17   preserve that for the record.  I would ask for the Court's

18   ruling on that.

19             THE COURT:  Okay.  Any response from the Government?

20             MR. FERRELL:  No, Your Honor.

21             THE COURT:  That motion is overruled.  I think the

22   Government has made a submissible case on each of the Counts.

23             Do we have the ---

24             MR. FERRELL:  Corrected instructions?  Yes, we do,

25   Your Honor.

1      THE COURT:  Okay.  Actually before we go into that,

2  maybe I should take up with the defense.

3      MR. LISZEWSKI:  I would prefer to take up the Fifth

4  Amendment issue, and I would ask that the Court ask the

5  Government to leave the room while I make a record on this.

6      THE COURT:  Yeah.  That's fine.  Why don't we -- Why

7  don't we go ahead and do that; have the Government's attorneys

8  leave the room and the Government agents leave the room, and

9  we'll make the record on that.

10      (Government's attorneys and agents excused from the

11  courtroom.)

12      THE COURT:  Okay.  Let the record reflect the

13  Government and the agents on this case have left the

14  courtroom.  Why don't you go ahead, Mr. Liszewski.

15      MR. LISZEWSKI:  Your Honor, at this point I have

16  indicated to my client on several occasions that he has a

17  constitutional right to testify on his own behalf if he so

18  chooses.  I cannot force him to testify or not to testify.

19  That's entirely up to his decision and his discretion based on

20  the advice I've given him.

21      My advice at this point is for him not to testify.  I

22  would just want to make it clear for the record that I have

23  done that, and that I would also like the Court to inquire of

24  Mr. Kent to make sure that he is aware of that right as well.

25      THE COURT:  Mr. Kent, do you want to step up to the

1    lectern?  To the microphone?  Thank you.

2         Now have you heard what your attorney has just stated

3    to the Court?

4         THE WITNESS:  Yes, Ma'am.

5         THE COURT:  Okay.  Now do you understand that you do

6    have the constitutional right to testify at this trial, if you

7    wish?

8         THE WITNESS:  Yes, Ma'am.

9         THE COURT:  Okay.  And do you understand that there's

10   no requirement that you testify?  That decision, whether to

11   testify or not to testify, is entirely for you to make?

12        THE WITNESS:  Yes, Ma'am.

13        THE COURT:  Okay.  And is it your decision today to

14   testify or not to testify at the trial?

15        THE WITNESS:  Not to testify.

16        THE COURT:  Okay.  And have you had an opportunity to

17   discuss the pros and cons of not testifying with your

18   attorney?

19        THE WITNESS:  Yes, Ma'am.

20        THE COURT:  And have you also discussed the

21   advantages of testifying?

22        THE WITNESS:  Yes, Ma'am.

23        THE COURT:  Do you feel you need any further time to

24   talk with your attorney about this decision?

25        THE WITNESS:  No, Ma'am.

1          THE COURT:  And so it's your decision today not to

2    take the stand.

3          THE WITNESS:  Yes, Ma'am.

4          THE COURT:  Okay.  Do you have any question at all

5    about that decision and about -- or about your right

6    concerning whether or not to testify?

7          THE WITNESS:  No, Ma'am.

8          THE COURT:  Okay.  Anything further, Mr. Liszewski?

9          MR. LISZEWSKI:  I have nothing further, Your Honor.

10         THE COURT:  Okay.  Thank you.  Why don't we bring the

11   Government attorneys back in.  Thank you.

12         (Government attorneys and agents returned to

13   courtroom.)

14         MR. SORRELL:  Your Honor, we're obtaining Mr. Ferrell

15   who's got control of the instructions.

16         THE COURT:  He's got the instructions.

17         MR. SORRELL:  I would do this but --

18         THE COURT:  Okay.

19         MR. SORRELL:  -- I'd be speaking out of turn.

20         THE COURT:  No.  Well, we'll wait for him and then we

21   can move on to -- Okay.  Here he is.

22         Okay.  Then do we have the corrections?  The

23   corrected instructions?

24         MR. FERRELL:  Yes, we do, Your Honor.

25         THE COURT:  I think the first one is the verdict

1    director, and for Count II there was a typo in that.

2           MR. FERRELL:  Yes, Ma'am.  On the verdict director --

3    Actually let's see here.  Excuse me, Judge.  I'm looking on

4    Count II?

5           THE COURT:  Yeah.  That was the first one.  There was

6    that typo of where it was "of" instead of "or" is what I had

7    here.

8           MR. FERRELL:  Yes, Ma'am.  I agree.  It was Count II

9    and Count IV.  It was the same typo.

10          THE COURT:  Exactly.  You're completely correct.

11          MR. FERRELL:  Okay.  I can -- Give me just one

12   moment, please, Your Honor.  I have a corrected Count IV,

13   Judge, and I'm looking to see if Count II has been corrected.

14   I don't see Count II.  Judge, I apologize for just a moment.

15   Could we -- Could we look at the others?

16          THE COURT:  Sure.  That's fine.

17          MR. FERRELL:  Count II is ---

18          THE COURT:  That's fine.  The next one that I had was

19   the verdict director on Count III, to delete that last

20   sentence.

21          MR. FERRELL:  Yes, Ma'am.  We have that corrected.

22          THE COURT:  Okay.  Thanks very much.  Okay.  We'll

23   get that one.  II and IV we'll come back to.  The next one

24   after that was Count V, just to change the number because

25   those are the ones that were mixed up.

1          MR. FERRELL:  Judge, I apologize.  I was handed the

2    instructions -- Yes, here we are.  Here's Count V.

3          THE COURT:  Which used to be Count IV.

4          MR. FERRELL:  Yes, Ma'am.

5          THE COURT:  Okay.

6          MR. FERRELL:  Count V, possession of a firearm by a

7    convicted felon.

8          THE COURT:  Right.  It's the possession on May 9th.

9          MR. FERRELL:  Yes, Ma'am.

10         THE COURT:  Thank you.

11         CLERK:  Yes, Ma'am.

12         THE COURT:  Okay.  And then the very last one where

13   we deleted giving the instructions to the Jury; the last -- in

14   conducting their deliberations, leaving out the business about

15   reading the forms.

16         MR. FERRELL:  Yes, Ma'am.

17         THE COURT:  Okay, thanks.

18         MR. LISZEWSKI:  Where do you wish to place that

19   instruction, Judge?  Second last?

20         THE COURT:  That's the very last instruction, just

21   before we get into the verdict forms.  So now we're just back

22   to II and IV, the verdict directors on those.  Then I'll

23   number these.

24         MR. FERRELL:  Your Honor, here's the change to Count

25   IV.  We changed the -- Count IV is -- now makes reference to

1    the crime of possession of cocaine.

2            THE COURT:  IV.

3            MR. FERRELL:  Yeah, cocaine base with the intent to

4    distribute it, and remove the line -- What was the end of it

5    about reading the verdict form?

6            THE COURT:  We just got that one, didn't we?  I think

7    we did that.

8            MR. FERRELL:  Yes.  Excuse me.  Judge, what I have

9    here is Count IV.  I apologize.  It's the drug trafficking

10   crime.

11           THE COURT:  In furtherance of the crime, and we

12   changed the "or" one.

13           MR. FERRELL:  Yes, we did.

14           THE COURT:  The number and the "or".  It's now Count

15   IV.  Okay, great.  And then the final one is Count II.

16           MR. FERRELL:  And, Judge, that has been changed.  On

17   Count II we changed "of" to "or."

18           THE COURT:  Right.

19           MR. FERRELL:  And I have one copy of it in my copies

20   that was brought to me but no additional copies in what was

21   just handed to me.

22           THE COURT:  Can we Xerox that?

23           MR. FERRELL:  We can copy this.

24           THE COURT:  Yeah.  Can we just -- How many?  We need

25   a copy for everybody.

1          MR. FERRELL:  Need a clean copy.

2          CLERK:  And a clean copy.

3          THE COURT:  Yes.  And we'll be all set as soon as

4   that comes out.

5          (Pause for Xeroxing of document.)

6          THE COURT:  Okay.  Does everyone have copies now?

7          MR. FERRELL:  Yes, Ma'am, Your Honor.

8          THE COURT:  All right.  Let me run through these and

9   number them.

10          Instruction 1 is Members of the Jury.

11          Instruction 2 is on stipulations.

12          Instruction 3 is credibility.

13          Instruction 4 is no burden upon the Defendant.

14          Instruction 5 describes the indictment.

15          Instruction 6 is reasonable doubt.

16          Instruction 7 is on expert testimony.

17          Instruction 8 is the 404(b) as to January 20th of

18   2004.

19          Instruction 9 is the indictment.

20          Instruction 10 refers to the various statutes.

21          Instruction 11 concerns in or around or on or about.

22          Instruction 12 is the verdict director for Count I.

23          Instruction 13 is the verdict director for Count II.

24          Instruction 14 is the verdict director for Count III.

25          Instruction 15 is the verdict director for Count IV.

1          Instruction 16 is the verdict director for Count V.

2          Instruction 17 is the verdict director for Count VI.

3          And instruction 18 is the verdict director for Count

4   VII.

5          The definition -- Instruction 18 is the -- Excuse me.

6          Instruction 19 is the definition of "to distribute."

7          Instruction 20 is the definition of a "controlled

8   substance."

9          Instruction 21 defines "possession."

10          Instruction 22 defines "knowingly."

11          Instruction 23 refers to intent.

12          And Instruction 24 is the last instruction, giving

13   specific rules for the Jury to follow.

14          And then we get to the verdict forms for Counts I,

15   II, III, IV, V, VI and VII.

16          Are there any additional objections, comments about

17   either any of the instructions or the verdict forms?

18          MR. FERRELL:  Not on behalf of the Government,

19   Your Honor.

20          MR. LISZEWSKI:  Not on behalf of the defense.

21          THE COURT:  Okay.  Then is there anything further we

22   need to take up before we bring the Jury back into the

23   courtroom?

24          MR. FERRELL:  No, Your Honor.  I just ask if we could

25   have a few minutes, like five minutes or ten minutes or

1   something, --

2           THE COURT:  Oh, okay.

3           MR. FERRELL:  -- just a few minutes to get things

4   organized with our evidence and things like that.

5           THE COURT:  That's fine.

6           MR. FERRELL:  I appreciate that.

7           (Court recessed from 10:35 A.M. until 10:43 A.M.)

8           THE COURT:  Okay.  Are we about ready?  Okay.  Then

9   why don't we bring the Jury into the courtroom.

10          (Jury seated by the Clerk.)

11          (The following proceedings were held within the

12   hearing and presence of the Jury:)

13          CLERK:  Please be seated.

14          THE COURT:  Ladies and Gentlemen, we have completed

15   the evidence in the case and you will now be hearing the

16   arguments of counsel and then my instructions on the law and

17   after that you will retire to deliberate.

18          At this time, Mr. Ferrell, are you ready?

19          MR. FERRELL:  May it please the Court.  Ladies and

20   Gentlemen of the Jury, it's now my obligation and privilege on

21   behalf of the people of the United States of America to

22   present the closing argument in this case.  But before I begin

23   my closing argument, I want to take just a moment to thank you

24   for your service as a juror in this case.  It has long been

25   said and I firmly believe that there is no greater service

 1    that you can render to your community than to serve as a juror

 2    in a criminal case because after all is said and done here, it

 3    will not be my voice that goes from this courtroom today.  It

 4    will not be Mr. Sorrell's or Mr. Liszewski's.  And with all

 5    due respect, it will not be Judge Hamilton's voice that goes

 6    from this courtroom.  The voice that goes from this courtroom

 7    today will be the voice of you 12 jurors.  It will be your

 8    voice that goes out through these hallways to Sikeston,

 9    Missouri; to Charleston, Missouri; throughout Southeast

10    Missouri that says in the United States District Court, when

11    the kind of evidence that is produced in this case is

12    produced, justice is as you determine it to be; guilty or

13    innocent.

14         Now I will not tell you that your duty as a juror is

15    an easy task.  Being a juror is not easy, but I will submit to

16    you, Ladies and Gentlemen, that based upon the evidence in

17    this case, that your service has to be much easier than many

18    who have sat before you because the evidence in this case is

19    absolutely overwhelming.  Some of you came in, never having

20    been jurors before, and you may have thought:  "How can I

21    reach the right decision?  How can I do justice in the case

22    when I don't know the law?"

23         And it's very simple.  Judge Hamilton is the judge of

24    the law.  She determines what the law is and she gives it to

25    all of us in the form of these written instructions.  Your

1    duty is to be the judges of the facts.  You determine what the

2    facts are, you and you alone, and you apply those facts to the

3    instructions as the Court gave them to you, and you will do

4    justice.  You will reach the right verdict in this case when

5    you apply them just exactly as the law directs from

6    Judge Hamilton.

7            I'm going to review with you now the evidence in this

8    case, and I am going to make reference to each of the Counts

9    that's charged in the indictment and how that evidence relates

10   to each Count.  But before I do, I want to first talk to you

11   about two general instructions that I anticipate the Judge is

12   going to give you because they relate to virtually all the

13   Counts in this case; certainly do.

14           The first is the instruction on reasonable doubt.

15   The burden is beyond a reasonable doubt, and that's a burden

16   which the Government told you in voir dire we're happy to

17   except but it is proof beyond a reasonable doubt.  It's the

18   same standard that's been applied in every case that's been

19   tried in this courtroom before.  It is not proof beyond all

20   doubt or proof beyond any doubt.  It's proof beyond a

21   reasonable doubt, a doubt based upon common sense and reason;

22   proof of such a convincing character that a reasonable person

23   would not hesitate to rely on it.  That's the standard that

24   the Government must meet.  That's the standard that has to be

25   applied to the Government's evidence; that standard and

1    nothing more.

2          The second instruction I want to talk to you about is

3    possession.  We talked a little bit in voir dire about what

4    "possession" means, but I anticipate you're going to get an

5    instruction that's going to tell you one person can possess

6    something or two people or more people.  It can be single

7    possession or joint possession, but the instruction tells you

8    that you may have possession if you have actual physical

9    control over an item.  You have it in your possession.  The

10   pen I just picked up I have in my possession but the

11   instruction, of course, goes on to tell you that "possession"

12   means much more than that.  Possession means not only items

13   which you actually control but items in which you have

14   although not actual control, you have the intent, either

15   directly or through another person, to have constructive

16   possession of it.  And in that, it says that if you have both

17   the power and the intention at a given time to exercise

18   dominion and control over something, you're in possession of

19   it.  Okay?  The pen, obviously if I don't have it in my hand,

20   I still intend to exercise control over it.  The items in my

21   car, I still intend to exercise control over them.  We talked

22   about the items that the Marshal takes from you when you come

23   in.  You're not giving up your right to that item.  It's the

24   same thing at home; the items that are in your home.  Maybe

25   it's something at work, the items that are back at your office

1   at work or wherever you may be.  Those are still in your

2   possession.  They're in your constructive possession.

3          With those two instructions in mind, I want to review

4   with you the evidence in this particular case as it relates to

5   the various Counts.

6          Each Count has its own verdict directing instruction.

7   That's an instruction that the Judge gives you that says,

8   "This is what you must find:  A, B, C, 1, 2, 3.  If you find

9   these, you must find him guilty."  Those are called "verdict

10  directing instructions."  Let's look first at the verdict

11  directing instruction on Count I.

12         If you remember, Count I is the charge of felon in

13  possession of a firearm.  Okay?  This relates to the incident

14  on January the 20th of 2004 in Sikeston with Officer Joey

15  Henry.  Counts I and II relate to that incident.  Count I,

16  felon in possession; Count II, that he possessed that firearm

17  in furtherance of a drug trafficking crime.  Okay?

18         Let's look first at Count I.  Basically what was the

19  evidence in the case?

20         You recall the testimony that came in through Officer

21  Joey Henry.  He took the stand and he told you exactly what

22  happened on January 20th.  They got a call of a man with a

23  gun.  He goes over to the area of Westgate in Sikeston, he and

24  Officer Rappert do, and what do they see?  They see this

25  Defendant, Tron Kent.  When they stop Tron Kent, they tell him

1    to put his hands up on the car.  He actually had his hand in

2    his right front coat pocket when they first came up.  They

3    said, "Put your hands up on the car."  They ended up -- When

4    he stands up, they do a search of him, put him on the car, do

5    a search of him and what do they find?

6           They find a loaded .380 caliber semi-automatic pistol

7    in his right front pocket.  Okay?  This is what they found in

8    his right front pocket.

9           We have -- Under the verdict directing instruction as

10   I'll tell you in a minute, this is going to be the only issue

11   is whether or not he possessed that gun on Count I, but that

12   was the testimony.  The testimony also was they then recovered

13   the two Baggies with five rocks each of crack cocaine.

14          After they recover that, the Defendant was

15   interviewed by Officer Blakely.  And what did he tell

16   Officer Blakely?

17          "Yes, I had the gun.  I bought it.  I had it about a

18   month."  He said he purchased the crack for $50.  He was going

19   to double his money.  That's what he was doing was selling the

20   crack cocaine and that he's heard about Sikeston and he was

21   not from here and, "I've heard about it," and he doesn't

22   always carry a gun but he did on this particular occasion.

23   Now that's the basic evidence in this case with the addition

24   of the fact that he then pled "guilty" in state court to

25   possession of that crack cocaine with the intent to

1    distribute.  That's the evidence that the Government offered

2    in this case.

3         The verdict directing instruction on Count I tells

4    you you have to find three things; actually two things.  Yes,

5    three things.  And you'll find in almost every case it

6    always -- it boils down to one issue.  Almost every case

7    there's only one issue.  In this particular case you have to

8    find that he was convicted of a crime with imprisonment of one

9    year or more.  Well, that's not an issue.  We all know that

10   that's not a question.

11        The third element is that this firearm, this exhibit,

12   Government's -- this Ruger handgun here, traveled in

13   interstate commerce at sometime prior to its possession by the

14   Defendant on January 20th.  Well, of course, it did.  We

15   stipulated to that, and it's also in the verdict director.

16        So what's the one issue left?  Did he possess it?

17        You've heard the evidence in this case, Ladies and

18   Gentlemen, from the officer that took the gun off of his

19   possession.  You heard his confession to Officer Blakely as

20   well.  There is no question that he possessed this firearm.

21   The evidence shows that he is guilty of Count I.

22        Now in Count II it's a little bit different.  Count

23   II is the possession in furtherance of a drug trafficking

24   crime.  If you look at the instruction on this one, you're

25   going to find that there's two elements.

1          First is on January 20th, 2004, the Defendant

2    committed the crime of possession of cocaine base with the

3    intent to distribute.  What did I say earlier?  There's

4    usually one issue, isn't there?  This one is not it.  He's

5    admitted this.  He pled "guilty" in state court.

6          So the issue is the second element; the Defendant

7    knowingly possessed the firearm in furtherance of that crime.

8    Now what you have to examine is what it means to be in --

9    possessed in furtherance of the crime.  That's the issue on

10   Count II.  Was this gun possessed in furtherance of the crime?

11   You will see an instruction in this portion of this verdict

12   directing instruction that tells you what it means to be in

13   furtherance of the crime.  And to be in furtherance of the

14   crime, it says that the gun has to have some purpose or effect

15   with respect to the possession.  Its presence or involvement

16   cannot be the result of accident or coincidence; the drugs and

17   the guns weren't related.  They didn't happen to be there --

18   They just happened to be there at the same time.  They had no

19   commonality.

20          And, finally, it says the firearms must facilitate or

21   have the potential -- the potential to facilitate the offense

22   of possession of cocaine base and the intent to distribute.

23   So your issue here is whether or not this gun facilitated or

24   had the potential to facilitate the distribution of crack

25   cocaine.  And that's a pretty easy question to resolve.

1          We do not have to wait until an individual uses a gun

2    for this offense to occur.  That's why they style it

3    "possession of the firearm."  It's not "use of the firearm."

4    We don't have to wait till somebody's shot before this offense

5    comes into play.  This offense says if you mix guns and drugs,

6    it's a dangerous combination.  You possess that gun in

7    furtherance of the crime.  That's 924(c).  That's the element

8    that we're concerned about in this case.

9          Was it possessed in furtherance?  The instruction

10   says it has to have some purpose.  We heard -- or excuse me --

11   the potential to facilitate.  We heard the testimony ---

12          THE COURT:  Two minutes.

13          MR. FERRELL:  Thank you, Your Honor.  Ladies and

14   Gentlemen, we heard the testimony.  That gun was there.  It

15   was loaded.  It had the ammunition in it.  It was cocked.  The

16   only thing necessary to shoot that gun was to pull the

17   trigger.

18          We heard Larry Gregory testify as to the role of the

19   firearm.  It protects the drugs.  It protects the drug

20   dealers.  They cannot call the police.  This is what helps

21   them to facilitate the drug trafficking crimes.  And when they

22   possess guns in furtherance of the crime, we're going to

23   punish them.

24          The next charge is possession of child pornography

25   that I'm going to talk to you about.  This is what is in Count

1   VI.  I'm going to make this fairly quick, Ladies and

2   Gentlemen.  We have a short period of time to talk to you, but

3   in Count VI, this is possession of child pornography.  Did he

4   possess child pornography?

5        Well, the elements are that he possessed an image of

6   child pornography.  Well, there's no question that this is an

7   image of child pornography.  The image was of a minor.  Well,

8   there's no question about that.  She was 16 years old.  She

9   told him she was 16 years old.  She told him she was in high

10  school, and he stayed with her.  He knew that she was 16 years

11  old.

12       And there must be -- The visual depiction must be

13  used with materials that travel in interstate commercial.

14  Well, there's no question that the phone traveled in

15  interstate commerce, and that's stipulated to.  Your one

16  question is:  Did he possess this one image of child

17  pornography?  Did he possess this?  If he possessed this

18  cellphone, he possessed this image of child pornography.

19  What's the evidence on whether or not he possessed it?

20       The evidence would be, Ladies and Gentlemen, that in

21  contrast to what the defense said and what the Defendant said

22  when he was arrested, basically "I don't know anything about

23  this," the evidence was quite to the contrary.  Amy Doyle

24  testified, of course, about this but there was a lot more

25  evidence.  We started out with the fact that the cellphone was

1  found where?  In the seat, the driver's seat of the car that

2  he was driving, the Dodge Intrepid.

3       What was the next item?  He had an empty cellphone

4  holder on his person.  Good evidence that this is his

5  cellphone.

6            THE COURT:  Do you want to encroach, Mr. Ferrell?

7            MR. FERRELL:  Yes, Ma'am.

8            THE COURT:  Okay.

9            MR. FERRELL:  Will you give me a five-minute warning,

10  please, Your Honor?

11            THE COURT:  Sure.

12            MR. FERRELL:  The next thing is when he went to the

13  Police Station, he claimed it.  Officer Husk went over it with

14  him; said, "Here's your property.  Do you certify that this is

15  your property?"  He said, "I certify the above is a correct

16  list of items seized from my possession," which is this phone.

17  And what was one of the telling factors of all of that?  When

18  he got ready to make his phone call from the jail, what did he

19  do?  He opened up that phone, got into it, got his number that

20  he wanted to call, and made that call.

21       Amy Doyle told you that she's certainly familiar with

22  the phone.  She helped him in acquiring the phone; could

23  identify it.  She also identified the phone number for his

24  phone, and that's the phone number that's on the phone when

25  you open it up.  It's what she knows to be Tron Kent's phone

1    number.

2         When we open it up, what do we see?  We see that

3    picture of Tron Kent.  Of all people on this cellphone, it

4    happens to be Tron Kent.  Of course, that's evidence that it's

5    his.  And we have the photographs of Amy Doyle that she

6    identified that only Tron Kent had and Tron Kent took which

7    was on that cellphone; that cellphone.  And then we had the

8    text messages from Amy to Tron back and forth on that

9    particular cellphone.

10         The conclusion is, Ladies and Gentlemen:  That phone

11   was his.  He possessed it.  He possessed that child

12   pornography, and he lied about it.

13         With regard to this Count VI, production of child

14   pornography, the only additional element, Ladies and

15   Gentlemen, essentially in this -- in this instruction for the

16   production, and I'm not going to go into that because of time,

17   but in the production of child pornography, the issue is:  Did

18   he take this photograph?  Did he produce it or did someone

19   else produce it?  Well, I think we just answered that last

20   question based upon the fact that he possessed it in his

21   cellphone.  Amy told you exactly what happened.  Amy told you

22   that he asked her several times repeatedly, "Can we take a

23   picture of us having sex?  Let's take a picture of us having

24   sex."  The answer was, "No, no, no," and finally she said,

25   "Yes."  And she did, and what did he do?  He was behind her.

1    He reaches out with his cellphone and he takes that picture,

2    that image that he wants to keep of him penetrating this

3    16-year-old girl to put on his cellphone.  That's producing

4    child pornography.  It is a separate charge, Ladies and

5    Gentlemen, because the production of child pornography is

6    worse than just the possession of it.  Because when you

7    produce it, you are the one that causes that child to engage

8    in that sexual act which can now be disseminated throughout

9    the world through the use of Internet in a matter of minutes.

10   He produced that child pornography.  He is responsible for it,

11   Ladies and Gentlemen, based upon the evidence.  And I submit

12   that based on this evidence, he is guilty of the charge of

13   possession or -- excuse me -- manufacturing of child

14   pornography.

15          The last Counts are -- that I'm going to talk to you

16   about are Counts III, IV and V.  You already know the elements

17   of two of these.  Count III is the possession with intent to

18   distribute 50 grams or more of crack cocaine.  Count IV is the

19   924(c); is that use or possession of the gun in furtherance of

20   a drug trafficking crime with regard to the gun that was in

21   the room.  And then Count V is felon in possession of that

22   gun.  So you know what the elements are.  The whole question

23   right here is whether or not he possessed those items.  That's

24   the question.  Did he possess those items in the room?

25          Well, let's talk -- First of all, you want to talk

1    about the gun.  Of course, we all know that the items were

2    found in Amy Doyle's bedroom.  All right.  We have the items

3    in Amy Doyle's bedroom.  Who is it that possessed these guns?

4         Well, the first testimony that we had was from

5    Amy Doyle.  Amy Doyle told you.  She took that stand under

6    oath, subject to the penalties of perjury, and she told you

7    whose gun that was.  She told you it was Tron Kent's gun.  She

8    told you how she first saw it on New Year's Eve.  She told

9    you, Ladies and Gentlemen, how he would bring it home at night

10   when he came home from Sikeston and he would wipe the handle

11   and the trigger before he puts it into the nightstand in her

12   house.  She told you, Ladies and Gentlemen, how he would take

13   that gun with him and would tuck that into his pants when he

14   would leave.

15        Ladies and Gentlemen, he was a felon at that time.

16   He was in possession of this particular firearm.  What does

17   Amy Doyle know about firearms?  She referred to the

18   difference -- Actually she didn't know the difference between

19   a revolver and a semi-automatic gun but she did refer to this

20   as the spinning thing on this particular gun.  Amy Doyle

21   didn't possess this gun.  We know based upon the evidence who

22   possessed this gun.  It was Tron Kent.

23        But in addition to what Amy Doyle told you about the

24   gun, she told you about the drugs.  She told you, yes, she did

25   lie to the law enforcement officers initially.  She's 16 years

1    old.  She's taken into custody, and she does -- she has crack

2    cocaine in her room that's possessed by the man she believes

3    she loves and who she believes loves her.  So she just says

4    "it's not mine" and ultimately she said in further

5    discussions, "It must be Tron's," something to that effect,

6    but she does not tell the truth until she stands here, Ladies

7    and Gentlemen, in front of you and she tells you what

8    happened.  She tells you that, "Yes, he was dealing crack;

9    yes, he came into the room and he asked me could he use my

10   jewelry box."  Think about that.  Twenty-six-year-old Tron

11   Kent comes in to ask a 16-year-old girl, "Can I keep the crack

12   cocaine in your jewelry box?"  And he puts the gun in the

13   nightstand after he wipes it off.  He throws the money and the

14   other crack cocaine into her shoebox.  There's a reason for

15   every one of those particular moves, but she says "yes."  She

16   has the earrings in there, and you heard her testimony.  After

17   that, she never touched it again.  She didn't touch the

18   earrings after that once he started putting crack cocaine in

19   it.  He got the crack cocaine out of it before he went to

20   Sikeston.  She saw him put the crack cocaine back into that

21   box.

22          Ladies and Gentlemen, it was this Defendant that

23   possessed the crack cocaine.  Certainly he had the intent to

24   distribute it.  There's no doubt about it; 50 grams or more of

25   cocaine.

1          Now the evidence, as testified by Amy, that he was in

2    the room, that he stayed there, that he lived there, that he

3    stayed there every night is supported.  It is supported time

4    and time and time again.  This Defendant lied.  He lied

5    directly to the officers when he said, "This is not my

6    cellphone.  Don't have a cellphone."  Well, we know that

7    that's a lie.  He also told the officers, "No, I've never been

8    in the house," and then, "Well, yes, I have but only in the

9    living room."  We know that that is a lie based on the

10   physical evidence.  If you want one piece of evidence to show

11   that Tron Kent wasn't telling the truth, take a look at this

12   photograph.  This photograph in his Al Pacino outfit standing

13   in the doorway of that very room with the common items that

14   show in the photographs for the search warrant.

15          THE COURT:  Mr. Ferrell, you have only five minutes

16   of all your time.

17          MR. FERRELL:  Thank you, Your Honor.  We know that he

18   was in the room.  We know that he was in the room based upon

19   the cigarettes and based upon the cigarettes that we had in

20   the room and the bed sheets.  His semen was on that bed sheet

21   to the exclusion of 1 -- what was it -- in 16.6 quadrillion or

22   something.  If every person in the entire world had been in

23   that room, only one person could have left that DNA based upon

24   that evidence.

25          And what other DNA do we have?  We had DNA off the

1    Baggie, DNA which is consistent with this Defendant.  All 16

2    of those -- the alleles in all 16 of those markers, those

3    areas, match but because it's cross-contaminated, the items of

4    jewelry, the box that belonged to Amy Doyle, it was

5    cross-contamination.  Her DNA was also there as you would

6    expect it to be, but all of his was there as well, Ladies and

7    Gentlemen.

8            Based upon that evidence and the 404(b) evidence that

9    says when you want to determine whether or not he knew he

10   possessed the cocaine, whether or not he knew about the gun,

11   you can take into account that in 1999 with Officer Hodges, he

12   possessed that nine-millimeter Ruger and crack cocaine.  You

13   can take into account that on January 20th of 2004 with

14   Officer Henry, he possessed that firearm and those bags of

15   cocaine.  And you can take into account that he was convicted

16   of selling the cocaine to Officer Blakely; helped to establish

17   through the confidential buy.  All of those can be considered.

18           Based upon the evidence in this case, Ladies and

19   Gentlemen, I'll be back at the close of this case to ask you

20   to return a verdict against this Defendant of each and every

21   Count in the indictment.  Thank you.

22           THE COURT:  Mr. Liszewski?

23           MR. LISZEWSKI:  May I have a moment, please?

24           (Pause)

25           May it please the Court?  Ladies and Gentlemen, I

1   told you yesterday that this case was going to be about

2   preconceived notions leading to driven-out ones, and that is

3   exactly what this case has been.

4        Now Mr. Ferrell actually used a very interesting

5   choice of words whenever he talked about the evidence.  He

6   said, "The evidence in this case is overwhelming."  Really?

7        Well, we're doing a trial.  I'm going to show you

8   what's going to be submitted as Instruction No. 9.

9   Instruction No. 9 is the indictment in which the Government

10  has charged my client with seven Counts.  You're going to have

11  the opportunity to look on there.  And this is dealing with

12  Count VI, the production of child pornography charge.  You are

13  going to hear the following:  That on or about February 26th,

14  2006, within the Southeastern Division, Cape Girardeau,

15  Missouri, the Defendant knowingly employed, used, persuaded,

16  induced and enticed and coerced her into taking pictures with

17  the cellphone.  You're going to read that.  That's going to be

18  an instruction that's given to you.  Interesting thing is

19  today folks, Mr. Ferrell, nor Mr. Sorrell, had any evidence to

20  show that.  They had Amy Doyle up there.  Amy ---

21       MR. FERRELL:  Pardon me.  I'm going to object,

22  Your Honor, because that is the indictment.  It's not the

23  verdict directing instruction.  The indictment includes all

24  the alternatives of how to commit the offense.  He is arguing

25  that the Government has to prove all the facts that are in

1    that indictment, not your verdict director.  He's misleading

2    the Jury.

3              MR. LISZEWSKI:  Judge, I'm arguing exactly what the

4    Government has claimed.  There's nothing misleading about

5    that.

6              THE COURT:  I'll allow it.  Overruled.

7              MR. FERRELL:  Thank you, Your Honor.

8              MR. LISZEWSKI:  There is no coercion.  That is a

9    plainly missing element in Count VI.  So we can tell right

10   there ---

11             MR. FERRELL:  Your Honor, I'm just going to have to

12   object on the record.  He's arguing to the Jury ---

13             THE COURT:  Yeah.  Let's step up here.

14             (The following proceedings were held at sidebar,

15   outside the hearing of the Jury:)

16             MR. FERRELL:  He is arguing to the Jury that coercion

17   is an element of Count VI as the Court instructs it.

18             THE COURT:  What has to be proved in this is in the

19   verdict director.

20             MR. LISZEWSKI:  I'm arguing what the Government said

21   in the indictment.  That's what he submitted.

22             MR. FERRELL:  But that's not ---

23             THE COURT:  What's said in the indictment and what's

24   needed for proof to get a conviction is what's in the verdict

25   director.  The indictment covers all kinds of possibilities.

1    It's based on the statute.  This has to conform to the proof.

2    The verdict directors are submitted based on the proof, and

3    that's what you argue.

4         MR. LISZEWSKI:  Judge, I understand the verdict

5    director is there.

6         THE COURT:  And that's what you argue.  Okay?  You

7    can argue anything about the verdict director.  You've agreed

8    that's an appropriate verdict director, and you argue that

9    and the evidence.  All right?

10        MR. FERRELL:  And, Judge, I think at this point he

11   has misled the Jury into thinking that ---

12        THE COURT:  Well, you can pick that up.  But I'm not

13   going to have you do that.  Okay?  Argue the verdict director.

14        (The following proceedings were held within the

15   hearing and presence of the Jury:)

16        MR. LISZEWSKI:  The next charges I'm going to talk

17   about are Counts III, IV and V of the indictment.  The issue

18   is going to be simple with respect to these three Counts.

19        Who had the gun?  Who had the drugs?  That's the

20   issue.  Whenever you have 60 some odd grams of cocaine base,

21   you're going to have the intent to distribute; not an issue.

22   The issue is:  Who had the drugs?  And let's look at the

23   objective evidence.

24        Today we have heard -- Throughout this trial we have

25   heard spin on the evidence.  Whenever you have a case with

1    competing witnesses, you have to look at the facts that tell

2    no lie.  The objective facts based on the action of the

3    parties, and let's look at that.

4            The police arrested my client.  Detective Moody was

5    there; patted him down.  No drugs; no gun; no client list; no

6    money.  According to Amy Doyle, 10:00 to 12:00 at night,

7    that's when he was out doing business.  So we already know

8    that that fact didn't occur.

9            No. 2:  We go to the Doyle residence.  They go into

10   the Doyle residence.  They find drugs in her jewelry box, in

11   her shoebox, and a gun in her nightstand and money in her

12   shoebox.  Objective fact:  Nothing was found in my client's

13   belongings.  Are you going to -- Is the Government going to

14   sit here and tell us that my client had this whole thing

15   planned out, that he was going to put everything in Amy

16   Doyle's stuff so whenever he got caught, he could blame it on

17   Amy Doyle?  That's absurd.  He didn't have that.  Nothing was

18   found on him.

19           The next thing -- The next thing, what happens?  Amy

20   Doyle is sitting in that house.  Tron Kent is sitting in the

21   Mississippi County Detention Center.  They arrest Amy Doyle

22   for drugs, for guns and for having the money.  That's exactly

23   what they arrested her for.  She gets to the Police Station.

24   Here is the most telltale sign.  While Tron Kent is being

25   booked on an unrelated charge and while Amy Doyle is in the

1    Mississippi County Detention Center, Agent Gregory and Trooper

2    Heath come to the jail.  They come to the jail to talk to

3    Tron Kent about his cellphone.

4         Was there ever any mention about a gun?  Was there

5    any mention about the drugs?  Was there ever any mention about

6    money?  No.  They asked about his cellphone and his cellphone

7    only.

8         Next fact:  Amy Doyle is being questioned by

9    Detective Moody and a juvenile officer.  Amy Doyle agrees to

10   cooperate.  And I've used that word a lot during this trial,

11   and let's look at the extent of her cooperation.

12        Amy Doyle said, "Oh, it can't be my drugs.  It's got

13   to be Tron Kent's drugs," even though she was arrested for it

14   and booked for it and processed for it and spent the night in

15   jail for it.  Amy Doyle turns around and says to -- in a

16   subsequent interview to Agent Gregory and to Trooper Heath,

17   "Well, it couldn't have been my drugs.  It had to be Tron's

18   drugs.  I didn't know anything about it.  I didn't know where

19   any of this stuff was.  I lost my jewelry box at my friend

20   Julie Stevenson's house.  So it just magically reappeared."

21        If they want to talk about who's lying, they have

22   built a case on a stack of lies.  And now they're going to put

23   Amy Doyle up here.  She's going to dress up.  She's going to

24   look all pretty coming to court, and she's going to tell you

25   that she's telling the truth?  You can dress up a liar and

1    it's still a pretty little liar.  That's all it is.

2          She's admitted on two separate occasions, "I lied to

3    Agent Gregory.  I lied to Trooper Heath.  I lied to Detective

4    Moody.  I lied to the juvenile officer."  Two weeks before

5    trial, magically she's having conversations with my client

6    about selling drugs.  None of us have ever heard this.  The

7    first time we heard it was at trial from Mr. Ferrell.

8          MR. FERRELL:  Your Honor, I object to that.  Counsel

9    is making personalized statements.

10         THE COURT:  Sustained.  Go ahead.

11         MR. LISZEWSKI:  So the story just keeps going as she

12   keeps getting further away from this.  Amy Doyle never faced

13   charges.  No charges were ever filed.  Amy Doyle never had a

14   lawyer and someone got her out of jail.  Eventually someone

15   found out she lied.  Amy Doyle is still out of jail.

16   Eventually Agent Novotny talked to Amy Doyle about the

17   pictures.  Amy knows which side her butter is being breaded on

18   or which side the bread and butter is on.  She knows that as

19   long as she keeps pointing the finger at Tron Kent, she gets

20   to walk.  She gets a free pass.  She gets to go to college and

21   he gets to go to prison, and that's what the Government is

22   trying to do.

23         The other thing I want to talk about is how the

24   Government just bought Amy Doyle's story lock, stock and

25   barrel.  The Government had an opportunity to investigate

1    after obtaining DNA from Doctor or Miss Ruth Montgomery.

2    She's not a doctor.  Excuse me.  She corrected me earlier.

3    They had an opportunity when they found out that two or more

4    people contributed to a nonsperm fraction found on a bed sheet

5    when there are possible multiple contributors on the plastic

6    bag.  Agent Gregory was up here and said, "Aside from Amy

7    Doyle and aside from Sally Doyle, I did nothing to verify

8    whether they were telling the truth."  In other words, the

9    Government took her lies and her lies and her fabrication at

10   face value and made no further investigation.

11          And why did they do that?  Why did they do that?  I

12   told you before and I'll say it again.  Tron Kent's not had

13   the perfect past.  He has had problems.  You've heard about

14   the priors.  They had a dog and pony show up here for a whole

15   bunch of witnesses where I didn't even ask a single question.

16   Why am I worried about asking a question that I already told

17   you is going to happen?

18          So they're getting up here and they're making a

19   point, talking about this huge dog and pony show, about all

20   these priors he has, about the trouble he's been into, but ask

21   yourself this:  Why are they talking about the past when we're

22   on trial for a different offense?

23          The answer is:  Because their case has got problems.

24   They can't prove it was Tron Kent's drugs.  They can't prove

25   it was his gun.  If you take Amy Doyle at face value -- I

1    don't know how you could -- she's a liar.  She's going to say

2    whatever it takes.  So you have Amy Doyle who's the only

3    person who's linking him to the cellphone, linking the

4    pictures on the cellphone.  We have Amy Doyle to say, "Sure,

5    it's me."  Did you expect her to say it's someone else?  No.

6    She knows what she's got to say to get out of this.  There's

7    no written agreement with the Government.  There's no written

8    agreement because you have to produce it.

9            If you're not charged with an offense, if no charges

10   are ever filed, you can say no deal ever happened, but we know

11   she got a deal.  She got the deal of a century.  She got to

12   skirt seven Counts on an indictment.  She got to skirt drugs

13   and guns, and we know she was running around in trouble.  She

14   told us she was running around in trouble.  She told us about

15   her friend Julie Stevenson.

16           The last thing I want to talk about is this:  The

17   Government has made a huge deal about this DNA evidence, and

18   they have made a huge deal about some cigarette butts.  Well,

19   the last time I checked, smoking cigarettes wasn't a crime

20   unless you were under the age of 18.  Okay.  So they have some

21   cigarette butts.

22           Now let's look at what else they don't have.  They

23   had an opportunity to test DNA bags.  We have

24   cross-contamination.  Cross-contamination essentially means

25   she's not going to be able to say whose DNA was on that bag.

1    More importantly, we have no idea when, how or where that DNA

2    got on the bag.  It's a red herring, folks.  It's meant to

3    make you look somewhere else.

4         Instead of looking at the objective facts where the

5    drugs were found, what the police did, more importantly, what

6    they didn't do when it comes to my client, they want you to

7    look at this and to say that, "This is what we're going to

8    hang our hat on.  This is how we're going to prove that he had

9    drugs," whenever their own expert by her own admission can't

10   say it's him.  At best, we get a consistency.  And you just

11   heard from her earlier today that 99.9 percent of us, we all

12   have 99.9 percent of the same DNA.  It's what makes us people,

13   what makes us grow hair, get old, and I don't know; pay taxes

14   eventually, too, so.

15        So essentially that's the evidence that we're looking

16   at in this case.  The other thing I'm going to ask you to look

17   at is another instruction that will be submitted to you.  In

18   deciding what the facts are, you can judge the credibility of

19   a witness.  You can consider their intelligence, the

20   opportunity, the manner; whether the witness said something

21   different at an earlier time.  That is incredibly critical

22   because we know Amy Doyle, she's a coin-operated witness.

23   She's going to say whatever it takes.

24        The other thing that we need to look at is the motive

25   or the bias of a witness.  Clearly, she has a bias.  Clearly,

1    she had a motive in saying that it's not her stuff.  Clearly,

2    she had a motive in trying to go home and, clearly, she had a

3    motive for testifying today.  You can fluff it however you

4    want and say that she took an oath under penalty of perjury of

5    law, but the fact of the matter is that she's lied before.

6    How can we expect her to tell the truth now?

7         That's what it comes down to.  That's the case in a

8    nutshell.  The rest of the evidence, you can remember it as it

9    was presented.  I'm sure you'll come to the right decision.

10   I'm sure that you'll weigh all of the evidence.

11        Count II, we heard Detective Blakely say, "I asked

12   Tron Kent to be honest with me.  He agreed to do that.  I

13   asked him to answer all of my questions.  He agreed to do

14   that.  I asked him why he had the gun.  He said, 'I had it for

15   protection.'"  Detective Blakely never asked anything about

16   drugs.  Interestingly enough, if drugs are so used in the gun

17   trade or guns and drugs are so synonymous with each other and

18   anyone who knows anything about police work knows this, why

19   didn't we hear Detective Blakely talk about it?

20        Why didn't we -- Detective Blakely works in Sikeston

21   every day.  If drugs and guns are synonymous, certainly a

22   Sikeston detective is going to know it.  We didn't hear

23   anything from him about it.  You know why?  Because he took

24   Tron at face value, and now the Government is asking you to do

25   otherwise.

1      So whenever you have a chance, you go back there.

2  You elect your foreperson.  You go through the evidence.  You

3  go through the instructions.  You look at everything in this

4  case.  You look at the motive of Amy Doyle.  You look at the

5  preconceived notions of the Government based on his past.  You

6  look at the Government's reaction to her story and the

7  Government's failure to do any follow-up; how they accepted

8  her at face value.  You think about all of those things.  And

9  you come back with your verdict, and you come back and you

10  acquit Tron Kent of Counts III, IV and V and VI and VII.  You

11  acquit him of Count II.  And Count I, I'll leave the evidence

12  to you.  Thank you.

13      THE COURT:  Thank you.  Mr. Ferrell, you have just

14  over three minutes.

15      MR. FERRELL:  How many minutes?

16      THE COURT:  Just over three minutes.

17      MR. FERRELL:  Okay.  May it please the Court,

18  Your Honor.

19      Ladies and Gentlemen, I have three minutes to tell

20  you what I'd like to say in about three hours but I simply

21  cannot do that.  I ask you to please take into consideration

22  everything that Mr. Liszewski said.  You examine it.  You know

23  the arguments that are in contradiction to it.  You can make

24  that position when you get back to the Jury Room.

25      Let me just quickly go over a few things about

1   Mr. Liszewski's arguments and what he said.

2         First of all, a felon in possession in Count I, we

3   heard nothing.  Of course, not.

4         On Count II, the 924(c), possession of that gun on

5   January 20th that was taken off of him, that that was not in

6   furtherance of a drug trafficking crime because Officer

7   Blakely didn't say so.  Well, we heard the testimony of

8   Larry Gregory, a man who's been in DEA for nearly 20 years;

9   who's been an undercover agent with the Highway Patrol; who's

10  done hundreds of undercover investigations, tell you that it

11  doesn't take a genious to know the relationship between guns

12  and drugs.  In this case, this Defendant had it.  He had it he

13  says for his protection.  That's fine.  That's what he said.

14  Even if that's true, it's only for his protection.  When you

15  got crack cocaine in your pocket and you're out dealing and

16  you've got the gun for your protection, that's furthering your

17  drug trafficking crime, but he also had it to protect his

18  drugs from other people as well.  Of course.  There's no

19  question about the 924(c) count in Count II.

20        He talked about something, Ladies and Gentlemen, and

21  I ask you to please examine this.  You examine this carefully

22  and you think about this when you think about the rest of

23  Mr. Liszewski's arguments.  He stood in front of you and

24  opened up his arguments talking about the production of child

25  pornography, and he read the indictment that the Grand Jury

1    returned that alleges lots of different things.  And he said

2    there's no evidence of coercion; that element is missing in

3    this case, indicating to you you should acquit this man of

4    producing child pornography because there was no coercion, but

5    when you look at the verdict directing instruction -- and I'll

6    put it right up here for you, folks -- what I anticipate will

7    be No. 17, if the word "coercion" is in there, you acquit him.

8    You follow up what Mr. Liszewski said, but I'll guarantee you

9    it's not because it's not an element of the crime.  The only

10   question is whether or not he produced it.  That's all that

11   matters.  Coercion is not an element whatsoever.

12          Ladies and Gentlemen, he wants to tell you a story.

13   And I'll say -- Let me just say this.  This is so

14   characteristic.  He wants you to believe, based upon this

15   evidence, that this cocaine was found in Amy Doyle's jewelry

16   box and in her bedroom and he didn't have sex with her.  He

17   wasn't there, and he's not guilty of these crimes as been

18   charged.  If he's not guilty, he's the unluckiest man that

19   ever walked on the face of the earth.  He said he had no

20   cellphone, and that's what he wanted to you to believe, but,

21   Ladies and Gentlemen, when he was arrested, the cellphone was

22   found.  Bad luck.  When that cellphone was examined, what turn

23   out to be on his cellphone?  His picture.  I guess bad luck

24   again.  What happened when we looked at the text messages of

25   -- the text messages with Amy Doyle?  What bad luck that he's

1    running into time and time again.

2            THE COURT:  One minute.

3            MR. FERRELL:  Thank you.  He wants to tell you that

4    the luck must have just continued to run out for him.  What's

5    the odds of him having a picture in a phone that he claims at

6    the Sheriff's Department is not his?  First of all, he claims

7    it but it's not his.  That's another bad luck.  When we look

8    into it -- Excuse me.  When he looks into it, it happens to be

9    the phone number that he needs to call.  Now what kind of bad

10   luck is that?  Everything happens the same way of a guy who's

11   never been to her house.

12           What happens when we look at the sheets in her house?

13   We find that it's like 1 in 16.6 quadrillion that that is his

14   semen on her sheets.  What kind of bad luck is that?  Never

15   been in the house.  She happens to have a photograph that

16   shows him right there, right inside the door of her bedroom.

17   What kind of bad luck has this man encountered?  When we say

18   that he knew that this crack cocaine was his in the room where

19   he was staying, he has convictions for dealing; for dealing in

20   crack cocaine, possessing crack cocaine, and having guns on

21   two different occasions.

22           What kind of bad luck has this guy run into?  I'm

23   going to tell you what the bad luck is.  The bad luck is he's

24   run into this Jury in the United States District Court for the

25   Eastern District of Missouri.

1          THE COURT:  Your time is up.

2          MR. SORRELL:  He has a right to plead "not guilty."

3    Now he has the right to face justice.  I ask you to return

4    justice and find this man guilty of every count that's in that

5    indictment, and I thank you.

6          THE COURT:  Members of the Jury:  The instructions I

7    gave you at the beginning of the trial and during the trial

8    remain in effect.  I now give you some additional

9    instructions.  You must, of course, continue to follow the

10   instructions I gave you earlier as well as those I give you

11   now.  You must not single out some instructions and ignore

12   others because all are important.  This is true even though

13   some of those I gave you at the beginning of and during the

14   trial are not repeated here.

15          The instructions I'm about to give you now are in

16   writing and will be available to you in the Jury Room.  I

17   emphasize, however, that this does not mean they are more

18   important than my earlier instructions.  Again, all

19   instructions, whenever given and whether in writing or not,

20   must be followed.

21          The Government and the Defendant have stipulated --

22   that is, they have agreed -- that certain facts are as counsel

23   have just stated.  You must, therefore, treat those facts as

24   having been proved.

25          In deciding what the facts are, you may have to

1   decide what testimony you believe and what testimony you do

2   not believe.  You may believe all of what a witness said or

3   only part of it or none of it.  In deciding what testimony to

4   believe, consider the witness' intelligence, the opportunity

5   the witness had to have seen or heard the things testified

6   about, the witness' memory, any motives that witness may have

7   for testifying a certain way, the manner of the witness while

8   testifying, whether that witness said something different at

9   an earlier time, the general reasonableness of the testimony,

10   and the extent to which the testimony is consistent with any

11   evidence that you believe.

12         In deciding whether or not to believe a witness, keep

13   in mind that people sometimes hear or see things differently

14   and sometimes forget things.  You need to consider, therefore,

15   whether a contradiction is an innocent misrecollection or a

16   lapse of memory or an intentional falsehood and that may

17   depend upon whether it has to do with an important fact or

18   only a small detail.

19         There is no burden upon a defendant to prove that he

20   or she is innocent.  Accordingly, the fact that a defendant

21   did not testify must not be considered by you in any way or

22   even discussed in arriving at your verdict.

23         The indictment in this case charges that the

24   Defendant -- charges the Defendant with seven different

25   crimes.  Under Counts I and V, the indictment charges that the

1    Defendant committed the crime of being a previously convicted

2    felon in possession of a firearm.

3           Under Counts II and IV, the indictment charges that

4    the Defendant committed the crime of possession of a firearm

5    in furtherance of a drug trafficking crime.

6           Under Count III, the indictment charges that the

7    Defendant committed the crime of possession of more than 50

8    grams of cocaine base with the intent to distribute.

9           Under Count VI, the indictment charges that the

10   Defendant committed the crime of child exploitation.

11          Under Count VII, the indictment charges that the

12   Defendant committed the crime of possession of child

13   pornography.

14          The Defendant has pleaded "not guilty" to each of

15   these charges.

16          As I told you at the beginning of the trial, an

17   indictment is simply an accusation.  It is not evidence of

18   anything.  To the contrary, the Defendant is presumed to be

19   innocent.  Thus, the Defendant, even though charged, begins

20   the trial with no evidence against him.  The presumption of

21   innocence alone is sufficient to find the Defendant not guilty

22   and can be overcome only if the Government proves beyond a

23   reasonable doubt each essential element of the crime charged.

24          Keep in mind that each Count charges a separate

25   crime.  You must consider each Count separately and return a

1    separate verdict for each Count.

2         A reasonable doubt is a doubt based upon reason and

3    common sense and not the mere possibility of innocence.  A

4    reasonable doubt is the kind of doubt that would make a

5    reasonable person hesitate to act.  Proof beyond a reasonable

6    doubt, therefore, must be proof of such a convincing character

7    that a reasonable person would not hesitate to rely and act

8    upon it.  However, proof beyond a reasonable doubt does not

9    mean proof beyond all possible doubt.

10        You have heard testimony from persons described as

11   "experts."  Persons who by knowledge, skill, training,

12   education or experience have become expert in some field may

13   state their opinions on matters in that field and may also

14   state their reasons for their opinion.  Expert testimony

15   should be considered just like any other testimony.  You may

16   accept it or reject it and give it as much weight as you think

17   it deserves considering the witness' education, experience,

18   the soundness of the reasons given for the opinion, the

19   acceptability of the methods used, and all the other evidence

20   in the case.

21        You have heard that the Defendant -- You have heard

22   evidence that the Defendant possessed a .38 handgun and

23   cocaine base on January 20, 2004.  You may consider this

24   evidence as it relates to the charge of felon in possession of

25   a firearm as charged in Count I and possession of a firearm in

1   furtherance of a drug trafficking crime as charged in Count II

2   in the same manner that you consider all of the other evidence

3   that relates to that charge, giving it the weight and value

4   that you believe it is entitled to receive as it relates to

5   that specific charge.

6        You may also consider this evidence as it relates to

7   the charge of possession of 50 grams or more of cocaine base

8   with the intent to distribute as charged in Count III, felon

9   in possession of a firearm as charged in Count IV, and

10  possession of a firearm in furtherance of a drug trafficking

11  crime as charged in Count V only if you unanimously find it is

12  more likely true than not true.  This is a lower standard than

13  proof beyond a reasonable doubt.  If you find that this

14  evidence is more likely true than not true, you may consider

15  it to help you decide motive, intent, preparation, plan,

16  knowledge or absence of mistake or accident.  You should give

17  it the weight and value you believe it is entitled to receive.

18  If you find that it is not more likely true than not true,

19  then you shall disregard it.

20       The indictment charges that the Defendant committed

21  seven offenses as follows:

22       Count I:  On or about January 20, 2004, in Scott

23  County within the Eastern District of Missouri, Tron Kent, the

24  Defendant herein, did possess in and affecting interstate

25  commerce a firearm; to it, a Jennings .380 caliber pistol

1    bearing Serial Number 923687, and had previously thereto been

2    convicted of a felony in violation of Title 18, United States

3    Code, Section 922(g)(1).

4            Count II:  On or about January 20, 2004, in Scott

5    County within the Eastern District of Missouri, the Defendant,

6    Tron Kent, possessed a firearm, a Jennings .380 caliber

7    pistol, bearing Serial Number 923687, in furtherance of a drug

8    trafficking crime for which he may be prosecuted in a court of

9    the United States, possession with the intent to distribute

10   cocaine base in violation of Title 18, United States Code §

11   924(c)(1).

12           Count III:  On or about May 9, 2006, in Mississippi

13   County within the Eastern District of Missouri, the Defendant

14   did knowingly and intentionally possess with the intent to

15   distribute 50 grams or more of cocaine base, a Schedule II

16   narcotic controlled substance, in violation of Title 21,

17   United States Code § 841(a)(1).

18           Count IV:  On or about May 9, 2006, in Mississippi

19   County within the Eastern District of Missouri, the Defendant,

20   Tron Kent, possessed a firearm, a High Standard .22 caliber

21   revolver, bearing Serial Number 1089924, in furtherance of a

22   drug trafficking crime for which he may be prosecuted in a

23   court of the United States, possession with the intent to

24   distribute 50 grams or more of cocaine base as alleged in

25   Count III of the indictment in violation of Title 18,

1    United States Code, Section 924(c)(1).

2           Count V:  On or about May 9, 2006, in Mississippi

3    County within the Eastern District of Missouri, Tron Kent, the

4    Defendant herein, did possess in and affecting interstate

5    commerce a firearm; to it, a High Standard .22 caliber

6    revolver bearing Serial Number 1089924 and had previously

7    thereto been convicted of a felony in violation of Title 18,

8    United States Code § 922(g)(1).

9           Count VI:  At all times pertinent to the charges in

10   this indictment, first, federal law defines the term:

11          (A) "minor" to mean any person under the age of 18

12   years; 18 USC Section 2256(1);

13          (B) "sexually explicit conduct" to mean actual or

14   simulated (1) sexual intercourse, including genital-genital,

15   anal-genital, oral-genital, oral-anal, whether between persons

16   of the same or opposite sex; (2) bestiality; (3) masturbation;

17   (4) sadistic or masochistic abuse; or (5) lascivious

18   exhibition of the genitals or pubic area of any person (18 USC

19   Section 2256(2)(A));

20          (C) "child pornography" to mean any visual depiction,

21   including any photograph, film, video, picture or computer or

22   computer-generated image or picture, whether made or produced

23   by electronic, mechanical or other means, of sexually explicit

24   conduct where:

25          (A) the production of such visual depiction involves

1   the use of a minor engaging in sexually explicit conduct; or

2   (C) such visual depiction has been created, adapted

3   or modified to appear that an identifiable minor is engaging

4   in sexually explicit conduct (18 USC Section 2256(8));

5   (2)  On or about February 25, 2006, in Mississippi

6   County within the Southeastern Division of the Eastern

7   District of Missouri, the Defendant, Tron Kent, did knowingly

8   employ, use, persuade, induce, entice and coerce a minor

9   female to engage in sexually explicit conduct; specifically,

10   sexual intercourse with the Defendant for the purpose of

11   producing a visual depiction of such conduct; to it, a graphic

12   image file saved on a Virgin brand cellular phone, Serial

13   Number 04EB64D4, and such depiction was produced using

14   materials that had been mailed, shipped or transported in

15   interstate and foreign commerce, in violation of Title 18,

16   United States Code §2251(a) and punishable under Title 18,

17   United States Code, §2251(e).

18   Count VII:  (1) The allegations contained in

19   Paragraph 1 of Count VI of this indictment is incorporated by

20   reference as if fully set forth herein.

21   (2) On or about May 8, 2006, in Mississippi County,

22   within the Southeastern Division of the Eastern District of

23   Missouri, the Defendant, Tron Kent, did knowingly possess

24   materials that contained visual images of child pornography;

25   to it, a graphic image file of the minor child engaged in

1   sexual intercourse with the Defendant and said image was

2   produced using materials that traveled in interstate and

3   foreign commerce; to it, a Virgin brand cellular phone, Serial

4   Number 04EB64D4, in violation of Title 18, United States Code,

5   §2252(A)(a)(5)(B) and punishable under Title 18, United States

6   Code, §2252(A)(b)(2).

7        Section 922(g)(1) of Title 18 of the United States

8   Code provides, in part, that:  It shall be unlawful for any

9   person who has been convicted in any court of a crime

10  punishable by imprisonment for a term exceeding one year to

11  ship or transport in interstate or foreign commerce or possess

12  in or affecting commerce any firearm or to receive any firearm

13  which has been shipped or transported in interstate or foreign

14  commerce.

15       Section 924(c)(1) of Title 18 of the United States

16  Code provides, in part, that:  It shall be unlawful for any

17  person to possess a firearm in furtherance of a drug

18  trafficking crime for which the person may be prosecuted in a

19  court of the United States.

20       Section 841(a)(1) of Title 21 of the United States

21  Code provides, in part, that:  It shall be unlawful for any

22  person knowingly or intentionally to possess with the intent

23  to distribute a controlled substance.

24       Section 2251(a) of Title 18 of the United States Code

25  provides, in part, that:  It shall be unlawful for any person

1    to use any minor to engage in sexually explicit conduct for

2    the purpose of producing any visual depiction of such conduct

3    if that visual depiction was produced using materials that

4    have been mailed, shipped or transported in interstate or

5    foreign commerce by any means.

6              Section 2252(A)(a)(5)(B) of Title 18 of the

7    United States Code provides, in part, that:  It shall be

8    unlawful to knowingly possess any material that contains an

9    image of child pornography that was produced using materials

10   that have been mailed or shipped or transported in interstate

11   or foreign commerce by any means.

12             The indictment charges that the offenses were

13   committed in and around or on or about a certain date.

14   Although it is necessary for the Government to prove beyond a

15   reasonable doubt that the offense was committed on a date

16   reasonably near the dates alleged in the indictment, it is not

17   necessary for the Government to prove that the offense was

18   committed precisely on the date charged.

19             The crime of being a convicted felon in possession of

20   a firearm, as charged in Count I of the indictment, has three

21   essential elements which are:

22             (1) The Defendant has been convicted of a crime

23   punishable by imprisonment for a term exceeding one year; and

24             (2) The Defendant, thereafter, knowingly possessed a

25   firearm on or about January 20th, 2004; and

1          (3) The firearm was transported across a state line

2     at sometime prior to the Defendant's possession of it.

3          You are instructed that the Government and the

4     Defendant have stipulated -- that is, agreed -- that the

5     Defendant has been convicted of a crime punishable by

6     imprisonment for more than one year under the law of the State

7     of Missouri, and you must consider the first essential element

8     as proven.

9          You are instructed that the Government and the

10    Defendant have stipulated -- that is, agreed -- that the

11    firearm in question was manufactured in a state other than

12    Missouri and transported across a state line at sometime prior

13    to the date mentioned in the indictment, and you must consider

14    the third essential element as proven.

15         The term "firearm" means any weapon which will or is

16    designed to or may readily be converted to expel a projectile

17    by the action of an explosive.  The Government and the

18    Defendant have stipulated that the Jennings .380 caliber

19    pistol, bearing Serial Number 923687, as mentioned in Count I

20    of the indictment, is a firearm as defined by federal statutes

21    and that it affected interstate commerce prior to its

22    discovery in Missouri.

23         If all of these essential elements have been proved

24    beyond a reasonable doubt as to the Defendant, then you must

25    find the Defendant guilty of the crime charged.  Otherwise,

1    you must find the Defendant not guilty of this crime.

2          The crime of possessing a firearm in furtherance of a

3    drug trafficking crime, as charged in Count II of the

4    indictment, has two elements which are:

5          (1)  On or about January 20th, 2004, the Defendant

6    committed the crime of possession of cocaine base with the

7    intent to distribute; and

8          (2)  The Defendant knowingly possessed a firearm in

9    furtherance of that crime.

10         The phrase "possessed in furtherance of" means the

11   firearm must have some purpose or effect with respect to the

12   offense of possession of cocaine base with the intent to

13   distribute.  Its presence or involvement cannot be the result

14   of accident or coincidence.  The firearm must facilitate or

15   have the potential to facilitate the offense of possession of

16   cocaine base with the intent to distribute.

17         If all of these essential elements have been proved

18   beyond a reasonable doubt as to the Defendant, then you must

19   find the Defendant guilty of the crime charged.  Otherwise,

20   you must find the Defendant not guilty of this crime.

21         The crime of possession of 50 grams or more of

22   cocaine base with the intent to distribute, as charged in

23   Count III of the indictment, has four essential elements which

24   are:

25         (1)  The Defendant possessed cocaine base;

1          (2)  The Defendant knew that he possessed cocaine

2     base;

3          (3)  The Defendant intended to distribute some or all

4     of the cocaine base; and

5          (4)  The amount involved in the offense was over 50

6     grams of cocaine base.

7          If you find these four elements unanimously and

8     beyond a reasonable doubt, then you must find the Defendant

9     guilty of the crimes charged.  Otherwise, you must find the

10    Defendant not guilty.

11         The crime of possessing a firearm in furtherance of a

12    drug trafficking crime, as charged in Count IV of the

13    indictment, has two elements which are:

14         (1)  On or about May 9, 2006, the Defendant committed

15    the crime of possession of cocaine base with the intent to

16    distribute; and

17         (2)  The Defendant knowingly possessed a firearm in

18    furtherance of that crime.  The phrase "possessed in

19    furtherance of" means the firearm must have some purpose or

20    effect with respect to the offense of possession of cocaine

21    base with the intent to distribute.  Its presence or

22    involvement cannot be the result of accident or coincidence.

23    The firearm must facilitate or have the potential to

24    facilitate the offense of possession of cocaine base with the

25    intent to distribute.

1          If all these essential elements have been proved

2    beyond a reasonable doubt as to the Defendant, then you must

3    find the Defendant guilty of the crime charged.  Otherwise,

4    you must find the Defendant not guilty of this crime.

5          The crime of being a convicted felon in possession of

6    a firearm, as charged in Count V of the indictment, has three

7    essential elements which are:

8          (1)  The Defendant has been convicted of a crime

9    punishable by imprisonment for a term exceeding one year; and

10          (2)  The Defendant thereafter knowingly possessed a

11    firearm on or about May 9, 2006; and

12          (3)  The firearm was transported across a state line

13    at some time prior to the Defendant's possession of it.

14          You are instructed that the Government and the

15    Defendant have stipulated -- that is, agreed -- that the

16    Defendant has been convicted of a crime punishable by

17    imprisonment for more than one year under the law of the State

18    of Missouri, and you must consider the first essential element

19    as proven.

20          You are instructed that the Government and the

21    Defendant have stipulated -- that is, agreed -- that the

22    firearm in question was manufactured in a state other than

23    Missouri and transported across a state line at some time

24    prior to the date mentioned in the indictment, and you must

25    consider the third essential element to be proven.

1      The term "firearm" means any weapon which will or is

2  designed to or may readily be converted to expel a projectile

3  by the action of an explosive.  The Government and the

4  Defendant have stipulated that the High Standard .22 caliber

5  revolver, bearing Serial Number 1089924, mentioned in Count V

6  of the indictment is a firearm as defined by federal statutes

7  and that it affected interstate commerce prior to its

8  discovery in Missouri.

9      If all of these essential elements have been proved

10 beyond a reasonable doubt, as to the Defendant, then you must

11 find the Defendant guilty of the crime charged.  Otherwise,

12 you must find the Defendant not guilty of this crime.

13      The crime of production of child pornography, as

14 charged in Count VI of the indictment, has four essential

15 elements which are:

16      (1)  That on or about February 25, 2006, the

17 Defendant knowingly used A.D., a minor, to engage in sexually

18 explicit conduct; that is, having sexual intercourse with the

19 Defendant;

20      (2)  For the purpose of producing a visual depiction

21 of such conduct;

22      (3)  That at the time of the offense, the Defendant

23 knew that A.D. was under the age of 18 years; and

24      (4)  That the visual depiction was produced using

25 materials that had been mailed or shipped or transported in

1     interstate or foreign commerce.

2          You are instructed that the Government and the

3     Defendant have stipulated -- that is, agreed -- that the

4     visual depiction was produced using a Virgin brand cellular

5     telephone that was manufactured in Korea and, therefore, had

6     been transported in interstate or foreign commerce.

7          If all of these essential elements have been proved

8     beyond a reasonable doubt as to the Defendant, then you must

9     find the Defendant guilty of the crime charged under Count VI.

10    Otherwise, you must find the Defendant not guilty of this

11    crime under Count VI.

12         The crime charged -- The crime of possession of child

13    pornography, as charged in Count VII of the indictment, has

14    three essential elements which are:

15         (1)  That on or about February 25, 2005, the

16    Defendant knowingly possessed a graphic image file of a minor

17    child engaging in sexual intercourse with the Defendant that

18    was a visual depiction of child pornography;

19         (2)  That the Defendant knew that the visual

20    depiction was of a minor engaging in sexually explicit

21    conduct; and

22         (3)  That the visual depiction was produced using

23    materials that had been mailed, shipped or transported in

24    interstate or foreign commerce.

25         The term "minor" means any person under the age of 18

1    years.

2         The phrase "child pornography" means any visual

3    depiction of a minor engaging in sexually explicit conduct

4    where the minor was engaged in the sexually explicit conduct

5    during production of this depiction.

6         The term "visual depiction" includes any photograph

7    or picture, whether made or produced by electronic, mechanical

8    or other means.  It includes data stored on computer disk or

9    by electronic means which is capable of conversion into a

10   visual image.

11        The term "sexually explicit conduct" means actual or

12   simulated sexual intercourse.

13        If all these essential elements have been proved

14   beyond a reasonable doubt as to the Defendant, then you must

15   find the Defendant guilty of the crime charged.  Otherwise,

16   you must find the Defendant not guilty of this crime.

17        The term "to distribute" as used in these

18   instructions means to deliver or to transfer possession or

19   control of something from one person to another.  The term "to

20   distribute" includes the sale of something by one person to

21   another.

22        You are instructed as a matter of law that cocaine

23   base is a Schedule II narcotic controlled substance.  You are

24   further instructed as a matter of law that the possession of

25   cocaine base with the intent to distribute is a drug

1    trafficking crime for which the person may be prosecuted in a

2    court of the United States.  It is solely for the Jury,

3    however, to determine whether or not the Government has proven

4    beyond a reasonable doubt that the Defendant possessed with

5    the intent to distribute a controlled substance.

6         The law recognizes several kinds of possession.  A

7    person may have actual possession or constructive possession.

8    A person may have sole or joint possession.

9         A person who knowingly has direct physical control

10   over a thing at a given time is then in actual possession of

11   it.

12        A person who, although not in actual possession, has

13   both the power and the intention at a given time to exercise

14   dominion or control over a thing either directly or through

15   another person or persons is then in constructive possession

16   of it.

17        If one person alone has actual or constructive

18   possession of a thing, possession is sole.  If two or more

19   person share actual or constructive possession of a thing,

20   possession is joint.

21        Whenever the word "possession" has been used in these

22   instructions, it includes actual as well as constructive

23   possession and also sole as well as joint possession.

24        An act is done "knowingly" if done voluntarily and

25   intentionally and not because of mistake or accident or other

1    innocent reason.  The purpose of adding the word "knowingly"

2    is to ensure that no one will be convicted for an act done

3    because of a mistake or accident or other innocent reason.

4           Intent or knowledge may be proved like anything else.

5    You may consider any statements made and acts done by the

6    Defendant and all the facts and circumstances in evidence

7    which may aid in a determination of Defendant's knowledge or

8    intent.  You may, but are not required to, infer that a person

9    intends the natural and probable consequences of acts

10   knowingly done or knowingly omitted.

11          In conducting your deliberations and returning your

12   verdict, there are certain rules you must follow.  I shall

13   list those rules for you now.

14          First, when you go to the Jury Room, you must select

15   one of your members as your foreperson.  That person will

16   preside over your discussions and speak for you here in court.

17          Second, it is your duty, as jurors, to discuss this

18   case with one another in the Jury Room.  You should try to

19   reach agreement if you can do so without violence to

20   individual judgment because a verdict, whether guilty or not

21   guilty, must be unanimous.  Each of you must make your own

22   conscientious decision but only after you have considered all

23   the evidence, discussed it fully with your fellow jurors and

24   listened to the views of your fellow jurors.  Do not be afraid

25   to change your opinions if the discussion persuades you that

1    you should but do not come to a decision simply because other

2    jurors think it is right or simply to reach a verdict.

3         Third, if the Defendant is found guilty, the sentence

4    to be imposed is my responsibility.  You may not consider

5    punishment in any way in deciding whether the Government has

6    proved its case beyond a reasonable doubt.

7         Fourth, if you need to communicate with me during

8    your deliberations, you may send a note to me through the

9    Marshal or bailiff signed by one or more jurors.  I will

10   respond as soon as possible either in writing or orally in

11   open court.  Remember, that you should not tell anyone,

12   including me, how your votes stand numerically.

13        Fifth, your verdict must be based solely on the

14   evidence and on the law which I have given to you in my

15   instructions.  The verdict, whether guilty or not guilty, must

16   be unanimous.  Nothing I have said or done is intended to

17   suggest what your verdict should be.  That is entirely for you

18   to decide.

19        Finally, the verdict form is simply the written

20   notice of the decision that you reach in this case.  You will

21   take this form to the Jury Room, and when each of you has

22   agreed on the verdicts, your foreperson will fill in the

23   forms, sign and date it and advise the Marshal or bailiff that

24   you are ready to return to the courtroom.

25        Ladies and Gentlemen, you have now heard the

1  evidence, the arguments of counsel, and my instructions on the

2  law.  I will be sending these instructions I have just read

3  back to the Jury Room as well as the verdict forms for you to

4  consult and fill out in your -- with your deliberations.

5         In addition, I think your lunch should be served

6  fairly shortly after you get to the Jury Room.  You may now

7  proceed to the Jury Room and begin your deliberations.

8         Would the jurors Mr. Pannells and Mr. Leimer stay

9  back here?  The rest of you may go on to the Jury Room.

10        THE COURT:  Gentlemen, do you want to step up here a

11 minute?

12        Thank you all very much, and you are alternates.  I

13 appreciate very much your time you have spent.  If you want,

14 you can hang around here.  We can give you a telephone number

15 and you can call later today to find out the verdict.  Thank

16 you very much.

17        (Court recessed from 12:00 noon until 2:10 P.M.)

18        THE COURT:  Let the record reflect the Jury is not

19 yet in the courtroom.  We did have a note from the Jury

20 concerning filling out some blanks on the verdict form with a

21 corresponding instruction, and it appears that the Jury seems

22 to have filled in those blanks with the appropriate or a

23 corresponding verdict director instruction as opposed to

24 Instruction 9 which is a copy which includes the indictment.

25        Having talked with the lawyers about this, I suggest

1    that we just bring the Jury back in.  They've also indicated

2    they have a verdict.  We'll bring them in and take a look at

3    both the instructions and the verdict forms.  I'll look at the

4    verdict forms, and we can -- to make sure we've got the

5    corresponding Counts in the corresponding instructions.

6              So does anyone else want to make any further record

7    on this?

8              MR. FERRELL:  Your Honor, I know the Judge may doubt

9    my credibility on which instruction is which after all we've

10   been through, but I want to let the Court know I have reviewed

11   it with the numbering instructions we have, and I believe

12   everything is totally appropriate.  Actually what I had in

13   chambers was the previous instructions.

14             THE COURT:  Okay.  Well then, I think we're okay.

15             MR. FERRELL:  Everything is correct.

16             THE COURT:  Okay.  Then I'll take a look at this.  It

17   seems to me we're okay.  And if they've completed voting and

18   filling out the appropriate verdict form, then they've

19   appropriately returned a verdict and we'll find out what the

20   verdict is.  So why don't we go ahead then and we'll bring the

21   Jury in.

22             (Jury seated by the Clerk.)

23             CLERK:  Please be seated.

24             THE COURT:  Ladies and Gentlemen, I realize that you

25   had sent out a question to the Court.  And it appears at this

1    time that there is no problem and that you have probably

2    handled the issue appropriately, but I won't know for sure

3    until I see the instructions and your verdict forms.  So I

4    will wait for that.  I've also been informed that you have

5    reached a verdict.

6              Has the Jury selected a foreperson?

7              THE JURY:  (Affirmative gesture).

8              THE COURT:  And has the Jury reached a unanimous

9    verdict on each Count?

10             JUROR NO. 5:  Yes.

11             THE COURT:  Okay.  Would the foreperson hand the

12   bailiff -- hand the Clerk the instructions and the verdict

13   forms?  Thank you.

14             THE COURT:  Would the Clerk, please, read the

15   verdict?

16             CLERK:  Thank you.  In the United States District

17   Court for the Eastern District of Missouri, Southeastern

18   Division, United States of America, Plaintiff, versus

19   Tron Kent, Defendant, in Case No. 1:06-CR-88(JCH), verdict:

20             We, the Jury, find the Defendant, Tron Kent, guilty

21   of the crime of being a felon in possession of a firearm as

22   charged in Count I of the indictment under Instruction No. 12;

23   signed by Foreperson Claude E. Roberts; dated May 30th, 2007.

24             We, the Jury, find the Defendant, Tron Kent, guilty

25   of the crime of possession of a firearm in furtherance of a

1    drug trafficking crime as charged in Count II of the

2    indictment under Instruction No. 13; signed by Foreperson

3    Claude E. Roberts; dated May 30th of 2007.

4          We, the Jury, find the Defendant, Tron Kent, guilty

5    of the crime of possession of more than 50 grams of cocaine

6    base with the intent to distribute as charged in Count III

7    under Instruction No. 14; signed by Foreperson Claude E.

8    Roberts; dated May 30th, 2007.

9          We, the Jury, find the Defendant, Tron Kent, guilty

10   of the crime of possession of a firearm in furtherance of a

11   drug trafficking crime as charged in Count IV of the

12   indictment under Instruction No. 15; signed by Foreperson

13   Claude E. Roberts, dated May 30th, 2007.

14         We, the Jury, find the Defendant, Tron Kent, guilty

15   of the crime of being a felon in possession of a firearm as

16   charged in Count IV of the indictment under Instruction No.

17   16; signed by Foreperson Claude E. Roberts; dated May 30th,

18   2007.

19         We, the Jury, find the Defendant, Tron Kent, guilty

20   of the crime of sexual exploitation of a child as charged in

21   Count VI of the indictment under Instruction No. 17; signed by

22   Foreperson Claude E. Roberts; dated May 30th, 2007.

23         We, the Jury, find the Defendant, Tron Kent, guilty

24   of the crime of possession of child pornography as charged in

25   Count VII of the indictment under Instruction No. 18; signed

1    by Foreperson Claude E. Roberts; dated May 30th of 2007.

2              THE COURT:  Mr. Liszewski, would you care to have the

3    Jury polled?

4              MR. LISZEWSKI:  Please, Your Honor.

5              CLERK:  Okay.  We'll start with Juror No. 1 in the

6    back row.  Are the verdicts that I have just read your true

7    and correct verdicts?

8              JUROR NO. 1:  Yes.

9              CLERK:  Juror No. 2, are the verdicts that I have

10   just read your true and correct verdicts?

11             JUROR NO. 2:  Yes.

12             CLERK:  Juror No. 3, are the verdicts that I have

13   just read your true and correct verdicts?

14             JUROR NO. 3:  Yes.

15             CLERK:  Juror No. 4, are the verdicts that I have

16   just read your true and correct verdicts?

17             JUROR NO. 4:  Yes.

18             CLERK:  Juror No. 5, are the verdicts that I have

19   just read your true and correct verdicts?

20             JUROR NO. 5:  Yes.

21             CLERK:  Juror No. 6, are the verdicts that I have

22   just read your true and correct verdicts?

23             JUROR NO. 6:  Yes.

24             CLERK:  Juror No. 7, are the verdicts that I have

25   just read your true and correct verdicts?

1          JUROR NO. 7:  Yes.

2          CLERK:  Juror No. 8, are the verdicts that I have

3    just read your true and correct verdicts?

4          JUROR NO. 8:  Yes.

5          CLERK:  Juror No. 9, are the verdicts that I have

6    just read your true and correct verdicts?

7          JUROR NO. 9:  Yes.

8          CLERK:  Juror No. 10, are the verdicts that I have

9    just read your true and correct verdicts?

10          JUROR NO. 10:  Yes.

11          CLERK:  Juror No. 11, are the verdicts that I have

12    just read your true and correct verdicts?

13          JUROR NO. 11:  Yes.

14          CLERK:  And, Juror No. 12, are the verdicts that I

15    have just read your true and correct verdicts?

16          JUROR NO. 12:  Yes.

17          CLERK:  Thank you.

18          THE COURT:  I will ask the Clerk to enter the

19    verdicts on the record.

20          Ladies and Gentlemen, I want to thank you all very

21    much for the time and the attention that you've given this

22    case.  I think after having sat through this trial and had to

23    make the determinations that you've made, you realize how

24    serious these allegations are and how serious the proceedings

25    in this Court are.  I think I speak for both sides that I

1   appreciate your giving your full attention, and I noticed

2   during the trial how attentive each one of you was.  These are

3   difficult cases.  Each side deserves a very fair and impartial

4   determination, and I think you've done your very best to give

5   each party that attention that it deserves.  It's only with

6   people like you who are willing to give your time and your

7   expertise as citizens to cases like this that our justice

8   system can be as successful as it is.  They're tough cases.

9   They're difficult decisions but in the end I think citizens

10  like you make a great difference to all of us by giving your

11  attention and your care to cases like this.

12          Thank you very much.  Your services are no longer

13  needed any further in this case, but I do want to tell you how

14  much we appreciate the care you've given in serving in this

15  and what good citizens you are for serving in this matter.

16  Thank you very much.

17          You're now free to go on home or back to work, and

18  please be sure you take all of your personal belongings with

19  you.

20          (Jury excused from the courtroom.)

21          (The following proceedings were held outside the

22  hearing and presence of the Jury:)

23          THE COURT:  Let the record reflect the Jury has left

24  the courtroom.  Would the attorneys please step up to the

25  sidebar for a minute?

 1            (The following proceedings were held at sidebar,

 2    outside the hearing of the open courtroom:)

 3            THE COURT:  I just wanted to point out, and I think

 4    Kathy read it appropriately, but there was a typo here in the

 5    verdict on Count IV.  I don't know.

 6            MR. SORRELL:  Okay.

 7            THE COURT:  The verdict on Count V.

 8            MR. SORRELL:  Right.  It lists the charge and they

 9    listed the correct verdict instruction.

10            THE COURT:  They listed that.  I didn't know what

11    record that anybody wanted to make on it, but it appears to me

12    to be a typo.  If there's any -- I just wanted to bring it to

13    everybody's attention.

14            MR. SORRELL:  Right.

15            MR. LISZEWSKI:  That's fine.

16            THE COURT:  Okay.

17            (The following proceedings were held within the

18    hearing and presence of the open courtroom:)

19            THE COURT:  Mr. Liszewski, would you and Mr. Kent

20    step up to the lectern?

21            MR. LISZEWSKI:  Sure.

22            THE COURT:  Mr. Kent, have you heard the verdicts of

23    the Jury in this matter?

24            THE DEFENDANT:  Yes, Ma'am.

25            THE COURT:  Okay.  I am going to order a presentence

 1   investigation to be prepared, and I would ask that you provide

 2   the Probation Office the information it needs to complete that

 3   report, and I suggest you have Mr. Liszewski with you when you

 4   talk to the probation officer.

 5           You will receive a copy of that presentence report,

 6   as will the Government, and if you have objections to anything

 7   in the report, Mr. Liszewski can file those objections with

 8   the Court, and we'll take them up on the day of sentencing.

 9   The sentencing date in this matter will be August 13th at

10   8:00.  That's a Monday.

11           MR. LISZEWSKI:  Your Honor, if the Court would be so

12   inclined, I haven't spoken with the Government about this.

13   Mr. Kent does have a trial pending at the state level.

14   Pat McMenamin is going to be representing him on that.

15   Inasmuch as possible, we'd like to have this wrapped up in

16   June, if there would be any possible way the Court could do

17   that.

18           THE COURT:  I don't believe there would be because

19   the presentence -- the Probation Office needs that amount of

20   time in order to gather the information and to complete the

21   report.  So I don't -- If -- So I really don't think that

22   that's going to be possible, given the volume of work they

23   have in other cases.  That would -- That would probably be

24   less than half the time that they normally have, so I don't

25   think that's going to be possible.

1            MR. LISZEWSKI:  Thank you.

2            THE COURT:  Okay.  Is there anything else at this

3    time?

4            MR. SORRELL:  No, Your Honor.

5            MR. LISZEWSKI:  I have nothing right now.  I'll file

6    my motion for a new trial.

7            THE COURT:  Okay, fine.  And -- Well, that's the

8    other thing -- Well, not at this time.  Go ahead.  That's

9    fine.  So I will see you all then on August 13th.

10           MR. LISZEWSKI:  Okay.

11           THE COURT:  Thank you.  Court is in recess.

12           (Court adjourned at 4:25 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Deborah A. Kriegshauser, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 149 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 3rd day of October, 2007.


_____

/s/ Deborah A. Kriegshauser

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR

Official Court Reporter